# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
### DAVENPORT DIVISION

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| Plaintiff, | ) | |
| **vs.** | ) | **Case No:   19-CV-00047** |
| | ) | |
| **UNIVERSITY OF IOWA;** | ) | |
| **BOARD OF REGENTS, STATE OF IOWA;** | ) | **COMPLAINT** |
| **TIFFINI STEVENSON EARL,** | ) | |
| individually and in official capacity; | ) | |
| **IRIS FROST,** individually and in | ) | |
| official capacity; | ) | **JURY TRIAL DEMAND** |
| **LYN REDINGTON,** individually and in | ) | |
| official capacity; | ) | |
| **ANGIE REAMS,** in official capacity; | ) | |
| **CONSTANCE SCHRIVER CERVANTES,** | ) | |
| individually and in official capacity; | ) | |
| **JOHN KELLER,** individually and in | ) | |
| official capacity; | ) | |
| **MONIQUE DICARLO,** individually and in | ) | |
| official capacity; | ) | |
| **MARK BRAUN,** individually and in | ) | |
| official capacity. | ) | |
| Defendants. | ) | |

# TABLE OF CONTENTS

I.     **NATURE OF ACTION** ....................................................................................3

II.    **PARTIES** ...................................................................................................6

III.   **JURISDICTION AND VENUE**..................................................................9

IV.   **INTRODUCTION TO JOHN DOE**...........................................................9

V.    **STATEMENT OF FACTS**........................................................................15

A.     COMPLAINANT ONE – SALLY ROE ...................................................... 15

B.     COMPLAINANT TWO – LISA ROE ......................................................... 39

C.     BIASED INVESTIGATION – DEFENDANT STEVENSON EARL ..................... 63

D.     PREHEARING AND DUE PROCESS ISSUES ........................................... 70

E.     FORMAL HEARING , THE ADJUDICATOR - DEFENDANT IRIS FROST....................... 79

F.     FORMAL HEARING OUTCOME REPORT................................................ 115

G.     DEAN OF STUDENTS – DEFENDANT LYN REDINGTON ............................. 119

H.     INTERNAL APPEAL – UI OFFICE OF THE PROVOST – DEFENDANT JOHN KELLER.... ................................................................................................................ 126

I.     IOWA BOARD OF REGENTS APPEAL ................................................... 129

J.     RAPE CULTURE................................................................................. 136

K.     HISTORY OF DUE PROCESS & DISCRIMINATION AT UI .......................... 149

VI.   **COUNTS** ..............................................................................................175

A.     COUNT 1 42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process ....................... 175

B.     COUNT 2 Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (Against all Individual Defendants) .......................................................... 180

C.     COUNT 3 Violation of Title IX of the Education Amendments of 1972 (Against UI)........... 181

D.     COUNT 4 Violation of Title IX – Selective Enforcement (Against UI)................................. 183

E.     COUNT 5 Violation of Title IX – Hostile Environment/Sexual Harassment and/or Discriminatio ................................................................................................................ 185

F.     COUNT 7 Violation of Title IX – Deliberate Indifference  (Against UI)............................... 188

G.     COUNT 8 Breach of Contract (Against UI)............................................................................. 189

H.     COUNT 9 42 U.S.C. § 1981: Discrimination Based on Race and National Origin ............... 191

I.     COUNT 10 Unjust Enrichment (Against UI)............................................................................ 194

J.     COUNT 11 Injunctive Relief   (Against UI, Angie Reams, and Keller)................................. 195

K.     COUNT 12 Declaratory Judgment - (Violation of Due Process Provisions of United States and Iowa Constitutions)................................................................................................... 196

L.      COUNT 13: 42 USC § 1983   (Violation of Right to Freedom of Speech under 1st and 14th

Amendments to United States)……………………………………………………..………...198

## I.   NATURE OF ACTION

1.      Plaintiff John Doe[1] ("Doe"), by and through his attorney Rockne Cole of Cole Law Firm PC, file

suit after Defendants at the UNIVERSITY OF IOWA (UI) and Defendants at the BOARD OF REGENTS,

STATE OF IOWA (The Board) harmed him irreparably by a campus disciplinary process that failed to

meet the minimum standards of due process. Doe seeks damages and injunctive relief to remedy

emotional, mental, and economic harm, damage to his future education and career prospects, and loss of

his tuition payments caused by Defendants arising out of false allegations of sexual misconduct.

2.      Sally Roe (Sally or Complainant One) and Lisa Roe (Lisa or Complainant Two) were two women

in a UI group/lab whom Doe stated were friends. They both accused Doe of sexual misconduct after Doe

accused Complainant One of recording incorrect hours in the lab sign-in sheet to receive credit for school

work when she was not doing work in the lab and being continually late in her work. Both accused Doe

of alleged sexually touching them without their consent in August/September 2016, sexual harassment,

and bringing alcohol to the group/lab.

---

[1] Contemporaneously with the filing of this Complaint, Plaintiff has filed a Motion for Permission to Proceed under Pseudonym, given the extremely sensitive and private nature of the matters alleged herein. The Defendants are aware of his identity and will not be prejudiced in any way. Plaintiff also seeks to maintain the privacy rights of his accusers, and other student-witnesses in the underlying student disciplinary proceeding. He is requesting permission to identify his accusers as "Sally Roe" and "Lisa Roe", and other current and former University students discussed by their initials.

3.      The Investigator, Defendant Stevenson Earl, after conducting a biased and unlawful investigation, where she excluded exculpatory information, recommended Doe to be suspended or expelled from UI if found responsible for sexual assault.

4.      Sally filed the first complaint almost six months after the alleged sexual encounter. As it relates to sexual assault, the false allegations were from a night, Sally and Doe went on a date. The allegations were kissing without verbal consent and touching her breast over her bra once.

5.      About two weeks after the first complaint, Lisa filed the second complaint six months after the alleged sexual encounter. As it relates to sexual assault, the false allegations were touching of her breast without consent once. This should have raised a red flag to the investigators as to why the two accusations were so close together, yet the alleged incidents occurred over six months in the past.

6.      Lisa Roe filed the complaint after the first complainant, Sally, gave her contact information of the Title IX Coordinator out of the blue and apparently said: *"I'm here for you."* Yet, both claim they knew no details about each other's involvement with Doe.

7.      Lawsuits seeking to remedy a university's gender-biased application of Title IX policies sometimes come too late. For example, at least two male students committed suicide after their universities mishandled allegations that they engaged in sexual misconduct.  *See, e.g.,* Ashe Schow, *She Accused Him Of Stalking After A One-Day Facebook Chat. The Campus Process Led Him To Overdose, Lawsuit Claims.*   (https://www.dailywire.com/news/44385/she-accused-him-stalking-after-one-day-facebook-ashe-schow)(accessed Mar. 10, 2019); Ashe Schow, *Texas student commits suicide after Title IX Kangaroo Court,* (https://www.watchdog.org/issues/education/texas-student-commits-suicide-after-title-ix-kangaroo-court/article_c16a55b7-0e53-5303-b39f-f5b4e4b834ae.html)(accessed Mar. 10, 2019).

8.      Like the decision in Brown[2], the facts detailed below outline how Defendants at UI; and

Defendants at The Board (collectively Defendants) violated UI Policies, Doe's Title IX, due process, and

equal protection rights. Defendants did this by creating a gender-biased, hostile environment against males

based in part on UI's pattern and practice of disciplining male students who engage in consensual sexual

activity with female students.

9.      UI's disciplinary process presumed guilt, prevented Doe from defending himself during the

investigation, adjudication, or appeal staged, arbitrary admitted and excluded evidence, and discriminated

against Doe due to outmoded stereotypes relating to aggression by men while ignoring similar behavior

by the women in this case.

10.     Defendants at UI; and the Board knew they were violating judicial decisions which held that

conduct such as theirs was violative of students' Title IX and due-process rights.

11.     UI Defendants' violations of UI's Policies, Doe's Title IX, due process, and equal protection rights

occurred because of:

        (a) UI Defendants' gender biased motivations against male students like Doe; which is

demonstrated, in part, in the direct and Indirect Evidence of Gender Bias[3] outlined in this Complaint;

---

[2] The lawsuits filed by male students often trigger hostile reactions which Brown Univ. discussed by noting:
" . . . . the Court is an independent body . . . [that] cannot be swayed by emotion or public opinion. After issuing the preliminary injunction this Court was deluged with emails resulting from an organized campaign to influence the outcome. These tactics, while perhaps appropriate and effective in influencing legislators or officials in the executive branch, have no place in the judicial process. This is basic civics, and one would think students and others affiliated with a prestigious Ivy League institution would know this. Moreover, having read a few of the emails, it is abundantly clear that the writers, while passionate, were woefully ignorant about the issues before the Court. Hopefully, they will read this decision and be educated." *Doe v. Brown Univ.,* Case No. 16–017 S, 2016 WL 5409241 (D.R.I. Sept. 28, 2016).

[3] The term "Indirect Evidence of Gender Bias" as used in this Complaint refers to statements from which at least the following inferences can be drawn: (1) a primary advocacy on behalf of females who allege males engaged in sexual misconduct; (2) minimal or no advocacy on behalf of males who are alleged to have engaged in sexual misconduct towards females; (3) minimal or no advocacy for protecting females from sexual misconduct perpetrated by other females; and/or (4) minimal or no advocacy for protecting males from sexual misconduct perpetrated by females.

and/or (b) UI Defendants bias for female students who accuse Asian male students of engaging in sexual misconduct, demonstrated in part, in the direct and indirect evidence of bias outlined in this Complaint.

## II.   PARTIES

**Plaintiff**

12.   Plaintiff, John Doe, is a male resident of Iowa and was a student at the University of Iowa (UI) during the relevant time period.

13.   Doe was a graduate student pursuing his Master's degree at UI when UI expelled him unlawfully in October 2017 for what they call sexual misconduct.

14.   Doe had ambitions of getting a Ph.D. in counseling psychology.

**Defendants**

15.   Defendant University of Iowa ("UI") is an Iowa collegiate institution and Public University in Iowa City, Iowa.

16.   UI receives federal funding and aid.

17.   Defendant 'Board of Regents, State of Iowa,' (The Board) operates, governs, and has legal control and responsibility for the functions of the UI.

18.   Alleged herein, UI, and the other named Defendants were operating under the authority and supervision of The Board.

19.   Defendant Tiffini Stevenson Earl ("Stevenson Earl" or "The Investigator") is a Compliance Specialist and ADA Coordinator at UI's Office of Equal Opportunity and Diversity. She was UI's 'Judicial

Administrator/Investigator' for the Title IX investigation during the relevant time period. She is sued in her official and individual capacity.

20.     Defendant Iris Frost ("Frost" or "The Adjudicator") is an Associate Professor in UI's Department of Rhetoric. She was a former prosecutor in Johnson County, and was UI's chosen 'Adjudicator' in the biased disciplinary process against Doe. She is sued in her official and individual capacity.

21.     Defendant Lyn Redington ("Redington" or "Dean of Students") was UI's Assistant Vice President, and Dean of Students for Student Affairs. She expelled Doe and did not provide a rationale for his disciplinary action even though UI policy states that the Dean of Students should provide one for the action they chose.[4] She is sued in her official and individual capacity.

22.     Defendant Angie Reams is the UI's Interim Associate Vice President and Dean of Students for Student Affairs since Redington left UI. She is named only in her official capacity for injunctive relief.

23.     Defendant Constance Schriver Cervantes ("Cervantes" or "The charging officer") is a compliance coordinator at UI's Office of Equal Opportunity and Diversity ("EOD"). She was the UI's chosen charging officer, and the person whose contact information UI provided to Doe if he had questions regarding the hearing. She is sued in her official and individual capacity.

24.     Defendant John Keller ("Keller") is the UI's Associate Provost for Graduate Education. He rejected the appeal Doe sent to the UI's Office of the Provost. Keller had the opportunity and the authority to take corrective action to end the inaccurate discrimination to Doe after receiving Doe's notice of internal appeal sent to UI's Office of the Provost.He is sued in her official and individual capacity.

---

[4] https://dos.uiowa.edu/policies/student-misconduct-procedure/

25.      Defendant Monique DiCarlo ("DiCarlo" or "Title IX Coordinator") was UI's 'Sexual Misconduct Response Coordinator' when Doe's investigation began. During July 2017, while Doe was still going through UI's Student Judicial Procedure, UI gave DiCarlo the additional position of 'Title IX Coordinator.' Upon information and belief, DiCarlo is the Chair of the Anti-Violence Coalition.

26.      DiCarlo conducted the initial intake interview of the complainants in the investigation.

27.      Upon information and belief, DiCarlo overlooks the gender-biased training investigators and Adjudicators receive.

28.      Upon information and belief, DiCarlo influenced the gender-biased programs offered by Ending Violence at Iowa, such as the Men and Masculinities Coalition, and the IDEAL Campus Culture Project, the gender-biased 'self-defense workshops,' and others offered by The Office of the Sexual Misconduct Response Coordinator (OSMRC), thereby setting up a hostile environment for males.

29.      Upon information and belief, DiCarlo was responsible for rejecting, on behalf of UI, the Department of Education's new sexual misconduct interim guidelines, a time during which Doe was going through UI's Student Judicial Procedure.

30.      DiCarlo is sued in her official capacities as 'Sexual Misconduct Response Coordinator,' 'Title IX Coordinator,' Chair of the Anti-Violence Coalition, and in her individual capacity.

31.      Defendant Mark Braun (Braun) is the Executive Director of the Board of Regents, State of Iowa ("The Board.") Braun had the authority to take corrective action to end the discrimination Doe gave him actual notice of in his written brief. However, Braun disregarded  and rejected at least part of the appeal that Doe sent to the Board. He is sued in his official and individual capacity.

32.      At all relevant times herein, Defendants acted under color of state law.

8

## III.    JURISDICTION AND VENUE

33.    This Court has subject-matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1367 because the claims either involve questions arising under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88 ("Title IX") or denial of Fourteenth Amendment Due Process under 42 U.S.C. § 1983.

34.    This Court has personal jurisdiction over all Defendants because the actions giving rise to Plaintiff's lawsuit occurred in Iowa City, Iowa.

35.    The venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of Iowa.

## IV.    INTRODUCTION TO JOHN DOE

36.    John Doe is an international student. He is a citizen of a South Asian country[5] (Country One); however, he has never lived in that country.

37.    Doe's parents migrated from South Asia to a country in the Middle East in which Doe was born. However, the Middle Eastern country (Country Two) does not offer birthright citizenship nor permanent residency to foreigners.

38.    Growing up, Doe survived multiple wars and sought shelter in refugee tents as a child, and under tables in schools as a teenager when air raid sirens sounded.

---

[5] Due to the credible fear of his physical safety and the Government's latest crackdown on spying and arresting citizens who criticize or misrepresent the country, Doe chooses to not name the country in case he gets deported.

39.     Doe came to the United States by himself to pursue his undergraduate degree at UI beginning in Fall 2008.

40.     During the Spring 2014 semester, when Doe was an undergraduate student, he joined a student-run research group supervised by Dr. Michael Lovaglia ("Dr. Lovaglia"), a UI Professor in the Department of Sociology.

41.     The group was in a transition of moving out of Seashore Hall basement to W411 Seashore Hall, which became the designated location for the group when Doe joined the group. The room was called a "lab."

42.     Upon information and belief, this group/lab was not registered under UI, nor UI's Department of Sociology.

43.     Dr. Lovaglia created this group/lab to facilitate students to design and conduct their independent research.

44.     Doe learned about the group/lab in 2014 while taking a class with Dr. Lovaglia, who was also his academic advisor for his undergraduate degree in sociology.

45.     Dr. Lovaglia, a UI professor of nearly 30 years, characterized Doe as one of the "best students" he had and described him as friendly and a "very social person."

46.     When Doe joined the group/lab, there were no positions for anyone, and Doe saw no students with any positions in the group/lab.

47.     When Doe joined the group/lab, it was informal, and it remained informal. Any student in any program could join the group/lab if they were interested. It was accessible to students 24 hours a day

during the weekdays. Most students in the group/lab met during the evening/late hours. Group/Lab meetings were on Friday at 12:30 p.m. for about one hour.

48.     Dr. Lovaglia was not present in the group/lab other than the times he attended some group/lab meetings.

49.     In 2015, Doe received his Bachelor of Arts, in psychology and sociology. However, Doe kept attending the lab as he wanted to do his independent research.

50.     In early 2016, after Doe had graduated, everyone that attended group/lab at the time decided it should have a name, and they named it "Sociology Undergraduate Research Group" ("SURG" or "lab").

51.     Doe was accepted into UI's Graduate College in January 2016, and in the summer of 2016, Doe officially began a Master's program in mental health counseling and rehabilitation.

52.     In 2016, Doe and another student, Ms. E.C., were working on their independent research studies in SURG. People who ran studies could request help, and everyone tried to help those who asked for help.

53.     Although Doe continued the independent research project, he created while a part of SURG during his undergraduate years, his graduate program had no affiliation with SURG. Sociology is part of UI's College of Liberal Arts and Sciences. Doe's program was at the UI College of Education and therefore was in a completely different department and different UI college.

54.     Doe was not receiving any credit nor assistance from SURG.

55.     Doe denied the sexual misconduct allegations. Doe asserts:

  A.  He was innocent, and wrongly found to have committed the offense.
  B.  Regardless of Doe's alleged misconduct UI found him "responsible" for, his gender as a male affected the severity of the penalty.

C. Regardless of Doe's alleged misconduct UI found him "responsible" for, his race and/or national origin affected the severity of the penalty.

56.   Both complainants admitted they were not afraid of Doe physically.

57.   None of the two complainants reported these allegations to law enforcement authorities/police.

58.   Throughout the investigation, UI's discrimination, errors, and flawed procedures resulted in a *Kafkaesque* process. UI was negligent and failed to provide Doe with a meaningful standard of due process.

59.   UI created a prejudicial hostile environment for accused males like Doe as it:

a) Prevented Doe from investigating or interviewing witnesses due to anti-retaliation;

b) Employed gender, outmoded and archaic stereotypes taking into consideration the female reports while completely ignoring similar concerns expressed by Doe, policy, his attorney could not UI was negligent and failed to provide Doe with a meaningful standard of due process,

c) Hired prosecution oriented adjudicators such as Frost while refusing to hire adjudicators experienced in the criminal law of sexual misconduct, who had defended accused males;

d) Prevented Doe from cross-examining either of the accusers through his attorney during the hearing;

e) Applied different evidentiary standards for determining the credibility of the accused and accusers,

f) "Started by believing" the female accusers while presuming the guilt of the accused,

g)  Ignored exculpatory information that would find males like Doe not responsible, such as Sally describing the entire event was "consensual" to Dr. Lovaglia days after the event,

h) Applied different standards to males and females that were not found in the UI Disciplinary Procedure, and

i) Refused to consolidate the hearing as requested by Doe's attorney, thereby having accused males like Doe simultaneously face both the accusers, their advocates, their attorneys, and UI's charging officer attorney, and a biased Adjudicator, all of whom were females, when it is their time to testify.

j) Provided no such support for the accused males. Doe did not have any idea what to do when a formal hearing was recommended, while UI provided the female accusers' information and access to resources, such as attorneys and advocates, for free.

k) Expelled males like Doe without giving a rationale for the expulsion as required by UI policy.

60.　Doe consistently voiced such concerns in his appeals to the UI Office of the Provost and The Board regarding the discrimination and lack of due process he endured during UI's Student Judicial Procedure.

61.　Both the Provost and the Board had the authority to take corrective action to afford an impartial due process and end the discrimination after Doe gave them notice.

62.　Doe also stated he did not want to sue UI and offered ample opportunities to rectify the issues by bringing them to UI's attention. Doe brought most issues regarding UI's Student Judicial Procedure in this complaint to UI and the Board's attention.

63.　Neither UI nor the Board addressed the issues.

64.　In Doe's own words in his appeal:

> "What followed after these complaints were filed in was appalling. The internal university investigation that led to this result was so tainted by ineptitude and bias, that it violated my contractual and legal right to a fair disciplinary process. This does not align with what I have viewed UI as over the many years I have been here for, nor does it align with the values that UI embodies."

65.　UI did not provide Doe with the accommodations available to him he requested during the investigation.

66.　All of this conduct derailed Doe's education, tarnished his reputation, and permanently damaged his future career and educational prospects

67.     UI's violation of Title IX for discrimination toward Doe created a prejudicial and a hostile environment. These unjustified actions violated its contract with Doe and the requirements of Title IX of the Education Amendments of 1972.

68.     UI expelled Doe from his program for what UI calls sexual misconduct in October 2017, when Doe had just two short months of studies remaining on campus before he graduated.

69.     Doe's next and final semester before receiving his degree would have been an off-campus practicum. Doe could have completed that anywhere in the country, and he would have become the first generation of his family to get a Master's degree.

70.     Instead, Doe lost his F-1 visa[6], placing him at risk of removal proceedings to a South Asian country in which he has never lived.

71.     This made it especially dangerous as the militant group, ISIS, targeted students in that country who study/studied in the United States, along with people who identify as secular, or as academics[7].

72.     During the disciplinary proceedings, Doe applied for political asylum in the U.S., which altered his visa status[8]. Doe's application is pending at the time of submitting this Complaint. Unless the Department of Homeland Security grants the asylum, Doe will be in removal proceedings from the U.S.

73.     Upon information and belief, since 2005 up until Doe was expelled, UI expelled less than ten people in total for sexual misconduct, including Doe.

---

[6] Expulsion from the school which has issued the most current Form I-20 would cause one to lose the status of Foreign Student and the right to legally remain in the United States. Under such circumstances, the student is expected to depart the United States immediately. www.f1studentvisa.com/maintaining-status.html.

[7] At each stage of the UI's Student Judicial Procedure, Doe made UI aware of these legitimate fears and concerns. Doe likewise made the Board aware of this and even provided evidence. Both showed no understanding of his unique situation.

[8] Doe was supposed to have his family visit him for his graduation in 2018. Due to UI's unlawful conduct, that did not occur, and Doe has not been able to see his family since January 2015.

74.     According to UI Dean of Students statistics, Doe was the sole student to get expelled for sexual

misconduct in the 2017-2018 academic year.

# V.     STATEMENT OF FACTS

## A.     COMPLAINANT ONE – SALLY ROE

**FALL 2016**

75.     Six months after the alleged encounter, and after Doe criticized her writing in hours for credit

when she was not helping in the lab, Sally alleged that Doe touched her breast one time without her

consent, kissed her without asking for verbal permission on the same day, engaged in non-consensual

tickling on another occasion after Doe stated she tickled him first, and for sexual harassment.

76.     In the Fall of 2016, Sally Roe ("Sally"), a white, first-year student majoring in Criminal Justice

enrolled in the UI course instructed by Dr. Lovaglia.

77.     Dr. Lovaglia informed the students about a group/lab he supervises and suggested that the students

could attend a meeting on Friday, September 2, 2016, at 12:30 p.m. if they were interested in research.

78.     Sally attended the meeting, and John Doe met Sally (and Lisa) for the first time.

79.     After the meeting, Sally and Doe talked about their interests in terms of majors and career

ambitions. After everyone that attended the meeting left, they exchanged phone numbers, and spent time

together for about two hours after the meeting.

80.     Doe said Sally was playful. During the conversation, Doe and Sally discussed pranks, and Sally

claimed pranks did not work on her.

81.     Later that day, at around 4 p.m., Sally started a conversation with Doe via text messaging. During the exchange, Doe asked Sally if she would like to attend an "improv comedy show" with him later that evening around 10 p.m. and Sally said yes.

82.     Doe told Sally that the show had a dress code which required one to wear red flannel shirts via text. There was no such dress code. Both Doe and Sally separately went to the improv show wearing red flannel shirts.

83.     Doe stated to the Investigator that upon arriving, Sally laughed about wearing the same shirts. Doe claimed pranks did work on her. Sally playfully responded, "Never trusting a sociology major again!"

84.     After the show, at about 10:30 p.m., Doe asked Sally if she wanted to go to his apartment. Sally agreed. They walked there.

85.     In his apartment, Doe offered Sally wine, and she accepted; each had only half a glass. They drank/talked for about 20-30 minutes, getting to know each other better while sitting beside each other on a couch.

86.     Sally and Doe then laid on their backs on the couch with their heads beside each other and observed Doe's light projector projecting light onto the ceiling while they talked.

87.     About 30 minutes after being in the apartment, Sally and Doe went to the fire escape in the building's hallway. They both rested beside each other on a small beanbag and spoke for about 10 minutes.

88.     While in the fire escape, Sally spilled her wine; Doe offered her some of his, and she accepted.

89.     There was no disagreement in facts from both Doe and Sally until here.

90.     After they conversed for some time, Doe said there was a pause in the conversation of about 30 seconds when, after they stared at each other's lips, they kissed mutually (The "First Kiss").

91.     Doe stated there was no sign the kissing was unwelcome from both parties, and Sally and he kissed for about 5 minutes while they kept their hands on each other's shoulders.

92.     Sally admitted to the Investigator she and Doe kissed. She then added, "*I didn't outright say I wasn't sure about it, but I did try to pull away when I felt uncomfortable.*"

93.     Doe disagreed Sally tried to pull away at any stage during the kiss.

94.     Both Doe and Sally agreed that after they stopped kissing, they remained on the fire escape before Doe got cold. They moved back inside Doe's apartment.

95.     Doe told the Investigator that inside his apartment, they sat on the couch and kissed mutually while sitting up. (The "Second Kiss.")

96.     Sally also admitted to this kiss. However, Sally then added she *"Did not say no to the kissing."*

97.     Sally further added that sometime while kissing, Doe allegedly rubbed her breast (over her bra), and she tried to pull away when uncomfortable.

98.     Throughout all of UI investigation, Sally did not tell Doe directly not to kiss her or touch her breast nor express any form of resistance. However, her body language of allegedly pulling away from Doe, was her indication and warning to Doe she was not interested in him allegedly kissing her or allegedly rubbing her breast.

99.     Doe again specified Sally never pulled away while they kissed, that all kissing that night was mutual, and expressly denied he touched/rubbed Sally's breast.

100.    Around midnight after they sat and conversed in Doe's apartment, Sally suggested she had to leave as it was getting late.

101.    Both agreed that while Doe walked Sally to her place, they casually chatted about existentialism.

102.    Doe told the Investigator they kissed once while walking to her place, but Sally denied this.

103.    Both agreed that outside of Sally's dorm, after Doe dropped Sally off, they kissed again.

104.    Doe told the Investigator Sally said she had a great night, and they then kissed "passionately" for about 20-30 seconds.

105.    Sally told the Investigator Doe kissed her. She did not say no. She did not indicate if she "pulled away" this time or offer any form of resistance.

106.    There were no complaints of force being used by any of the complainants and Doe was not found to have used any force against anyone by the Investigator.

107.    Doe suggested they hang out again, and Sally said *"Sure!"* Sally admitted to this.

108.    Upon leaving, Doe then called his best friend, S.B., on his phone and provided him a brief version of what transpired that night. Doe said he was excited to see Sally again soon. At the formal hearing, Doe supplied a phone record of the phone call transaction from his cell phone carrier.

109.    Sally said to the Investigator, she went to a dorm besides her, where her friend from high school lived, and told him what occurred between Doe and her. According to Sally, *"I think we ended up joking about it because I didn't take it so seriously at the time."* (emphasis added).

110.    On September 3, 2016, the following afternoon, Doe sent a text message to Sally about submitting a paper for his class a minute before it was due online. Doe said, "Totally on top of life. I think,". Doe

stated to the investigator that it was a football game day, and Sally replied 3 hours later—Haha/LOL that's interesting followed by a comment or two.

111.    On September 4, 2016, Doe sent Sally a text message saying he saw someone drunk fall of a railing. Sally replied 3 hours later and indicated she amused by Doe's text.

112.    Doe, being socially intelligent, then inquired if he was correct in assuming Sally was not as interactive as the day they met. Sally replied she was thinking of a platonic relationship. Doe said that was fine and thanked her for letting him know.

113.    Doe sought counseling services from a licensed social worker every week since 2015, and he informed her sometime then what occurred between Sally (and Lisa) and him.

114.    Doe also told Ms. E.C., a member of SURG he was friends with, what occurred between Sally (and Lisa) and him.

115.    During UI's Judicial process, Doe provided many text message exchanges and multiple pictures of Sally and him to UI that began after this platonic conversation[9]. (s)

116.    From September 2, 2016 - January 27, 2017, Sally frequently initiated communications with Doe via text. Text message evidence shows both parties were playful with each other; they initiated conversations, and exchanged jokes. s.

117.    Doe and Sally remained friends after the platonic conversation and engaged in text conversations lasting 2-3 hours at least twice a week. They joked around together in the lab.

---

[9] Sally did not provide any conversations of Fall 2016 that occurred between her and Doe for evidence.

118.    All parties were flirtatious in their text messaging, and in the formal hearing report, the Adjudicator indicated that to be true.

119.    During midterms, Sally and Doe had both stayed up late and had text conversations between study sessions. These conversations sometimes went on till 4 a.m., and topics included recommendations for study music, and encouraging each other through their all-night studying.

120.    Doe then started becoming confused about Sally's intentions regarding their relationship. Doe mentioned this matter to his therapist in one of their sessions during then.

121.    Sally said to the Investigator for about a month after the September 2, 2016 encounter, nothing inappropriate occurred with Doe. However, Doe then complimented her once in a text message conversation they were having[10].

122.    In the text message, Sally was telling Doe what she wanted to do in her career, and Doe said because Sally had a keen sense of purpose early in her career, it makes her "attractive." However, Sally said Doe used the word "sexy" instead of "attractive."

123.    Sally asked if such comments were necessary, considering she just got a boyfriend. Doe knew Sally was talking to someone but did not realize they committed into a relationship.

124.    Sally never explicitly told Doe she was uncomfortable regarding this conversation. However, later that week, on around October 10, 2016, Sally mentioned to Dr. Lovaglia, she was receiving more attention than she wished from Doe.

---

[10] When asked if she had evidence of this text message conversation during the investigation, Sally said that she did not have it anymore.

125.    Sally then informed Dr. Lovaglia of the full story on what occurred the night she went on a date with Doe to the improv show.

126.    Sally expressed to Dr. Lovaglia everything that took place in Doe's apartment on September 2, 2016, was mutual and consensual, and she only changed her mind about the relationship later.

127.    Dr. Lovaglia took handwritten notes of what Sally had informed him that day[11] and said he would talk to Doe. Dr. Lovaglia brought these handwritten notes with him to the formal hearing.

128.    On or about October 14, 2016, a few days later, Dr. Lovaglia and Doe went on a stroll around the city and river. While they walked, Dr. Lovaglia asked Doe about how he was adjusting to being a new graduate student before he brought up a few women had joined SURG that semester.

129.    As they conversed, it became apparent to Doe that Dr. Lovaglia knew details about the date between Sally and him.

130.    Dr. Lovaglia never named Sally but advised Doe not to date people from the lab with his new role, and be professional about it. Dr. Lovaglia never directly spoke to Doe about the concern Sally had about him.

131.    Doe told Dr. Lovaglia he was confused about the role he was speaking about.

132.    Doe was confused because Doe's graduate program he had started was not associated with the SURG group/lab, and it was in a different department and college in UI. Doe was not receiving any credits nor any assistantship from the group/lab.

---

[11] Dr. Lovaglia brought these written notes with him at the formal hearing. UI put them in the exhibits.

133.   At the formal hearing, Dr. Lovaglia confirmed that Doe initially had a challenging time understanding and told Dr. Lovaglia he was confused.

134.   Dr. Lovaglia explained to Doe, a first-generation graduate student, that graduate school comes with a new role, and he would be subject to a different set of expectations as it relates to sexual relationships with undergraduate students.

135.   Dr. Lovaglia also confirmed that Doe told him he did not realize this was an issue.

136.   Dr. Lovaglia told Doe he should have oriented Doe to his new role and took responsibility for not doing so. At the formal hearing, Dr. Lovaglia blamed himself for the mess this created.

137.   Dr. Lovaglia advised that because Doe now understood his new role as a graduate student, there would be consequences if something like this happened again. Doe understood and changed his behavior accordingly.

138.   Doe understood he should not have sexual relations with anyone from the group/lab. Doe was already friends with a few SURG members, some for over a year, and decided he would remain friends with everyone in the lab.

139.   Doe apologized to Sally about what occurred via text.

140.   Doe was put in a precarious position, and he was unhappy at the inappropriate way Dr. Lovaglia handled the situation.

141.   Most of these communications occurred via text between Doe and E.C.

142.    Doe had never asked for any role in the lab, nor was he given a role in the lab. Doe believed Dr. Lovaglia was disorganized in how he operated the group/lab, and he had previously suggested he help in organizing.

143.    When interviewed, Dr. Lovaglia told the Investigator a sexual misconduct incident occurred in his lab in the past (about two years before Doe joined). This incident would have been before the lab transitioned.

144.    Upon information and belief, UI investigated the previous sexual misconduct, and Dr. Lovaglia informed that the person was C.K.

145.    Upon information and belief, about two years before Doe joined Dr. Lovaglia's group/lab, Dr. Lovaglia was the Director of a proper, registered lab in UI named "Center for the Study of Group Processes."

146.    Upon information and belief, Dr. Lovaglia was part of the Ph.D. dissertation committee for doctoral students of the lab, and he published studies in journals with these students.

147.    Upon information and belief, UI investigated one of these doctoral students - a white male in his forties at the time, named C.K., for sexual misconduct.

148.    Upon information and belief, C.K. was also a sociology instructor in UI's Department of Sociology, a doctoral teaching assistant who graded students signed up for lab credits, and the lab manager for Dr. Lovaglia's lab.

149.    Upon information and belief, C.K. dated an undergraduate woman in the lab whom he had an instructor/student relationship with.

150.    Upon information and belief, UI found C.K. responsible for sexual harassment.

23

151.    Upon information and belief, UI allowed C.K. to graduate and get his degree. (s)

152.    After his discussion with Dr. Lovaglia, Doe took proactive initiatives to cut down on conversations with Sally. Doe tried to avoid being in the lab after lab meeting ended as Sally often attempted to stay and converse with Doe while they were alone.

153.    Doe provided evidence of his careful attempts in avoiding Sally to the Investigator, but the Investigator made no note of this in her report. The evidence shows that in a text message conversation in October 2016, Doe texted E.C., and asked for help in finding a survey. Doe then said they could work together after the lab meeting ended. He then said it had to be away from the lab, because: *"I don't want to be anywhere near Sally as soon as lab meeting gets done."* .

154.    While Sally and Doe both engaged in some playful texting, teasing, and banter throughout the time they were in contact with each other; Doe was clear in his intentions, they would be just friends.

155.    After October 2016, Doe understood the need for some boundaries; however, Sally did not. For example, on November 6, 2016, Sally joined an Improv Group Doe had just started with a few others.

156.    Sally knew improv was an essential part of Doe's life. Doe had explained this to Sally. Doe explained how he would go to Chicago every weekend from Iowa City for a year to do improv comedy at *Second City*, the largest improv comedy enterprise. There were three to four other groups in Iowa City Sally could have joined, yet she chose to join the one Doe started.

157.    Annoyed, Doe sent Sally a text message and asked her intentions before texting *"leave me alone."* Doe was not happy that Sally was trying to get into his personal life, despite her never doing improv.

158.    Upon Sally joining the improv group, Doe consulted R.F., who started the improv group with Doe, over Facebook Messenger. Doe told him he and one member of the improv group had a history of

intimacy, and Doe feared it might affect the group dynamic . Doe did not explicitly tell R.F. the individual he referred to was Sally to respect her privacy. Doe provided evidence of this at investigation and the hearing.

159.    Doe also contacted E.C. and expressed his displeasure of Sally Roe joining the improv group by saying, *"I hate my life right now. This is my improv group."*

E.C. texted back, saying, *"Hahaha she does improv?"*

Doe replied by saying, *"No she doesn't! I'm trying to get rid of her from my life and she just keeps joining shit that I love."*

Doe ended the thread by saying, *"Improv is my safe zone"*

149A.  Doe provided Stevenson Earl with this evidence, and she made no note in her report.

160.    Despite Doe expressing his displeasure to Sally about her joining the improv group, Sally started attending the group.

161.    In November 2016, Doe once stopped by SURG around 9 p.m. to work on his research study and saw Sally was also in the lab.

162.    Doe had beer in his backpack as he planned to sip on them while he proofread the survey he wrote.

163.    Doe asked Sally if she wanted a beer while they both worked in the lab. Sally said, yes. Sally had admitted to this. Doe and Sally each sipped on one can of beer over an hour while they worked. After finishing work, they engaged in casual conversations for approximately 30 minutes.

164.    Sally did not allege inappropriate sexual comments during this discussion. When telling the Investigator what they spoke about, Sally said one topic they talked about was pickup artists. She said

Doe told her he got into an argument with a pickup artist because the pickup artist was sexist toward women. Sally did not state such topics of conversation made her uncomfortable.

165.    Doe told the Investigator that Sally shared with him how she was bad in relationships and did not know how they worked. They spoke about Doe's past relationship and then talked about self-improvement as it related to dating advice for both men and women. The conversation about pickup artists was related to unhealthy men's dating advice, a topic discussed in Dr. Lovaglia's class "Sociology of Self Improvement."

166.    Doe stated the books discussed were "The Rules," a dating advice book for women, and a book called "The Game," a dating advice book for men, written by a self-described pickup artist.

167.    Doe stated when discussing "The Game" Sally and Doe spoke about how unhealthy it was because the book objectified women. Such topics were typical discussions in sociology, and Doe had given a presentation on this topic when Doe took that class with Dr. Lovaglia

168.    After 10:30 p.m., when Sally's boyfriend, D.L., was finishing working at the recreation center to come to pick her up, Sally poured the rest of the beer in her water bottle while getting ready to leave.

169.    The evening ended by Doe walking Sally downstairs, Doe telling Sally to have a good night, and giving Sally a casual side hug.

170.    Although Sally did not make a big deal about the hug, her boyfriend and UI did. According to Sally, she and Doe hugged only about four times, and she did not allege they were sexual in nature. All these interactions were platonic side hugs.

171.    During the Fall 2016 semester, everyone in the lab worked on two projects. The first project was by Dr. Lovaglia's sociology intro class project, and the second one was E.C.'s survey. For the first project,

Doe took the initiative to organize Dr. Lovaglia's class project. Doe promised Dr. Lovaglia he would email the results of his project to him by the date he requested.

172.    Everyone in the lab delivered their portion of the work on time except Sally. Because Sally was late, Doe submitted Dr. Lovaglia's work much later than he requested. When submitting the work, Doe took responsibility for being late and did not blame Sally.

173.    In December 2016, Sally submitted E.C.'s data from her project late as well while everyone else in the lab submitted their work on time. Her lateness meant they could not compile the data before the winter break (s).

174.    Seeing this was becoming an issue, Doe asked E.C. to talk to Sally about her lateness (s).

175.    Toward the end of the Fall 2016 semester, Doe needed help with his research project and asked if members would feel comfortable doing it over winter break.

176.    Doe requested the members helping to have it submitted by the end of winter break, so he could present the results of his study when school started again.

177.    Sally took the initiative to enter the data.

**WINTER BREAK 2016/2017[12]**

178.    Over the winter break of 2016/2017, Sally and Doe communicated with each other a few times. They mostly joked around as friends. Sally sent Doe pictures of books she was reading for leisure during the break.

---

[12] Sally did not initially complain about anything making her uncomfortable during the winter break before or during the investigation, thus such allegations were not investigated by Defendant Stevenson Earl. The Adjudicator at the formal hearing, Defendant Iris Frost overlooked these text messages.

179.    These communications happened while they were off campus.

180.    Since Sally started attending the improv club Doe started in Fall 2016, it was not unusual of Sally and Doe to have playful banter back and forth.

181.    During one of their conversations during winter break, Doe teasingly accused Sally of loving power because she ordered a SURG member to clean the lab tables for her, and also requested Doe to purchase a new couch for the lab and carry it to the lab. Doe made a joke about BDSM and an adult actor named "Missy," and Sally replied with her usual wit, and the conversation ended in a playful manner.

**SPRING 2017**

182.    On January 19, 2017, Doe sent a text reminder to Sally about data as everyone else from the lab submitted their data except Sally . Doe told everyone else in the lab he would present the results of his data during lab meeting on January 27, 2017.

183.    On January 20, 2017, after a lab meeting ended, everyone except Lisa Roe, Sally, and Doe left the lab. Lisa Roe wanted to talk to Doe about her receiving poor grades in the previous semester and asked him if he knew of helpful resources. Since Lisa Roe wished to speak to Doe privately, he asked Sally to leave, and a 15-minute conversation took place.

184.    However, Sally did not leave the building. Instead, she waited right outside the lab during Doe and Lisa Roe's discussion. After Lisa Roe left, Sally returned to the lab to talk to Doe about their winter breaks.

185.    Doe, who started the first job of his career that week, held an office hour in the lab as UI was still figuring out a location for his office hours.

186.    When Sally came back to talk to him, Doe clarified he was starting office hours in a few minutes and would have to ask Sally to leave if someone came to speak to him. This did not bother Sally.

187.     Sally, knowing that Doe was vulnerable as he could not leave his office hours, continued with where she and Doe left off during their texting session in the winter break.

188.     Sally admitted to being in the lab with Doe alone and casually conversing with him that day.

189.     Doe stated to the Investigator that Sally was not interested in doing any research that day. However, she signed in for lab hours she needed for her credit she was receiving from the lab from Dr. Lovaglia, even though she had pending work for the lab.

190.     Because Dr. Lovaglia mentioned that the lab was so messy, it looked like a frat house; Doe suggested cleaning/decorating the lab. While decorating the lab, Sally and Doe came across a filing cabinet in the top floor of the building. Sally stole a pair of "Iowa Hawkeyes" sunglasses from the filing cabinet for herself, handed one to Doe, and took photos together back in the lab wearing those sunglasses ("Before tickling pictures."

191.     Doe stated to the Investigator that Sally was playful. They joked and laughed (.)

192.     Doe said to the Investigator he knew Sally and Lisa Roe were friends. So, Doe suggested taking a picture and sending to Lisa Roe after they filled up one of the recycle bins .

193.     Doe and Sally both decided to sit on the recycle bin. While sitting on the recycle bin, Sally tickled Doe on the ribs (left side) as she asked him to scoot over while sitting on the recycling bin. Doe was apparently taking too much space in sitting on the recycle bin.

194.     Sally stated to the Investigator that she does not remember if she tickled Doe.

195.     Doe retrieved a cassette recorder sitting on a shelf located to the right of the lab entryway. Doe stated Sally did not want the recorder to be in the lab, and Doe insisted they could not throw it out.

196.    Sally tickled Doe on the ribs before she tried to pull the recorder from his hands.

197.    Doe stated to the Investigator he held the recorder tight, and Sally could not get it from him.

198.    Later, Doe wanted to put up ceiling lights for the lab, he had purchased, in his way. However, Sally wanted to put it up her way. Doe and Sally argued playfully about how to string the lights to the ceiling. Doe tried to get the string from Sally to do it his way.

199.    Sally started getting up on a chair to put up the string in her way. Because Sally had tickled Doe to get the recorder back, Doe tickled Sally to get the lights back.

200.    Sally excluded a lot of information during the interview and alleged that Doe walked up to her and tickled her for no reason while she tried to hang up lights Doe purchased.

201.    Sally claimed the tickling was near her arms and Doe also said it was a similar place by saying it was near below arm, near ribs.

202.    Doe said Sally never indicated the tickling made her uncomfortable that day. Doe told the Investigator Sally was laughing during the tickling.

203.    Sally admitted she laughed, but then said it was because tickling makes her laugh; however, she told the Investigator she said stop.

204.    Doe denied Sally ever said stop.

205.    Sally initially attempted to paint the image of this day as her being uncomfortable and creeped out by Doe to the Investigator.

206.    After they hung the lights, Sally and Doe left the lab to look around in the hallways to find more items for the lab. Sally and Doe came across a microwave sitting in the hallway. The microwave had a

sheet of paper taped that read in large letters "Trash." Sally taped it to her chest and posed while she laughed. Doe took two pictures of her.

207.    These pictures were taken after Doe tickled Sally to get his light strings from Sally. ("After tickling pictures")

208.    Doe also provided these pictures in both the investigation and the hearing. Evidence from the pictures shows Sally looked comfortable and was laughing.

209.    Shortly after, Sally and Doe finished decorating the lab and left the lab around 6:45 p.m.

210.    During the day, Sally never mentioned being uncomfortable at any point during this day.

211.    Sally stayed with Doe in the lab despite hearing Doe explain he was holding office hours.

212.    At some point, while they were decorating the lab, Sally and Doe discussed their plans for the weekend since it was Friday. Doe told Sally he was going to a play later that day. He did not invite Sally.

213.    Sally, who never watched a play at UI until then, decided she might go, and attended that evening with her boyfriend, D.L. Doe went to watch the play with his friend. After noticing Doe and his friend, D.L. and Sally, who were already sitting down, exchanged in friendly small talk with Doe.

214.    Sally and Doe exchanged text messages that night after the play (s). Sally mentioned nothing about tickling, and none of the text message exchange between Doe and Sally showed Doe made Sally uncomfortable at any point earlier in the day. The conversation, which took place over hours, was casual and friendly, and mostly about the play they watched.

215.    Doe provided these text messages as exhibits in both the investigation and at the hearing.

216.    Doe stated to the Investigator that on January 24, 2017, Sally again signed her name on the lab sign-in sheet but spent time laughing and messing around with her roommate, E.J., and her boyfriend, D.L.

217.    The due date for the research project and presentation was approaching, and Doe was pressed for time with his work. He found Sally's behavior incredibly burdensome to the lab and unprofessional since Sally did no work that day.

218.    That evening, Doe had music playing from a study playlist in Spotify.com called "Brain food," in low volume. It is a playlist meant to boost concentration with a mild stimulating ambient effect. Sally turned up her music to get Doe to turn his off, which Doe found distracting and annoying.

219.    Doe reminded Sally to have the data entry done as soon as possible by January 26, 2017, so he would have time to compile the data accurately for his presentation on January 27, 2017.

220.    Sally said that would not be a problem and she would have it completed by then.

221.    On January 26, 2017, Sally failed to provide the data on the requested day again.

222.    Doe, upset he could not present the results of the study, emailed and canceled lab meeting the following day because he did not have the work to present.

223.    Doe assumed Sally would have provided the data at the end of the winter break, which was when he requested, and everyone in the lab provided the data on time. However, two weeks passed, and Sally still did not provide the necessary data.

224.    After Doe canceled the lab meeting, Sally sent a passively aggressive email to Doe at 3:30 am, and it contained all her data.

225.    Doe woke up and replied to the email. He first thanked Sally for submitting the data. He then empathized how the first few weeks of a semester can be hectic. Doe then lamented Sally's history of work-related problems and stated how she turned work late for the lab and yet received credit by writing in hours when not working.

226.    Sally did not respond to the email, however, that afternoon, Sally sent Doe a lengthy furiously compiled text message starting with, *"I don't know what your problem is but this stops right now."*

227.    In the text message, Sally then accused Doe of tickling her and making her feel uncomfortable. Doe defused the situation by being neutral. s.

228.    The Investigator asked Sally if she received credit as part of the lab, and she replied, ***"Yes."*** The Investigator then asked Sally whether Doe questioning her work ethic in the lab and receiving credit for it made her upset, and she replied, ***"Yes."***

229.    On February 3, 2017, there was a lab meeting in which Dr. Lovaglia was not present. During the meeting, Sally was inappropriately conversing with others in the lab about Doe.

230.    Doe stated to the Investigator that Sally talked about partying and taking jello shots that weekend, how her ex-boyfriend got a restraining order and deserved it, and other inappropriate topics when Doe was working on data in the lab.

231.    Doe stated to the Investigator the conversational topics made Doe uncomfortable, and so he did not participate in them.

232.    Doe continued by telling and writing to the Investigator, Defendant Stevenson Earl:

> "Sally was talking a lot that day, and at one point someone asked something about me that I was not paying attention to entirely as I was focused on E.C.'s data on SPSS (statistical software). I just heard Sally casually add, *"The thing you have to know about Doe is that*

*when you want to deal with him, you have to put him in his place."* I found this comment to be incredibly rude. I decided not to engage in that conversation, and this was the first conversation that day that I did not participate in. Later, I decided to not participate in the others."

233.    When the Investigator asked Sally participated in these inappropriate conversations, Sally claimed she did not remember.

234.    However, after UI expelled Doe, Sally admitted to the Board, in her written brief, that she had these conversations, but said she was telling these to another person in the lab.

235.    According to the Investigator's handwritten notes, Sally's boyfriend and roommate encouraged Sally to report concerns. Sally told the Investigator she ***"did it for them"*** (emphasis added)

236.    After the lab meeting ended, Sally went to Dr. Lovaglia's office and complained about Doe. She told him about *"tickling hanging lights"* and *"aggressive about data"* according to the Investigator's handwritten notes.

237.    In the conversation with Dr. Lovaglia, Sally reported Doe touched her in ways that made her feel uncomfortable when she referred to being tickled. The Investigator found this statement as evidence that "sexual assault" occurred on September 2, 2016, in Doe's apartment, thereby linking two unrelated events.

238.    On February 5, 2017, Dr. Lovaglia told Doe the lab was under investigation, and Doe could no longer be part of the lab. Dr. Lovaglia handed Doe a letter that told him to avoid contact with everyone from the lab.

239.    On February 10, 2017, Doe received an email from the Dean of Students, Defendant Lyn Redington, who designated Defendant Tiffini Stevenson Earl as a judicial administrator/investigator to determine whether Doe had violated the *Code of Student Life,* the *Sexual Misconduct, Dating/Domestic*

*Violence, or Stalking Involving Students* policy*, Anti-Retaliation Policy, Policy on Consensual Relationships Involving Students* or other university policies. The letter also alleged Doe retaliated against Sally after she addressed her concerns to Dr. Lovaglia.

240.    Through the UI disciplinary proceedings, Doe denied he behaved in a non-consensual sexual manner toward Sally, and he denied his actions were in retaliation against Sally.

241.    The Investigator, Stevenson Earl, initially interviewed Sally on February 14, 2017.

242.    The Investigator interviewed Doe on April 4 and 6, 2017, for both Sally and Lisa.

243.    Doe came with his legal counsel, Davis Foster, a known and experienced criminal lawyer in Iowa City who represented many students of UI in university disciplinary matters such as sexual misconduct.

244.    Constance Shriver Cervantes, an attorney in UI's Office of Equal Opportunity and Diversity (EOD), also participated in the interview.

245.    At the beginning of the interview, the Investigator expressed she would be a neutral/unbiased Investigator.

246.    The Investigator and Cervantes interviewed Doe for about five hours on April 4, 2017, and about three hours on April 6, 2017.

247.    The interview appeared to be fair to Doe based upon the information available to him at that time.

248.    Defendant Stevenson Earl did a follow-up interview with Sally on May 5, 2017.

249.    Doe stopped attending the improv group he started with R.F. Doe told R.F. in a private conversation on Facebook Messenger he could not attend the group because of this impending investigation and it was related to a person who attended the improv group. Doe was professional and

never disclosed to R.F. who the person was to respect her privacy. Doe then told him he lost his job at UI but was hopeful things would work out fine.

250.    UI interviewed R.F., and they found their accounts corroborated.

251.    However, according to the Investigator's notes for Sally, the Title IX Coordinator, DiCarlo, disclosed Doe's private information about his job to Sally during the investigation. This was unprofessional. DiCarlo shared and discussed private conversations between Doe and R.F. with Sally before Stevenson Earl decided the outcome of the investigation. There was no reason, as it related to investigating sexual misconduct, for DiCarlo to disclose to Sally what Doe told another person in private about the status of his job.

252.    In the appeal, Sally voluntarily shared the grade she received from the lab credits, showing her grade did not get affected. Doe believes she shared her grade to prove to him that him being upset with her performance did not affect her.

**Dr. Lovaglia**

253.    The Investigator interviewed Dr. Lovaglia on May 12, 2017.

254.    Dr. Lovaglia described the workings of the group/lab and the lab's philosophy: "if interested, come and talk about research."

255.    When asked by the Investigator if there were any rules in this lab, Dr. Lovaglia answered: *"not really."*

256.    According to the Investigator's report, Dr. Lovaglia stated that during his first meeting with Sally on October 14, 2016, Sally told him Doe paid more attention to her than she wanted.

257.    Dr. Lovaglia stated that after he asked Doe to leave the group/lab, he reorganized the structure of it and gave students roles. There were clear expectations of what was required of them.

**SUMMARY OF ALLEGATIONS FOR SALLY ROE**

258.    Sally alleged Doe kissed her and rubbed her once on her breast without her consent on September 2, 2016.

259.    In both cases, Sally stated she did not verbally object. However, she also stated she did not provide affirmative verbal consent either.

260.    Sally does not deny that she and Doe kissed multiple times.

261.    Doe denies he ever touched/rubbed Sally's breast and stated all kissing was both consensual and mutual.

262.    Sally waited nearly six months to make a formal report of misconduct, after being accused by Doe of what Doe believes is essentially academic misconduct.

263.    Although Sally told Dr. Lovaglia about one month after the alleged incident how everything that happened in Doe's apartment was consensual, her story changed almost six months later when she wanted Doe investigated for sexual misconduct.

264.    When the Investigator asked Sally why she came forward several months after the initial alleged incident, Sally's response did not address the main offense regarding the alleged sexual assault, but rather alleged sexual harassment.

**DEFENDANT STEVENSON EARL'S FINDINGS FOR SALLY ROE**

265.    On June 23, 2017, Defendant Stevenson Earl, the Investigator, found Doe responsible for violating student conduct rules during the Fall 2016 and Spring 2017 semesters. The list of Rule violations includes Rule D.13 (sexual assault and sexual harassment) and Rule D.17 (impermissible use or possession of alcohol).

266.    In summary, the Investigator noted there were no witnesses to the alleged sexual assault or harassment.

267.    The Investigator mainly made her finding based on her assessment of Sally's credibility.

268.    The Investigator wrote there was no evidence presented to indicate force (physical violence or threats) intimidation, or coercion was used at any time.

269.    According to the Investigator, Sally was more credible because she reported her concerns to Witnesses Lisa, Mr. D.L. (her boyfriend), and Mr. R.C. (her close friend from high school) and Dr. Lovaglia, and her reports to them were similar to that made to the Investigator, though she limited details she provided to each witness.

270.    The Investigator found Doe not to be credible even though "his version" mostly, matched Sally's account, unless she questioned him about behaviors prohibited by university policy, i.e., behaviors "sexual in nature."  Investigator Report 1.

271.    The Investigator wrote that when questioned about those behaviors, Doe's responses seemed overdramatic because of how Doe characterized the sexual contact (Doe explained with details such as what he was doing with his hands while Sally kissed him).

272.    The Investigator also assumed that Doe exaggerated the number of times Sally and he kissed, especially given Sally never denied kissing took place. (Doe stated Sally and he kissed while walking to Sally's dorm. Sally denied that kiss occurred but admitted to all other kissing, which included kissing in his apartment multiple times, and kissing upon being dropped off at her dorm.)

273.    The Investigator gave no reason to believe why she thought the kiss while walking to the dorm did not occur, and why she found Sally credible.

274.    In her report, the Investigator recommended suspension or expulsion of Doe from UI **if found responsible for sexual assault**. (emphasis added).


B.      **COMPLAINANT TWO – LISA ROE**

**LISA ROE'S VERSION OF EVENTS:**

275.    About two weeks after Sally's allegations, Lisa, who Doe stated was a friend of Sally, filed the second complaint six months after the alleged sexual encounter. Lisa alleged that Doe touched her breast once without her consent, and sexually harassed her throughout the fall of 2016.

276.    On or around August 31, 2016[13], Doe asked Lisa, a white, second-year student double majoring in biology and art, to meet at the lab and discuss the lab and research. Doe provided a website.

277.    Doe asked Lisa if she wished to stay and study after the lab, and she agreed.

---

[13] Doe states that this occurred on or after September 5, 2016. Doe states that he met Sally and Lisa on the same day on September 2, 2016, and thus it cannot be before then. Sally also stated that she met Doe on September 2, 2016. In her initial reporting, Lisa stated that it was September 5, 2016. However, Lisa then changed it to August 31, 2016, during her first interview and stated that she was not sure of the date. UI had used August 31, 2016 as the date the incident allegedly occurred.

278.    Lisa alleged Doe left to get his books and apparently returned with beer. Lisa claimed she did not know that Doe would bring beer back to the lab.

279.    While sitting at a table in the lab, next to each other, Doe offered Lisa a beer, which she said did not want to drink because it was a school night and she did not like beer. No information was provided on what her response was when Doe allegedly offered beer.

280.    Lisa stated Doe opened his beer and drank it.

281.    Lisa alleged Doe of asking questions that made her uncomfortable; she did not know what to think of the questions/situation and thought he was kidding. For example, Lisa claimed that Doe, out of nowhere, allegedly asked Lisa her favorite sex position, the kinkiest sexual act she had performed.

282.    Lisa stated that she avoided answering Doe's alleged questions related to sex.

283.    Lisa alleged Doe of opening her beer, and apparently putting it to her lips, telling her to drink, which she says she just took a sip of.

284.    Lisa stated that she became uncomfortable, nervous, and upset by Doe's behavior, but said nothing and did not leave for reasons unknown.

285.    Lisa states she asked where the restroom was, so she could have privacy and send a text message to T.M., her ex-boyfriend, to ask him to pick her up from the lab. Doe told her where the restroom was, and she left the lab to go to the restroom.

286.    Rather than escaping the building from Doe's alleged horrific behavior, Lisa claimed that she went into the men's restroom.

287.    Lisa alleged that Doe also went into the men's restroom. Lisa said she did not know it was Doe until he allegedly said, *"Wow I can tell you have a lot of sex by the way your pee sounds,"* and rather than telling him to leave, or tell him that she finds such behavior offensive, Lisa said she believes she responded by asking him how he could tell.

288.    Lisa then went back to the lab to be alone with Doe again but told Doe that a friend was coming to pick her up.

289.    Doe, equipped with the knowledge that a friend was coming, then apparently used a "bossy and condescending tone" and encouraged Lisa to move to the couch.

290.    Lisa, an adult woman, did not ask Doe why he was talking to her in such a manner, and instead acquiesced and moved to the couch.

291.    Lisa alleged that while sitting beside each other on the couch, Doe attempted to kiss Lisa, but she leaned back away from him.

292.    Lisa claimed that she did not say no to anything.

293.    While sitting beside each other, Lisa alleged that Doe then placed his hands under Lisa's shirt and bra and touched her left breast (skin to skin) and fondled for about 30 seconds.

294.    At the hearing, Lisa confirmed that she never told Doe no or nor voice her concern about the kissing or the alleged breast touch to Doe.

295.    Other than her allegedly leaning away, Lisa provided no non-verbal cues indicating she was uncomfortable nor did she allege any resistance.

296.    Throughout the entire process from the first complaint through the final disciplinary decision, no one claimed that Doe used any implied or express threats of force during the encounter.

297.    Lisa alleged Doe touched breast once without consent.

298.    Lisa then stated that she removed Doe's hand from under her shirt, and he sought to kiss her again, but she declined and told Doe her friend was coming to pick her up. No information was provided on how she declined.

299.    Lisa alleged that using a "bossy tone," Doe told Lisa she had to hug him **before she left**, and so Lisa hugged him.

300.    No information was shared about where she left to while she waited for T.M to arrive.

301.    T.M. arrived about 20 minutes later.[14] Lisa stated nothing about Doe meeting T.M. to the Investigator, and according to her story, he could not have met him since she left Doe and waited for T.M. to arrive.

302.    Lisa stated during the walk home, T.M. thought Lisa was acting "hysterical" because she was walking fast, crying, and kept looking back over her shoulder.

303.    Lisa stated T.M. became nervous because he thought something bad happened based on her attitude, and so he asked her what happened. Lisa told him Doe tried to kiss once, but she moved away. At the hearing, Lisa stated that that was the end of the discussion, and she went home and went to bed.

---

[14] At the time of this incident, T.M. was a friend of Lisa; someone she liked. At the time, this Complaint was filed, he was her boyfriend.

304.     After the August 31, 2016 incident, Lisa alleged that Doe would always get close to Lisa's face and try to kiss her while in the lab, but she would decline. Lisa alleged this happened on at least five occasions in the lab, but did not specify the dates, time, or place of the alleged incidents.

305.     After the incident, she did not **initially** inform T.M. that Doe touched her breast, but told him only about the attempted kiss

306.     Once Lisa started dating T.M. again toward the end of September 2016, Lisa told Doe she had a boyfriend, and she believed that Doe understood. Lisa claimed that Doe would not seek to touch Lisa any longer but would continue to make sexual comments; however, Lisa provided no details or evidence as to the sexual innuendo used by Doe.

307.     Throughout the Fall Semester, Lisa alleged that Doe apparently asked Lisa to come to the lab at night. At the hearing, Dr. Lovaglia stated that the students were encouraged to work in the lab at night as people have classes during the day.

308.     Lisa alleged that sometime in October 2016, Doe asked Lisa if he could put a collar around her neck and have sex with her. Lisa did not report this interaction to anyone until she filed the formal complaint with UI nearly six months later.

309.     Lisa alleged that Doe demonstrated the use of the collar by placing his hands around Lisa's neck. Lisa claims she apparently casually removed Doe's hands from her neck and changed the subject of the conversation.

310.     Lisa alleged that Doe, via text message, asked Lisa if she was good in bed and asked questions about the lab. Lisa did not provide these alleged text messages as evidence for reasons unknown.

311.    Lisa stated that she answered Doe's questions about the lab but avoided answering his questions about sex. Lisa alleged that Doe also referenced to her as a girl with nice "boobs"; however, she provided no details as to when, where, or how this conversation happened.

312.    Lisa alleged that Doe asked Lisa to dinner on four or five occasions. No information was provided on when he asked her to dinner, or where he suggested. Lisa stated that Doe would supposedly get upset if Lisa declined the requests.

313.    Lisa alleged that in December 2016, Doe asked her to have dinner. They ate at Chipotle. After eating at Chipotle, they went to Doe's apartment.

314.    Despite being allegedly sexually assaulted by Doe earlier in the semester, Lisa voluntarily entered Doe's apartment, knowing she will be by herself with him that night.

315.    In Doe's apartment, Lisa agreed to consume wine with Doe alone because he is "bossy," and she did not want Doe to become upset. No information was provided on how they picked up the wine bottle.

316.    Lisa stated that they were at Doe's apartment for just 30 minutes.

317.    Lisa never alleged that Doe tried to sexually assault her again even though he was alone with Doe multiple occasions throughout the Fall semester (at least once a week).

318.    T.M. picked Lisa up, and neither T.M. nor Lisa testified that Lisa was at all upset or uncomfortable after being with Doe alone in his apartment, drinking wine[15].

---

[15] Doe claims that it was a few hours, and that they finished a bottle of wine together while listening to Christmas carols on Spotify radio station, something Lisa requested.

319.     Considering that T.M., her boyfriend, previously saw Lisa acting "hysterical" when she left Doe on the first day they hung out in the lab, he was not worried by his girlfriend drinking wine alone with the alleged perpetrator in his apartment after the alleged sexual assault.

320.     Lisa stated she did not like meeting with Doe after dark because of his overall behavior toward her, despite Doe providing plenty of text message evidence where Lisa tells Doe to come to the lab late at night while she is by herself, and although her own testimony contradicts that she would meet with Doe and drink with him only at night.

321.     Lisa stated Doe's comments made her uncomfortable, and initially, she did not know if Doe was serious. Lisa realized he was serious when Doe allegedly attempted to kiss her. Therefore, according to Lisa, that means she realized that Doe was serious from the first day they spent time together in the lab alone.

322.     Lisa explained the alleged sexual assault and alleged sexual harassment that continued for six months vaguely, without giving many details of the allegations.

323.     Lisa provided absolutely no evidence of the allegations she had made. There were no first-hand witnesses and no text messages provided.

**JOHN DOE'S RESPONSE**

324.     Before Doe spoke about Lisa's allegations in the interview, he notified the Investigator that Lisa's allegations were outrageous and utterly false.

325.     Doe then shared his truth and provided ample evidence to prove his innocence.

326.     Doe provided text messages over many months, pictures from the lab when they were alone together, and a video from the lab when they were alone together, all of which point to the truth.

327.    Doe started by saying Lisa first attended the initial lab meeting on September 2, 2016, the same day that Sally did and met Doe for the first time then. Sally Roe stated September 2 as well.

328.    Doe stated that August 31, 2016, is not the day the alleged incident occurred. Doe stated that the alleged incident occurred on or after September 5, 2016.

329.    Lisa told Doe in their first encounter at the lab, she had an art class right after lab and had to leave early. They exchanged numbers. It was a very brief encounter.

330.    Around September 5, 2016, Lisa came to the lab at about 8:30 p.m. and Doe gave her a link to an intro website that UI encouraged everyone to do if they are part of a lab.

331.    This is where the stories diverge.

332.    Doe had nothing else to say and asked Lisa if she wanted to socialize. Lisa stated that she was free and that she had only an art project due the next day.

333.    While socializing, Doe asked Lisa if she enjoyed drinking and if she wanted to get a drink together. Doe stated that Lisa said yes.

334.    Doe stated that Lisa, and he started walking to a bar (Brothers) from Seashore Hall to grab a drink.

335.    While walking there, Lisa remembered she did not bring her fake ID with her that day.

336.    Doe suggested "Konnexion" instead, which is a convenience store one block away from Seashore Hall, and they made the short walk together and purchased beer. Doe lives above Konnexion.

337.    Doe told the Investigator the cameras outside Seashore should have picked up footage of them walking to the store and back as they used Iowa Avenue entrance. Doe requested her to investigate if getting footage was still feasible, and the Investigator ignored him.

338.    Sally claimed that she never left Seashore building and that Doe went to bring his books and laptop by himself and that Doe brought back beer.

339.    At the formal hearing, T.M., Lisa's boyfriend, revealed that **Lisa told him they went to purchase beer from a gas station, thus corroborating Doe's statement**. (emphasis added)

340.    After purchasing beer from the store, Doe and Lisa went up to Doe's apartment to pick up his laptop so he could work on his research.

341.    While leaving his apartment, Doe almost walked out, forgetting to pick up the bag with alcoholic beverages, and Lisa reminded him he was leaving the beers in the apartment and picked it up herself.

342.    They returned to the lab, sat on the couch, and Lisa sat to the right of Doe. Doe denied that they sat at the table and tried to study.

343.    They opened the beers individually right after sitting down and conversed over a beer about activities they do when they are not studying.They had a casual conversation for about 15 minutes.

344.    Doe vehemently denies putting the beer can to Lisa's mouth and making her drink the beer.

345.    While conversing on the couch for about 15 minutes, Doe asked Lisa if she was single. Lisa answered yes and then added it is kind of complicated because she lived with her ex-boyfriend.

346.    The conversation continued, and Doe asked Lisa if wanted to go on a date, and Lisa said yes; Doe laughed and asked why, and Lisa replied, *"I don't know. You're somewhat kind of attractive."*

347.    Doe said *"Somewhat,"* and both laughed.

348.    Conversation slowed down. Both Doe and Lisa started kissing (for 5 minutes); talked (teasing each other) and kissed more:

349.    At some stage, while kissing, Doe asked Lisa her favorite sex position, and she told him, cowgirl because she likes to *"be in charge."*

350.    Lisa's leg over Doe's lap while facing towards him. They were close to each other.

351.    Lisa lifted shirt and invited Doe to touch her breast.

352.    Doe, after asking for verbal consent by asking "May I?" and receiving it, lifted Lisa's bra, and touched one of her breasts. Lisa did not indicate she was uncomfortable.

353.    This was after 10 p.m.; Seashore Hall quiet at that time of night. They heard someone walk by, so Doe pulled Lisa's shirt down and nudged her off to the side. Doe accidentally kicked over a beer can that was on the floor in doing so.

354.    The person they heard was the custodian (Mike) who opened the door, and Doe said, *"Sorry, we spilled something, and we are cleaning it up"* after which Mike left.

355.    According to Doe, Lisa seemed embarrassed.

356.    Lisa and Doe cleaned up the beer, and after a few minutes of chatting, Lisa said that she had to get going soon. Lisa sent a text to her friend to pick her up.

357.    Lisa said Doe could walk her downstairs. They walked downstairs. Lisa and Doe waited outside for 5-10 minutes for her ex-boyfriend to pick her up. While waiting, they engaged in small talk. Lisa stated that she had to sketch her foot for her art class homework.

358.    Doe stated that T.M. arrived and Lisa introduced them after which they shook hands and engaged in small talk.

359.    At the hearing, T.M. also affirmed that Lisa introduced them, thus corroborating with Doe's statement.

360.    Later that night, Doe and Lisa shared nice to meet you messages and Lisa texted Doe a picture of her homework—a sketch of her foot.

361.    During this encounter, Doe drunk half of his beer and was not intoxicated. No witness testified about either Doe or Lisa being intoxicated that evening.

362.    Doe stated that during this encounter, both Doe and Lisa went to the bathroom. However, Doe used the men's, and Lisa used the women's. Doe completely denies discussing her sex life or her urine.

363.    Doe testified about many normal social interactions with Lisa at the lab and socially while they were alone. For example, just three weeks after the alleged incident, Doe stated that while he and Lisa were in the lab alone at about 8 pm, Lisa suggested going to get something to eat as Doe said he was hungry.

364.    Lisa and Doe went to the restaurant Iowa Chop House together; Lisa took out her fake ID and ordered alcohol. Lisa got two fruity beers by herself even though she previously declared that she does not like beer, does not drink them on the weekdays, and that Doe apparently put beer can on her mouth and made her drink it. Lisa ate nothing and just drank beers. Lisa admitted to going to Iowa Chop House with Doe and ordering beers for herself.

365.    After they left Iowa Chop House; Doe and Lisa went to Indian Café and both had Chai. They were there for 30-40 minutes.

366.    During the disciplinary process, Doe provided multiple text messages initiated by Lisa, pictures, and video corroborating the truth as to the type of relationship he had with Lisa.

49

367.    For example, Doe shared a video of Lisa hanging up a sign-in sheet in the lab in October 2016, while they were alone in the lab at night. Lisa is giggling and laughing in the video because of what Doe was saying. Lisa seemed perfectly comfortable in the video while being playful with Doe.

368.    Sometime around then, Doe learned Lisa was back with her ex-boyfriend.

369.    Doe adamantly denies asking Lisa in October 2016 if he could put a collar around her neck and have sex with her and denies he demonstrated this by placing his hands around her neck. In his own words, Doe told Stevenson Earl:

> "These statements are horrifically disturbing, and it makes me angry that someone could lie about something so profane. Such claims are extremely serious, and there is no excuse for using them against someone for personal gain."

370.    On at least four occasions after the alleged assault, Doe testified that he walked Lisa home late at night after working together late at the lab. These were usually around 2 a.m., and Doe walked her home in the Iowa cold winters just so she can be safe from the people coming out of the bars during bar close.

371.    Lisa confirmed the late-night walks and did not say anything inappropriate happened on those walks. However, she said she did not ask Doe to walk her home.

372.    During these late lab sessions Lisa did not allege Doe ever tried to do anything inappropriate.

373.    From November 2016 to late January 2017, Doe presented multiple text message conversations to and from Lisa, demonstrating a mutually supportive friendship in which Doe helped Lisa with resume, with applications, general advice, and did everything he could to support her academically.

374.    On December 20, 2016, they met up in the lab (s), worked on Lisa's resume and engaged in small talk.

375.    Once done, they talked—Lisa told him about living in England and playing soccer, and Lisa lifted her t-shirt, showing him a scar near her stomach from surgery for a ruptured spleen from a soccer injury and told Doe to touch it.

376.    Doe stated that Lisa's boyfriend kept calling; Lisa lied to him telling him she was busy working. They talked from about 4 p.m.-8:30 p.m. They did not have dinner that day, and Doe said he was hungry, and he would eat dinner and invited Lisa to join.

377.    They went to Chipotle to have dinner. First, they went to Doe's apartment, so he could get a thicker jacket for the walk, and Lisa saw wine bottle in Doe's apartment. Lisa asked if they could come back and drink wine after Chipotle, but the wine bottle was empty, and Lisa then asked if they could pick up a bottle of wine, and Doe agreed.

378.    After dinner at 9:30 p.m. they went back to Doe's apartment, and they drank until about 11:45 p.m.  Lisa stated that she was only there for 30 minutes at first and then she changed the story to 15 minutes. Lisa brought her food back with her, and Doe put it in the fridge. Lisa suggested Christmas music as background music, and they conversed over hours as friends.

379.    Lisa does not allege Doe of doing anything inappropriate during then. However, she stated at the hearing that she was fearful, even though she admitted that she chose to take the stairs to go up to Doe's apartment by herself and drink wine while by herself.

380.    Lisa's boyfriend called and asked where she was, and she told him to pick her up from Java House, a block away from where Doe lived.

381.    On Friday, December 23, 2016, Lisa initiated contact with Doe by sending Doe a text message saying '*21 things that are so uncomfortable*' with one on the list being 'Wearing a backpack while sitting in a chair.'

382.    In Spring 2019, Lisa sent a text to Doe saying she was having a "panic attack" because of her poor grades from the fall and that her academic advisor was not being supportive about her applying for medical school. Lisa felt discouraged.

383.    Being a good friend, Doe by texted back and provided empathy, support, and resources for her. (s):

> "I understand. I want you to know that I'll be your biggest supporter in chasing your dream and doing what you want to do rather than having your dreams defined by your advisor."
>
> "There are no guarantees in life but if you commit to your dreams, take massive action and surround yourself with people that believe in you, you can surprise yourself with what you can achieve. I hope that helps to calm down some nerves. Sorry I was in class and busy and couldn't get to your earlier"

384.    These were some of the last conversations between Doe and Lisa.

385.    When Doe was under investigation in February 2017, Dr. Lovaglia told him to leave the lab and not contact anyone.

386.    About a couple of weeks later, Lisa filed complaint for sexual misconduct.

387.    Throughout UI's Judicial Process, Doe had alleged that Sally and Lisa conspired against him, and suggested this was Sally's idea.

**FOLLOW-UP INTERVIEW WITH LISA ROE + DOE'S REBUTTALS**

388.    During this follow up interview, Lisa provided several material details that directly contradicted her earlier statements to the Investigator and her later statements at the hearing.

389.    The Investigator, Stevenson Earl, scheduled a follow-up interview with Lisa on May 5, 2017The purpose of the follow-up interview was to confirm which parts of Doe's interview she could confirm or deny.

390.    The Investigator asked Lisa in this interview why she came forward, and during this time she replied, *"Came forward b/c **after talking to Sally Roe**, Doe was crossing line b/c of lab/student relationship."* (Emphasis added.)

391.    These are handwritten investigation notes on the investigative file titled "May 5, 2017, 2nd Interview w/Lisa Roe."

392.    Lisa stated that Doe introduced himself as lab manager.

393.    Doe claims he was never given the title lab manager because both he and Dr. Lovaglia were on the same page regarding his new responsibilities as a graduate student after they went on a walk. Evidence shows it was then that Doe understood he could not date people in the lab.

394.    Regarding the purchase of beer with Doe on the night she accused Doe of touching her breast, Lisa did not remember if she told Doe about not having a fake ID

395.    Lisa did not remember if she left the building and went to Konnexion with Doe.

396.    Lisa did not remember going up to Doe's apartment with him to grab his laptop, but she denied she wanted to look around his apartment.

397.    However, Lisa said that she did not sit on the couch "after they returned to the lab." (emphasis added)

398.    At the hearing Lisa testified that she was at the lab the whole time, and Doe went to get the beer.

399.    However, T.M., her boyfriend, testified that Lisa told him she went with Doe to a gas station to purchase alcohol.

400.    Lisa denied sitting on the couch after they returned to the lab, and she stated that they both sat at the table and studied together. No information was shared about what they could have studied together on the first night they met.

401.    Lisa then admitted that she moved to the couch after she told Doe that T.M. was on his way to pick her up, and that Doe, still apparently sexually assaulted her even though he would have known that a witness was near.

402.    Lisa stated she only took one sip of her beer, which "Doe made her do," and did not indicate that she was intoxicated.

403.    Lisa then admitted that Doe did ask her if she was single and would like to go on a date, and stated that she told him her situation is complicated because she lives with her ex-boyfriend.

404.    Lisa denied kissing Doe during the encounter. Lisa stated Doe got close to her face, but she kept backing up.

405.    Lisa denied placing her shirt above her breasts

406.    During the hearing Lisa denied that Doe asked her if he could play with her breasts and giving him verbal consent to do so.

407.    Lisa then admitted that a beer was kicked over, but Doe cleaned it up.

408.    At the hearing, Lisa admitted that the janitor did interrupt them

409.    In her first interview, Lisa stated that at this time, she got up and ran away, cried, and waited for T.M. to come.

410.    However, after Doe shared the truth, Lisa then admitted walking down with Doe and waiting for T.M. with Doe beside her. She did not state if she was crying anymore.

411.    Doe stated that while he waited with Lisa for T.M. to arrive, they discussed Lisa's homework she would do that night for her art class.

412.    Lisa stated that she did not introduce Doe and T.M. to each other; and that Doe introduced himself. At the hearing, she added that Doe was "acting weird" in front of T.M. apparently as if he was "trying to hide something bad that happened."

413.    At the formal hearing, T.M. testified that Lisa introduced them, corroborating Doe's statement, and that they had small talk. He did not specify that anything weird occurred.

414.    Lisa then admitted that she did text Doe a picture of her foot she sketched for her art class but stated that it was apparently later in the week and not during the same night.

415.    T.M. testified that **Lisa really loved the lab in the beginning** (emphasis added)

416.    However, Lisa alleged that she got sexually assaulted on the first day in the lab which made her cry and be hysterical.

417.    Lisa still stated that Doe asked her if he could put a collar on her and have sex with her, stating she remembered because he put his hands around her neck. No other information is known from the Investigation of this alleged incident as the Investigator did not probe into it.

418.    Lisa then admitted to giggling and laughing in a video that showed her hanging the sign-in sheet.

419.   At the formal hearing, Lisa stated that she did not know about this video and had never seen it until before the hearing when Doe put it in the exhibits.

420.   Lisa admitted to eating at the Iowa Chop House with Doe in October 2016. But Lisa said that she told Doe to get something to eat, and she would just continue working; however, she alleged that Doe told her to come with him to eat. Lisa apparently could not say no and then admitted to going to Iowa Chop House.

421.   Lisa then admitted that at the Iowa Chop House she did use a fake ID while there to order alcohol for herself. She then admitted to going to the Indian café afterward with Doe because he wanted some chai tea.

422.   Lisa then admitted to studying alone late in the lab and Doe offering to walk her home, but she stated that each time she declined.

423.   Doe stated that he had walked Lisa back multiple times late at night in the freezing Iowa cold just so she can be safe around 2 a.m.

424.   In fact, Doe has helped her gather information to apply to biology labs, helped her edit her resume, helped her with mental and emotional health issues she was having and provided her support after she did poorly in her Fall semester. When Lisa was asked about this, she then admitted this did occur but then she changed the topic.

425.   Lisa identified nothing inappropriate during those study sessions.

426.   Lisa then admitted telling Doe she lived in England and telling him about an injury she sustained playing soccer.

427.    Lisa stated that she told Doe about her scar and she would not have shown him her scar because it is too far up, and she denies that she told Doe to touch it. Lisa stated her scar came up because she was apparently trying to come up with a study about her scar in a sociology lab.

428.    Lisa then admitted to going to Chipotle with Doe in December 2016.

429.    Doe stated and provided evidence in text messages they had been working in the lab from p.m. until 8:30 p.m., and they missed dinner. Doe asked Lisa if she wanted to grab a bite, and she agreed.

430.    Lisa denied they went to get to Doe's apartment to get Doe's jacket.

431.    However, at the hearing, she admitted that she did go to pick up Doe's jacket.

432.    Lisa denied asking Doe if they could drink wine afterward while they were alone in the apartment. She states after they left Chipotle, Doe went to get wine. Lisa provided no information of where she waited while Doe "went to get wine"

433.    However, at the hearing, Lisa admitted that she did accompany Doe to get wine.

434.    Lisa denied being at Doe's apartment, listening to music and drinking for hours, contradicting her previous interview where she admitted to being in his apartment and drinking wine.

435.    However, there is a text message record where she thanked Doe *"for not changing the station even though you hated it."*

436.    When asked at the hearing, if she felt fearful of being assaulted when she went back to Doe's apartment by herself alone in December, Lisa stated she did not fear for her physical safety.

437.    Lisa denied telling T.M. to pick her up at the Java House, and telling Doe not to come outside.

438.    However, at the hearing, both T.M. and Lisa admitted that he came to pick her up at the Java House.

439.    Lisa admitted to sending Doe an article titled *21 Things That Are So, So Uncomfortable* in December. When asked why, Lisa stated she sent it because Doe would always tell her not to sit in a chair with her backpack on. She stated this was one of Doe's ways of telling her what to do.

440.    Lisa stated that Doe did text her asking her if she was good in bed and referencing to girls with nice boobs. She recalls this because it related the topic in Professor Lovaglia's class to sex.

441.    Lisa provided no evidence of the text message.

442.    Doe was not in Professor Lovaglia's Intro to Sociology class. He was in a completely different department.

443.    Lisa provided no corroborative evidence in the Investigation.

444.    In seven months, Lisa did not report the "sexual assault" or the "sexual harassment" to any person, to the UI, or any law enforcement agency.

445.    Lisa stated that she learned this was sexual assault **after she spoke to DiCarlo**. (emphasis added)

446.    However, Lisa's resume demonstrates that she has a firm grasp on what sexual assault means since she had been teaching students and faculty at UI about sexual assault since Summer 2016.

447.    Despite Lisa's story containing significant changes in subsequent retelling, both Stevenson Earl and Frost found Lisa credible and used these criteria as her credibility assessment.

448.    Frost, the Adjudicator, wrote that Lisa had "excellent recall" in her report.

449.    Cross-examination would have allowed the above dialogue to occur, and not only show how inconsistent Lisa is, but prove how extreme of a false accusation this was, something Doe had been saying since the first day of the investigation to UI.

450.    UI knew or should have known these were false allegations as otherwise they would not be selectively not asking questions that would show inconsistencies.

451.    UI knew or should have known that Lisa did not make these allegations in good faith, and rather than sanctioning her, they sanctioned Doe with expulsion.

452.    UI knowingly prosecuted false sexual assault allegations that were obvious even at face value made by Lisa.

**Dr. Lovaglia**

453.    Dr. Lovaglia stated that Lisa reported no issues to him. He learned about this when the Dean of Students, Redington, emailed the notice to Doe and copied him in the email.

**SUMMARY OF ALLEGATIONS OF LISA ROE**

454.    Lisa alleged Doe touched her breasts one time without consent, that he tried to kiss her during the Fall, and that one time, he placed his hands around her neck and said a sexual thing for no apparent reason.

455.    Lisa waited for nearly six months to report Doe.

456.    After her second interview, the Investigator emailed Lisa and asked her again why she came forward several months after the initial incident. Lisa provided a different response this time:

> "I was so embarrassed and in shock that something like this happened to me, that I didn't want to talk about it. But since the harassment (sic) kept going and I was starting to not feel safe at the lab, I decided I needed extra help."

457.    Dr. Lovaglia told Doe to leave the lab at the beginning of February, and thus Doe could not have

been there at the lab as Lisa is claiming nor could there have been any harassment going on since Doe was

not in contact with her. Doe alleges that her "extra help" is accommodations Lisa requested for doing

poorly in the previous semester, which was the last conversation Lisa had with Doe.

**DEFENDANT STEVENSON EARL'S FINDINGS FOR LISA ROE**

458.    The Investigator, Defendant Stevenson Earl, noted Lisa alleged attempted kisses and touching her

breast was unwelcome and non-consensual.

459.    Doe alleged the sexual touching (kissing and touching Lisa's breasts) was consensual, and he had

verbal consent to touch her.

460.    The Investigator wrote there was no evidence presented to indicate that Doe used force (physical

violence or threats), or coercion. She then stated that it is questionable if Doe used intimidation when Lisa

alleged that Doe used a "bossy and condescending tone" in his voice but did not hold Doe responsible for

it.

461.    The Investigator, Stevenson Earl, who has a law degree from UI, put the burden on Doe to prove

his innocence by writing she had *"no reason for not believing Lisa's account"* and thus, credited her

account, even though there were no corroborating details, nor could any other witness verify she has

reported the details to them in any conversations with them.

462.    The Investigator found Doe non-credible because his account "was extremely different from

Complainant's account, both when he was questioned about minor details related to the incident on or

around August 31, 2016, and about behaviors that are potentially prohibited by university policy, i.e.,

behaviors that are sexual in nature."

463.    At some point during her interview, Lisa allegedly had tears in her eyes. The Investigator, Stevenson Earl, used her tears in her credibility assessment. Stevenson Earl used a cognitive distortion such as emotional reasoning as a credibility assessment. Emotions are individual, arbitrary, and unanalyzable. In his appeal to the Board, Doe mentioned this by writing: "*Generally speaking, logic is the preferred means upon which to assess rational decision making or credibility, not emotions.*"

464.    The Investigator also noted Doe's "*overdramatic responses,*" and that one of his supporting witness testimonies appeared "scripted." She did not explain why she believed this. Further, the only thing Doe's supporting witness could have provided was information about seeing them in the lab once in December 2016, seeing them hug each other, and them having a playful conversation with each other. When asked for specific details of the conversation, he did not remember a lot of it. During her analysis for credibility, the Investigator, thus, used Doe's friend forgetting a lot of details of the conversation that occurred between Doe and Lisa in the lab months later as a way to determine Doe not credible in the truth he shared of what occurred on the night Lisa alleged being groped.

465.    Doe stated that the outrageous claims Lisa is making are extremely serious, and there is no excuse for using them against someone for personal gain. Rather than asking Doe about what he meant by personal gain, the Investigator put the burden on Doe to say he provided no additional details about the personal gain comment.

466.    None of the examples of text messages, pictures, and videos provided by Doe between him and Lisa from October to the last conversation they have had, portray the things Lisa is saying about Doe. This points to how contradictory Lisa Roe's statements are from everything she had stated earlier.

467.   For instance, Doe provided plenty of text messages showing how Lisa continuously invited him to come to the lab late at night, knowing they would be by themselves.

468.   The Investigator did not ask Lisa to explain these texts. In other text messages, Lisa seems playful and appreciative of Doe.

469.   In the video from October 2016 Doe provided of them in the lab while alone, she seems to laugh and playfully converse with Doe.

470.   In the pictures Doe provided, she is smiling and posing for the pictures taken. Lisa did not include a single piece of physical evidence to support her claims.

471.   Since lab/student relationship is not an actual policy as Lisa stated, but instructor/student is, something UI investigated Doe for, Lisa was likely talking about instructor/student relationship.

472.   Evidence shows that Sally, knowing that Doe was not an instructor for the lab, attempted to anger Lisa by suggesting to her he was in such a role. This is a piece of critical exculpatory evidence intentionally left out by the Investigator.

473.   However, the instructor found he did not violate the consensual relationship with the student's policy because:

> "The evidence does not indicate that John Doe's role in the lab was in the instructional context. Information received from Dr. Lovaglia does **not** indicate that John Doe instructed, evaluated, or supervised directly or indirectly, Complainants, or any other lab members research. The evidence indicates that any lab member can run the meetings and conduct research at any time in the lab."

474.   In her report, the Investigator recommended Doe to be suspended or expelled from UI if found responsible for sexual assault.

475.   Doe not only proved his innocence under a preponderance of evidence standard, but Lisa had proved these were false allegations under a preponderance of evidence standard.

476.   Rather than sanctioning Lisa for the false allegations, UI had found Doe responsible for all allegations.

## C.   BIASED INVESTIGATION – DEFENDANT STEVENSON EARL

477.   In or around the beginning of August 2017, UI was informed that Doe was being represented by attorney Marcus Mills, a former UI General Counsel.

478.   UI scheduled the hearing for September 17, 2017. Redington named Defendant Cervantes as the charging officer for UI.

479.   In September 2017, Doe's new attorney asked Defendant Cervantes for the handwritten and typed investigative notes taken in the investigation right away.

480.   Upon information and belief, Ms. Cervantes did not know that the Investigator, Stevenson Earl, left out critical information from her reports and/or edited information to find Doe responsible.

481.   When Cervantes accepted the request and provided the documents, Doe noticed that not only were there many inconsistencies, but that **the Investigator withheld exculpatory information from Doe**– information he would require to defend himself at the hearing.

482.   September 2017 would count as the time around which Doe could have been realistically made aware that the Investigator discriminated against him.

**DELIBERATELY EXCLUDED EXCULPATORY INFORMATION AND EDITED INFORMATION**

483.   When the Investigator interviewed Dr. Lovaglia, he said that a month after the alleged incident, Sally told Dr. Lovaglia what occurred when she went back to Doe's apartment after their date.

484.   At the interview with the Investigator, Dr. Lovaglia told the Investigator there was ***"mutual attraction, and she had initially been okay, but she changed her mind."*** (emphasis added)

485.   Dr. Lovaglia said, "***they*** *kissed on the couch.*" (emphasis added)

486.   The Investigator left out this critical information in her report.

487.   Doe renews his argument he wrote in his appeal to the Board:

"UI's disregard for evidence during disciplinary proceedings can trigger Title IX liability. Flawed disciplinary proceedings occurred in part because of "critical omissions" by university investigators in preparing witness summaries (*John Doe v. Wash. & Lee Univ.*, 2015 WL 4647996, *10)"

488.   Doe told the Investigator that Sally never indicated she was uncomfortable during the tickling, and even provided text messages of an hour-long text message conversation they had later that night which was friendly and showed no form of uncomfortableness.

489.   When the Investigator interviewed D.L, Sally's boyfriend, she discriminated against Doe by editing information in her report to find Doe responsible.

490.   The Investigator interviewed D.L. twice. During the first interview, on March 21, 2017, D.L. gave a detailed description of everything he knew regarding Doe and Sally. In his first statement, D.L. reported the kissing incident from a stance where Doe was the initiator yet said nothing about Doe touching Sally's breast.

491.   The Investigator interviewed Doe after D.L., and Doe denied the occurrence of such touching.

492.    After this, the Investigator re-interviewed D.L. for unknown reasons on June 7, 2017, and during the interview, he stated for the first time that Sally told him that Doe touched her breast and that it still upsets him.

493.    The Investigator excluded this crucial information of D.L. changing stories regarding what he knew about Doe allegedly touching Sally's breast.

494.    Instead, the Investigator edited the story after speaking to D.L. for the second time and did not make a note in her summary of the inconsistency so she can find Doe responsible. Other witnesses knew nothing about Doe allegedly touching Sally's breast.

495.    The information related to the second interview is written right at the top of one of D.L.'s Equal Opportunity and Diversity (EOD) interview pages, it says "6/7/17 DL on phone" and is written with a different pen font color showing this was written on a different day from the first interview with D.L. This evidence is in the investigative files.

496.    There was no audio or video record of the investigation, and thus impossible to know the accuracy of statements or find out the biases of the Investigator.

497.    In her report of Sally, the Investigator wrote details about what Dr. Lovaglia said in the interview. She wrote Sally, "*informed Dr. Lovaglia that Doe kissed her while at his apartment, and he wanted to go farther **and began touching her in ways that made her uncomfortable.**"*

498.    In the EOD interview notes, at no point when describing what happened in Doe's apartment between Sally and Doe did Dr. Lovaglia say anything about Doe, *"touching her in ways that made her uncomfortable."*

499.    This occurred the next semester (written under 'Jan '17' in the EOD interview notes) between Dr. Lovaglia and Sally where she was referencing the tickling that occurred in the lab.

500.    **The Investigator combined two conversations of different incidents between two semesters to hold Doe responsible for sexual assault.**

501.    To further confirm, at the hearing, Dr. Lovaglia said everything that happened in Doe's apartment was consensual, and he did not know about any alleged touching of Sally's breast.

502.    Doe also stated that it was mutual, and it was only after he accused Sally of writing in hours and complaining to the EOD he first heard anything about it being non-consensual.

503.    Despite this, the Investigator put the burden on Doe to see if he obtained consent before the kissing, and the Investigator never asked Sally if she obtained consent before the kissing took place

504.    Dr. Lovaglia brought the note he wrote when Sally told him the story along with him to the formal hearing, and again, it had nothing related to "touching.". The university added it to the exhibits.

505.    The Investigator also edited information provided to her by Doe about Lisa and her boyfriend T.M. On the day of the alleged encounter with Lisa, Doe stated he knew that T.M. was coming to pick Lisa up from the lab that night. The Investigator changed the story to state Doe did NOT know T.M. was coming to pick Lisa that night, thereby adding more credibility to Lisa's story.

506.    After dropping off Sally, Doe  suggested they hang out again, and Sally said "Sure!" Sally also admitted to this. TheInvestigative notes say she said "Sure," however the Investigator edited the information while writing the report and instead changed it to say "Complainant told Respondent that she did not want to hang out again because she was busy."

507.     After Doe dropped Sally off to her dorm, Sally went to a dorm besides her, where her friend from high school lived, and told him what occurred between Doe and her. According to the investigative notes Sally said, *"I think we ended up joking about it because I didn't take it so seriously at the time."*- Investigator excluded this important information out of her report. It is in the investigative notes.

508.     Dr. Lovaglia told Doe he should have oriented Doe to his new role and took responsibility for not doing so. - Investigator excluded this information from her report. It is in the investigative notes.

509.     The Investigator asked Sally if she received credit as part of the lab, and she replied, "Yes." The Investigator then asked Sally whether Doe questioning her work ethic in the lab and receiving credit for it made her upset, and she replied, "Yes."  Investigator excluded this information from her report.

510.     According to the Investigator's handwritten notes, Sally's boyfriend and roommate encouraged Sally to report concerns. Sally told the Investigator she "did it for them." Investigator excluded this information from her report.

511.     After the lab meeting ended, Sally went to Dr. Lovaglia's office and complained about Doe. She told him about "tickling hanging lights" and "aggressive about data" according to the Investigator's handwritten notes. Investigator excluded information from her report that Sally's initial complaints were about Doe being aggressive about tickling and aggressive about data.

512.     The Investigator asked Lisa after the second interview why she came forward, and during this time she changed her story to reply, "Came forward b/c after talking to Sally Roe, Doe was crossing line b/c of lab/student relationship." Investigator excluded this information from her report. It would show that Sally and Lisa did communicate regarding Doe.

513.     Doe renews his argument he wrote in his appeal to the Board:

67

"[i]f Ms. Stevenson Earl did not leave out crucial information, or intentionally edit information to find guilt, which I will be talking about more later in the appeal, she could have avoided tainting the entire investigation. A formal hearing may not have even been required."

## A HOSTILE ENVIRONMENT

514.    The Investigator investigated Doe while being indifferent to the harassment he received from Sally.

515.    Doe stated that in January 2017, he was studying in the lab at night and Sally came to the lab, signed in on the sheet, but spent time laughing and finding stuff on the internet/messing around.

516.    Doe also stated that Sally tickled him twice in January before he tickled her back.

517.    Despite Doe's statement that Sally tickled him first, Stevenson Earl never investigated Sally for harassment.

518.    He gave examples by saying that when they were sitting in the recycle bin to take a picture, Sally tickled him to scoot him over because he was taking up a lot of space and she did not have space to sit.

519.    Doe said she tickled him again when trying to get a cassette recorder from him she wanted to throw away, but Doe wished to keep.

520.    In Doe's own words provided to the Investigator:

"Sally was talking a lot that day, and at one point someone asked something about me that I was not paying attention to entirely as I was focused on E.C.'s data on SPSS (statistical software). I just heard Sally casually add, *"The thing you have to know about Doe is that when you want to deal with him, you have to put him in his place."* I found this comment to be incredibly rude. I decided not to engage in that conversation, and this was the first conversation that day that I did not participate in. Later, I decided to not participate in the others."

521.    Doe told the Investigator that after he accused Sally of writing in lab hours she was getting credit for, Doe threatened her ego. Sally was an honors student, and grades are important to her.

522.    Sally's anger and need for retaliation led to the untimely complaint of sexual assault and sexual harassment.

523.    Doe never threatened Sally. Doe simply hoped to encourage Sally to change her conduct in the lab and Doe expressed to the Investigator how Sally retaliated against him.

524.    Doe was engaging in good faith protected activity by bringing up this subject with Sally, considering her inability to do things on time affected Doe's own work and research.

525.    The Investigator showed indifference to Doe's concerns while she investigated Sally's allegations.

526.    This led to Doe being harassed by UI further when Frost and other Defendants not only harassed him, but allowed the complainants to harass him too.

527.    As with a gender-biased investigation, the Investigator only rationalized how Doe speaking about mainstream dating advice for men – a New York Times Bestselling book called 'The Game,' written by a pickup artist, created a hostile environment for Sally. However, the Investigator had no issues with Doe talking about women's dating advice that Doe stated they also spoke about called "The Rules," which is arguably just as unhealthy and sexist.

528.    The Investigator seems to believe that discussions about topics of sociology create a "hostile environment." If these topics are creating a hostile environment, according to the Investigator, Dr. Lovaglia's class, which talks about such topics in sociology, should also create a hostile environment.

529.    Doe and his attorney told the Investigator at the beginning of the investigation what the dire consequences would be if UI expelled Doe.

530.    This was not done in a manner to distract her from the truth-finding process but done to emphasize how important the due process afforded to Doe would be.

531.    The UI knew that expulsion would lead to loss of the F-1 Visa for Doe, leading to deportation to a South Asian country.

532.    Doe told her deportation to the South Asian country he has never lived in, can threaten his life primarily because of the recent attacks by ISIS on students who study in the United States, people who identify as secular, or as academics.

533.    The federal government requires international students expelled to leave the United States immediately[16].

534.    Doe felt pressured to apply for political asylum.

535.    It changed his visa status to one where if the Homeland Security denies the asylum, Doe would have to face an immigration judge in an immigration court for removal proceedings.

## D.      PREHEARING AND DUE PROCESS ISSUES

536.    UI can provide deferred sanctions according to their UI Judicial Process, and he brought up that Doe had respected the interim sanctions for the past seven months and that Doe would be nowhere near the complainants or contact them.

537.    This would have allowed Doe to finish his degree since he only had about two months remaining on campus. Cervantes rejected his request.

---

[16] "Expulsion from the school which has issued you the most current Form I-20 would cause you to lose the status of Foreign Student and the right to legally remain in the United States. Under such circumstances, the student is expected to depart the United States immediately." www.f1studentvisa.com/maintaining-status.html.

538.   Following the rejection of the request, Cervantes stated in the Notice of Hearing she is increasing the interim sanctions, for reasons unknown to Doe, before the hearing. No explanations were given why.

539.   The new interim sanctions stated that UI prohibited Doe from being in any university building other than the Lindquist Center, and that he was only allowed there for classes during scheduled class times, and scheduled meetings with his academic advisor.

540.   Cervantes abused her discretion in increasing sanctions without explanation, and without giving Doe a chance to appeal it.

541.   This letter also had no information on any resources available to him.

542.   None of the complainants had classes in the Lindquist Center, which was a building in the College of Education, a different college from theirs.

543.   Doe asked his attorney to request UI he be permitted in the Lindquist Center *"Monday through Friday from 9 a.m. to 7 p.m."* as that would allow him to complete his internship and finish any homework in the computer stations. Doe already had classes most days from 9 am till the afternoon.

544.   Doe's internship, which he was being graded on, depended on when his clients were free, and thus it was important he received access to the building at least during business hours.

545.   Mills, his attorney, told him that when he requested the accommodation, Cervantes said she would "entertain the idea" and would reply to them. Cervantes never replied.

546.   Cervantes deprived Doe of his educational experience.

547.   For the hearing, Cervantes put the summary of the findings of the Investigator's report into their exhibits and therefore gave that as a copy to Frost weeks before the formal hearing.

548.   The report as already noted was biased as it excludes much valuable information and includes an analysis of the Investigator's subjective perspective. Reading this <u>before</u> the hearing can build the ground for confirmation bias to occur.

549.   Further, Cervantes took Doe's text messages he provided in the investigation and put them in UI's exhibits as UI hardly had any evidence against Doe.

550.   Doe came with over a hundred pages of exhibits that includes text messages over many months, multiple pictures of both Sally and Lisa that proves the truth and his account credible, and a video of Lisa which shows them alone in the lab at night being playful.

551.   The UI Disciplinary Process prevented Doe from defending himself in the formal hearing, ensuring an unreliable process.

**UI POLICY PREVENTS DOE'S ATTORNEY FROM CONTACTING MATERIAL WITNESSES.**

552.   This policy had prohibited Doe from gathering evidence and testimony to defend himself for the formal hearing. In his appeal to the Board, Doe stated:

> "In the 'Notice of Complaint' letters, interim sanction number 2 includes the following statement: *"Also, do not discuss this matter with any of your mutual friends because the University's Anti-Retaliation Policy applies to your case. Any action on your part to discuss the case with another student could be considered retaliation on your part."*
>
> "This has prohibited me from gathering evidence and testimony to defend myself. I wanted to have a conversation with and use Ms. E.C., having her testify as a witness, as she was another lab member I was good friends with but also mutual friends with Ms. Sally and Ms. Lisa."

553.   Because Doe could not interview E.C., he could not evaluate her as a witness.

554.    E.C. could have given testimony regarding knowing Doe was confused about his role in the lab, how even after a year of being in SURG she did not think Doe had authority, and how informal and student-run the lab was.

555.    E.C. could have furthered testified about Doe providing consistent statements to her about Lisa taking her breast out, how Sally struggled to submit work on time, how Doe was uncomfortable and annoyed about Sally joining the improv group, how Sally "rubbed her the wrong way," how Doe wanted to quit SURG because of Sally before the investigation, and how Doe avoided being in the lab after lab meetings to avoid Sally.

556.    E.C. also could have testified that he observed no unusual interactions between Doe and Lisa and Sally.

557.    E.C. further observed no harassing behavior throughout personal observations of Doe, Lisa, and Sally throughout the relevant time period.

558.    Additionally, Doe could not interview Mr. R.F., a mutual friend of Doe and Sally.

559.    After Cervantes listed R.F. as a witness, Doe submitted several Facebook Messenger messages between Doe and R.F. as evidence.

560.    Those messages would have confirmed Doe's repeated desire not to interact with Sally.

561.    Contact with witness does not apparently apply to UI.

562.    Thus, while an accused cannot interview a witness before the hearing, UI can entirely talk with whoever it wants.

563.    Doe also wanted to discuss proposed testimony of Dr. Lovaglia however, he warned Doe against discussing the investigation, probably because of the anti-retaliation provisions.

564.    This was harmful since Sally informed Dr. Lovaglia everything was consensual, and he knew information that the Investigator withheld.

565.    This was damaging because, although Doe knew Dr. Lovaglia would testify the encounter consensual, he had no way of talking or preparing with Dr. Lovaglia before the actual hearing.

566.    Finally, because of the blanket prohibition against talking to mutual friends/lab members, Doe could interview none of the lab (approximately 10) to determine whether they observed any of the alleged harassing behavior by Doe.

567.    Sally and Lisa would not admit to talking about experiences with Doe because of UI's retaliation policy. If Doe knew that Sally communicated details of what occurred with them of them with Lisa, Doe could have requested to investigate Sally for retaliation as Lisa was a mutual friend. Thus, it would be in Sally's best interest to not admit communication details with Lisa. UI had denied Doe the opportunity to communicate with material witnesses because of its policies, as it relates to retaliation, prohibiting Doe from gathering further evidence and testimony to defend himself. University should not use "retaliation" policies to prevent an accused student from mounting a proper defense.

## JOHN DOE'S ATTORNEY COULD NOT CROSS-EXAMINE WITNESSES.

568.    Besides being unable to investigate material witnesses for his defense, Doe could not cross-examine witnesses at the hearing.

569.    The Adjudicator did not ask many questions that Doe submitted before the hearing.

570.    The questions submitted by Doe were not repetitive by any means.

571.    All questions except one were worded carefully to be respectful. However, one question regarding Sally's character was asked to be removed due to its irrelevance.

572.    The Adjudicator did not ask, as Doe and his attorney requested, about the significant contradiction in Lisa's story of the night in question, where Lisa alleged she stayed in the building while Doe brought beer and forced it down her mouth.

573.    This story directly contrasted with Doe and her boyfriend, T.M., testified that Lisa and Doe both went to buy alcohol together from a store/gas station that night.

574.    The questions provided by Doe and his attorney she asked, she rephrased them as open-ended questions to the extent possible. The Adjudicator re-worded the questions so heavily that the questions were essentially useless.

575.    Part of cross-examination is being able to flow with what somebody is saying. Besides flow, follow-up, and context issues that arise from a lack of cross-examination, the Adjudicator completely changed the order of the questions Doe, and his attorney requested her to ask. This effectively denied Doe not just cross-examination, but basic due process protections.

576.    Many more important questions would have highlighted inconsistencies and bringing credibility into question through cross-examining.

577.    Doe's attorney could not explore in depth either Sally's or Lisa's motives for testifying falsely against him.

578.    For example, Doe stated that Sally and Lisa were friends and they were each other's witnesses in the investigation.

579.    Their reports came nearly simultaneously with one another and a similar period of time elapsed from the time of the report through the conclusion.

580.    Doe's attorney could have asked more questions regarding the reason behind Sally providing Lisa with the Title IX coordinator's number when Sally claims she knew nothing about Lisa's story.

581.    Doe renews his argument he wrote regarding cross-examination in his appeal to the Board:

> "There was also no effective cross-examination at the hearing. Cross-examination has been recognized as the greatest legal engine ever invented for the discovery of the truth, *Lilly v. Virginia,* 527 U.S. 116, 124 (1999), and has been ruled to be required for basic due process in campus disciplinary cases, *Donohue v. Baker*, 976 F. Supp. 136 (N.D.N.Y. 1997)."

582.    None of the witnesses have first-hand knowledge of the critical facts, yet, in a case where UI relied upon a credibility assessment, there was no effective cross-examination available.

583.    The matter came down to Doe's word against the complainant's words. There were no eyewitnesses present for both the alleged incidents."

584.    UI Defendants based their unlawful decision to expel Doe on testimony attributed to witnesses other than just Doe and Sally/Lisa.

585.    Under the new regulation issued by the Department of Education:

> "Such cross-examination at a hearing must be conducted by the party's advisor of choice, notwithstanding the discretion of the recipient under paragraph (b)(3)(iv) of this section to otherwise restrict the extent to which advisors may participate in the proceedings."

586.    Doe had raised this same issue of cross-examination in his appeal to the Iowa Board of Regents as the Adjudicator discarded many questions Doe and his attorney provided, so this is not a newly raised issue.

587.    Frost also allowed the complainants to provide new evidence and exhibits at the hearing, toward the end in the disguise of them being rebuttals.

588.    The Adjudicator asked Doe if he wanted to comment on the new exhibits right after UI presented them. Doe declined as UI had not informed him these items would be offered nor allowed to prepare a defense to them. This is not in university policy. This was not a formal hearing; this was essentially a victim impact hearing.

## IMPROPER CONSOLIDATION OF HEARINGS

589.    The consolidation of both complaints into one hearing was another major issue.

590.    The charging officer consolidated the two complaints of the two students at her discretion under Section 12(D) of the Student Judicial Procedure.

591.    Doe's attorney objected to this consolidation orally before the hearing and then placed the objection on the record at the beginning. He did so because of the environment it created for Doe.

592.    Each complainant received information on resources from UI on free attorneys and advocates they could bring to the hearing. However, UI did not provide Doe with any such resources.

593.    UI encouraged the complainants to get both attorneys and advocates. For example, when Sally said that she did not come with an attorney, Frost asked her if she was sure and suggested she re-think her decision.

594.    Thus, each complainant had the option to come with a personal attorney and an advocate. On top of that, UI offered an attorney to the complainants who was the UI charging officer. Last, the Adjudicator is also completely on the side of the complainants as seen in the rest of this Complaint.

595.    When Doe testified, he faced the two complainants, their personal attorneys, their advocates, Cervantes (UI's attorney), and Frost (prosecutor/attorney), simultaneously. There was a divider in the room and so Doe cannot see the complainants. But all the attorneys and advocates were staring at Doe who was made to sit on the other side of the room. This set up an intimidating and hostile environment for a respondent and Doe's attorney did not think this environment was appropriate for a university hearing.

596.    The complainants, their personal attorneys, their advocates, and Cervantes could submit questions to the Adjudicator simultaneously, and she bombarded Doe with an endless list of questions one after another.

597.    Consolidating the complainants and their complaints into one hearing, unfairly and unreasonably prejudiced the Adjudicator in determining the facts and in weighing the credibility of the witnesses. This is clear from the manner and substance of the questioning of the Adjudicator, and in her findings (e.g., her comment there was a "pattern" of behavior involved).


**UI DISCIPLINARY PROCESS PREVENTS ATTORNEY FROM ADVOCATING FOR CLIENT**

598.    As it relates to attorney participation, UI policies state:

> The attorney may call witnesses; ask clarifying procedural questions of the Adjudicator; may lodge objections to witnesses, evidence, and others issues; and may consult with the party or student who brought the attorney, but the attorney otherwise may not speak during the hearing unless requested by the Adjudicator.

599.    This was essentially equivalent to having a mute lawyer. Since Doe's case was "unusually complex" as Doe's F-1 visa dependent on it, and that UI, a public university, utilized an attorney as their charging officer, they should have allowed Doe's attorney to have a more active role in the formal hearing.

600.    Throughout the investigation process, UI investigators treated Doe as "guilty before proven innocent.[17]"

601.    Upon information and belief, UI instructs investigators and adjudicators to presume people reporting abuse are credible while presuming the guilt of the accused.

## E.    FORMAL HEARING , THE ADJUDICATOR - DEFENDANT IRIS FROST EXTREMELY BIASED AND UNQUALIFIED

602.    The adjudicator in this case, Iris Frost, did not display the slightest degree of impartially throughout the proceedings.

603.    She cross-examined, and cajoled Doe, seeking only incriminating evidence against Doe while ignoring exculpatory evidence.

604.    As to the accusers, she ignored directly exculpatory evidence, asked softball opened questions, bolstered week or evasive answers, and willfully failed to ask questions presented by Doe.

605.    Many Universities and Colleges bring in Adjudicators from the outside of their organization to ensure that they insulate the Adjudicator from campus political pressures and a reliable process ensues.

606.    In contrast, the UI utilized Frost, an Associate Instructor of Rhetoric at the UI.

607.    The UI website describes her as "Associate Professor of Instruction" and that "Ms. Frost joined the Department after ten years as a prosecutor with the Johnson County Attorney's office, where she

---

[17] The conduct of UI created an unlawfully hostile and/or abusive environment for male UI students like Doe, in part, because this conduct is like that addressed by legal scholars documenting bias against male students accused of sexual misconduct on college campuses. See, e.g., Barclay Sutton Hendrix, *A Feather On One Side, A Brick On The Other: Tilting The Scale Against Males Accused of Sexual Assault In Campus Disciplinary Proceedings*, 47 Ga. L. Rev. 591, 594-599 (2013); Stephen Henrick, *A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses*, 40 N. Ky. L. Rev. 49, 50-52 (2013).

concentrated on felony and misdemeanor crimes, including vehicular homicide, impaired driving, arson, bank robbery and murder." See https://clas.uiowa.edu/rhetoric/people/iris-frost.

608.    When Redington emailed 'notice of hearing' and appointed Defendant Frost as the Adjudicator for this case initially, he and Doe's original attorney had concerns about her involvement since she had been a prosecutor in the Johnson County Attorney's office for over ten years.

609.    Frost's CV promotes lengthy prison sentences a sign of her prosecuting skill, but does not any identify any leniency to Defendants as a sign of her effectiveness.

610.    Upon information and belief, before the hearing, Frost had little or no training about the definitions to apply, and her role in being a neutral and impartial Adjudicator.

611.    She lacked the knowledge, training, and experience to conduct a fair and competent fact-finding investigation.

612.    Frost's CV demonstrates this, which shows no certifications in Title IX investigations or that she possessed requisite skills to be an impartial Adjudicator.

613.    Upon information and belief, this was the first hearing Frost was adjudicating, as according to her CV, below the title certifications, she received a Continued Education Unit in Sexual Misconduct in September 2017, the same month in which she was the Adjudicator for the hearing. .

614.    Doe mentioned the following in both his appeals: UI's pool of Adjudicators was fundamentally unfair and biased. Doe's attorney, and him debated asking UI to have another Adjudicator without a prosecutorial background appointed but UI informed them that the two other potential Adjudicators were also former prosecutors (one county, one federal), This is a basis for questioning the underlying fairness

and objectivity of the process itself as UI is making the accused defend against experienced prosecutors in a university hearing.

615.    Upon information and belief, UI does not consider hiring Adjudicators with a defense background, who specialize in sexual assault cases.

616.    For example, Davis Foster, Doe's first attorney, applied to serve as a UI Adjudicator after representing Doe as the injustice he was seeing in his clients concerned him. Upon information and belief, UI told him they would consider him once he got rid of all the clients he was representing against UI, which took him many months. After he did, UI refused to hire him citing his lack of prosecutorial experience. In spite of his stellar professional reputation experience, Foster's 30 plus years of experience representing accused in essence disqualified Foster from serving as an adjudicator, which is circumstantial evidence of UI's interested in securing responsibility determinations in its disciplinary proceedings.

**THE FORMAL HEARING**

617.    Doe was not given a fair opportunity to share his truth and to benefit from an investigation of the accuracy of that truth, as Frost was not interested in obtaining Doe's account of the alleged incidents.

618.    Since the complainants' accounts are "believed" to be true and their "survivor" status presumed, it is not difficult to imagine how this approach opened the door to serious injustice.

619.    For the Complaining witnesses, she asked leading questions of them and helped direct their testimony to a finding of guilt.

620.    She was empathetic to the complainants, even counseling them, and taking their words at face value.

621.    This was not the case when she dealt with Doe. She was aggressive in her questioning, which she filled with leading, loaded, and incriminating questions. There was a sharp contrast with the way she treated opposing parties.

622.    Frost, in effect, cross-examined Doe while asking direct examination questions of Sally and Lisa.

623.    She blatantly led and coaxed the complainants, putting words in their mouths, through her questioning methods and found them credible and emotionally distressed. She manipulated the outcome.

624.    If this was an investigation free of bias, under the UI policy of consent, both Stevenson Earl and Frost should have questioned Sally on whether she asked Doe for consent before they kissed. However, UI failed to ask this question and assumed that Doe initiated the kiss.

625.    Doe renews his argument he wrote regarding Frost's bias and sexism in his appeal to the Board:

> "Also, there seems to be an after the fact presumption and bias in the investigators, especially Ms. Frost, because of the questions they ask, or the lack of, that the male is always the initiator, and that there is no possibility of it being mutual. **Ms. Frost's view that the male is the initiator is sexist, patriarchal, and applies gender stereotypes.** Under the United States Department of Education's (DOE) Office for Civil Rights (OCR), this violates Title IX policies for not being objective and impartial. Their website states: "*Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially.*"

626.    Doe had carefully organized the exhibits chronologically, so he could state a coherent story allowing him to defend himself by showing the context of each event.

627.    Yet, his carefully reconstructed chronology did not matter to Frost as she was all over the place in her questioning, jumping from event to event over different months, de-contextualizing the situations.

628.    Frost overlooked questions to multiple exhibits provided by Doe that corroborated his account.

629.    Frost was not interested in the truth and was ruthlessly determined to prove Doe responsible for the charges.

630.    Frost had not allowed him to share information he felt was relevant, as she did with the complainants.

631.    Doe's attorney requested multiple times to allow Doe a chance to go through the exhibits he submitted, and Frost can even be heard in the audio arguing with his attorney to guide her further as she does not want to go through the exhibits Doe submitted.

632.    At the hearing, Frost dehumanized Doe while humanizing the complainants. Frost did not treat Doe with respect and dignity, and thus created a prejudicial and hostile environment that lasted all three days.

**TESTIMONIES**

**<u>Sally Roe</u>**

633.    When asked if Sally told R.C. about Doe touching her breast that night, Sally said **"yes."**

634.    Sally mentioned that Doe's displeasure with whether she gets things done on time would concern her because of how it might affect her relationship with Dr. Lovaglia.

**<u>R.C. (Sally's friend from high school)</u>**

635.    Regarding the close relationship between Sally and R.C.:

> "Her and I went to the same high school, we were in the same friend group, and we've been friends since Freshman year of high school. Now that her and I go to the same school, we talk a lot, like a good amount"
>
> Last year (when the alleged incident happened) they had a lot of meals together

636.    In response to Frost's questions about when he allegedly saw Sally on September 2, 2016, R.C. quoted the following:

a)    There wasn't very much of a tone in her voice when she called.
b)    She looked calm, her voice was not tense. She sounded normal.
c)    She lived a couple of doors down, she wasn't far from where I lived.
d)    She looked fine.
e)    She was definitely kind of calm.
f)    Her appearance was more or less tranquil.
g)    Conversation started pretty normal, just catching up and then she started talking about this "interesting encounter" that she had
h)    This conversation started completely normal, it did not start with her being scared.
i)    He [Doe] was clearly interested in her, **she did not know how she felt about him."** (emphasis added)
j)    She did not smell like alcohol at the moment at all.
k)    She did not act or talk or smell in any way that she had a drink. If she had, I would have noticed. She did not appear to be impaired in any way.
l)    She said at one point he started making like moves on her, he started putting his arm around her, and leaning in to kiss her, and she would pull away, but I think she told me she was okay. I don't think she told me he was forcing anything.

637.    Despite R.C. mentioning multiples times, Sally was calm and tranquil, Frost would not give up on attempting to squeeze out anything that could support the decision she had made up in her mind. Here is an example of how biased Frost was with her leading questions:

Frost: Did she specifically tell you that he touched her breast?

R.C.: I can't remember to be completely honest, that sounds like something that might have happened, and I feel like that sounds familiar but to be completely honest, I don't remember.

Frost: Do you think if she told you that it might have stood out in your mind as dramatic?

R.C.: **Probably**. (emphasis added)

Frost: At any time during the conversation in the stairwell, did you find Sally to be upset, crying, shaken?

R.C.: She was much more shaken upon telling me what happened than she was when she walked into the bottom of the dorm. So, I would say she was a little confused, a little freaked out maybe.

638.     In her report, Frost left out all the things R.C. said about Sally being calm, and not knowing about the alleged touching of her breast and instead wrote that she was *"confused, freaked and shaken"* that her response of telling someone about it then shows how distressed she was. This was enough evidence for Frost to state it was her opinion that Doe touched Sally's breast.

**E.J. (Sally's roommate and best friend at the time)**

639.     When asked about her relationship with Sally, she said *"We were really close."* (emphasis added)

"We like to tell each other about our days like when we came home and like how things are going. So, I'd like to say yeah that we were very, like **I knew intimate parts of her relationship and stuff like that.** She knew the same about me as well."

640.     Frost, without using the word 'alleged 'asked E.J. the question: *"Did she tell you that he touched her breast?"*

641.     E.J. replied *"No."* (emphasis added)

642.     Frost without using the word 'alleged' again asked E.J: *"Did she tell you that he kissed her?"*

643.     E.J again replied *"No."* (emphasis added)

**Lisa Roe**

644.     When asked what she thought of Doe when she met him in the lab at night, Lisa said Doe seemed like a "nice and welcoming person" even though she stated that she was allegedly harassed and assaulted by him within minutes of meeting him.

645.     Lisa said that Doe was gone for 15 mins and that when Doe came back, Doe came with a paper bag and pulled out two beers.

646.     Frost asked how she "felt" about that to which Lisa replied that she felt uncomfortable.

647.    Frost asked if she "consensually" agreed to move to the couch with Doe.

648.    Frost encouraged Lisa to portray herself as the victim by asking questions implying that she was distressed and had no agency as a person.

649.    Lisa said Doe got close to her and tried to kiss her and that Doe did not make contact with her lips.

650.    Doe stated that they kissed.

651.    Lisa then said Doe did not say anything. She says that Doe did not tell her he wanted to kiss her or make any complimentary comments, and that Doe just put his hands under her shirt and grabbed her breast.

652.    When Frost asked how she responded, Lisa replied she did not say anything.

653.    Lisa said at this point Doe kicked over his beer bottle and they got up to clean that up.

654.    Lisa said that T.M. then texted that he came and that she had to leave.

655.    Lisa did not mention that the custodian entered and saw them.

656.    Doe gave UI permission to contact the custodian at the time of the investigation and provided them his name, but UI never contacted the custodian.

657.    Lisa said that Doe had contact with T.M. that night and that it was "awkward," and that Doe "was trying to cover up something uncomfortable that happened."

658.    Lisa said that she was not speaking during then, and that Doe was just speaking and complemented T.M. and "it felt weird."

659.    Lisa suggested that Doe, after allegedly sexually assaulting her, would then go down and wait for her friend to come to pick her up, so she can get him into trouble, but then also "try to cover up something uncomfortable that happened."

660.    During the investigation, Lisa provided a completely different story where she said she ran away from the lab and cried while she waited for T.M. and did not even initially share that Doe came downstairs with her to meet T.M.

661.    Doe consistently said that he and Lisa walked downstairs together, they waited for T.M. to arrive and spoke about what she had going on for the night, that Lisa introduced T.M. to him, and that they shook hands and spoke for a couple of minutes, including talking about rock bands.

662.    T.M. who gave his testimony later corroborated with Doe and mentioned that Lisa and Doe waited downstairs and that Lisa introduced them.

663.    Due to the lack of cross-examination and a biased Adjudicator, Doe could not ask questions regarding these inconsistencies.

664.    When Frost asked Lisa about whether she drank beer with him at Iowa Chop House, she said *"yes."* Unfortunately, that ended the line of questioning from Frost.

665.    Frost repeatedly failed to ask questions Doe and his attorney had requested. For example, Frost was supposed to ask Lisa reasons behind taking out her fake ID and drinking two beers by herself with Doe while alone that night, especially considering that Lisa alleged she did not drink alcohol on weekday nights, that just a couple of weeks prior Doe allegedly forced alcohol down her mouth and sexually assaulted. Frost changed the question to ask Lisa if she drank beer (which Lisa already admitted to in the Investigation) and asked her what the beer tasted like, an unimportant question.

666.    Despite Doe and his attorney's request for the Adjudicator to explore these critical issues, Frost

chose not to ask any follow-up questions.

667.    Frost: During these events did you snap at him or tell him it made you feel bad?
        Lisa: No.

668.    Rather than asking the questions Doe and his attorney requested to ask about pictures and videos

Doe provided of Lisa (and Sally), on why they looked comfortable (and being playful) with him late at

night while alone in the lab, Frost asked these questions regarding all pictures and videos provided instead:

Frost: So, who took the picture?

Lisa: John Doe.

Frost: And you knew he was taking this photograph?

Lisa: Not at first. I didn't know at first until I saw them.

Frost: So, he never asked you permission to take the photograph?

Lisa: No.

Frost: You never said, "hey don't take my picture or it's okay to take my picture," but your photograph was being taken?

Lisa: Yes

Frost: Was there any purpose to this photograph? Like did it help anybody with research, did it show your spelling error which intended to teach other people?

Lisa: I don't believe so.

Frost: Did John Doe ever send you a copy/text you a copy of this photograph?

Lisa: No.

Frost: Was it okay he took the photograph?

Lisa: I guess so, it's a little weird.

Frost: So, it didn't offend you, you just thought it was weird?

669.   This line of questioning is biased because it omits any inquiries that Doe wanted to discuss, such as why Lisa looked comfortable and friendly in the pictures and why she was even the one posing in the photos.

670.   Despite Frost's effort to make it look like a "non-consensual" photo, the court needs to look only at the photo to see she was posing for the photo surreptitiously taken.

671.   Lisa provided no evidence other than a sheet with Doe's research on it regarding sexual assault, and said that Doe went on her computer and renamed a sexual assault literature file as "Sexual Lisa."

672.   Frost consistently acted as a prosecutor, using marginal evidence to hold Doe responsible.

673.   For example Frost found Doe responsible for sexual harassment because he wished Lisa Merry Christmas and asked her what the cutest present she got from her family is:

> Frost: Exhibit 4, page 19: Very bottom of the page at 10:29 p.m. This was Christmas day or the day after Christmas. John Doe asked, "what is the cutest thing you got?" You were discussing Christmas activities. Did that strike you as comfortable or unusual?
>
> Lisa: Unusual, little uncomfortable.
>
> Frost: Why do you think he phrased it that way?
>
> Lisa: I think he was trying to flirt
>
> 674.   Frost: At some point did you stop going to lab?
>
> Lisa: Yes.
>
> Frost: Could you tell me about that?
>
> Lisa: I stopped around after Christmas
>
> Lisa: I was just kind of getting sad and him like making me come at nights, making me feel uncomfortable, so I didn't want to be…I didn't want to go at night, so I guess I was pulling back in how involved I was and after I reported…or after Sally told me that there are rumors going around, I just stopped going to lab meetings because I felt like uncomfortable and like I didn't want them to see me that way.

Frost: What way?

Lisa: Like…umm…I mean I don't know if they would believe me if I said I didn't want this, this was not supposed to happen like he kind of like he did himself without my consent umm, I didn't know if they would believe me or if they would judge me, I don't know…umm…and so I didn't go back until this semester cause I was trying to get over the uncomfortable feelings, that's also when I saw the sexual misconduct.

675.    Lisa's quote about Doe "making" her come to the lab would have been a sufficient reason to let Doe inquire about the multiple texts she, herself, sent to Doe asking him to attend the lab at night with her.

Frost: I think you told me that the reason you made the decision to report it was that you simply overheard a conversation that John Doe was having with the new recruits, the new students?

Lisa: Yes and also like when Sally told me she had a lady that she was talking to, she said, I mean I, when she told me she was like, **I mean if you just want to talk to her you can like talk to her, you don't have to take it as far as going to umm reports and like going to court umm and so umm I forgot what I was saying**.

Frost: We were talking about what motivated you to report.

Lisa: Oh yeah. **So when I heard that I guess I didn't realize this whole time that I could have reported it to the police or to like anyone else I need help because it wasn't a rape umm and so I didn't think like going to the police they would be like well I mean he didn't rape you, and I have no evidence, I have don't have much evidence, I just have my words, so that's why I waited long. (emphasis added)**

**Frost: And at that time in point did you know what sexual assault was? That it wasn't rape?**

**Lisa: Not really. I didn't know it was sexual assault until I met Monique (DiCarlo). (emphasis added)**

676.    Despite Frosts' biased questions, it leads to the fact that Lisa decided, on her own, to follow Doe into his apartment and he did not invite her to.

Frost: A few days before Christmas on December 20th, you spent some time with John Doe inside his apartment.

Lisa: Must have been after Chipotle.

Frost: So, the only time you remember being in his apartment is?

Lisa: After Chipotle.

Frost: Do you remember how long that encounter lasted?

Lisa: Like 15 mins.

Frost: And you went to his apartment that day for what purpose?

Lisa: That was after Chipotle, and he wanted to get a coat.

Frost: Did he encourage, you to come upstairs or did he invite, you to come upstairs or did he just not want to stay downstairs and wait for him to get a coat?

Lisa: I guess I just followed him up there.

Frost: So, at any time where you frightened physically? That you will be in physical danger?

Lisa: Like the whole…umm…like that he would hurt me? Not so much physical more like mental

Frost: So, you were not afraid of him physically?

Lisa: Umm…

Frost: You weren't afraid that he was going to punch you or hit you?

Lisa: No.

Frost: You were more concerned about mind games?

 Lisa: Yeah. And like if he would touch me again.

Frost: Okay. Did you try to keep your distance?

Lisa: Yes.

     (There is now a short break)

677.   Frost: Let's go back to exhibit 4, pages 2 and 3, and 17 and 29. These appear to be text messages where you initiate contact with John Doe. Is that what they appear to you?

Lisa: Umm… (no response)

Frost: Looks like at 4:50 p.m., you say also are gonna be by chance at lab tonight. It's at the top of page 2. Is that you asking him if he's going to be at the lab?

Lisa: Yes.

Frost: Do you remember why you were asking?

Lisa: (No comment. LONG PAUSE)

Cervantes (Charging officer): What are the dates? There's no dates.

Frost: That was where I was going to go next.

Marcus Mills: There is a date at the bottom of that one.

**Cervantes: Just for the record, these were documents that were produced by John Doe in the investigation.**

**Marcus Mills: Right.**

**Cervantes: So, it wasn't documents produced by Lisa.**

**Marcus Mills: Right, correct.**

**Frost: I'm just asking at Mr. Mills request if you have any recollection of this email as being an initiation of meeting at the lab? I think that's what you're getting at**

**Lisa: Umm…(pause)**

**Frost: Looks like this would have been before Wednesday of December 14th**

**Lisa: I mean I asked him, I don't know what the previous conversation was like if we were talking about something**

**Frost: So I guess my question would be are you trying to figure out if he's at the lab or are you inviting yourself to be with him at the lab?**

**Lisa: Umm my guess would be that I was wondering he's at lab cause I needed help with something.**

**Frost: Okay.**

678.    Frost asked no further questions about at least five other occasions she invited Doe to come to the

lab late at night.

**T.M. (Lisa's boyfriend)**

679.   Lisa boyfriend testified that Lisa liked the lab and in response to the question about who go the beer, he testified that they got it from the gas station, corroborating Doe's version of how they got beer.

680.   Frost: What did she tell you about the lab?

**T.M.: At first, she said that she liked it. She liked organizing data and everything. (emphasis added)**

681.   **Frost: Did she tell you anything about how beer got there [the lab]? Did she buy the beer, did she bring the beer?**

**T.M: I believe she said that John Doe bought it.**

**Frost: And did she tell you that she went with him to buy it?**

**T.M: I think she said that they went to the gas station to buy it.**

**Frost: Tell me what else she told you?**

**T.M: At that night, that was it.**

682. **Frost: Did she tell you more about the events that evening?**

**T.M: No.**

**Frost: Did she tell you that she was physically touched?**

**T.M: He tried to kiss her.**

**Frost: She never told you that there was any contact with her breast or body in any way?**

**T.M: No**

683.    Here, Frost attempted to ask leading questions to support the witness in her own preconceived

outcome regardless of the facts.

Frost: Was the nature of your relationship in the Fall of 2016 one in which she might have been trying to spare you the details because of your on again and off again relationship?

T.M: What do you mean exactly?

**Frost: If you weren't really dating, if you were having some issues in your relationship, might she have wanted to spare you the details of what was upsetting her?**

**TM: I don't believe so.**

**Frost: Was she scared of what you might think?**

**TM: I don't think she was scared of what I might think.**

684. Frost: How would you have reacted if you learned more about those events of August 31st? Would you have been angry, would you have been disappointed in her, would you have some negative reaction?

TM: Well it depends on the events obviously but if something further happened, yes, I would have been angry, not at her, at the person who did it, I wouldn't have been disappointed in her, it's out of her control if it's forced on her, it's nothing she could do about it.

**Dr. Lovaglia**

    685.  **Frost: Did Sally tell you that he kissed her?**

    **Dr. Lovaglia: Yes.**

    **Frost: Did she tell you that it was a consensual kiss?**

    **Yes.** (Left out by Frost in her report)

    **Frost: Did she tell you that he touched her breast?**

    **Dr. Lovaglia: I do not remember that.** (His notes he wrote after she left the lab do not reflect that)

    **Frost: Does that seem like something that you might remember if she had told you?**

    **Dr. Lovaglia: I think I would…**

686.   Many parts of the above testimony were left out of Frost's report indicate Frost's bias and his practice of mishandling the entire investigation to construct a story that does not correctly reflect the testimony:

    Frost: Can you tell me what you did after Sally told you about these issues?

    Dr. Lovaglia: First, I'd like to clarify something. **My recollection is, and I'm really hope that I did not misunderstand her, my recollection is that she conveyed the idea that all of that sexual behavior that occurred in Doe's apartment was consensual…**

687.   Upon learning of the sexual complaint by Lisa, Dr. Lovaglia stated that it "*was a complete surprise."* The testimony further indicates that Dr. Lovaglia had a positive impression of Doe's relationships with female students.

    Frost: In the Investigator's report, it is my recollection that you suggested that Doe had a very difficult time absorbing the information that you were attempting to communicate. Is that correct?

    Dr. Lovaglia: That is correct

    688.  Frost: You said something about John Doe seeking those relationships as he had been, seeking social relationships from the students. Is that what you believed he had been doing? Is that what he told you he had been doing and would cease doing that?

    Dr. Lovaglia: John Doe was very friendly with the women in the lab.

Frost: What does that mean?

Dr. Lovaglia: He's a very social person, so they're laughing and joking and being friendly with students in the lab. I did not notice any touching or any other signs that would worry me about relationships becoming potentially troublesome.

**S.B. (John Doe's friend and witness)**

689.    For Doe's witness, in contrast to her questioning of Lisa and Sally, Frost assumed the role of a prosecutor, repeatedly cross-examing S.B.

> Frost: Did he describe to you kissing her on the couch in his living room?
>
> SB: So I'm not sure he gave me the details about where they kissed every time they kissed, but I'm sure I recall there being a lot of it over an extended period of time.
>
> Frost: So, you're not certain he gave you all the details, all the intimate details?
>
> SB: Well, I think all the intimate details of what they had done together he had given me, every single moment by moment second of the story, nobody gives that kind of detail to each other.
>
> Frost: You told me a little bit earlier that you share everything
>
> SB: Yes, but you know what I mean by this, I'm sure.
>
> Frost: Well, I'm not sure I do
>
> SB: Well, let me explain for you then. When I say I shared everything with someone, I'm not going to tell them I was in the bathroom three minutes ago or I had a hole in my sock this morning. I'm going to tell them things like "hey my professor told me this today" "I shared a kiss with a girl today" "I went on a date, and it was wonderful" Things like this. Virtually everything that is not superfluous I would say.Frost: Ok (says the okay in what seems like a sarcastic tone).

690.    This following question directly demonstrates Frost ignorance of basic principles of Title IX policies, which expressly prohibits such use of gender-based archetypes, e.g. that men are sexist. She asked no similar questions of any of Sally or Lisa's witnesses.

> **Frost: Have you known John Doe to make sexist comments?**

No, in fact, his research is specifically looking at things against sexual aggression toward women, and he's frequently spoken to me about this too.

691.    Frost continued her leading questions:

Frost: Did there come a time when you heard that John Doe had allegedly kissed Lisa and groped her breast against her will?

No.

**<u>John Doe</u>**

692.    Frost: Do you know how old she (Lisa) was in August of 2016?

John Doe: Yes.

Frost: How old was she?

John Doe: She was 19.

Frost: I think we established that point you were 26.

John Doe: Yes.

Frost: Clearly you had some more experience than she did just based on age.

John Doe: I did.

Frost: Did you at any time feel that this may be inappropriate behavior? (unfair question, it's not illegal for a 26-year-old to ask out a 19-year-old nor is it against UI policies)

John Doe: No, at that moment, no.

Frost: And why is that?

John Doe: I didn't see myself as something of a leader or I didn't think there was much wrong with dating someone years older. My parents are eight years apart. I don't see that as a thing.

693.    Frost: Do you have any idea if she intended to have dinner with you? Did you have a plan?

John Doe: I just came in as if I'm really hungry. I need to eat something. I feel like I'm about to faint because I have class till seven that day and she's like "well, let's go get you something to eat." That was, and I quote her on that.

Frost: So was her idea to go to get you something to eat?

John Doe: "Let's go get something to eat" yes.

Frost: But when she originally scheduled her lab time with you on that night, it was intended to be lab time work time in the office. Is that correct? (Work time in the office? This is a volunteering lab.)

John Doe: Well, there was nothing that said it was going to be work time in the office, but we did talk about research over dinner. So, we did work over there. In fact, I did take out my book or not my on my book, but my research materials in Chop House to talk about it

Frost: And you felt that that was an appropriate arrangement?

John Doe: Yes, I did.

Frost: And then you went to dinner with her at Chipotle?

John Doe: Yes.

Frost: And when was that?

John Doe: That was in December, December I'm blanking on the dates, but it would be around the midway I believe.

Frost: You think it was probably before the break?

John Doe: It was definitely before the break yes.

Frost: And what was the purpose of that dinner was that?

John Doe: Yeah, so we spend the entire day from 4:00 p.m. Well, texts was sent from 4 p.m. To almost been at 11:45. I would say and around 9:00 p.m. I got hungry. You're spending an entire day over there. I don't have any food with me. She didn't have any food with her. We both were hungry, and I asked her I want to go grab something to eat, would you like to come along? And she said yes, and she has never been to Chipotle and I was like I wanted to go to Chipotle.

Frost: How would you have felt if she said no, I'm not going to go to dinner (These are clear cross-examination questions)

John Doe: That's totally fine.

Frost: You wouldn't have gotten angry?

John Doe: No.

Frost: Wouldn't have gotten frustrated?

John Doe: No, that's her response and she's free to her response.

Frost: Wouldn't have tried to convince her otherwise? (This question lacks any relevance)

John Doe: No.

Frost: So how long do you think that dinner at Chipotle lasted?

John Doe: I would say about an hour.

Frost: And you thought that…did you talk about work over dinner?

John Doe: We spoke about my research and it's related to politics, so we spoke about politics as well while we were at the topic.

Frost: And you thought that was an appropriate venue?

John Doe: I believe it is, yes.

694.    Frost: What happened when this session was completed?

John Doe: Well, it was getting late. It was I believe around 12/12:30 and she said she has to get going, and I said great I'll walk you to your place. I already knew where she lived she told me. She told me she lives at Daum

Frost: And did she allow you to walk her there?

John Doe: Yes.

Frost: And what happened when you got to Daum?

John Doe: We kissed.

Frost: Did you ask her at that point if you might kiss her? (But here, Frost never asked Sally if she asked for permission to kiss Doe)

John Doe: I don't ask no.

Frost: But you did kiss her? (Doe answered the question. Frost being repetitive)

John Doe: We kissed yes.

Frost: Your lips touched her lips? (Unless UI has different levels of sanctions based on styles of kissing, there is no point in this question. Frost is harassing Doe because she cannot get a response to confirm her biases)

John Doe: That's correct

Frost: Did you use any tongue or anything other than your lips?

John Doe: No

Frost: And then you went home I presume

John Doe: I called S.B. while walking home

Frost: Okay, and what did you tell him?

John Doe: I told him what happened. I met Sally earlier that day and that we went to an improv show. We wore same shirt well pretty much, and I liked her, I was excited to see her the next day

Frost: When you took the course [sexual harassment seminar] in February or March 2017, did you recognize any of your behavior in the past as being in violation of the sexual harassment code of the University?

John Doe: If I were in a position of authority, I would have, and if I didn't have the comfort that I had with Miss Lisa and Sally at the time of her friendships, I also would have.

Frost: And I understand that you didn't perceive yourself as a person in a position of authority?

John Doe: I did not

695.     The sexual harassment training course that Doe took online after UI had started the investigation suggested that a person of power in a workplace (a manager) can date someone lower in power, however, it explicitly warned of retaliation if the relationship would not work out.

696.     The sexual harassment training course also stated how the level of comfort between people is a significant factor in determining whether it qualifies as sexual harassment.

697.     Even though Frost said she would get back to Doe's questioning and include the text message exchange with her that shows that Doe was uncomfortable about Sally joining his improv group, she does not get to those questions when they are relevant. Frost does not allow Doe to demonstrate evidence of his own discomfort.

Frost: Well, you were pleased initially that she joined the improv group where you're not? (Frost has evidence that shows Doe was not pleased and even told her "stay away from me", yet she asked such a biased question)

John Doe: Absolutely not.

Frost: But if you had a friendship with her, why wouldn't you be pleased that she joined the improv group bringing another friend into the group?

John Doe: Because I did not want her to come into my personal life. That is where I drew my line. It is a friendship and anything more than that is perceived as something. I would

say this that improv means a lot to me, that is where I am my truest self. I want to be comfortable over there to the fullest extent. I was not fully comfortable with that and I think it shows in the text messages too

Frost: I'll get to those in a minute.

John Doe: But let me see if I can understand what you're saying because I believe what you're suggesting sounds contradictory. So, I want you to clear this up for me

Frost: You had a date with Sally?

John Doe: Yes

Frost: You have this group, you wanted to create an environment in The SURG lab of friendship and camaraderie (Frost is being condescending)

John Doe: Yes.

Frost: You talked with her about your improv group.

John Doe: Yes

Frost: You had her to your apartment, there was a session of kissing, but yet you you wanted to go out on a date with her?

John Doe: Yes

Frost: But improv was off-limits?

698.   Frost was argumentative and manipulative. The underlying archaic assumption here is that she sees Doe, a man, as so lost in his lust for Sally, a woman, that he should be grateful that Sally joined the improv group that Doe started. Despite Doe having concrete evidence to prove how uncomfortable he felt about this, and although he already replied "absolutely not" to her when she asked him if he was pleased Sally joined the group, Frost argued with Doe to convince him otherwise. It did not matter to Frost how Doe felt as she undermined his emotions. As can be seen from Doe's last response, he is getting frustrated with Frost.

(contd.)

John Doe: No, well after the date, she said that she was not interested and that will mean that I have to think differently about the situation in the sense that okay, I could have you as a friend, but that's where I draw the boundaries. That's where I draw my boundaries. Improv

is a more vulnerable place and I hope that answers the question. (Doe is getting frustrated by Frost)

Frost: Did you tell her that you didn't want her to join your improv group because you were not comfortable with her there?

John Doe: I have not fully voiced it out in that manner

Frost: Is that a no?

No.

Frost: The answer was no, you never verbally told her that you didn't want her in the Improv group (Frost shut down Doe's response)

699.    Frost is harassing Doe based on his gender. Evidence of this includes the number of archaic assumptions she made about him and her attempting to argue in such an unnecessary manner. Saying "stay away from me" (it was actually "leave me alone") is a clear message, and that was not the full message. Doe provided the text message exchanged to Frost. Doe text messaged Sally and asked her why she joined his improv group. When she basically said she felt like doing so, Doe said, "leave me alone" and ended the conversation there.

700.    Frost is also taking Doe to task because he did not say "no" because to her "leave me alone" is not a strong enough response. However, her double standards are exposed as she did not do this to the complainants when they said that they did not say "yes" nor a "no".

Frost: At some point in January of 2017, did you tickle Sally?

John Doe: Yes. If I could add to that, may I?

Frost: Yes.

John Doe: Okay. I was tickled first at that point and it happened while we were sitting on the trashcan

Frost: And you believed that you needed to retaliate by tickling back? (Unfair leading question, not allowing the opportunity to explain myself from an open-ended stance)

701.    Here, Frost disregards any opinion this behavior was consensual by asking leading questions and using the negatively connotated characterization of "retaliation", which does not allow Doe to explain himself.

(contd.)

John Doe: Well we were in, I mean the pictures kind of show that we were in a very fun playful mood at that point. So yes, I would say that we were goofing around that day.

Frost: And you did tickle her? (This is not a "neutral" adjudicator)

John Doe: I did.

Frost: Did you ask her if you could touch her before you tickled her? (Frost did not ask the question if Sally asked Doe if she could touch him before she tickled him)

John Doe: No, I did not.

Frost: Did she express to you that it was making her uncomfortable that you were tickling her?

John Doe: No, she did not. As a matter of fact, she laughed when I did.

Frost: Did she move away from you at that time?

John Doe: No.

702.    Frost: So, you never equated his suggestion (Dr. Lovaglia's) that sexual assault was a problem with your activities?

No, I did not think so and I did not believe so.

703.    Not once did Lovaglia claim sexual assault or mention anything related to it. Frost's harassment is severe and offensive. Doe had to cope with such conduct for three full working days.

704.    Doe became frustrated that the Adjudicator did not ask the questions and so he brought them up. He talked about how Lisa would not be sending these text messages if she was uncomfortable. To which, Frost replied:

Frost: Well, I know what I know what you would do or wouldn't do is not necessarily what others would do. There are a lot of reasons wouldn't you agree that people do things that they need to do?

So, whether she was comfortable or not showing up at the lab (at 10 o'clock and the countless other times Lisa did so) really you can't make that determination. She may have had other needs for being there. Isn't that right?

705.  Frost: At some point there was some conversations and testimony about the fact that you talked to Lisa about wearing a dog collar or you attempted to put your hands or did put your hands around her neck and talked about sex and dog collars. Do you have any recollection of that conversation?

John Doe: I did not do that.

Frost: Well, I'm not asking you if you did or didn't I'm asking you if you have any recollection.

706.  Frost continually promised to come back to arguments that Doe wants to make but she never does.

707.  When Doe criticized Sally about being late and turning work late and writing in lab hours, Frost questioned him on why it was important to him she would do such a thing although Frost knew Doe's own work depended on the data that Sally submitted on time.  Frost therefore attempts to negate Doe's character by undermining his important work in the group.

708.  When discussing the photographs Frost asked if she knew that Doe was taking the picture. Doe replied yes and demonstrated that she was posing for the picture. However, Frost continued to hound Doe about the context of the photographs and videos even though he ascertained that they were consensual

709.  Frost: I just want to know if Ms. Lisa knew you were taking the video of her.

John Doe: I don't know if she knew, but I showed her that video multiple times later. I showed her after taking it, and I showed her that in December as well when we hung out that day

Frost: But you never asked her prior to videotaping her no and never told you were going to do that. Simply showed it to her after the fact.

John Doe: Yes. I showed her that I took a video and I could delete it if he wants to, and she had no objection.

## DEFENDANT FROST'S DISCRIMINATORY CONDUCT AND FINDINGS .

710.    In his appeal Doe stated that it was extremely difficult to be in this environment.

711.    Doe stated that Frost devalued Doe's rational statements. Frost did not devalue the complainants' statements in this way.

712.    Frost's bias and incompetence were clearly demonstrated by her failure to ask proposed questions about multiple communications **initiated by Lisa** for Doe to spend time with her alone in the lab late at night, which appears to strikingly with a claim of a sexual assault four months earlier.

713.    Following her allegation of sexual assault and harassment, Lisa at various times throughout the year sentence multiple texts to Doe asking him to come to the lab late a night.

714.    She refused to ask those questions because they would demonstrate that Lisa's behavior was inconsistent with an alleged prior sexual assault with Doe.

   a)   On December 13, 2016, Lisa texted Doe asking if he would be in the lab at night although she knew that Doe was there most nights at the lab by himself. Doe responded saying he will be and that she may join. She joined around 10 p.m. and stayed till 2:30 a.m. alone with him. She initiated contact with him the next morning too by texting him and being playful.

   b)   On December 15, 2016, Lisa texted Doe asking if he could meet after 9 p.m.

   **c)**   On December 17, 2016, Lisa texted Doe stating, **"lol but I am free Monday later…is eight too late for you?"**

   d)   Lisa texted Doe: *21 Things That Are So, So Uncomfortable* with one being, "Wearing a backpack while sitting in a chair."

   e)   On January 20, 2017, Lisa texted Doe saying, **"Come to lab!"**

   f)   On January 26, 2017, Lisa texted Doe saying, **"Going to lab btw!!!"**

715.    Frost ignored or tried to explain away information that impugned Lisa's credibility.

716.    Lisa was in the room, and she never made this argument herself, and it is Lisa's job to defend herself against Doe's questions, not Frost's.

717.    Frost curtailed the fundamental rights crucial to any definition of a fair hearing by intentionally omitting crucial questions, among all other factors involved, which led to the erroneous outcome. Frost's decision to not ask particular questions would be a Title IX violation if the questions caused Frost to find Doe responsible erroneously.

718.    UI's failure to ask relevant questions and failure to consider relevant evidence demonstrates its bias in favor of female students during the investigation process because they: (1) believed the complainants allegations to be true from the outset and the investigation was a foregone conclusion; (2) did not want to embarrass the complainants; and/or (3) were motivated to avoid negative publicity relating to this incident and to criticism or sanctions because UI historically does not adequately address female complaints of sexual assault.

719.    None of those texts refer a claim to be uncomfortable, accuse Doe of doing something inappropriate, or suggest fear or even unwanted contact with Doe.

720.    Those texts are at odds with her claim that Doe harassed her throughout the Fall of 2016 or that he assaulted her.

721.    This was clearly an avenue to ask reasonable cross-examination.

    a)  Why did you the texts?

    b)  Were you afraid to be alone?

    c)  Did he do anything inappropriate late at night?

722.    The texts indicated enthusiasm. These texts also clearly impeached Lisa' claim she was uneasy meeting Doe in the lab late at night and that Doe would constantly tell her to come to the lab at night. Instead of asking reasonable follow-up questions, Frost asked one opened ended softball question.

723.    In response, Lisa hesitated for a significant amount of time, and could barely answer.

724.    Frost saw no issue with her response and chose not to write in her report that Lisa struggled to answer the first (and unfortunately the only) question, regarding her desire to spend time with Doe at lab alone late at night.

725.    Doe provided text evidence of their continued contact in the exhibits.

726.    In late Fall 2016 and early Spring 2017, Lisa disclosed to Doe about her struggles and lack of happiness , and her failure to get good grades in the previous semester (s) which again, are highly unlikely actions someone would do if they did not feel comfortable around that person.

727.    Yet, Frost did not ask Lisa how, in light of the claim that Doe assaulted her and sexually harassed her, could feel so comfortable sharing her personal and professional concerns with Doe.

728.    In the end, Frost ignored and discounted the entirety of Doe's testimony. At the end of three days, she had not believed a word Doe had said.

729.    As neutral and unbiased fact-finders, UI had an obligation to weigh the quantity and quality of the information they were provided and to come to a fair and just result.

730.    In his appeal to the Board of Regents, Doe stated that Frost's conduct could be seen as harassment. This is because when questioning Doe and his friend, Mr. S.B., she asked embarrassing questions on irrelevant or collateral matters, and leading questions that were unintelligible and compound. Her questions indicated that she assumed facts not demonstrated with evidence, and she took an undue

consumption of three full working days to harass Doe. The hearing should not have taken more than a day and a half.

731.    Frost applied evidentiary rulings that were arbitrary and capricious.

732.    For example, regarding the exhibits at the hearing Frost went through the text messages Doe provided to ask him if the text messages between the complainants and him were complete because some did not have a date on them (as Doe took screenshots of them when they occurred and did not have them anymore).

733.    Yet she did not ask Lisa the same question when **she** provided the screenshot of a document on **her** computer called 'Sexual Lisa.'

734.    First, Lisa submitted this file as evidence about a week before the hearing. She sent it as an email to Ms. Cervantes with the subject "Possible evidence?" implying that she was not even sure about this. This file is undated, and Doe claimed this is inauthentic as Doe could not have and did not do such a thing on her computer.

735.    Further, the file was attached to a document on sexual assault, Doe's research topic he asked others help with in searching.

736.    Despite no evidence connecting Doe to the file, Frost used that evidence as complete and used it as evidence of sexual harassment, as that made the list for it.

**WITHHELD QUESTIONS AND EVIDENCE**

737.    Upon information and belief, UI withheld exculpatory evidence related to accommodations that UI provided Lisa when she falsely accused Doe of sexual misconduct.

738.    Doe could have relied on these accommodations to impeach his accuser's credibility during his formal hearing.

739.    Doe had mentioned the issue with UI not informing him had Lisa received accommodations in his appeal with the Board. Doe, in his own words, stated:

a)  UI never told me if any accommodations were given to Ms. Lisa because of her filing in for sexual misconduct. According to the Office of Sexual Misconduct website, one of the accommodations offered are *"Retroactive or late drops."* Other accommodations include *"excused absences"* and *"extension on assignments"* yet this is not an exhaustive list and that she could ask for more as stated in the page below. *See Iowa Accommodations at* https://osmrc.uiowa.edu/resources-victimsurvivors/victimsurvivor-options/accommodations

b)  Such accommodations create a significant incentive for students to fabricate allegations of sexual assault. It also creates a significant incentive for students to continue to pursue allegations of sexual assault even if the evidence does not support the allegations, just to ensure that they do not miss out on these opportunities. Such accommodations are not disclosed by UI in the hearing, or at any given moment, even though they would be highly relevant to the credibility of the testimony. If academic accommodations were provided to Ms. Lisa, it would be in her best interest to fully invest in the investigation in a way that if she later retracted her story, she could face adverse impact on her grades if the school work related accommodations were deemed to have been improperly obtained. Further, she would try to build a story to sound highly victimized in order to rationalize and justify why she should get such accommodations throughout her stay at UI if she ever needed them.

c)  It is also no coincidence that about a month and a half after Ms. Lisa tells me that she did poorly last semester, asking me for my help and support both in person and over text messaging as evidenced by the exhibits, that she filed in for sexual misconduct.

740.    Since Doe could not present her as a witness, Doe tried to present text messages from E.C., but Cervantes objected, citing E.C.'s lack of personal presence, and questioned the authenticity of the text messages. The Adjudicator agreed on her lack of personal presence.

741.   Facebook Messenger messages Doe provided with R.F., who was in UI's witness list, show how Doe was uncomfortable with Sally, how Sally joined the improv team Doe started despite Doe expressing his displeasure about it, and how Doe could not have been persistent about Sally.

742.   After receiving the messages, Cervantes did not include R.F. as a witness.

743.   Thus, R.F.'s lack of personal presence meant Doe could not provide these text messages.

**Frost Ignored Directly Exculpatory Evidence**

744.   Frost ignored directly exculpatory evidence. For example, at the hearing Dr. Lovaglia brought evidence of the notes he wrote in October 2016 confirming that Sally told him that the kissing that occurred between Sally and Doe was consensual.

745.   UI put this in their exhibits Dr. Lovaglia wrote: "***They** ended up kissing on the couch*," implying that Sally thought it was consensual, and those not do not contain any mention of Doe allegedly touching Sally's breast.

746.   List of people who testified at the hearing: Sally, Lisa, R.C.,D.L., E.J.,T.M.,S.B. Dr. Lovaglia, and Doe.

747.   List of people that do NOT know about the alleged touching Sally's breast: R.C. (Sally's friend since high school) stated that at the hearing she told him that night about alleged touching Sally's breast, yet he said he does not remember that), Ms. E.J. (her roommate and best friend who testified), Dr. Lovaglia, Mr. S.B., and Doe.

748.   List of people that allegedly claim the touching of Sally's breast occurred: Sally and D.L. (her boyfriend, and he did not know in the initial interview until the Investigator allowed him to change his story months later and not see any issues with credibility)

749.    Lisa only had one witness, T.M. and he did not know about Doe touching Lisa's breast.

750.    Doe could not fully explore by cross-examining either Lovaglia or Sally about what she told Lovaglia.

751.    Only Frost could, and she made no mention of this in her report.

752.    Sally's statement that it was consensual not only directly undermined her story, but also, would have Lisa's as both Frost and Stevenson used each accuser's story to corroborate one another.

753.    There was no hearing panel, and Frost had the discretion to decide the relevance of all evidence and determine whether certain types of evidence would be included or excluded in determining responsibility.

754.    Further demonstrating her own bias, Frost found Dr. Lovaglia to be credible, yet placed no weight or even mention that Sally reported the kissing was consensual or that he was surprised that it even occurred.

755.    Bias and discrimination are indicated in Frost's actions as she intentionally kept out the testimony and evidence that would have found Doe not responsible for sexual assault, with no explanation in her report why she did.

756.    The misuse of testimony by Frost contributed to a flawed disciplinary proceeding, as failing to consider evidence intentionally led to the erroneous outcome.

757.    This bias also affected the credibility determination of Lisa, who was determined credible, in part, because Sally had reported similar allegations of misconduct.

758.    Doe's two exhibits were removed due to this ruling. One exhibit was a character testimony from his advisor at UI after interviewing all the professors[18] The second letter was a note from Doe's therapist merely stating what he told her when the alleged incidents occurred and the months following[19]. She gave no reference to any scientific, technical, or professional issue, and yet it was seen as expert testimony and character evidence, and thus declined and not allowed to be put in the record.

759.    Reviewing courts, for common sense reasons, defer heavily to the initial fact finders determinations of credibility since they can observe the demeanor of the witnesses.

760.    However, exercising that discretion must be consistent with due process standard of fairness and impartiality.

761.    Frost discounted Doe's key witness as not credible since Doe did not report to his friend everything that was said.

762.    At the same time, Frost did not mention that Sally failed to mention anything about the sexual assault to Dr. Lovaglia and Lisa failed to tell her boyfriend and multiple others about the purported sexual assault.

---

[18] Department note: "I have consulted with faculty with regards to Doe's truthfulness prior to writing this letter. Faculty have multiple methods and numerous opportunities to verify the honesty and integrity of Doe. His self-reporting in the past 2 years is honest and consistent with our observation, for successful and for less successful learning experiences."
[19] Therapist note: "I have been meeting with Doe for counseling nearly weekly for the past two years. With regards to the allegations being made against Doe in the University of Iowa case: Doe did report his account of the nature of his relationship with both Lisa and Sally to me. In both instances, Doe reported that he was engaged in a dating and consensual relationship with both women. Doe felt the flirting went both ways, and the person to initiate contact came from both parties. It is my understanding that some of the interactions from Doe were perceived as inappropriate by the accusers. I know these allegations certainly came as a surprise to Doe. I can attest to his intentions from these interactions with both women, which was never to act in a way that would have been perceived as predatory or unwelcomed advances. I do not think Doe should be suspended based on these accusations. I do not feel he is a threat to anyone on campus."

763.    Of course, there can be multiple reasons not to share something, but Frost did not try to identify Doe would not share with his friend while easily coming up for excuses as to why Lisa or Sally would not report either.

## HOSTILE ENVIRONMENT AND HARASSMENT

764.    At the beginning of each testimony, Frost asked everyone where they were from. Mr. S.B., Doe's friend, testified before Doe did. With Doe's turn to answer the question, he told her he grew up in the Middle East. Doe understood a stereotype relate to Middle Eastern men being authoritarian, aggressive toward women, objectifying of them, and being sexist.

765.    During the hearing, Frost asked Doe's friend, Mr. S.B. the following question: *"Have you known John Doe to make sexist comments?"* She did not provide a context for this question. There are many issues with this question.

766.    Frost's harassment was so severe, pervasive, and objectively offensive it deprived Doe of access to educational opportunities or benefits provided by the university. It led to Doe suffering from more harassment

767.    A disparity in power formally exists between UI/Frost and Doe.

768.    In his appeals that followed, Doe notified UI and the Board about the harassment he suffered under Frost. Because of Frost's conduct, Doe suffered from more harassment from UI..

## ASSESSMENT OF CREDIBILITY AND EVIDENTIARY STANDARD

769.    Frost noted there were no witnesses and thus credibility was vital to making a finding whether Doe violated University Policy.

770.    Frost used diametrically opposed standards for evaluating the credibility of Doe as opposed to Sally and Lisa. For example, she found Lisa to be credible because she has "excellent recall" and consistent descriptions of the past occurrences.

771.    The evidence clarifies that Sally did not believe at the time, and a month after the incident in her discussion with Dr. Lovaglia, that she was the victim of sexual assault. As expected, there was no mention of touching of her breast or any other unwanted touching that could cause making her feel uncomfortable. Frost left out this critical information in her report. Frost omitted valuable information from Dr. Lovaglia's testimony.

772.    **In his final summation on behalf of Doe, his attorney, Mills, argued that UI had failed to prove its case by a Preponderance of the Evidence.**

773.    Frost disagreed by stating there was ample evidence from testimony, exhibits, and collaboration by credible witnesses to justify findings of responsibility, yet she offers no examples of such evidence in her conclusion.

## DEFENDANT FROST'S BIASED AND OFFENSIVE REPORT

774.    Frost produced a report without any page numbers, making it hard to reference, and forwarded it to the Dean of Students, Lyn Redington.

775.    Frost selectively chose information to create a narrative of fault finding with a false, incomplete, and biased report.

776.    The report cherry-picked statements from the witnesses' observations; omitted key, qualifying facts; and manipulated supporting facts. This led to a predetermined conclusion in which Frost reached conclusions that were incorrect and contrary to the weight of the evidence.

777.    In her report, Frost places no weight on the delay in reporting these assaults, the near-simultaneous reporting by Lisa and Sally, their friendship, Lisa's academic troubles prior to making the report, Sally's anger towards him after being admonished, the multiple texts initiating contact with Doe, and the tenor of those texts.

778.    Frost demonized Doe and portrayed him as sadistic, barbaric, without conscience and in the mindless pursuit of sexual gratification while she described the complainants in terms of "innocence" and purity.

779.    For example, Frost, without any statement about a fantasy, stated that Doe version as to what happened with Lisa as a "fantasy," yet believed Lisa's portrayal of him as a sexual predator with no regard for people's feelings. By believing so, Frost is advocating gender stereotypes that propose that women are not aggressive during sexual encounters as Doe had described Lisa to be.

780.    By believing so, Frost is advocating gender stereotypes that propose that women are not aggressive during sexual encounters as Doe had described Lisa to be.

781.    Yet, the Department of Education's Office for Civil Rights states: "*Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially."*

782.    Frost even included a Christmas greeting as evidence of sexual harassment. For example, Doe, provided text messages of him wishing Lisa Merry Christmas and saying he hopes she enjoys her time with her family

783.    Lisa replied that she did and said she got many gifts.

784.    Doe asked Lisa what the cutest gift was that she received.

785.   Frost used Doe's comment of what was the cutest gift she received from her family as evidence

for sexual harassment and held him responsible for it.

## F.   FORMAL HEARING OUTCOME REPORT

786.   **LISA ROE**

(i)   **Responsible for Sexual Assault**. Frost found that Doe "sexually assaulted" UI
student Lisa Roe by engaging in acts of sexual intimacy without obtaining prior
consent."  "By kissing Lisa Roe without her prior consent, and caressing her breast
without her prior consent in the SURG lab at the UI – John Doe violated the
University's Sexual Misconduct Policy, Chapter 2.2; Chapter 2.3(1)(e)(3)&(4)."

(ii)   **Responsible for Sexual Harassment.**  Frost found that Doe "sexually harassed" UI
student Lisa Roe in the Fall of 2016 and Spring of 2017 with persistent, repeated and
unwelcomed efforts to develop an intimate relationship; with repeated and unwanted
sexual attention; and by limiting her educational performance, in violation of Chapter
2.2; Chapter 2.3(f)(2)(a)(b)&(c).

(iii)   **Responsible for Consuming Alcoholic Beverages** and Possession the Same in the
SURG Lab on August 31, 2016, in violation of UI Coe Rule 17 and 13.

787.   **SALLY ROE**

(i)   **Responsible for Sexual Assault** Frost found that because of these "non-consensual
acts" on September 2, 2016 – kissing Sally Roe without her prior consent, and
touching her breast over her bra once without prior consent in Doe's off-campus
apartment – Doe violated the University's Code of Student Life Sexual Misconduct
Policy – Chapter 2.2; Chapter 2.3(1)(e)(3)&(4).

(ii)   **Responsible for Sexual Harassment.**  Frost found that Doe "sexually harassed"
UI student, Sally Roe, with persistent, repeated and unwelcomed efforts to develop
an intimate relationship; with repeated and unwanted sexual attention; and by
limiting her educational performance in violation of Chapter 2.2; Chapter
2.3(2)(f)(a)&(c).

(iii)   **Responsible for Possession of Alcohol**.  John Doe possessed and consumed
alcoholic beverages (beer) in the SURG lab at Seashore Hall, a University building
on the main Iowa City campus, in the presence of UI student Sally Roe in violation
of Rule 17 that prohibits possessing and/or consuming alcoholic beverages on

campus; and Rule 13, which requires all students to adhere to the University's rules and policies.

**REPORT REBUTTALS**

Doe provided rebuttals in his appeal to the Board. Doe renews his rebuttals he wrote to the Board in his appeal about Frost's report:

788.   "*John Doe is obfuscating his role – trying to downplay or minimize the actuality of his leadership position within the structure of the SURG lab in the Fall Semester 2016*"

At the hearing, Dr. Lovaglia explicitly said I was confused about my role in the lab. He then took responsibility for not orienting me to it earlier. I testified that I was not given any position or role. Frost left out that evidence.

789.   "*For the new recruits to the lab, John Doe had an educational leadership role. He helped undergraduate students obtain the IRB certification necessary for conducting research*."

I was not in any educational leadership role, nor has they have ever told me I was in one. Merely giving someone a link to a website does not put me in such a role. It was disingenuous for Frost to assume that. Please look at Ms. Stevenson Earl's report (which Frost had access to as it was in exhibits) as this would clarify it. Ms. Stevenson Earl wrote: **"*The evidence does not indicate that John Doe's role in the lab was in the instructional context. Information received from Dr. Lovaglia does not indicate that John Doe instructed, evaluated, or supervised directly or indirectly, Complainant's, or any other lab members', research. The evidence indicates that any lab member can run the meetings and conduct research at any time in the lab.*"**

790.   "*Sometimes, John Doe's texts were stern or authoritarian: "Lisa, for future reference, let me know if you can't make it in advance.*""

Frost does not intentionally provide the context of this text message to find me "authoritarian." The full conversation, which took place in December 2016, would show I had an exam that day and pulled an all-nighter for it. Lisa asked me to come to the lab that day, and despite a lack of sleep, I got up, as a good friend, and went to the lab the time she told me to arrive to see what she needed help with. Lisa then texted, saying she cannot make it, unfortunately. I have the right to tell someone they should not tell me to come to the lab if they know they cannot make it, or at least give me a heads up if they cannot make it before the meeting time. There is a stereotype associated with men from the Middle East as being authoritarian. After knowing this information, Frost used this stereotype against me.

791.    *"On the second occasion, in December 2016, Lisa arrived at the lab, again prepared to work, when John Doe announced that he was hungry and urged Lisa join him for dinner at Chipotle. John Doe asked Lisa once to join him for dinner in October 2016 at Buffalo Wild Wings; she declined"*

Again, Frost selectively took information from another day and merged it with this day to make me look bad. Lisa was in the lab when I arrived at 4 p.m.  From 4 p.m. to 9 p.m., Lisa and I worked together on my data entry, and I also helped her out with her resume. At 9 p.m., I said I was hungry and suggested we grab dinner. Lisa agreed. It is not unprofessional to ask if Lisa wanted to come along to dinner. At no point was I told that I could not eat with someone from the lab. None of these were "romantic" even if Lisa would try to have us believe it was. Second, I never asked Lisa for dinner at Buffalo Wild Wings in October 2016 and at no point did she decline to eat with me. Exhibit G-3 (and G-4) referenced by Frost were entered by me in his exhibits to show an occasion when I went to Buffalo Wild Wings with Mr. S.B. and uploaded a picture of myself on Facebook. Lisa, who at this time said that she was apparently traumatized and would avoid me, left a playful comment on the picture  Frost was supposed to ask why Lisa was leaving playful comments on my Facebook days after she was allegedly sexually assaulted. She obviously did not, and somehow managed to make this my problem.

792.    *"John Doe brought cans of Miller Lite beer to the SURG lab, and when Lisa declined to drink the can John Doe brought for her, John Doe suggested she pour the beer into her water bottle. Lisa complied. John Doe consumed his beer in Seashore Hall. When Lisa left the lab, she met Mr. T.M. who watched as she poured the beer into the bushes between Seashore Hall and Van Allen Hall. An underage Lisa did not want to carry the beer in her water bottle."*

This incident never happened, and neither Lisa nor Mr. T.M. testified to this. Frost, as she has done throughout, selectively merged Sally's story with Lisa's to artificially create a pattern of behavior when there is none. All this influences Dean Redington's decision-making when she reads it.

793.    *"John Doe took video footage on his cell phone of Lisa without her knowledge or consent."*

Frost overlooked the evidence in the exhibits where Lisa in the interview [with Stevenson Earl] said that she knew about the video.

794.    *"It is the opinion of this Adjudicator that Sally was groped against her will"*

The evidence does not suggest it, and the Adjudicator gave no reason for this conclusion. Again, Frost shows us her bias.

795.    "*Mr. S.B. testified that John Doe said he was "very excited" to have gone on this date with Sally, but there was no testimony about the intimate details of the date, despite Mr. S.B.'s testimony he and Doe shared the intimate details of their lives.*"

He testified about the kissing. That is all that happened regarding intimacy. It seems like its frustrated Frost that she can find no evidence regarding the alleged touching of Sally's breast incident and is trying to put this burden on Mr. S.B. unfairly in her report.

796.    "*It should be noted that John Doe continues to work with students/clients with disabilities, a vulnerable population, as part of his counseling duties in the UI Department of Education.*"

This is appalling and unprofessional from Frost. Redington gave Frost the job of a fact-finder, not someone who determines what I mean to the entire society at large based on her biased investigation. That is the responsibility of others, typically people higher than her, to make. She was not given this power. The UI's Student Judicial Procedure (2016-2017 academic year) states the following for Adjudicator Decision: *The written decision shall summarize the findings of fact, identify rules violated, and determine whether the accused student is responsible for violating University policies*. Frost held me to the standard of a state-licensed counselor when I was merely a counseling student. I had four supervisors, and I was always under supervision with every session I had with a client. In a counseling environment, I know what my roles and duties are, and what the ethical and state laws are. The American Counseling Association Code of Ethics outlines what is expected of me. In this lab, none of that is present.

797.    When speaking of Lisa, Frost wrote this: "*She did not want to quit working at the lab because she believed it could enhance her educational mission, yet she tried to negotiate daytime hours at the SURG lab, and she found herself making excuses for her inability to attend lab hours in the evenings. Sometimes, her friends would accompany her to the lab, so she would not have to be alone with John Doe.*"

[a]t no point did Lisa ever have her friends accompany her to the lab, so she would not have to be alone with me. This was not in her or her witness testimony and is something Frost fabricated to get me expelled. UI is defending a lawsuit where the Adjudicator has no issues fabricating facts.

## G.        DEAN OF STUDENTS – DEFENDANT LYN REDINGTON

**DISCRIMINATORY SANCTIONING:**

798.    Dean of Students, Redington, redacted Frost's report and forwarded a copy of it to Doe and wrote

that he was expelled from the university.

799.    Doe renews his argument he has written in his appeal to the Board:

> Frost finds me responsible for sexual assault because of the *Sexual Misconduct Policy Chapter 2.3 (1) (e). Sexual Assault - 4. Any other intentional unwanted bodily contact of a sexual nature*. This is an ambiguous and overbroad policy that too easily encourages administrative abuse as it relates to power, arbitrary application, and injustice, which has happened here. How is an intentional unwanted bodily contact of a sexual nature defined? Which part of the body does this apply to? What is considered contact of a sexual nature? It seems like UI effectively may define these terms differently in each case in its absolute discretion and without notice. Such policies make it almost impossible for a student to be found not responsible of sexual assault, once charged, as even if that student is found not responsible for groping or penetration, UI can rationalize any form of touching to be an intentional unwanted bodily contact of a sexual nature. Such policies are unacceptably prone to arbitrary enforcement by UI, and it is troubling because it does not distinguish kissing without verbal consent and sex crimes, thus equating kissing without verbal consent with rape. This undermines sexual assault and makes campus less safe for women not taken seriously when a true sex crime does occur.

> Due process requires that rules must be written with enough clarity that individuals have fair warning about prohibited conduct and that courts have clear standards for enforcing the law without arbitrariness. Such vague rules and policies are biased and implicate constitutional protections. Further, such ambiguous policies would disproportionately harm innocent minority students, given the criminal justice system's history of bias against black/men of color accused of sex crimes.[20]

---

[20] Trachtenberg, Ben, *How University Title IX Enforcement and Other Discipline Processes (Probably) Discriminate Against Minority Students* (December 14, 2017). 18 Nevada Law Journal 107 (Fall 2017); University of Missouri School of Law Legal Studies Research Paper No. 2017-22. Available at SSRN: https://ssrn.com/abstract=3035999

800.    Male students of color are "vastly overrepresented" in the cases, Yoffe has tracked. Janet Halley, a professor at Harvard Law School and a feminist, addressed the role of race in a 2015 Harvard Law Review article, *"Trading the Megaphone for the Gavel in Title IX Enforcement:*[21] [22]*"*

801.    UI defines sexual harassment as: persistent, repetitive, or egregious conduct directed at a specific individual or group of individuals that a reasonable person would interpret, in the full context in which the conduct occurs, as harassment of a sexual nature, when:

- Submission to such conduct is made or threatened to be made explicitly or implicitly a term or condition of employment, education, on-campus living environment, or participation in a University activity; or
- Submission to or rejection of such conduct is used or threatened to be used as a basis for a decision affecting employment, education, on-campus living environment, or participation in a University activity; or
- Such conduct has the purpose or effect of unreasonably interfering with work or educational performance, or of creating an intimidating or hostile environment for employment, education, on-campus living, or participation in a University activity.

The proposed new Title IX rules state that universities should use the Supreme Court definition, which is:

---

[21] "American racial history is laced with vendetta-like scandals in which black men are accused of sexually assaulting white women," followed eventually by the revelation "that the accused men were not wrongdoers at all." She writes that "morning-after remorse can make sex that seemed like a good idea at the time look really alarming in retrospect, and the general social disadvantage that black men continue to carry in our culture can make it easier for everyone in the adjudicative process to put the blame on them."

"But as the definition of sexual assault used by colleges has become broader and blurrier, it certainly seems possible that unconscious biases might tip some women toward viewing a regretted encounter with a man of a different race as an assault. And as the standards for proving assault have been lowered, it seems likely that those same biases, coupled with the lack of resources common among minority students on campus, might systematically disadvantage men of color in adjudication, whether or not the encounter was interracial."

I've assisted multiple men of color, a Dreamer, a homeless man, and two trans students" Professor Halley was quoted in the New York Times. "How can the left care about these people when the frame is mass incarceration, immigration or trans-positivity and actively reject fairness protections for them under Title IX?"

[22] *I'm a Democrat and a Feminist. And I Support Betsy DeVos's Title IX Reforms,* New York Times

62 FR 12041, "conduct of a sexual nature is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from the education program, or to create a hostile or abusive educational environment"

## ACCOMMODATIONS

802.    Doe is part of the international student community, which represents only about 10% of the student body.

803.    UI has been expelling about one student per year. Trying to make sense of the discrimination he had experienced at UI, Doe interviewed other international students and found information regarding it.

804.    Upon information and belief, an international graduate male student from Asia, specifically (redacted), named A.V. was expelled from UI for nonviolent sexual misconduct about a year before Doe was expelled.

805.    Expulsion seems extreme for what seems nonviolent sexual misconduct. Upon information and belief, there appears to be a pattern among UI's investigation where international male students from Asia are being overrepresented and expelled, the harshest treatment available.

806.    This is because Asian male students are handicapped when it comes to appealing and taking legal action - As soon as they are expelled, their visa becomes invalid, and they must leave the country immediately, making it extremely difficult for them to appeal the process, gather money for legal services, and file a complaint in Court. Further, many countries from Asia are predominantly Muslim countries, and it becomes extremely difficult for such male students from these countries to obtain a new visa after they have been expelled from their universities because of sexual misconduct, making it difficult for them to sue their universities.

807.    Upon information and belief, UI takes advantage of this, so they can share their statistics to show the Office of Civil Rights (OCR) they have been taking sexual misconduct seriously without the headache and publicity that comes from the expelled male students fighting back through lawsuits.

808.    Doe's sanction of expulsion was incredibly harsh, given the circumstances and UI's history with such allegations. According to annual reports produced by UI, for the school year 2013-2014, of the 18 reports made involving unwanted physical contact of a sexual nature, **six involved forced penetration**. The final sanctions included **one student** expelled from UI.  For 2014-2015, **of the 21 reports involving unwanted physical contact of a sexual nature, a majority involved forced penetration.** UI expelled only **one student** this year.  *See report a*t https://dos.uiowa.edu/policies/reports/

809.    Reports state only two people have been expelled since 2015 at UI.

810.    Showing that Doe has not just been discriminated against because of his gender, but because he is an international student from Asia **UI carried out 26 investigations regarding sexual misconduct in the 2017-2018 academic year, the year he was expelled. Of the 26, 15 were of sexual assault,** and 11 were sexual harassment.

811.    Yet, according to their data, only **one student** was expelled in the academic year, Doe – an international student, indicating that the expulsion was extreme and biased. *See annual report at* https://dos.uiowa.edu/assets/Uploads/2017-2018-Annual-Report-Final.pdf.

812.    Upon this realization, Doe had brought this issue to the attention of UI and the Board in his appeal. Doe renews his argument:

> "After reading the above statistics in the UI report, if UI still state that expulsion matches the severity of the crime UI found me responsible for, I would ask them to consider how offensive it would be to all the complainants that came before them at the university and reported rape as they have many times showed by statistics above, only to get sanctions

for the people found responsible less than expulsion, since UI hardly hands out expulsions. We must be concrete and objective when dealing with such things, but it seems like UI is becoming increasingly subjective, one where feelings and emotions take over rationality, when dealing with sanctions."

813.    Upon information and belief, similarly situated women have been penalized to a lesser degree for a similar offense.

814.    Upon information and belief, similarly situated white male students have been penalized to a lesser degree for a similar offense.

815.    Upon information and belief, individual decision-makers such as Defendant Stevenson Earl and Defendant Frost, and/or Defendant Redington altered their disciplinary decisions based on the identity of Doe being male, and because of Doe being an international male student from Asia.

816.    Upon information and belief, individual decision-makers such as Stevenson Earl, Frost, and/or Redington enhanced both the charges against and the discipline imposed on Doe because of being an international male student from Asia.

817.    As it relates to sanctions, The Dean of Students, Redington never gave a rationale for why Doe was expelled in her letter. **University policies state that "The Dean's sanction letter shall include a rationale explaining why the chosen status sanction was selected over an alternative."** *See Student Judicial Procedure at* https://dos.uiowa.edu/policies-16-17/student-judicial-procedure/

818.    Expulsion is the academic equivalent of a death penalty. This violated not only university policies but Doe's Constitutional and Title IX rights, which includes, but is not limited to, the failure of UI to provide any written explanation detailing how or why Redington, reached her extreme decision.

819.    UI arbitrarily and capriciously dismissed Doe.

820.     Redington failed to act under university procedures designed to give accused students a due process. This is evidence of flawed procedures.

821.     The sanctions ordered by her did not consider that Doe had a previously unblemished disciplinary record at UI and that he essentially had an entire department at UI support his character and integrity.

822.     The Dean of Students sanction letter stated:

> Effective immediately, you are not permitted to enter University of Iowa property at any time for any reason **without my written permission**. In the event you were to violate campus prohibition order, University Police would be called, and you would be subject to arrest for Criminal Trespass."

823.     Toward the end of the letter, it states: "*If you are seeking emotional support, please contact University Counseling Service at 319-335-7294.*"

824.     If Doe wanted to confidentially speak to a counselor at University Counseling Service, while his appeal was being considered, he would have to go to the University Counseling Service building at Westlawn, which is a University of Iowa property, a property he is not permitted to enter, so this was confusing.

825.     Doe emailed the Dean of Students, Defendant Redington, with a personal letter **addressed just to her**, along with attachments that included copies of the letter from his therapist and his department, on October 17, 2017.

826.     In the personal letter, Doe informed her he had issues with the decision of the Adjudicator. He then asked for her written permission by writing "*During this time, I would request that I have access to the University Counseling Service and the rec center so that I can continue to take care of my mental and physical health during this stressful period.*"

827.    Redington ignored Doe's request, and instead replied with a message indicating that she would be closed off to the concerns by writing:

> "[A]s you know, the deadline to appeal my decision and sanctions is October 24. If you choose to do so (or if these are your final appeal documents), I will forward everything to the provost for their consideration."

828.    Redington had shown indifference for Doe's rights and his mental and physical health.

829.    UI had no issue charging Doe full tuition for the semester yet failed to provide him with the necessary health services he is entitled to. By doing so, she has caused immense suffering on Doe's part.

830.    Doe's depression was so bad, he had seen a psychiatrist at this point to be put on an antidepressant. Being falsely accused of sexual assault, found wrongly responsible for, where one loses their career, is a terrible and vulnerable situation for anyone to experience. During this critical period, UI had neglected Doe.

831.    Doe had no one to turn to as he has no family in the U.S. Doe wanted access to University Counseling Service in particular because he has counselors there who know him, understand him, and thus have a strong rapport with him, making him feel safe in sharing what occurred, and what he was going through.

832.    UI demonstrated sufficiently significant questions regarding breached duties while instituting and prosecuting Doe's investigation.

833.    Upon information and belief, after Doe complained in his appeal about not having resources available to him during UI's Judicial Process to the Board, UI included "resources for respondents" on the sexual misconduct website where they now have included that respondents will have the same resources as complainants.

834.    Redington imposed the harsh penalty of expulsion even though both Sally and Lisa's actions dictate they were not afraid of Doe or needed to be protected from him by the standards of any reasonable person. This is evidenced by the fact that they both have hung out with him alone multiple times for months, usually late at night/early mornings after the alleged incidents.

835.    UI's led Doe to start a new semester before getting dismissed right away with a massive bill of over $21K to pay. UI keeps emailing/calling Doe to pay off this amount.

836.    Doe developed alcohol dependence after being expelled from UI and not being provided with mental health services requested. He was drinking every day and had a difficult time controlling his alcohol intake. He felt hopeless. Because of concerns with liver damage, Doe quit drinking alcohol on June 28, 2018. He has not touched alcohol and has been sober since.

837.    Doe started working full time in September 2018 for a nonprofit day care program for people with disabilities. He has been helping people with severe behavioral issues in becoming more independent in their lives. Frost, in her report, wrote as if he was a threat to people with disabilities when Doe told her that was the population he works with in counseling. Doe remains committed to helping people who are less fortunate than him.

## H.    INTERNAL APPEAL – UI OFFICE OF THE PROVOST – DEFENDANT JOHN KELLER

838.    According to UI policies, both the complainants and the accused student may appeal. Appeals are limited to:

(A)    The decision was unsupported by substantial evidence when viewed as a whole.

(B)    The decision was arbitrary, capricious, unreasonable, or constituted an abuse of discretion.

(C)    The sanction was unreasonably harsh in the light of the circumstances.

(D)  New evidence, not reasonably available at the time of hearing, warrants reconsideration.

839.  Doe appealed on all grounds and filed a timely appeal within the ten days provided after the report is released.

840.  In his appeal Doe highlighted that he was not provided an adequate opportunity to defend himself and explained how he was stopped from sharing his truth and now wished for the chance to state the truth he could not earlier.  Doe was not given sufficient opportunity to go over his exhibits and articulate relevant concerns and issues and salient opinions.

841.  To be brief, Doe had raised these important points in UI's internal appeal. Doe renews his arguments:

a)  I believe that this is the first proper opportunity where I am truly getting to express my side of the story, after the complainants have shared theirs, without having leading questions thrown at me or have my answers devalued. Until now, it felt like I was a perpetrator without given a realistic chance to defend myself.

b)  Please note that to investigate the claims, it is vitally important to get the Equal Opportunity and Diversity (EOD) investigative files, as they give the complete story of each person involved in this investigation, and thus give me a fair process.

c)  Frost asks me if he had verbal consent to kiss, with no further follow-up question, and decided that it was enough to be considered sexual assault. Frost did not even bother asking me if there were clear, unambiguous signs, which is included in the sexual assault policy.

d)  The idea that an Adjudicatory process should be fair to both sides is about as basic as any facet of American law can be. As shown through plenty of examples in this letter, anyone that uses a system biased toward finding a student responsible for sexual misconduct, as Frost and Ms. Stevenson Earl did, commits gender and/or other forms of discrimination.

e)  My attorney and I assembled a list of questions for the Adjudicator to ask on my behalf, and the Adjudicator highly edited and changed the questions to be biased in favor of the complainants, and she has ignored and failed to ask questions provided we thought were important as well.

f)    The sanction was unreasonably harsh in the light of the circumstances. Expulsion from the university will result in devastating consequences for my future. I have been a student of the UI since 2008. During this time, I have had no issues of any type, let alone of the nature of the allegations that have been put forth against him. Currently, I only have two months remaining of my graduate studies on campus.

g)    Being expelled for sexual violation can prevent me from achieving my dreams and may permanently bar me from many professions. My values of helping people, of advocating for the rights of the less fortunate, and using my knowledge to be a catalyst for creating change in both personal and societal level has attracted me to the field of counseling. An even harsher consequence would be forcing me to pack his belongings leave the United States and be sent to a country I have never lived, am not fluent in the local language, and do not have any immediate family in.

h)    Depriving me of higher education opportunities, and thus, my career, should not be done lightly, and therefore, my due-process rights should be protected. Unfortunately, from the way the investigation has been carried out thus far, it seems like just an accusation of wrongdoing can derail a person's entire college education. The investigators were not objective fact finders, and the vital information they were leaving out in their investigative files from their reports seemed like they were assuming I was guilty from the beginning, and cherry-picking evidence to prove their point.

i)    As I mentioned above, even if you accept the findings of the Adjudicator, I believe the interim sanctions that the charging officer and the Dean had in place for over 8 months while this matter was investigated and prosecuted adequately protected the complainants and the University community as a whole, and if left in place until I completed my coursework on campus (at the end of this semester), would fairly and adequately balance the interests of all the parties. At that time, once I completed my Master's degree, I would voluntarily leave the UI and attempt to pursue my doctoral degree elsewhere.

## UI'S OFFICE OF PROVOST APPEAL DECISION:

842.    The decision of Redington is appealable to a single faculty member. This individual, who is the Provost, and Dean of the Graduate College, John Keller, supposedly reviewed all the facts. Keller then determined to uphold the decision answering none of the legitimate questions Doe raised in the appeal.

843.    No rationale was given again for the expulsion or the rejection of the appeal.

844.    Keller showed deliberate indifference to the legitimate concerns Doe raised in his appeal, including raising the point of discrimination based on his "gender and/or others"

845.    Doe addressed the way the Keller treated him in the following appeal to the Board by expressing that he found a purpose higher than himself:

> "This made me feel like no one in UI was listening to me or my concerns. I am not writing this appeal just for myself. I am also writing this appeal to put light on UI's biased investigation, hoping that I can make UI aware of this, so that the people that come after me get a fair due process and never have to go through such injustice again."

846.    After the appeal, Doe and Dr. Lovaglia had a meeting at a coffee place downtown Iowa City after Doe had asked him for guidance.

847.    Doe noticed that the relationship between Dr. Lovaglia and Doe had changed permanently, which altered his hopes of a mentorship and recommendation letters from a professor with whom he had developed a relationship over many years.

848.    In the meeting, Doe had informed Dr. Lovaglia how the Adjudicator was racist and sexist, and that UI does not even expel students found responsible for rape, yet how he was expelled for conduct much less serious that UI had even found him responsible for.

849.    Dr. Lovaglia agreed with Doe that the sanction given to him did not match the severity of the conduct Doe was found responsible for. He did not support the sanctions that UI handed Doe.

## I.      IOWA BOARD OF REGENTS APPEAL

850.    On December 11, 2017, Doe, representing himself, timely appealed UI's decision to expel him and sent his appeal to the Board executive director, Mark Braun.

851.    Doe's appeal outlined the harshness of the expulsion and his desire for his appeal to be heard:

"I am an international student, and that since an expulsion is the most severe penalty the UI can issue (and the expulsion is in effect a "deportation" since I cannot stay in the US), the Board should review the matter."

852.    Doe appealed on the grounds of:

    1.    Not supported by substantial evidence in the record
    2.    Arbitrary and capricious; and/or
    3.    Unconstitutional or otherwise contrary to law, including procedural irregularities or deficiencies materially prejudicial to the Appellant.

853.    Doe explained that he had never lived in Country One, that he does not have family there and is not fluent in the language.

854.    Doe stated that he felt fearful of being deported to Country One and gave detailed evidence through credible media sources of how extremist groups such as ISIS have targeted people like him recently, including Country One citizens who studied in the United States, and people who voice liberal views and opinions.

855.    Doe said there was disagreement in facts and said:

"I also have significant issues with the outcome. Most of the issues I have are that it is unconstitutional or otherwise contrary to law, including procedural irregularities or deficiencies materially prejudicial to the Appellant, which I will be talking more about in my written briefs if my appeal is accepted. I have previously questioned the fundamental fairness of this hearing and due process."

856.    Levin, UI general counsel, and thus a UI employee, was given the responsibility to represent UI in the Board appeal. Levin was also given the power to request a stay for Doe if he deemed appropriate.

857.    On January 16, 2018, after reviewing the in disciplinary process, Levin had an opportunity to grant Doe a stay by writing to the Board. Instead he wrote against Doe:

Appellant has not established a strong likelihood of success on the merits such that a stay is warranted. He presents no argument that the University's decision to hold him

responsible based on a preponderance of the evidence for violating University policies was not supported by substantial evidence, was arbitrary and capricious, or was unconstitutional or otherwise contrary to law."

858.    The instructions for the Board's "Notice of Appeal" clearly said: *3.A.vi. Identification of the basis or bases of appeal* was required for this stage of the process. It did not ask to provide arguments. The "written brief" that follows is where one must present the arguments.

859.    Levin stated that whether Doe gets deported upon expulsion from UI should not be considered when deciding if he will be irreparably harmed. He concluded by saying that Doe's request for stay should be denied and the University's decision to expel should be upheld.

860.    On January 23, 2018, as it related to decision on request for stay, Braun repeated Levin, as he did throughout the appeal, and also said that Doe had not established a strong likelihood of success on the merits of his appeal.

861.    Braun then repeated Levin's message by saying that Doe did not directly dispute the alleged misconduct other than to challenge, without explanation, the constitutionality of the outcome, the severity of the sanctions, and the fundamental fairness of the process.

862.    As it related to irreparable injury, Braun said that if deportation to Country One could rise to the level of irreparable injury, Doe had not presented sufficient evidence that his visa status has been impacted or is likely to be impacted if a stay is not granted.

863.    Doe had said that expulsion would mean he lose his F-1 visa. Losing a visa meant that visa status is impacted.

864.    Braun then said that Doe's visa status and his deportation to Country One is speculative.

865.   On February 20, 2018, Doe submitted a timely, well-researched, evidence-based, written brief to the Board.

866.   In his brief, Doe expanded upon my grounds of appeal and detailed his issues. The issues specified in this Complaint were also in Doe's written brief. Thus, Levin, and thus UI, knew of these issues in this Complaint.

867.   Doe knew that Levin is a UI employee and stated that he was giving Levin an opportunity to reverse the decision and grant him a stay, who had the option to request the Board a stay. Doe had written throughout the brief he did not want to sue.

868.   Examples included in the brief have been provided throughout this Complaint. Doe renews his arguments for all examples he included in his appeal to the Board, including but not limited to:

a)   At the time of my dismissal, I only had two months remaining on campus to graduate before doing my internship for a semester off campus. I had a clean disciplinary record until this investigation and the expulsion that it resulted in. Unless the expulsion is overturned, the sentence will remain a part of my permanent educational record. My transcript will permanently show the statement: *"Not Permitted to Register – Dean of Students."* This will substantially limit my ability to transfer to another institution, get a doctoral degree, or secure future employment.

b)   The Department promulgated the new guidance specifically to protect the due process rights of accused students and ensure fundamental fairness to all parties, but UI unfortunately ignored and continues to ignore these rights.

c)   If UI cared about sexual harassment or sexual touching or *"assaultive behavior,"* which Ms. Frost considered, without being gender biased, it would have investigated Ms. Sally's touching me first and not put the burden on me to gain consent. Specifically, UI would have investigated if Ms. Sally did, in fact, tickle me first and if she earned my consent before doing so. UI showed absolutely no concern for such a thing.

d)   If what occurred between us is not seen through the lens of a friendship that involved constant teasing and banter, there are many instances where Ms. Sally harassed me which are either in the exhibits or have been testified to. For example, she tried to kick a trash can

near me outside of the lab while we were waiting for the lab to be opened (she thought this was funny), she kept talking about stories about sex with me, including stories about her *"ghost roommate"* and refer to sex as *"getting dicked down"* and she did all this in an educational setting as the lab. She constantly harassed me about being skinny and one of the conversations about her making fun of me for skipping the gym (arm day) is in the text message exhibits.

e)    This created a hostile environment. Ms. Sally never denied any of these things, in fact, she tried to keep quiet about them as much as possible even though these are in the exhibits. UI had knowledge of this as I had shared most of this in the EOD interview. I even tried to get some of this information in the hearing even though Ms. Frost did not ask questions regarding it. Yet, UI had shown absolutely no concern about Ms. Sally harassing me nor asked me anything regarding how I may have felt and if I wanted this to be investigated. I believe that if the genders were reversed here, UI would have acted differently.

f)    At no point did any of the investigators think to wonder the improbability of an alleged "victim" by then choosing to drink alone multiple times at night with someone after he allegedly told her that he wants to "put a collar around her neck, have sex with her and treat her like a dog."

g)    I vehemently deny all of Ms. Lisa's claims. Her claims are false, and she has provided no evidence to back her claims, while I provided plenty to refute them. I am absolutely not responsible for any of those allegations that she is claiming.

h)    It is essential to differentiate among the offenses, and it seems like UI erases the distinction between categories of behavior as it relates to sexual misconduct, even if their vague policies do not directly do so.

i)    I know that public universities are obliged to treat similar cases in a similar way under the Fourteenth Amendment's guarantee of "equal protection of the laws," which requires that the government apply the same rules in a standardized and consistent manner to people in similar circumstances.

j)    If a college student is to be marked for life as a sexual predator, it is reasonable to require that the student is provided a fair opportunity to defend themselves and an impartial adjudicator to make that decision.

k)    While I understand the premise behind "start by believing" in that women were not listened to or heard, and thus not believed throughout history when they came forward with complaints, and while I am by no means minimizing the continued challenges women face today despite the advancements we have made, the advancements have made it easier for women to come forward to report.

l)      There are no policies in the UI's Student Judicial Procedure that state that witnesses must be present in order to provide text messages I had with them as evidence.

m)      It is my belief that Ms. Cervantes, and thus UI, after seeing the Facebook messages I put with Mr. R.F. in the exhibits were clearly in my favor and supports my version of the story than Ms. Sally's, especially regarding the fact that I was avoiding her in the Fall semester and had issues with her joining the improv group I started, decided at the hearing that she would not call him

n)      It feels as if this system is built in a way such that the respondent is inevitably stripped of all due process.

o)      On 11/18/2015, a student in UI who took RHET1058 with made the following comment about her [Frost]:

    *"At first, I really liked her. She's a lawyer in Iowa City, and since the course is based on pre-law and criminal justice, she knew what she was talking about. However, when we started getting into racial issues, she was very uneducated. She disregarded the opinions of the very few student of color. She said many problematic things during the course"* See: Iris Frost on ratemyprofessors.com

    As a student of color, I had a similar experience with her. She disregarded not just my opinions but facts and evidence as well.

p)      "The rejection of my appeal by the Office of Provost hurt because my legitimate questions remained unanswered on why evidence was kept out, why I was not allowed to defend against the full policy of UI's consent, and why important questions were not asked among many other things. The outcome of the appeal did not answer any of the questions I raised and just let me know that no violations were found, and that the sanction was not harsh

q)      I hope that the Board can remedy a solution to this disaster, one that does not unnecessarily prolong this investigation. I do not think that I am asking for much. The most important thing that I am asking for is being allowed to finish the one semester I have remaining on campus so that I can get a degree and that the monies spent on obtaining a college education are not lost, and the real sacrifices made by my family from halfway across the world so that I could receive a quality education are not wasted.

869.    UI, Levin, and the complainants had 20 days to respond and reply to the written brief.

870.    Levin asked for multiple extensions and still failed to submit his written brief timely. Levin finally emailed Doe at 3 a.m. on April 3, 2018 and attached UI's written brief. He gave no explanation for submitting late and past the deadline.

871.    Levin wrote a brief that was a little over 3 pages. Levin overlooked Doe's serious concerns.

872.    Levin took Doe's grave concern of losing his visa and expressing that to the Board as *"playing to the sympathies of the Board."* Levin then continued to harass Doe and said *"Doe has made his bed and now he must lie in it"* to conclude his statement on Doe losing visa and having credible fear of deportation, and his physical safety.

873.    Levin concluded: *Doe has not met his burden of proof on appeal. Therefore, the Board should affirm the final institutional decision.*

874.    Doe, in his written brief, explicitly clarified that he was giving Levin the opportunity to reverse the decision. Levin had knowledge of the misconduct Doe faced. Rather than accepting Doe's invitation to correcting the misconduct, Levin further harassed Doe by minimizing his credible fears, attacking his character, misrepresenting the sexual assault policy by including hugs in it, misrepresenting how UI applies its retaliation policy, and blatantly providing false information on Frost's involvement at UI.

875.    The Board website states that following review of the appeal, the Board may affirm, modify, remand or reverse all or any part of the final institutional decision. It also states that the decision of the Board of Regents represents final agency action.

876.    On June 11, 2018, Doe received the Board's decision in his email. All the letter said was:

> "The Board of Regents considered the appeal of Doe on Wednesday, June 6, 2018. **The Board voted to affirm the final decision of the University of Iowa in its entirety (8 in favor, 0 opposed, 1 absent):** John Doe may seek further review of this decision as permitted by Iowa Code Chapter 17A."

877.    The Board failed to give a rationale behind their decision to affirm UI's decision in its entirety.

135

878.    Since Doe had made UI and the Board aware by threatening with a lawsuit due to the gender and race/national origin discrimination he faced, and since UI and the Board showed indifference to his detailed allegations.

879.    UI and the Board showed that it had failed to serve the vital public interest.

## J.    RAPE CULTURE

880.    The standard definition "rape culture[23]" was offered by Emilie Buchwald in her influential anthology *Transforming a Rape Culture* (1993). She called it

> "A complex set of beliefs that **encourage male sexual aggression** and **supports violence against women**. The 1-in-4 or 1-in-5 figure for the rate of sexual assault is a bastion stat of the rape culture[24].

881.    In the past few years, publicity about rape culture and the campus rape crisis have created widespread anxiety over rampant violence committed by college men participating in entrenched norms- anxiety that justifies top-down punitive intervention and moves women to live in fear or at least stress.[25]

---

[23] Kate Millett's *Sexual Politics* (1968) argued that women had been "confined to the cultural level of animal life" by men who used them as sexual objects and breeding stock. Susan Brownmiller's wildly successful book, *Against Our Will: Men, Women and Rape* (1975), "gave rape its history" – a history in which men were natural and sadistic rapists. The rape culture was born. See McElroy, Wendy. *Rape Culture Hysteria: Fixing the Damage Done to Men and Women.* Vulgus Press.

[24] Id

[25] See Douglas W. Pryor & Marion R. Hughes, *Fear of Rape Among College Women: A Social Psychological Analysis*, 28 VIOLENCE & VICTIMS 443, 444 (2013) (discussing existing literature indicating that "[f]ear of rape has been found to increase with perceived risk of victimization and the perceived seriousness of rape" and that "[f]ear of rape exerts social control over women, restricting choices about social activities, living arrangements, dress and style, personal associations, and daily movement"); Aya Gruber, *Rape, Feminism, and the War on Crime*, 84 WASH. L. REV. 581 (2009) (discussing this fear); *cf.* Jodi Lane et al., *Fear of Violent Crime Among Men and Women on Campus: The Impact of Perceived Risk and Fear of Sexual Assault,* 24 VIOLENCE & VICTIMS 172 (2009) (finding fear of sexual assault more predictive of women's general fear of crime than perception of actual risk of crime).

882.   However, incidents of rape, including campus rape, have significantly declined over the past 20 years.[26] According to the Bureau of Justice Statistics, the general rate of rape fell to a 40-year low in 2013. [27]

883.   Despite, this backlash on the unscientific ideas of the anti-rape culture grounding theory, it had not stopped ideology-based researchers and agenda-driven advocates in the soft sciences (grievance studies) from attempting to make it scientific and pass politically motivated laws and policies because of it.

884.   Ideology-based researchers and agenda-driven advocates in the soft sciences attempting to make the anti-rape grounding theory sound scientific [28]and they use it to pass politically motivated laws. An example of this is the 1 in 5 women sexual assault myth.

---

[26] See SOFI SINOZICH & LYNN LANGTON, RAPE AND SEXUAL ASSAULT VICTIMIZATION AMONG COLLEGE-AGE FEMALES, 1995-2013, 3 (2014), http://www.bjs.gov/content/pub/pdf/rsavcaf9513.pdf (showing general decline in rapes on and off campus in Figure 2); Michael Planty et al., *Female Victims of Sexual Violence, 1994-2010*, U.S. DEP'T JUST. BUREAU JUST. STAT. 1 (Mar. 2013), http://www.bjs.gov/content/pub/pdffvsv9410.pdf (showing the same general decline in Figure 1). This decrease probably cannot be attributed to an uptick in non-reporting, given that reporting rates have precipitously increased in the last few years. See Joseph Shapiro, *Campus Rape Reports Are Up, and Assaults Aren't the Only Reason*, NPR NEWS (Apr. 30, 2014, 7:04 p.m.), http://www.npr.org/2014/04/30/308276181/campus-rape-reportsare-up-and-there-might-be-some-good-in-that (stating that campus rape reports increased 49 percent from 2008 to 2012).

[27] "For women attending college, the rate of rape/sexual assault has fallen by more than 50% over the last several decades, from 9.2 incidents per 1,000 women in 1997 to 4.4 cases per 1,000 in 2013. According to the media, politicians and gender activists, there is supposed to be a college 'rape epidemic' when in fact, the rate of college female victimization has been trending downward for almost 20 years."

[28] 5.   "Rape culture" is theory grounded in social construction. Social construction theory falls on the nurture side of the nature/nurture debate. By going deeper into their theory, one finds it comes from the assertion that Truth is constructed, and it is relative rather than objective. The intellectual roots of such thinking can be traced to the works of Michel Foucault. Foucault stated that reality and truth are whatever the dominant group defines

6.   Social construction theory argues, is that humans are blank slates and that their environment shapes them. There is no scientific evidence to state that humans are blank slates and plenty of evidence to refute it. Thus, we see the rise of ideology-based theories rather than ones that are evidence driven.

885.    UI keeps stating and emailing students with the controversial statistic that 1 in 5 **women** will be a

victim of sexual assault during her time in college.[29] This statistic however is an anxiety-inducing myth.

886.    This statistic comes from two extremely flawed studies. The first one was done in 2007 funded by

the National Institute of Justice, called the *Campus Sexual Assault Study*. The lead author of the study,

Christopher Krebs, said, *"We don't think one in five is a nationally representative statistic"* as his team

sampled **only two schools**.[30] See Washington Post: The latest big sexual assault survey is (like others)

more hype than science.

887.    The second flawed study often referenced in college campus sexual assault is the 2015 Association

of American Universities (AAU) Campus Survey on Sexual Assault which states the same 1 in 5 women

(20%) get sexually assaulted and that only 12% of assaults are reported.

> "Simple arithmetic demonstrates that if the 12% reporting rate is correct, the 20% assault
> rate is preposterous. Mark Perry of the American Enterprise Institute notes, for example, that
> in the four years 2009 to 2012 there were 98 reported sexual assaults at Ohio State. That
> would be 12 percent of 817 total out of a female student population of approximately 28,000,
> for a sexual assault rate of approximately 2.9 percent — too high but nowhere near
> 20 percent[31]"

888.    Even the AAU said that *"estimates such as '1 in 5' or '1 in 4' as a global rate"* across all

universities is [sic] over simplistic, if not misleading." Several flaws with the study include the low

response rate, sampling bias, and overly broad definitions of sexual assault – In fact, respondents

---

[29] See Washington Post: Obama's claim that one in five American women has been a victim of rape or attempted rape. Fact Checker - One Pinocchio, Slate: The Problem With Campus Sexual Assault Surveys.

[30] Emily Yoffe, *The College Rape Overcorrection,* Slate

[31] [13]    See, e.g., Will, George*, "Colleges become the victims of progressivism,"* Washington Post (June 6, 2014).              http://www.washingtonpost.com/opinions/george-quewill-college-become-the-victims-of-progressivism/2014/06/06/e90e73b4-eb50-11e3-9f5c-9075d5508f0a_story.html

themselves answered that their so-called assaults went unreported because the "victims" themselves did not believe them serious enough to do so.[32] Such studies are called "advocacy research[33]."

889.    A more reliable estimate came in 2014 from the Justice Department's annual *National Crime Victimization Survey* (NCVS): No more than 1 in 160 (0.6 percent) of college women per year — or 1 in 32 (3 percent) over five years — are sexually assaulted. The NCVS is one of the few national level, longitudinal sources of data on rape and sexual assault, and it has a relatively high response rate (88%) compared to other studies of sexual victimization. It also has standardized and grounded definitions of rape and sexual assault, and looked at unreported rape and sexual assaults.

890.    RAINN (the Rape, Abuse & Incest National Network), the largest anti-sexual violence organization, considers the NCVS to be one of *"the most reliable source of statistics"* about sexual violence and uses it as their primary source.[34]

891.    UI released the results of their campus survey in 2016, stating, as facts, that 21% of female undergrads say they were raped. However, there are major issues with this study. First, only 9.3% of students took the study. Second, the survey was voluntary and anonymous surveys and thus cannot be relied upon for a wholly accurate reflection of reality. Third, students who have experienced sexual assault — along with their allies — will be more likely to participate in the survey. To assess the victimization risk accurately for women throughout a college career, longitudinal research following a cohort of female

---

[32] *The latest big sexual assault survey is (like others) more hype than science,* Washington Post

[33] Christina Hoff Sommers, *"CDC study on sexual violence in the U.S overstates the problem,"* Washington Post, January 27, 2012.          http://www.washingtonpost.com/opinions/cdc-study-on-sexual-violence-in-the-us-overstates-the-problem/2012/01/25/gIQAHRKPWQ_story.html

[34] *"The Criminal Justice System: Statistics".* RAINN. RAINN states "The primary data source we use is the National Crime Victimization Survey (NCVS), which is an annual study conducted by the Justice Department"

students across time is needed.[35] The one-fifth to one-quarter assertion would mean that young American college women are raped at a rate similar to women in Congo, where rape has been used as a weapon of war.[36]

892.    Despite RAINN's consideration of the NCVS to be one of "the most reliable source of statistics" about sexual violence and using it as their primary source, UI continued emailing and constantly referencing the 1 in 5 women get sexually assaulted statistic as a fact.

893.    When such statistics are repeated and used to create university policies or training policies for investigating/adjudicating sexual misconduct, it can easily lead to the biased and predetermined investigations and discrimination toward males as evidenced by Doe's disciplinary process.

894.    RAINN, in a report detailing recommendations to the White House on combating rape on college campuses, identified problems with an overemphasis on the concept of rape culture to prevent rape and as a cause for rape, saying:

> "In the last few years, there has been an unfortunate trend toward blaming 'rape culture' for the extensive problem of sexual violence on campuses. While it is helpful to point out the systemic barriers to addressing the problem, it is important to not lose sight of a simple fact: Rape is caused not by cultural factors but by the conscious decisions, of a small percentage of the community, to commit a violent crime."[37]

---

[35] http://www.press-citizen.com/story/news/education/university-of-iowa/2016/09/21/university-of-iowa-sexual-assault-survey-results/90777176/

[36] Emily Yoffe, *The College Rape Overcorrection*, Slate

[37] RAINN Urges White House Task Force to Overhaul Colleges' Treatment of Rape". *RAINN.org*. RAINN. 6 March 2014.

895.    In the report, RAINN cites a study by David Lisak, which estimated that **3% of college men caused 90% of campus rapes**[38]. The report argues that the trend toward focusing on cultural factors that supposedly condone rape *"has the **paradoxical effect of making it harder to stop sexual violence**, since it removes the focus from the individual at fault, and seemingly mitigates personal responsibility for his or her own actions."[39]*

896.    When misleading and flawed information like this is constantly repeated, it can unnecessarily create hostile attitudes toward males on campus, creating an environment that promotes witch-hunt toward males who then face university policies or training policies for investigating/adjudicating sexual misconduct also designed under the premise of such false statistics. It can lead to the biased and predetermined investigations and discrimination toward males Doe was a part of at UI.[40]

897.    Examples of lack of due process include developing gender-biased policies that are vague and arbitrary, and a reduction in due process protections for the accused such as no opportunity for cross-examination, where the accuser is "believed" from the start. [41]

---

[38] "White House Task Force to Protect Students from Sexual Assault United States Department of Justice Office on Violence Against Women" (PDF). *rainn.org*. p. 2.

[39] "WH Task Force Recommendations" (PDF). *RAINN.org*. RAINN. 28 February 2014.

[40] As Emily Yoffe said:
"There is a danger when the findings of surveys like AAU's are treated as proof that vast numbers of female college students are victims of sexual violations. It puts schools under increasing pressure to prove that they are doing something about this alleged epidemic, and this, in turn, has led to the creation of policies that offer little due process. See Emily Yoffe, *The Problem With Campus Sexual Assault Surveys - Why the grim portrait painted by the new AAU study does not reflect reality*, Slate

[41] Such policies can destroy innocent men's lives. They are also offensive to women. As Laura Kipnis, a feminist professor at Northwestern, writes in her book about Title IX and flawed statistics, *Unwanted Advances*, "I can think of no better way to subjugate women than to convince us that assault is around every corner."

898.    UI shows how it implements this bias from such advocacy research by its commitment to the *"It's On Us"* campaign[42], which uses misleading statistics from Dr. Krebs' 2007 study to influence activists. *Numbers that Need to Change*, University of Iowa., https://itsonus.org.uiowa.edu/numbers-need-change

This campaign manifests Direct and Indirect Evidence of Gender-Biased Motivations in part because it portrays male students as sexual predators in promotional materials.

899.    Further, the Investigator, Stevenson Earl, was on a panel for *It's On Us*.

900.    It is exceedingly difficult to get a numerical handle on a crime usually committed in private[43], and yet institutions such as UI and the activists it invites cherry pick statistics of "false accusations" from flawed studies to promote their causes. We do not have good data on false accusations, especially in Title IX investigations, and likely never will. With ath said, according to academic literature, crime comparison studies have shown that false allegations of rape are at least five times as common as false accusations of other types of crime[44].

901.    Therefore, while UI likes to state that the range is between 2% to 7% in its events[45], the true percentage remains unknown[46]. Such investigations try to determine whether there is sufficient evidence

---

[42]    Obama Administration's press release identifying UI's participation in the said campaign See https://obamawhitehouse.archives.gov/sites/default/files/docs/college_list_updated_9.22.14.pdf

[43]    Spohn, Cassia; White, Clair; Tellis, Katharine (2014-03-01*). "Unfounding Sexual Assault: Examining the Decision to Unfound and Identifying False Reports"*. Law & Society Review. **48** (1): 161 192. doi:10.1111/lasr.12060. ISSN 1540-5893.

[44]    De Zutter AWEA, Horselenberg R, van Koppen PJ (2017) *The Prevalence of False Allegations of Rape in the United States from 2006-2010*. J Foren Psy 2: 119. doi:10.4172/2475-319X.1000119

[45]    Edward Greer*, The Truth behind Legal Dominance Feminism's Two Percent False Rape Claim Figure*, 33 Loy. L.A. L. Rev. 947 (2000).  Available at: http://digitalcommons.lmu.edu/llr/vol33/iss3/3

[46]    Turvey, Brent E. (2013). *Forensic Victimology: Examining Violent Crime Victims in Investigative and Legal Contexts*. Academic Press. p. 277. ISBN 978-0124080843.

to prosecute, not to evaluate the cases for which there is **not sufficient evidence to prosecute and classify such cases as "false" or "true"[47]"** In fact, studies vary widely in their conclusions about false reports, with estimates ranging from 8% to 41%, and some estimates significantly higher, although the very high-end studies have some flaws[48].

902.    The rationale behind the motive of false allegations of sexual assault are: (i) the need for a cover story or alibi; (ii) retribution for a real or perceived wrong, rejection or betrayal; (iii) desire to gain sympathy or attention; or (iv) extortion. [49]

903.    Rather than treating each case on its merits, UI uses cases to determine guilt. This is evidenced by, but not limited to, the Adjudicator at Doe's hearing already making a pre-determination of Doe's guilt before he could even speak based on her leading, guilt-assuming, questions towards Doe.

904.    UI's recent rhetoric, and the actions that have come from it, as stated in this Complaint, have **created a hostile environment for men**. A just society does not make conclusions about the guilt of an accused person (or group) based on statistics (e.g., "Believe Women/Survivors").

**AFFIRMATIVE CONSENT**

905.    The pressure from "rape culture" had led to anti-rape culture activists changing policies where the burden is shifted to the accused to prove their innocence. With consent, unlike the populist "no means no"

---

[47] See generally, James McNamara and Jennifer Lawrence, "False Allegations of Adult Crimes," FBI Law Enforcement Bulletin, September 2012.  (There are a large number of alleged sex crimes that although do not fall into the category of having been determined as "false," nevertheless fall into the category of being unsupported, or, too speculative as to be considered legitimate claims to form a basis for arrest and prosecution).

[48] See Rumney, *False Allegations of Rape*, for a discussion of these studies as well as their conclusions and methods.

[49] See, e.g., Reggie D. Yager, What's Missing From Sexual Assault Prevention and Response, (April 22, 2015), pgs. 46-62 http: ssrn.com/abstract=2697788.

standard for consent, UI's consent standard requires an understanding of what range of behaviors constitute "clear, unambiguous, actions" other than a verbal consent.

906.    UI makes absolutely no effort to describe or explain how they define or operationalize "clear, unambiguous, actions."

The way UI used it displayed:

    a) Explicit consent is required every time there is sexual activity.

    b) Each new level of sexual activity requires clear consent; for example, moving from an agreed upon kiss to an embrace requires a new explicit agreement.

    c) Without prior agreement, body movements and non-verbal responses, such as returning a kiss, are not consent.

    d) Silence is not consent[50].

907.    Although the policies are often gender neutral in language, the male is almost always considered the default offender[51]

908.    The definition is arbitrary and capricious.

909.    It comes from the assumption that men are just waiting to sexually assault women and that the only way they can be controlled from doing such a thing is to ask them to say an affirmative yes at every stage of courtship.

910.    Researchers have found that student understanding does not align with legal definitions of affirmative consent and practices.[52] There has also been push-back from the legal community.

---

[50] McElroy, Wendy. Rape Culture Hysteria: Fixing the Damage Done to Men and Women. Vulgus Press. Kindle Edition
[51] Id
[52] *"It Just Happened" - Inside Higher Ed*

911.    In May 2016, American Law Institute overwhelmingly rejected a proposal to endorse affirmative consent which would have otherwise required it to be included in the penal codes.

912.    A letter written to the committee by 120 members stated, *"By forcing the accused to prove the near-impossible — that a sexual encounter was vocally agreed upon at each stage — affirmative consent standards deny the accused due-process rights."*[53]

913.    Doe will challenge Affirmative consent as unconstitutional.


**TRAINING**

914.    UI collaborates with RVAP for their sexual misconduct workshop and training.

The Office of Sexual Misconduct Response Coordinator website provides evidence that RVAP is extensively involved in the training of investigators, Adjudicators, appeal officers, and decision-makers. See https://osmrc.uiowa.edu/about-us/2017-annual-report/training.

915.    While details of the training are not provided, one can look at other services that RVAP is involved in to get their ideology. For example, RVAP has set up for freshmen students studying rhetoric to learn about "rape culture."

916.    UI websites promote more of such gender-biased messages. For example, UI's RVAP states it supports the "*Start by Believing*" campaign on their website: *Start by Believing is a public awareness campaign established by the organization **EVAWI (End Violence Against Women International**) to foster an environment in which survivors are believed, and perpetrators are held accountable for their crimes. See Training Rules at https://rvap.uiowa.edu/take-action/prevent-and-educate/start-by-believing/*

---

[53] *"American Law Institute rejects affirmative consent standard in defining sexual assault"* Washington Post

917.   UI's training website shows they get training from EVAWI.

918.   It threatens the long-established principle that investigators must remain neutral throughout their investigation and assess the credibility of the complainant at its conclusion, rather than tossing out neutrality at the start and pursuing only evidence designed to "support the charges filed"[54] and "undermine" defense strategies.[55]

Such methods are an anathema to the principles of fairness, due process, and the presumption of innocence. Federal Title IX regulations require that college grievance procedures be "equitable."

919.   On October 4, 2016, an expert panel consisting of investigators, attorneys, and other experts analyzed investigative methods such as those endorsed by the *Start by Believing* campaign, and concluded these approaches *"violate ethical requirements for impartial and honest investigations, are inconsistent with basic notions of fairness and justice, and give rise to wrongful convictions and determinations of guilt."*[56]

On February 7, 2018, over 150 professors and legal experts had signed an Open Letter criticizing the use of "victim-centered" methods such as *Start by Believing.*[57]

If the woman is always believed, then it is impossible for the man ever to prove his innocence. As what happened with Doe, no matter how much evidence the accused produces, the demand to believe the accuser will prevail. Despite factors such as exonerating evidence or contradicting witnesses, the woman's

---

[54] EVAWI Effective Report Writing, at 4

[55] EVAWI Effective Report Writing, at 4, 26

[56] Center for Prosecutor Integrity, Victim-Centered Investigations Undermine the Presumption of Innocence and Victimize the Innocent: Report of an Expert Panel (Oct. 4, 2016). http://www.prosecutorintegrity.org/wrongfulconviction-day/victim-centered-investigations-undermine-the-presumption-of-innocence-and-victimize-theinnocent-report-of-an-expert-panel/

[57] http://www.saveservices.org/wp-content/uploads/VCI-Open-Letter-7.20.18.pdf

accusation must always be believed. It becomes a logical impossibility for an accused to prove his innocence before a rape culture court.

920.    Doe, in his own words, mentioned in the appeal to the Board:

> "There is a difference between hearing and listening to someone with empathy by understanding what feels true to them, and believing them. Maybe I am ignorant about this, and my blind spots may not be allowing me to see this yet, in which case I apologize, but if we are to go around and just "believe" 50% of the world population without listening to the full story, there would be no need ever to be skeptical, and no need for law and a due process."

921.    It is a fair argument to make that one should "start by listening.[58]"

922.    On January 31, 2018, UI decided that it is removing Steve Wynn's name from the campus research center amid anonymous sexual misconduct allegations against him, which Mr. Wynn vehemently denied at the time.

923.    The UI Institute of Vision Research became the Stephen A. Wynn Institute for Vision Research in 2013 after Wynn committed to donating $25 million to the cause. Other than they were anonymous allegations of sexual misconduct, no additional information about the allegations was available at the time.

924.    Right away, UI President, Bruce Harreld, commented by saying, "*The University of Iowa is committed to ending sexual violence and sexual misconduct and **ensuring survivors know they are***

---

[58] Emily Yoffe describes it in an unbiased manner when she said:
"Women who tell their stories should have the support, and belief, of loved ones, friends, and a therapeutic community. But when a woman, in telling her story, makes an allegation against a specific man, a different set of obligations kick in. Even as we must treat accusers with seriousness and dignity, we must hear out the accused fairly and respectfully, and recognize the potential lifetime consequences that such an allegation can bring. If believing the woman is the beginning and the end of a search for the truth, then we have left the realm of justice for religion. Whether an investigation takes place at a school, at a workplace, or in the criminal justice system, neutral fact-finding must apply, regardless of how disturbing we find the offense, the group identity of the accused, or the political leanings of those involved. Unfortunately, we must also accept the reality that the fact-finding process will, by its very nature, cause pain to both parties. "

*believed, supported, and assisted. It is incongruous with the university's values to maintain the Wynn name on our program and building,*"

925.    Whether someone is a "survivor" is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning.

926.    Each case must be decided on its own merits, according to its own facts.

927.    The UI President is seeing complainants as survivors before an investigation is made or before the allegations have been found to be credible by some sort of a due process afforded.

928.    If respondents are presumed innocent why are they not supported? This shows that UI does not care about the presumption of innocence, an international human right, under the UN's Universal Declaration of Human Rights, Article 11.

929.    Such statements by Mr. Harreld, and thus UI, addresses federal government pressure to discipline more students accused of sexual assault, and from UI trying to fix its brand image damaged by the recent accusations and lawsuits from females complaining that UI had failed to investigate appropriately.

930.    UI's investigation into the Wynn matter followed this model of "Start by Believing" with a lack of regard for a due process just as it has in Doe's case.

931.    Fair-minded investigators are enjoined to avoid preconceptions and confirmation biases, and instead to "follow the evidence." UI's "trauma-centered" or "Start by Believing" type investigators seem to assume that "all sexual assault cases are valid unless established otherwise by investigative findings."

932.    If the Investigator presumes that the complainant is a "survivor" and should be believed, that would likely dissuade an Investigator from making the necessary efforts to reconcile conflicting evidence.

933.    Upon information and belief, UI Defendants bias against Doe was caused in part by UI's practice of "believ[ing]" students who allege they were sexually assaulted. Evidence supporting this belief includes but is not limited to numerous articles and court decisions that address how UI Defendants have violated the rights of students accused of sexual misconduct[59].

## K.    HISTORY OF DUE PROCESS & DISCRIMINATION AT UI

934.    UI has a history of struggling to confront sexual assault starting with a 2007 case in which two football players took turns assaulting an intoxicated female athlete and a separate case in which two professors were found violating consensual relationships among students.

935.    Upon information and belief, widespread anti-male bias increased at UI largely because of an April 11, 2011 "Dear Colleague Letter" (DCL) issued by the United States Department of Education's ("DOE") Office of Civil Rights ("OCR") which instructed how colleges and universities must investigate and resolve complaints of sexual misconduct under Title IX. ("2011 Dear Colleague Letter")[60].. This letter manifests Indirect Evidence of Gender Bias in part by equating complainants in sexual misconduct

---

[59] *John v. Univ. of Mississippi,* No. 3:16-CV-63-DPJ-FKB, 2018 WL 3570229, *4-7 (S.D.Miss July 24, 2018)(refusing to dismiss a Title IX claim, in part, because the university's Title IX training materials "might suggest bias" favoring accusing students); *John v. the Univ. of Colorado, Boulder,* No. 1:18-cv-02243-LTB, 2019 WL 764568, *9. (D. Co. Feb. 21, 2019)(denying motion to dismiss a male plaintiff's Title IX claim because the plaintiff alleged the university's "trauma-informed" practices favored female Accusing Students); *John v. The Trustees of The Univ. of Penn.,* No.16-5088, 2017 WL 4049033 *10 (E.D. Pa. Sept. 13, 2017)(rejecting motion to dismiss a male plaintiff's contract claim in part because his universities' policies required investigators and adjudicators be trained "to provide a process that is 'free of bias'' and plaintiff alleged the university's training did: "not promote fairness and impartiality' and, instead, 'undermine[d] principles of impartiality, favor[ed] complainants (typically female), and [created] biase[d] proceedings against respondents (typically male)."); *John v. Ohio State Univ.*, 219 F. Supp. 3d 645, 658 (S.D. Ohio 2016)(noting biased sexual misconduct training can overcome the "presumption" that university employees acted with "honesty and integrity" in disciplining a student for alleged sexual misconduct); Emily Yoffe, "The Bad Science Behind Campus Response to Sexual Assault," *The Atlantic*, Sept. 8, 2017 which noted:"[a]ssertions about how trauma physiologically impedes the ability to resist or coherently remember assault have greatly undermined defense against assault allegations. But science offers little support for these claims.") , https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/ (assessed may 22, 2019); KC Johnson and Stuart Taylor, "The Title IX Training Travesty," *The Weekly Standard*, Nov. 10, 2017, https://www.weeklystandard.com/kc-johnson-and-stuart-taylor-jr/the-title-ix-training-travesty (assessed may 22, 2019).
[60] available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html

proceedings as being females who must receive preferential treatment. For instance, the 2011 Dear Colleague Letter suggests educational institutions seek grants from the U.S. Department of Justice's Office on Violence against Women which require institutions *"develop victim service programs and campus policies that ensure victim safety, [and] offender accountability." Id.*, p.19 (emphasis added);

936.   The 2011 Dear Colleague Letter (DCL) has resulted in colleges and universities, including UI, making it more difficult for males accused of sexual misconduct to defend themselves. Most notably, the DCL required schools adopting the lowest burden of proof — "more likely than not"—in cases involving sexual misconduct, including sexual assault. Before the circulation of this latter, several colleges had been using "clear and convincing" and some, like Stanford, applied the criminal standard, "beyond a reasonable doubt."

937.   Using the Preponderance of the Evidence standard has been challenged multiple times[61], including in a paper submitted by the American Association of University Professors in March 2016. The paper severely criticized OCR's mandates as undermining student's rights to fair and impartial adjudications in cases of alleged sexual misconduct. *The History, Uses, and Abuses of Title IX*, American Association of University Professors., https://www.aaup.org/report/history-uses-and-abuses-title-ix

938.   Multiple courts have questioned whether OCR's "preponderance of evidence" standard is too low[62].

---

[61] Tamara Rice Lave, *Ready, Fire, Aim: How Universities Are Failing the Constitution in Sexual Assault Cases,* 48 ARIZ. ST. L.J. 637, 642 (2016)
[62] *See e.g., Lee v. Univ. of New Mexico,* No.1:17-cv-01230, Doc. 36, p.2-3 (N.M. Sept. 20, 2018)(rejecting motion to dismiss student's due process claim because university prohibited him from cross examining witnesses in "formal or evidentiary hearing" and because the court "conclude[d] that preponderance of the evidence is not the proper standard for disciplinary investigations . . .  given the significant consequences for students found responsible for engaging in sexual misconduct); *Doe*

939.    On April 29, 2014, OCR published a document regarding Title IX and sexual assault [63] and this OCR directive manifested Indirect Evidence of Gender Bias in part because it hampered the accused student's ability to defend himself by reducing or eliminating the ability to expose credibility flaws in the allegations made against him.  For example, OCR's 2014 Q-and-A states schools:

a)    "[M]ust not require a complainant to be present" at sexual misconduct disciplinary hearings.  OCR's 2014 Q-and-A, p.30.

b)    May decide to eliminate all opportunities for "cross-examination." *Id.*, p.31.

c)    Must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event." *Id.*, pp.30, 38.

940.    Unlike the new proposed guidelines by the Department of Education, which is currently in the review process of the notice-and-comment rulemaking, the DCL was not subject to notice-and-comment rulemaking, and therefore its validity as binding law is questionable. But some universities, including UI, treat the DCL as binding authority.

941.    In 2016 Senator James Lankford expressed his concerns that the Dear Colleague letters are not interpretive but are unlawfully altering the regulatory and legal landscape of Title IX and the U.S. Constitution.

---

*v. Univ. of Mississippi,* No.3:18-cv-138-DPJ-FKB, Docket 60, p.15-21 (S.D.N.D. Miss., Jan. 16, 2019)(unreported)(rejecting motion to dismiss procedural due process claims based on plaintiff's allegations that following five due process violations: (1) university's Title IX coordinator excluded exculpatory evidence from her report; (2) university's training materials suggested the credibility of accusers need not be diminished by their false testimony or withholding of facts because this behavior is common among sexual assault victims;  (3) plaintiff was denied an unbiased adjudication because one of his adjudicators "had previously mocked the defenses raised by men accused of sexual assault;" (4) university prohibited plaintiff from cross-examining "witnesses whose accounts of the evening led to his discipline; and (5) plaintiff's allegation that university's "preponderance of the evidence standard" was too low.")

[63] signed by OCR's then Asst. Sec. of Ed. Catherine E. Lhamon ("Sec. Lhamon") titled *"Questions and Answers on Title IX and Sexual Violence"* ("OCR's 2014 Q-and-A")(available at http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (accessed 4/3/19)

942.    In 2013, Sec. Catherine Lhamon became the assistant secretary for Civil Rights at the U.S. Department of Education.

943.    Upon information and belief, UI institutionalized OCR's Indirect Evidence of Gender Bias into UI's implementation of UI Policies Evidence supporting this allegation includes, but is not limited to threats made by Sec. Lhamon in February 2014 when she told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents suggested afterward there were "crisp marching orders from Washington[64]."

944.    OCR's investigations of universities put millions of dollars in federal student aid at risk. This is because DOE/OCR can impose civil penalties and/or suspend institutions from participating in federal student financial aid programs if DOE/OCR finds a university, such as UI, did not do enough to discipline males alleged to have engaged in sexual misconduct with female students.

945.    Sec. Lhamon confirmed this risk of losing federal funds at a national conference in 2014 when she said, "I will go to enforcement, and I am prepared to withhold federal funds.[65]"

946.    In 2014, Sec. Lhamon told a Senate Committee, "[t]his Administration is committed to using all its tools to ensure that all schools comply with Title IX..." In addition, Sec. Lhamon noted: [66]

---

[64] See, Colleges Are Reminded of Federal Eye on Handling of Sexual Assault Cases, Chronicles of Higher Education, February 11, 2014, located at http://chronicle.com/article/Colleges-Are-Reminded-of/144703/ (accessed 4/3/19).

[65] ." See, How Campus Sexual Assaults Came to Command New Attention, NPR, August 12, 2014, located at http://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention (accessed 4/3/19).

[66] Sec. Lhamon confirmed this risk of losing federal funds at a national conference in 2014 when she said, "I will go to enforcement, and I am prepared to withhold federal funds." See, How Campus Sexual Assaults Came to Command New Attention, NPR, August 12, 2014, located at http://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention (accessed 4/3/19).

"If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education.  OCR has not had to impose this severe penalty on any institution recently because our enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments."

947.   Upon information and belief, OCR's Chicago Office - which prosecutes complaints filed against Iowa universities - continues to advance Sec. Lhamon's even after Sec. Lhamon's departure from OCR. Information supporting this belief includes, but is not limited to, the fact that the Director and numerous senior attorneys at OCR's Chicago Office worked under Sec. Lhamon during her entire tenure at OCR. [67]

948.   Upon information and belief, for UI, the withdrawal of federal funding would be catastrophic, in part, because, in the academic year 2016-2017, UI undergraduate students received over 67 million dollars in federal student loans. (https://nces.ed.gov/collegenavigator/?q=iowa&s=all&pg=2&id=153658#finaid) (last accessed Feb. 28, 2019).

949.   Doe was found responsible in part because of threats by the federal government that UI could lose federal funding or face other adverse consequences if UI did not find male students responsible for

---

[67] See e.g., (https://www2.ed.gov/about/offices/or/ed-org-directory.pdf (last accessed Mar. 3, 2019)(identifying these individuals as employed at OCR's Chicago Office as of March 8, 2018: Adelle Rapport, Algis Tamosiunas, Karen Mines, Judith Levitt, and Jeff Turnbull); (https://www.federalpay.org/employees/office-for-civil-rights/top-100/2017) (last accessed Mar. 3, 2019)(containing links to dates when said OCR employees were hired which predate Sec. Lhamon's tenure at OCR).

sexually assaulting female students. Evidence of this pressure includes, but is not limited to, The White House's April 2014 report[68] entitled *"Not Alone[69]"*

950.    In February 2014, then President of UI, Sally Mason, claimed controversially that it's not possible to completely get rid of sexual assault given human nature, leading to campus-wide protests.

951.    UI students – through protests, online petitions, social media, and written letters pressured UI by asking administrators to take a "zero tolerance" stance on sexual violence and start expelling violators.[70]

952.    Zero tolerance policies in educational settings have been frequently criticized, especially when universities use educational deprivation as a form of punishment,[71] which is unconstitutional.[72]

---

[68] In March and April 2019, Biden was accused of sexual misconduct by multiple women. "If Biden were a college student, [his actions]- ambiguous as those actions might be – could easily result in him being investigated by the Title IX office and subjected to education-disrupting punishment"#. See https://www.politico.com/magazine/story/2019/04/03/joe-biden-college-campus-sexual-assault-226481

[69] Which includes: (a) references to Vice President Biden's *"new Public Service Announcement"* which encourages schools to combat the sexual assault of women on campuses; and (b) warnings that if colleges like UI do not adhere to Title IX they "risk losing federal funds" and/or face potential lawsuits filed by DOJ. In July 2016, Vice President Biden suggested that schools that do not comply with Administration guidelines could be stripped of federal funding. See: Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault

[70] See   https://www.thegazette.com/subject/news/university-of-iowa-debuts-sex-assault-sanctioning-guidelines-20140904

[71] Blumenson, Eric and Nilsen, Eva S., *One Strike and You're Out? Constitutional Constraints on Zero Tolerance in Public Education* (October 20, 2002). Washington University Law Quarterly, Vol. 81, No. 1. Available at SSRN: https://ssrn.com/abstract=352181 or http://dx.doi.org/10.2139/ssrn.352181

[72] Emily Yoffe, in the New York Times, states: "Usually at the beginning of a zero-tolerance campaign, those leading the charge promise it will vanquish the worst of the worst: the drug kingpins, the gang leaders, the serial sexual predators, the murderers. But it inevitably turns out there aren't very many of them. So the definition of what will not be tolerated starts expanding, allowing politicians and other moral arbiters to say they are cleansing society of those who commit any kind of lapse. People who urge a more proportionate, incremental, and individualized response to complex problems are tarred as being some percentage — usually 100 — tolerant of the menaces that trouble us."
"Despite the overwhelming evidence that zero-tolerance policies sweep up the harmless and the innocent, we are so habituated to thinking in zero tolerance terms that when a new issue appears, it is often our default response."

953.    The American Bar Association opposes "zero tolerance policies that mandate either expulsion or referral of students to juvenile or criminal court, without regard to the circumstances or nature of the offense or the students *[sic]* history."[73] School suspension and expulsion result in several negative outcomes for both schools and students.[74] Analysis of the suspension rate of students shows black females and other racial minorities are suspended at a greater rate.[75] The American Psychological Association concluded that the available evidence does not support the use of zero tolerance policies as defined and implemented and that the policies create several unintended negative consequences[76 77], including making schools "less safe."[78] Zero--tolerance policies have been struck down by U.S. courts[79] and by departments of education.[80]

954.    Despite this, UI showed it had no backbone and gave in to the pressure from the public.

President Mason stated that UI would take a zero-tolerance stance on sexual misconduct. Larson, Lin, *President Reaffirms Zero Tolerance Stance on Sexual Misconduct,* (2014), Iowa Now., https://president.uiowa.edu/home/mason-reaffirms-zero tolerance-stance-sexual-misconduct.

---

[73] "School Discipline "Zero Tolerance" Policies - Center on Children and the Law". *www.americanbar.org*

[74] Russell J. Skiba *Zero Tolerance, Zero Evidence: An Analysis of School Disciplinary Practice* Policy Research Report #SRS2 August, 2000

[75] *"Are we Closing the School Discipline Gap?"* (PDF). *UCLA Center for Civil Rights Remedies*. Feb 2015.

[76] Zero Tolerance Policies: no substitute for good judgment Summary of the APA Task Force Report at everydaypsychology.com

[77] Are Zero Tolerance Policies Effective in the Schools? An evidentiary review and recommendations. *American Psychologist,* December 2008.

[78] Nuckols, Ben (13 October 2009). "Delaware board likely to tweak zero tolerance rule". Associated Press. Archived from the original on October 16, 2009.

[79] *"Pensacola honor students win zero tolerance drug ruling"* article of the AP/Bradenton Herald, Sept. 8, 2002 at Overlawyered.com archives Sept. 2002 pt. III

[80] Rhode Island Officials Rule School Can't Censor Teen's Yearbook Photo

155

1081.   UI then released new vague sanctioning guidelines that lay out a range of penalties, from probation to suspension to expulsion. Even organizations against sexual misconduct criticized it.

"The level of discretion in the new system is so great…that it's difficult to take this model seriously," said a member of ROAR Iowa City, a group organized against sexual harassment and violence. University of Iowa Debuts Sex Assault Sanctioning Guidelines (2014), The Gazette. https://www.thegazette.com/subject/news/university-of-iowa-debuts-sex-assault-sanctioning-guidelines-20140904

955.   Like other tough-on-crime movements, the campus anti-rape movement utilizes the language of "crisis" and "epidemic" to push through rapid, broad, and contestable policy changes.[81]

956.   Eventually, President Mason, to redeem herself from her controversial comment, created a new stricter model to combat sexual assault on campus, before stepping down from her position a year later. Agnew, Sara, *Sally Mason Apologizes for Sexual Assault Remark* (2014), Des Moines Register., https://www.desmoinesregister.com/story/news/2014/02/26/sally-mason-apologizes-for-sexual-assault-remark/5827897/

957.   UI then made changes that one could infer were designed to secure more convictions.

---

[81] See, e.g., Tara Culp-Ressler, *New Study Finds 'Epidemic Level' of Rape on College Campus*, THINKPROGRESS (May 20, 2015, 2:02 p.m.), http://thinkprogress.org/ health/2015/05/20/3661010/campus-rape-surveys/; Alex Morris, *'The Hunting Ground': Inside a Crucial Look at the Campus-Rape Crisis*, ROLLING STONE (Mar. 3, 2015), http://www.rollingstone.com/movies/features/the-hunting-ground-inside-a-crucial-look-at-thecampus-rape-crisis-20150303#ixzz3xFnXaarg (noting that the film "tackles not just the epidemic of rape on campus-the film notes that more than 100,000 college students will be sexually assaulted in the coming year-but also the way in which universities cover it up"); Anya Jaremko-Greenwold, *Kirby Dick and Amy Ziering on Exposing the Horrifying Campus Rape Epidemic in 'The Hunting Ground'*, INDIEWIRE (Feb. 26, 2015, 10:39 a.m.), http://www.indiewire.com/article/kirby-dick-andamy-ziering-on-exposing-the-horrifying-campus-rape-epidemic-in-the-hunting-ground-20150226.

About a month after President Mason's *"Six Point Plan"* to address sexual misconduct, UI had expelled a student in 2014 for the first time in over 10 years[82]

958.   The plan's "Point 1" creates sanctions and outlines the new aggression UI will be moving toward as it relates to it. Schmidt, Mitchell, *U of I Student Expelled for Sexual Assault Is The First in At Least a Decade*,  (2014)  Des  Moines  Register., https://www.desmoinesregister.com/story/news/education/2014/04/11/u-of-i-student-expelled-for-sex-assault/7602963/

959.   As part of her Six Point Plan to combat sexual assaults on campus, President Mason, expanded the "Nite Ride" by adding a second vehicle in Mach 2014 however only allowed this transportation for women[83].

960.   On August 2016, The Iowa Civil Rights Commission (ICRC) settled a case with the UI regarding the discriminatory practice of the Nite Ride. *Logan Allee v. University of Iowa*, *See* https://icrc.iowa.gov/document/logan-allee-v-university-iowa-et-al.

961.   Despite this, UI continues to discriminate against men as it relates to services provided against sexual misconduct.

---

[82] *We have used indefinite suspensions, we've used termed suspensions, but the president's plan, the Six Point Plan, calls for the use of expulsion in the most serious offenses, and this is one of the most serious offenses, so I think it is fair to say this is part of the Six Point Plan that the president announced,"* UI's then vice president of student life, Tom Rocklin said.
The procedures adopted by colleges have received substantial criticism from Courts: "Sexual assault is a deplorable act of violence… Universities have perhaps, in their zeal to end the scourge of campus sexual assaults, turned a blind eye to the rights of accused students. Put another way, the snake might be eating its own tail." Joe Dryden et. al., Title IX Violations Arising from Title IX Investigations: The Snake Is Eating Its Own Tail, 53 Idaho L. Rev. 639 (2017). Doe v. Ohio State Univ., 311 F. Supp. 3d 881, 892-893 (S.D.Ohio 2018)
[83] UI to unveil second Nite Ride van - Iowa City Press-Citizen

For instance, the Office of Sexual Misconduct, via it's 'Ending Violence at Iowa' website offers two self-defense workshops/classes – "Flip the Script" and "Rape Aggression Defense." Both of these classes are for women only. Men or people who identify as part of the LGBTQ community are not welcome. See Flip the Script; Rape Aggression Defense. While it is understandable and even necessary sometimes to limit the class to a single gender, it is important to make the same format available to other genders.

962.    The workshops offered to men in the department seems to come from a social construct/blank slate ideology[84] [85], where the focus is on reconstructing men's behaviors and their masculinity through feminist theories rather than coming from a place of self-acceptance.

963.    No workshops are offered on femininity as it relates to sexual aggression or harassment by women.

964.    In July 2018, Iowa State University psychologist Pelin Gul, criticized such training programs by stating:

> "Masculinity training programs can be damaging to male college students indeed, since it seems like these programs are focused on a very unrealistic conception of gender equality. I don't think we should force men and women to be and act identical to each other," she added. "Encouraging/forcing men to be identical to women is social engineering in a cruel way." *See* https://www.campusreform.org/?ID=11134

965.    On April 14, 2015, UI sponsored and publicly showed the film *"The Hunting Ground,"* a film about campus sexual assault that purports to be a documentary but is misleading and biased.

966.    It was sponsored by UI's Department of Communication Studies and the Bijou Film Board, with a panel discussion after the film. DiCarlo, UI's Title IX Coordinator, was part of the panel. High, Andy, *Film, Panel to Address Sexual Assault*, 2015, Iowa City Press., http://www.press-

---

[84] Steven Pinker, *'The Blank Slate'*, New York Times (2002)
[85] Deborah Smith, *Dissolving myths about human nature*, American Psychological Association (2002)

citizen.com/story/opinion/contributors/guest-editorials/2015/04/11/opinion-hunting-ground-sexual-assault-campus/25584465/

967.    Upon information and belief, UI sponsors and publicly shows this video every academic year. For instance, there was a screening and a panel discussion of the documentary on April 19, 2019, at UI's Van Allen Hall.

968.    "The Hunting Ground" has been widely criticized:

a)    For example, nineteen Harvard University professors denounced the film as "propaganda" that is "one-sided" and "biased."

b)    Hunting Ground claims to be a documentary but are biased; "We don't operate the same way as journalists — this is a film project very much in the corner of advocacy for victims, so there would be no insensitive questions or the need to get the perpetrator's side" — The Hunting Ground co-producer Amy Herdy. Taylor, Stuart, *Smoking Gun Email Exposes the Bias of the Hunting Ground*, 2015, National Review., http://www.nationalreview.com/article/427166/hunting-ground-smoking-gun-e-mailexposes-filmmaker-bias-against-accused

c)    It features three women, whose claims of sexual assault were later largely discredited, including in one case fabricating evidence (a bloody condom that when eventually tested contained DNA of another male who was not the alleged assailant).

d)    It repeatedly omits the word "alleged," thus confusing an accusation of sexual assault with a proven case, and offers no meaningful opportunity for the accused to respond to the charges, as expected in any fair, balanced documentary.

969.    On April 19, 2016, UI sponsored a "sex-assault summit" focusing on men (emphasis added). The keynote speaker invited was Derrick Williams, an "intersectionality activist." Williams started by saying, "*Women have been on the frontline since the beginning. It's time for men to step up. Men have to be part of transforming rape culture.*"

970.    Williams noted that many young men bring up false reporting to illegitimatize the problem of sexual assault. However, he said, this defense is a myth. "*False reporting is around 2 to 7 percent, but we*

159

*talk about it as if it's 90 percent,"* Williams said. *"The most important thing we can do for victims and survivors is believe them."* Williams followed that up with *"Indifference is more lethal than any perpetrator."* (emphasis added) *"Masculinity is a social construct about how we subscribe to things,"* he said. Onstad-Hargave, Anna, *Sex Assault Summit Focuses on Men*, (2016) The Daily Iowan., https://dailyiowan.com/2016/04/20/sex-assault-summit-focuses-on-men/

971.    UI's Vice President for "Diversity, Equity, and Inclusion", Melissa Shivers sent the following email about the masculinity programs UI conducts:

> The What About Me(n) Summit is also taking place this afternoon. This is an opportunity to engage those identifying as male and those leading/mentoring male-identified to explore the many ways that our learned understandings of 'masculinity' impact rape culture and perpetuate an overall culture of violence. We believe that we can end sexual assault, domestic abuse, stalking, and all forms of gender-based violence when male-identified youth and adults become actively involved in this vital prevention work.

972.    Generally speaking, men display masculinity while women display femininity. UI had pathologized masculinity. Assigning collective guilt to an entire gender's attributes, behaviors, and roles for the actions of about 3% of its population is unfair, unnecessary, and reflective of irrational stereotypes about sexual violence committed by men.

973.    Led by RVAP and Women's Resource &Action Center, UI has created a gender biased and a hostile environment for men by producing something called the "IDEAL Campus Culture Project" a project that studies "rape culture." They then implemented this in their rhetoric classes, a mandatory class required for first-year students, who are less likely to have developed the skills to critically question such

ideologies[86]. Lesson 3 is called "Redefining Sexual Assault" where, rather than being concrete about the crime of it encourages students to define their own version of sexual assault. Lesson 5 forms the core of the course called "False Accusations and Victim Vlaming, where it encourages one to believe the misleading and debunked statistic that false accusations happen only 2% of the time[87].

974.    On May 19, 2017, while Doe's investigation was ongoing, UI paid $6.5 million to settle a lawsuit that alleged gender discrimination toward women. *University of Iowa pays 6.5 million in Meyer Girsbaum Cases* (2017) ,The Gazette., https://www.thegazette.com/subject/news/higher-education/university-of-iowa-pays-6-million-in-meyer-griesbaum-cases-20170519

975.    On October 16, 2017, just days before Doe's hearing, UI settled a lawsuit alleging gender discrimination toward women again, this time for $2.68 million. The Iowa City Press-Citizen reported: *Lawsuits seek changes to University of Iowa sexual assault policies.* Foley, Ryan (2017) available at http://www.press-citizen.com/story/news/education/university-of-iowa/2017/10/16/lawsuits-seek-changes-university-iowa-sexual-assault-policies/769292001/

976.    The media explained how Provost and Dean of the Graduate College at UI, who was supposedly John Keller, decided as it related to reversing the expulsion of an accused male student in the appeal stage.

---

[86] The course starts with the sentence: "One problem with "rape culture" is the fact that is produces a discourse that does not believe it, and especially when coupled with the power of the internet where anyone can write about anything, suddenly people are much more willing to dismiss rape culture as a product of the "liberal agenda" or "feminists." This can be a problem as well, because although all of the issues that the article we read for today brings up can be supported with a large body of research and statistics from the federal government, some people still refuse to believe it and feel that it is some sort of conspiracy. This is further evidence of how rape culture functions to normalize sexual assault, blame victims, and do much more in terms of damaging our culture's relation to these problematic dynamics, and creates further divisions in terms of how we can collectively respond to these problems."

[87]"In particular, it is not unusual for men and even women to tell an anecdotal tale about how one of their friends was falsely accused of sexual assault and how it "ruined their life". While you should avoid trying to take away from these stories or by any means discredit them, just point out that sometimes false accusations do happen but, as the article states, only about 2% of the time "

This cost UI $2.68 million, and arguably played a significant factor into overcorrecting and being biased against Doe days later.

977.    The lawsuit shows that UI had failed to properly discipline male students' sexual misconduct against two female students. The lawsuit sought orders requiring UI to make several changes, including surveying students about its handling of complaints, analyzing investigations and decisions to monitor for bias, and boosting training on gender-based violence. The lawsuits argued UI's response remains inadequate because the changes did not address biases that can lead to institutional hostility against female accusers.

978.    Since 2015, UI was also under investigation by OCR for multiple Title IX offenses due to discrimination toward women and had multiple open investigations throughout Doe's investigation and sanctioning process.

979.    On January 10, 2018, soon after Doe was expelled, and his internal appeal dismissed. UI had been cleared from one investigation by OCR, where they found no discrimination toward women. Thus, they could now be more relaxed about how strict they enforce their policies.

980.    Upon information and belief, UI stacked the deck against male students accused of sexual misconduct by discriminating against men in their investigations to avoid further damage to their brand name as another opening of an investigation by the OCR or a lawsuit alleging gender discrimination toward women would have been disastrous. The Chronicle of Higher Education available at https://projects.chronicle.com/titleix/campus/University-of-Iowa/?case=81

981.    Doe renews his argument he wrote about his expulsion to the Board in his appeal:

"Sometimes it is in an organization's interest to find a scapegoat for all ills at the university, especially if that university is trying to find reasons to justify and appear Title IX compliant,

given recent events. It was set against this stage that UI either succumbed to pressure or otherwise sought to make an "example" out of me as a male accused of sexual assault and meted out a disproportionately severe sanction of expulsion from the school."

982.   UI officials were reacting to substantial criticism of UI not taking seriously complaints of female students alleging sexual assault by male students.

983.   The direct and indirect evidence of gender bias motivations indicates that UI engages in gender discrimination based on unlawful notions of masculinity and femininity, which results in a hostile environment for males. This hostile environment, in turn, leads an adverse educational setting in violation of Title IX. This hostile environment causes innocent males on UI's campus to be unlawfully disciplined and interferes with males' ability to participate in or benefit from various activities, including learning on campus.

984.   Upon information and belief, UI's pattern and practice of discriminating against male students are done to appease the federal government, UI's female student body, and/or the general public even though the Preponderance of the Evidence proves these male students did not engage in sexual misconduct.

985.   In 2017, The American College of Trial Attorneys' ("ACTA") White Paper on Campus Sexual Assault Investigations noted: "OCR has established investigative and disciplinary procedures that, in application, are in many cases fundamentally unfair to students accused of sexual misconduct." (American College of Trial Attorneys' March 2017 *White Paper on Campus Sexual Assault Investigations*) To remedy this unfairness, ACTA made these recommendations:

a)   Sexual misconduct investigations and hearings should be conducted with due consideration for any appearance of partiality, including that which might arise from the fact-finder's other responsibilities or affiliations.

b)   The parties to a sexual misconduct investigation should be permitted to conduct some form of cross-examination of witnesses, in a manner deemed appropriate by the institution, to test the veracity of witnesses and documents.

c)    The subject of a sexual misconduct investigation should be provided with access to all evidence at a meaningful time and in a meaningful manner so he/she can adequately respond to it.

d)    The standard of proof for "responsibility" should be clear and convincing evidence.

e)    Fact finders in sexual misconduct investigations and hearings should produce written findings of fact and conclusions sufficiently detailed to permit meaningful appellate review. *Id.*, p.2.

986.    UI afforded Doe none of the traditional cornerstones of American justice articulated by ACTA. Instead, upon information and belief, UI Defendants allowed their Investigator and Adjudicator to cause them to expel him unlawfully despite the exculpatory evidence establishing his innocence.

987.    UI's legitimate goal of preventing sexual assault is not the issue in, nor is it the basis for this Complaint.    Rather, this Complaint addresses how - upon information and belief - UI Defendants' Investigator and Adjudicator caused them to: (a) afford females preferential treatment regarding Title IX and/or UI Policies; (b) severely discipline male students like Doe alleged to have engaged in sexual misconduct regardless of their innocence, and (c) equate "victim/complainants" in sexual misconduct proceedings as being females who receive preferential treatment over the males they accuse of sexual misconduct.

988.    In a speech on September 7, 2017, the same month when Doe's hearing took place, the Secretary of Education Betsy DeVos said: *"no school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by – or loss of funding from – Washington."* DeVos declared that the DOE would fight against the 2011 policies which *"lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation."*

989.    DeVos officially revoked the Obama Administration's guidance on college sexual assault, offering interim guidelines on how universities should handle the issue[88].

990.    In place of these documents, the Department issued a new question-and-answer document – the September 2017 Q-and-A on Campus Sexual Misconduct – to guide institutions while the Department conducts an official rulemaking process to promulgate new Title IX regulations. "Q-and-A on Campus Sexual Misconduct," U.S. Dep't of Education, September 2017 a*vailable at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf

991.    The new Q-and-A guidance, which was released while Doe was still going through his grievance process, clarified the Department's expectation that the standard of evidence for school's investigations of sexual violence under Title IX is the same as the standard used in other disciplinary proceedings. Thus, it may require many schools to either raise the standard used in Title IX investigations or lower the standard used in all other proceedings.

992.    OCR confirmed that "[i]n every investigation conducted under the school's grievance procedures, the burden is on the school – not on the parties – to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred. OCR stated that schools must avoid discriminatory practices against accused students (who are overwhelmingly male) that had become

---

[88] DeVos commented that too many students had been falsely charged with sexual assault and schools feared being accused of ignoring the accusations, before stating, *"Schools must continue to confront these horrific crimes and behaviors head-on. But the process also must be fair and impartial, giving everyone more confidence in its outcomes"*
*"any school that uses a system biased toward finding a student responsible for sexual misconduct also* **commits discrimination."**
She concluded by saying, *"Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one."* U.S. Dept. Of Education available at https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement

commonplace at colleges and universities nationwide after issuing the 2011 Dear Colleague Letter – i.e.,

schools

    a)    Must not "restrict[] the ability of either party to discuss the investigation (e.g., through 'gag orders'),"

    b)    Must not use "training materials or investigative techniques and approaches" or "[d]ecision-making techniques or approaches" that "apply sex stereotypes or generalizations,"

    c)    Must "avoid conflicts of interest and biases for or against any party" by investigators or Adjudicators, and

    d)    Must "prevent institutional interests from interfering with the impartiality of the adjudication." "An equitable investigation of a Title IX complaint requires a trained Investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence – including both inculpatory and exculpatory evidence – and take into account the unique and complex circumstances of each case."

993.    The proposed regulations would require schools to investigate sexual assault and harassment only if the alleged misconduct was reported to certain campus officials and only if it occurred on campus.

994.    On October 9, 2017, a day before Doe's sanction of expulsion was chosen, UI President, Bruce Harreld, and Title IX Coordinator, Ms. DiCarlo, released a joint statement regarding the new interim guidelines stating:

"The University of Iowa has reviewed the new guidance on Title IX compliance from the Department of Education. We do not foresee any changes in our policies under the temporary guidance.

We remain committed to ending sexual violence and sexual misconduct and will continue to work with campus and community partners to that end, as well as ensure **survivors know they are believed**, supported, and assisted. There is absolutely no place for sexual misconduct and violence on the UI campus." *Available at* https://osmrc.uiowa.edu/new-guidance-title-ix-compliance

995.    Upon information and belief, UI's disciplinary action against Doe was caused in part by UI's practice of "believ[ing]" students who allege they were sexually assaulted.

996.    By continuously parroting the same message, UI shows it resonates with the message of the early 1990 women's groups who called for "swift and unquestioning judgments about the facts of harassment without standard evidentiary procedures with the chant 'always believe the victim.'"[89].

997.    UI's refusal to even consider a fair process for both complainants and Doe is precisely the policies that Ms. DeVos and the DOE implied is problematic in her statement for the September 22, 2017, Dear Colleague Letter.

998.    Universities must provide protection and support for those who are subject to sexual abuse, while providing a fair process calculated to yield a reliable factual determination[90].

999.    At the third UISG town hall meeting on sexual assault, on December 5, 2017, UI's Title IX Coordinator, Ms. DiCarlo, stated that UI "believes" in due process, before saying *"We are working hard not to pit due process against safety. Fair process is about safety."* Watson, Sarah, *Third UISG Town Hall addresses sexual assault* (2017), The Daily Iowan., http://daily-iowan.com/2017/12/07/third-uisg-town-hall-discusses-sexual-assault/

1000.  Supreme Court Justice, Ruth Bader Ginsburg, when asked about campus due processes in an interview on February 2018, has spoken in favor of it by noting:

---

[89] Patricia Sharpe and Frances E. Mascia-Lees Source, *"Always Believe the Victim," "Innocent Until Proven Guilty," "There Is No Truth": The Competing Claims of Feminism, Humanism, and Postmodernism in Interpreting Charges of Harassment in the Academy,* Anthropological Quarterly, Vol. 66, No. 2, Constructing Meaningful Dialogue on Difference: Feminism and Postmodernism in Anthropology and the Academy. Part 1 (Apr., 1993), pp. 88
[90] Ultimately, there nothing contradicts a policy that both strongly condemns and punishes sexual misconduct and ensures a fair Adjudicatory process, which was the heart of DeVos' message.

"Well, that must not be ignored, and it goes beyond sexual harassment. The person who is accused has a right to defend herself or himself, and we certainly should not lose sight of that. Recognizing that these are complaints that should be heard. There's been criticism of some college codes of conduct for not giving the accused person a fair opportunity to be heard, and that's one of the basic tenets of our system, as you know, everyone deserves a fair hearing."

1001.   When asked if those criticisms of colleges are valid, she replied *"Yes[91]"* (emphasis added) and that due process can't fall by the wayside in the pursuit of "gender equality" by noting: "*It's not one or the other. It's both. We have a system of justice where people who are accused get due process, so it's just applying to this field what we have applied generally.*" Rosen, Jeffery, *Ruth Bader Ginsburg Opens Up About #MeToo, Voting Rights, and Millennials* (2018), The Atlantic., https://www.theatlantic.com/politics/archive/2018/02/ruth-bader-ginsburg-opens-up-about-metoo-voting-rights-and-millenials/553409/

1002.   As part of UI's wider cultural onslaught on private associations, especially male-only groups, UI had banned four fraternities in 2018 because of "alcohol violations[92]".

1003.   Upon information and belief, no such restrictions were imposed on sororities as it relates to alcohol.

---

[91] Reason magazine was bowled over by Ginsburg's pivot to campus:
"Note that Ginsburg was asked about due process, but not campuses specifically. The fact that she immediately suggested college codes of conduct as an example of a policy that sometimes violates "the basic tenets of our system," says a great deal about the glaring unfairness of the modern approach to Title IX, the federal statute that requires universities to investigate sexual harassment and assault. And Ginsburg didn't just make note of the controversy; she explicitly said critics of the current procedures have a point."
…
"[I]f a campus sexual misconduct case adjudicated under the deficient standards ever made it all the way to the Supreme Court, it certainly sounds like Ginsburg would question whether the accused was given a meaningful opportunity to defend himself."
[92] While Doe understands and respects that damaging things can happen inside fraternities, Doe sees UI's attack on fraternities because of, which are viewed as inherently suspect.

1004.   Dept. of Ed's regulations published on November 16, 2018 ("OCR's 2018 Regulations") *available at* (https://www.ed.gov/news/press-releases/secretary-devos-proposed-title-ix-rule-provides-clarity-schools-support-survivors-and-due-process-rights-all) (last accessed May 22, 2019)(containing link to OCR's 2018 Regulations).   OCR identified a "Guiding Principles" behind OCR's 2018 Regulations was the need to "achieve fairness and reliable outcomes" by requiring "due process protections" such as:

a)   A **presumption of innocence** throughout the grievance process, with the burden of proof on the school;

b)   The clear and convincing evidence or preponderance of the evidence standard, subject to limitations;

c)   The opportunity to **test the credibility** of parties and witnesses through **cross-examination**, subject to "rape shield" protections;

d)   . . . . an equal opportunity to **review the evidence**; [and]

e)   Title IX Coordinators, investigators, and decision-makers free from bias or conflicts of interest . . . .  *Id.,* (containing link to *U.S. Department of Education Proposed Title IX Regulation Fact Sheet)*(emphasis in original).

1005.   During the comment period for the new guidelines, UI offered targeted workshops to men through the Women's Resource Action Center to comment in the Department of Education website as a way to send mass letters to the Department of Education.

1006.   On January 30, 2019, DiCarlo, representing UI, formally submitted a response to the new guidelines. In it, DiCarlo continued to show her displeasure against the new policies. She said:

a)   "The university has demonstrated a commitment to evidence-based interventions [93] and continuously assesses its anti-violence programs, policies, and resources. Updates and recommendations are routinely discussed with the university president and vice president for student life."

---

[93] It is concerning that a university, an institution that should be committed to the discovery of Truth, spends most of its time talking about pseudoscientific terms such as "rape culture" and develop programs for masculinity without carefully assessing what the long-term damages of such programs may be.

b)      "The requirement of a hearing with direct cross-examination for all formal complaints of sexual harassment would lengthen complaint resolution time, hamper our ability to take prompt action against employees who have violated our policies, and add substantial cost[94] as we ensure those overseeing hearings and providing cross-examination are competent and qualified to do so. We are concerned that this has the potential to discourage the reporting of problems on our campus."

c)      "Serving as a quasi-court system would be especially burdensome in our employment grievance procedures."

d)      "The University of Iowa uses a three-module training curriculum for new decision-makers that in addition to the topics noted above, includes a case study, practice application of our policies and procedures, content on due process principles, dynamics of sexual harassment, sexual assault, dating/domestic violence and stalking, and information to assist in working across differences related to race, sexual orientation, gender identity, and language. Ensuring a culturally responsive process[95] is exceedingly important because research literature and our own climate survey data suggests bisexual, gay men, and lesbian students are at a significantly greater risk of experiencing sexual misconduct compared to their heterosexual. "

e)      "Even with the more restricted training requirements proposed, however, the costs of training will increase substantially because of the additional personnel necessary to implement the proposed procedural changes calling for a quasi-court system approach[96] rather than our current educational and employment procedures. The additional hearing officers, aligned advisors, and investigators managing inspection and review of considerably more and more sensitive documentation will need to be trained to perform these responsibilities effectively."

f)      "Live hearing with direct cross examination: This provision, alone and in conjunction with the inspect and review requirement addressed below, converts the grievance procedures into quasi-court systems. Administrative complaints are not an appropriate substitute for the formal criminal or civil judicial systems. Subjecting students and employees to a directly adversarial process that is intimidating, hostile, and draining by its very nature likely will yield unintended consequences."

---

[94] A public university can pay the costs required for fairness in Title IX procedures. Further, it avoids them of costs that may come from lawsuits they may have to face if they continue with their discriminatory practices.

[95] Nothing about UI's Judiciary Process that Doe went through, which had multiple levels and multiple people involved, showed any trace of "culturally responsive process"

[96] However, as both of Doe's previous attorneys discovered, UI only hired prosecutors from federal and county courts and set up hostile environments for males creating a quasi-court system without the protections that come from it.

g)      "When it comes to the questioning of witnesses, the NPRM requires an on-the-spot explanation for any decision to exclude a question—a standard higher than any judge must follow in a court of law, and one likely to protract the proceedings and to invite further challenge."

h)      "Because the NPRM requires that any testimony that is considered must be subject to cross-examination, we fear aggressive questioning tactics will be used by advisors, who could include parents, classmates, or attorneys, in an attempt to intimidate the reporting party, the responding party or other witnesses from participating in a hearing. [97]We believe the Department can make changes to existing guidelines with less prescriptive rules than noted in the NPRM. We strongly urge the Department to remove the requirement of direct cross-examination and live hearings for all sexual harassment cases."

i)      "Right to an aligned advisor who will serve to cross-examine: The university believes that this provision, if included in the final regulation, will be cost-prohibitive for the University of Iowa. If one party hires a well-known aggressive litigator as an advisor who is permitted to conduct direct cross-examination, we might be required to ensure fairness in our process by providing a well experienced advisor to the other party. Hiring individuals with these skills would be very costly and also creates an imbalance in the level of institutional support provided to the parties. It is not reasonable to expect that we direct our resources in this manner to either or both parties. We currently rely on trained hearing officers to control the questioning of witnesses and to maintain fairness and appropriate decorum in our hearings."

DiCarlo recommends the preponderance of evidence standard on college campuses. However, the most recent academic study on Title IX and evidentiary standards, from UCLA professor John Villasenor, provides evidence that given all other factors as constant, the likelihood of error when using just the "preponderance standard" on Title IX investigations issue an erroneous finding of responsibility of innocent students' 33 percent of the time. However, that number, as it related to an erroneous finding,

---

[97] However, where they use experienced prosecutors to aggressively question to intimidate the accused. Providing the accused with the same artillery would reduce such abuse of power.

dropped to 4 percent when using the "beyond a reasonable doubt" standard[98]. Villaseno, John, *A probabilistic framework for modeling false Title IX convictions under the preponderance of the evidence standard* (2016) Oxford Academic. See https://academic.oup.com/lpr/article/15/4/223/2549058

1007.  DiCarlo demonstrated blatant hypocrisy when she suggested that she does not want these procedures to follow the procedure of a quasi-court system.

1008.   DiCarlo also seems to congratulate herself for suggesting that when it comes to the questioning of witnesses, UI uses an "on-the-spot explanation" for any decision to exclude a question—"a standard higher than any judge must follow in court." Although questions explicitly rejected that are asked on the spot will be given an explanation, the Adjudicator can choose not to ask many critical questions, including many of the questions provided before the hearing. When Doe's attorney argued with the Adjudicator about not asking questions, she would either say she will come back to it later and never did, or just said that she would not go through everything, which was her way of removing questions that may put light on the inconsistencies of the complainants[99]..

---

[98] Doe asserts that wrongly holding someone responsible presents the greatest injustice of all. Thus, Doe alleges, through empirical research done in the subject, that the preponderance standard in Title IX proceedings is unjust, and unless overturned will continue to destroy innocent lives.
- FIRE expected Title IX coordinators such as DiCarlo to make such arguments as it related to supporting basic due process, so they prepared an eloquent response.
- The proposed regulation follows the lead of the growing number of federal courts that have recognized cross-examination is essential to due process in the campus context.
- As the ACLU notes, the definition of student-on-student sexual harassment articulated in the proposed rules is taken from the 1999 Supreme Court case Davis v. Monroe County Board of Education, the leading case in this area of the law. Both the Court in Davis and the rules proposed last week define such harassment as "[u]nwelcome conduct on the basis of sex that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity."
- The Davis standard carefully balances schools' obligation under Title IX to address sexual harassment and their obligation to protect students' expressive rights. The Davis standard encompasses sexual violence, but

1009.   On January 30, 2019, the ACLU, after being skeptical at first, submitted a response to the

Department of Education. The ACLU sided with the DeVos guidelines than with the well-intentioned

Obama guidelines:

> "The ACLU supports many of the increased procedural protections required by the Proposed
> Rule for Title IX grievance proceedings, including the right to a live hearing and an
> opportunity for cross-examination in the university setting, the opportunity to stay Title IX
> proceedings in the face of an imminent or ongoing criminal investigation or trial, the right
> of access to evidence from the investigation, and the right to written decisions carefully
> addressing the evidence."

---

it can also include repeated harassing conduct or even pure speech (without accompanying conduct) that interferes with a student's access to education because of its severity and pervasiveness.

- The proper standard of evidence: This has long been the primary argument made by those who believe that Title IX should mandate that campus tribunals use the preponderance of the evidence standard — that of a mere 50.01% certainty — when determining whether or not a student committed any form of sexual misconduct, from verbal harassment to forcible rape. Since this is the standard in use for civil trials regarding these offenses (or, for those that are criminal offenses, their analogs in tort law), they say, it would be unfair to complainants to use any higher standard. After all, campus tribunals are not criminal courts, and their findings cannot result in jail time or criminal records.

- But are campus proceedings that purport to determine whether or not a student sexually assaulted someone really best compared to a civil trial? Even under the proposed regulations, colleges will lack tools we deem critical in both civil and criminal litigation: the power to subpoena witnesses, the ability to take sworn testimony under penalty of perjury, rules that protect both parties from the introduction of unreliable or prejudicial evidence, and many more procedural requirements designed to achieve reliably just outcomes.

- As Joe Cohn, FIRE's legislative and policy director, wrote in The Chronicle of Higher Education all the way back in 2012:
  "One other important feature distinguishes civil lawsuits from campus proceedings: Civil suits can be settled for money and kept confidential. Yet students accused of sexual misconduct cannot simply settle the case for money and stay in school. Preponderance advocates should ask themselves why this is so. If the answer is that campus sexual misconduct is more like a crime (with a victim and alleged perpetrator) than a civil dispute (with a plaintiff and defendant)—as is certainly the case—then why is the preponderance standard sufficient for charges of sexual misconduct on campus?"

- Even if the due process improvements being considered in the proposed regulations come to pass, students will still have far fewer protections than they would find in those civil trials using the preponderance of the evidence standard. So adopting a higher standard of proof is a step that we believe universities interested in justice should take.

1010.   It urges a requirement that universities "provide counsel for both parties for the hearing if either party requests counsel." The ACLU questioned the ascendant notion that protections for accused students and justice for victims are at odds, before stating:

> "There are, however, important ways in which the goals of due process and equality are shared. Both principles seek to ensure that no student—complainant or respondent—is unjustifiably deprived of access to an education. Moreover, both parties (as well as the schools themselves) benefit from disciplinary procedures that are fair, prompt, equitable, and reliable."

1011.   Sexual assault is a serious crime and it needs to be addressed in a serious manner. The manner in which UI approaches sexual assault, however, moves away from solutions. It harms innocent people while destroying the structure of justice itself.

1012.   The act of just "believing" someone who accuses others of sexual misconduct and assigning them "survivor" status is not a new idea. This country had seen it before. UI might want to learn that the history of controlling minority men's intersexual behavior in this country is closely intertwined with the history of lynching[100]. Those who are involved in this field, such as DiCarlo, need to be aware of that history, lest they make things worse.

1013.   A university committed to "diversity, equity, and inclusion" should know how minority men like Doe are affected when they lack due process protections or when they intentionally use a system to find such men responsible. Instead of using these commitments for virtue signaling, UI could start with fairness and the presumption of innocence they deserve.

---

[100] See for example, Emmett Till

## VI.   COUNTS

L.   **COUNT 1 42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process (Against all Individual Defendants)**

1.    Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

2.    Before enrolling in UI, Doe relied on UI's promise – as a public university – to honor Doe's due process rights under the United States' Constitution and in doing so Doe also knew he needed to comply with his constitutional obligations to UI.

3.    Before enrolling in UI, Doe reviewed and relied on UI's promises in UI's Policies and in doing so Doe knew he needed to comply with his obligations detailed in UI's Policies.

4.    As detailed in part above, Individual Defendants were involved in decisions about investigating said complaint; prosecuting said complaint; adjudicating said complaint; and/or the ratification of the unlawful actions involved in the investigation, prosecution, and/or adjudication of said complaint.

5.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

6.    Here, UI Defendants are state actors subject to the Fourteenth Amendment.

7.    Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

8.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

9.      A person has a protected property interest in pursuing his education, and in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

10.      Doe's constitutionally protected property interest in his continued enrollment at UI and his right to complete his undergraduate degree at UI was violated by UI Defendants' actions.

11.      Doe had a constitutional right to be free from arbitrary suspension, dismissal, or restrictions on his ability to enter the UI campus.

12.      Doe's constitutionally protected property interest in his right to continued enrollment at UI also arises from the policies, courses of conduct, practices, and understandings established by UI.

13.      Doe's constitutionally protected property interest further arises from the express and implied contractual relationship between UI and Doe.

14.      It is well established that the Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

15.      A person admitted to a public university has a protected property interest in continuing his education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process.

16.      If Doe as a UI student faced disciplinary action that included the possibility of suspension or dismissal if found responsible for alleged sexual misconduct, then the due process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process that UI used.

17.      UI, as a flagship university established by the State of Iowa, and the Individual Defendants, as agents of UI, must provide UI's students equal protection and due process of law by and through any and all policies and procedures set forth by UI

18.      Under both federal and state law, Doe had a constitutionally protected property interest in

completing his graduate education at UI when he was disciplined by UI and in the future.

19.      Doe was entitled to fundamentally fair procedures and a meaningful opportunity to be heard and

process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and

repercussions he was facing.

20.      In such investigation and adjudication, UI Defendants flagrantly violated Doe's clearly established

rights under the Due Process Clause of the Fourteenth Amendment through its deprivation of the minimal

requirements of procedural fairness in numerous respects.

21.      Due to the Adjudicator's discrimination at the hearing where she chose not to ask critical questions

requested by Doe, UI Defendants denied Doe opportunity to confront evidence, to cross-examine his

accusers, and to confront any other witnesses.

22.      At least 20 courts have determined the need for cross-examination in adjudications of sexual

misconduct allegations at public and private schools[101].

---

5.   [101] *See e.g.,   John v. Baum*, 903 F.3d 575, 578 (6th Cir. 2018)(holding: if a public university has to choose between competing narratives to resolve a case, the university *must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder*)(emphasis added); *Powell v. Montana State Univ.,* No. 2:17-cv-15 SEH, Docket 134, p.21 (MT Dec. 21, 2018)(citing lack of cross examination as basis for rejecting university's summary judgment motion to dismiss a procedural due process claim because "[i]f a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination in order to satisfy due process."); *John v. Univ. of Cinn.* No.16-4693, 2017 WL 4228791, *5 (6th Cir. Sept. 25, 2017)(discussing need for cross-examination in Title IX disciplinary proceedings); *John v. Miami Univ.* 882 F.3d 579 (6th Cir. 2018)(same);   *Nokes v. Miami Univ.,*   No. 1:17-cv-482, 2017 WL 3674910, *10-12 (S.D.OH. Aug. 25, 2017)(same); *John v. Penn. St. Univ.,* No.17-cv-1315, 2017 WL 3581672, *7-8 (M.D.Pa. Aug. 18, 2017)(same);   *John v. the Univ. of Colorado, Boulder,* Civil Case No. 1:18-cv-02243-LTB, 2019 WL 764568, *15 (D. Co. Feb. 21, 2019)(rejecting motion to dismiss due process claim because "the lack of a full hearing with cross-examination provides evidence supporting a claim for a violation of [Doe's] due process rights."); *Oliver v. Univ. of Tx. Southwestern Med. Sch.,* NO. 3:18-CV-1549-B, 2019 WL 536376, *13 (N.D. Tx. Feb. 11, 2019)(rejecting motion to dismiss procedural due process claim in part because university did not provide Doe with an opportunity to cross-examination Doe's accuser in a "live hearing."); *John v. The Regents of The Univ. of Cali.,* No. B283229 2nd App. Dist. 6th Div., p.2 (Oct. 9, 2018)(same); *John*

23.     Since no eyewitnesses observed Sally/Lisa and Doe's physical interactions, and no conclusive

documentary or physical evidence, Sally's and Lisa's allegations against Doe came down entirely to a

credibility assessment – a choice between believing Sally/Lisa or Doe.

24.     By declaring Doe guilty of sexual assault without affording him an opportunity to adequately

cross-examine Sally and Lisa, Dr. Lovaglia, and/or Sally's or Lisa's witnesses, UI Defendants violated

Doe's clearly established constitutional rights.

---

*v. Univ. of Mississippi*, 361 F.Supp.3d 597, 611-13 (S.D. Miss. 2019)(rejecting motion to dismiss procedural due process claims based on university prohibiting Doe from cross-examining "witnesses whose accounts of the evening led to his discipline."); *Smock v. Bd. of Regents of the Univ. of Mich.* 353 F.Supp.3d 651, 657-58 (E.D. Mich. 2018)(rejecting motion to dismiss procedural due process claims based on university prohibiting Doe from cross-examining witnesses in disciplinary proceeding involving allegations of sexual misconduct); *John v. The Penn. State Univ.* No. 4:18-cv-164, Docket 27, PageId.15-18 of 19, Memorandum Opinion (M.D. Pa. Aug. 21, 2018)(unreported)( rejecting university's motion to dismiss male student's due process claim is based on concerns about lack of meaningful cross-examination); *John v. Univ. of Southern Mississippi*, No.2:18-cv-153, Docket 35, p.5-7 (S.D.E.D. Miss., Sept. 26, 2018)(unreported)(enjoining ongoing sexual misconduct disciplinary proceeding because university violated Doe's due process rights by denying him the right to cross-examination); *Jane Roe v. Javaune Adams-Gaton,* Case No. 17-cv-945-EAS-CMV, Docket 46 (S.D.E.D. Oh. April 17, 2018)(unreported)(enjoining university from imposing Title IX disciplinary sanctions against Doe because her procedural due process rights were violated since she was unable to cross-examine her accusers and/or adverse witnesses during her university level disciplinary hearing); *John v. Univ. of Mich.,* No.2:18-cv-11776-AJT-EAS, Docket 30, PageId.743, 739 *Order Granting In Part and Denying In Part Doe's Motion For Temporary Restraining Order And Preliminary Injunction* (E.D.S.D. Mich. July 6, 2018)(unreported)(enjoining disciplinary proceeding because university violated Doe's due process rights by not providing "the opportunity for a live hearing" where Doe could submit cross-examination questions to adjudicators to be asked of witnesses because "[w]ithout a live proceeding, the risk of an erroneous deprivation of Doe's interest in his reputation, education, and employment is significant."); *Lee v. Univ. of New Mexico,* No.1:17-cv-01230, Doc. 36, p.2-3 (N.M. Sept. 20, 2018)(rejecting motion to dismiss student's due process claim because university prohibited him from cross-examining witnesses in "formal or evidentiary hearing" and because the court "conclude[d] that preponderance of the evidence may not be the proper standard for disciplinary investigations . . . given the significant consequences for students found responsible for engaging in sexual misconduct); *John v. University of Southern California*, 28 Cal.App.5th 26 (2018)(granting male Doe's writ of administrative mandate because private university did not allow cross-examination during Title IX disciplinary proceeding); *John v. Claremont McKenna College,* 236 Cal.Rptr.3d 655, 656 (Cali. 2nd App. Dist. Aug. 8, 2018)(same); *John v. Allee,* 2019 Cal. App. LEXIS 8, *55, 56, 60 (Cal. App. 2d Dist. January 4, 2019)("We also agree with *Baum*'s holding extending the right of cross-examination to the questioning of witnesses other than the complainant where their credibility is critical to the fact-finder's determination."); *John v. Marymount Univ.,* 297 F.Supp.3d 573, 584 (E.D.VA. Mar. 14, 2018)(rejecting motion to dismiss Title IX claim at private university in part because private university denied Doe right to cross-examine his accuser in Title IX proceeding).

25.     By declaring Doe guilty of sexual assault without affording him an opportunity to adequately cross-examine Sally and Lisa, Dr. Lovaglia, and/or Sally's or Lisa's witnesses, UI Defendants deprived Doe of his liberty and property interests without affording him basic due process, including, but not limited to: (i) his right to a fair adjudication, free of bias; (ii) his right to be innocent until shown to be responsible; (iii) his right to be heard by an impartial factfinder; (iv) his right to question Sally and Lisa, Dr. Lovaglia, and/or Sally's and Lisa's witnesses; (v) his right to adequately present evidence and witnesses to support his defense; and (vi) the disparate standards for assessing credibility, ie the UI starts by the believing the victim allegations while assuming at the outset that the accused his guilt.

26.     UI Defendants, and other agents, representatives, and employees of UI, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Doe's constitutional rights.

27.     Because of these due process violations, Doe continues to suffer ongoing harm, including damages to his reputation, loss of employment and educational opportunities, and other economic and non-economic damages. Courts have voiced these issues multiple times[102].

28.     The discipline imposed by UI has permanently damaged Doe's his career prospects in his chosen profession, denied him the benefits of education at his chosen school, damaged his relationships with his professors he took years to build, and damaged Doe's reputation.

29.     UI Defendants are liable to Doe in violation of 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

---

[102] *See e.g., Baum*, 903 F.3d at 58 ("Time and again, this circuit has reiterated that students have a substantial interest at stake when it comes to school disciplinary hearings for sexual misconduct . . . Being labeled a sex offender by a university has both an immediate and lasting impact on a student's life. The student may be forced to withdraw from his classes and move out of his university housing. His personal relationships might suffer. And he could face difficulty obtaining educational and employment opportunities down the road, especially if he is expelled.")(internal citations omitted).

30.     As a direct and proximate result of the above conduct, Doe sustained tremendous damages, including, without limitation, emotional distress; loss of educational and career opportunities; economic injuries; and other direct and consequential damages. Doe's interests in the results of the disciplinary process are significant.

31.     UI Defendants' conduct as described herein was malicious, reckless, and/or callously indifferent to Doe's rights.

## A.     COUNT 2 Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (Against all Individual Defendants)

32.     Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

33.     The Fourteenth Amendment to the United States Constitution provides in pertinent part:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

34.     The allegations of discrimination made in Count 1 above and elsewhere in this Complaint further demonstrate that UI Defendants violated Doe's clearly established not to be discriminated against on the basis of sex, and/or status as student accused of sexual misconduct, in violation of the Fourteenth Amendment and, therefore, 42 U.S.C. § 1983.

35.     Fourteenth Amendment's guarantee of "equal protection" of the laws, requires that the government apply the same rules in a standardized and consistent manner to people in similar circumstances.

36.     While Doe re-affirms his innocence, even if he was found responsible for his conduct, the sanction of expulsion is extreme. The Investigator in her recommendations stated that Doe be expelled if found responsible for sexual assault.

37.     UI's Dean of Students sanctioning report states that people found responsible for forced penetration are not being expelled, and that Doe was the only person expelled in the academic year. Doe was incorrectly found responsible for allegedly touching the breast of two women once.

## B.     COUNT 3 Violation of Title IX of the Education Amendments of 1972 (Against UI)

38.     Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

39.     Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

40.     Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972.

41.      In academic year 2016-17 UI undergraduate students received over 67 million dollars in federal student loans.

42.     Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by imposing university discipline where gender is a motivating factor in the decision to discipline. In either case, the statute is enforceable through an implied private right of action.

43.     The Sixth Circuit has expressly recognized several different "theories of liability that a student who is 'attacking a university disciplinary proceeding on grounds of gender bias can potentially assert under Title IX[103]."

44.     Under *Yusuf,* an erroneous outcome claim is properly plead when a plaintiff: "asserts that he or she was innocent and wrongly found to have committed the offense. . . (or) regardless of guilt, the severity of the penalty was affected by the student's gender[104]."

45.     Doe alleges both these prongs.

46.     UI Defendants' finding that Doe was guilty of non-consensual sexual assault with Sally and Lisa was erroneous.

47.     UI Defendants' finding that Doe was guilty of sexual harassment was erroneous.

48.     These facts casting much more than "articulable doubt" on its accuracy of UI's expulsion of Doe.

49.     There was a particularized causal connection between the erroneous outcome and UI, including but not limited to UI having settled two lawsuits alleging gender discrimination towards women in the year Doe was expelled, with one of them just two days before Doe's hearing. Further, UI was being investigated for gender discrimination towards women by the OCR. As Doe's attorney found when he asked, UI only used prosecutors for a university hearing.

---

[103] *Doe v. Miami Univ.,* 882 F.3d 579, 589 (6th Cir. 2018) (citation omitted). Three of these recognized theories of liability are "(1) 'erroneous outcome,' (2) 'selective enforcement,' [and] (3) 'deliberate indifference.'" *Id.*

[104] To plead an erroneous-outcome claim under Title IX, an accused found guilty of sexual assault by a university must allege: "(1) 'facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) a 'particularized…causal connection between the flawed outcome and gender bias.'" *Id.* at 592 (citations omitted).

50.     Doe also alleges that regardless of guilt, the severity of the penalty was affected by his gender.

51.     Similarly, this Complaint details how Doe satisfies the elements of a selective enforcement claim[105]

## C.     COUNT 4 Violation of Title IX – Selective Enforcement (Against UI)

52.     Doe hereby incorporates by reference the aforementioned allegations contained in this Complaint as though fully set forth herein.

53.     As detailed in this Complaint, UI violated Title IX's prohibitions against engaging in the "selective enforcement" of UI Policies on the basis of gender[106].

54.     The facts detailed in this Complaint establish that UI's decision to initiate the proceeding against Doe and/or the severity of the penalty imposed on Doe was affected by Doe's male gender, without regard to his guilt.

55.     Upon information and belief, UI had never found a similarly-situated woman responsible for sexual assault for kissing without (verbal) consent as the Adjudicator found Doe responsible for and given a sanction as extreme as Doe's.

---

[105] The Sixth Circuit defines as requiring a plaintiff "show that a similarly-situated member of the opposite sex was treated more favorably than [Doe] due to his . . . gender." *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016).

[106] See e.g., Marshall v. Indiana Univ., Case No. 1:15-cv-00726, 2016 U.S. Lexis 32999, *19 (S.D. Ind. Mar. 15, 2016) (emphasis in original) (citing Routh v. Univ. of Rochester, 981 F. Supp. 2d 184, 211-12 (W.D.N.Y. 2013) (stating that "selective enforcement" liability under Title IX occurs when a plaintiff "allege[s] facts sufficient to give rise to the inference that the school intentionally discriminated against the plaintiff because of his or her sex"). In addressing a selective enforcement claim raised by a male student in a similar situation to Doe, the Second Circuit noted the "selective enforcement" theory requires that the school's "decision to initiate the proceeding" or the "severity of the penalty" "was affected by the student's gender" without regard to guilt. Yusuf v. Vassar College, 35 F. 3d 709, 715 (2d Cir. 1994).

56.     UI treated Doe and the complainants differently. Doe detailed this at each stage of UI's Judicial

Process, and in his appeals to UI and the Board. Doe described how Sally harassed him throughout the

relevant time period.

57.     UI had not investigated Sally for any of the misconduct explained by Doe during his interview

with the office of sexual misconduct.

58.     Doe was also not given accommodations available to him by UI. Upon information and belief,

Lisa was given accommodations by UI.

59.     UI held Doe responsible for initiating kissing Sally, despite credible evidence stating that it was

mutual, and finding him responsible for sexual assault.

60.     Upon information and belief, female students sufficiently similar to Doe who engaged in similar

offenses were treated more favorably by UI. Upon information and belief, the difference in treatment was

because of his gender.

61.     Upon information and belief, UI failed to discipline female students for initiating nonconsensual

physical contact with male students.

62.     Upon information and belief, UI had **not** expelled female student(s) for making false accusations

such as Sally and Lisa.

63.     Upon information and belief, UI had expelled male student(s) for making false accusations.

64.     UI knew or should have known that the allegations against Doe were false. This is evidenced by

UI excluding exculpatory evidence that would have found Doe not responsible and refusing to ask Sally

and Lisa questions that would display major inconsistencies in their story.

65.    UI's Title IX liability to Doe caused Doe to suffer and continue to suffer the damages detailed in this Complaint.

## D.    COUNT 5 Violation of Title IX – Hostile Environment/Sexual Harassment and/or Discrimination (Against UI)

66.    Doe hereby incorporates by reference the aforementioned allegations contained in this Complaint as though fully set forth herein.

67.    Pursuant to 20 U.S.C. § 1681, Title IX is a federal statute designed to prevent sexual discrimination and/or harassment in educational institutions receiving federal funding.

68.    Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, applies to all public and private educational institutions that receive federal funds, including colleges and universities. The statute prohibits discrimination based on sex in a school's "education program or activity," which includes all the school's operations. Title IX provides in pertinent part:

> "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The United States Supreme Court has held that Title IX authorizes private suits for damages in certain circumstances.

69.    UI receives federal financial assistance and is thus subject to Title IX.

70.    Both the DOE and the DOJ have promulgated regulations under Title IX that require a school to *"adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by"* Title IX or its regulations. 34 C.F.R. § 106.8(b) (Department of Education); 28 C.F.R. § 54.135(b) (Department of Justice).

71.    Title IX mandates UI afford equitable procedures and due process to Doe which includes but is not limited to those detailed in this Complaint.

72.     UI knew, or in exercising due care should have known, that it denied Doe his rights under Title IX and/or UI's policies as set forth in the preceding paragraphs.

73.     UI's policies fail to meet the standards required by Title IX and/or Constitutional safeguards as interpreted by the United States courts regarding how institutions of higher education conduct disciplinary proceedings.

74.     Upon information and belief, in virtually all cases of campus sexual misconduct addressed by UI, the accused student is male.

75.     UI created an environment in which male students accused of sexual assault, such as Doe, are fundamentally denied their rights under Title IX and/or UI Policies so as to be virtually assured of a finding of responsibility. Such a biased and one-sided process deprives male UI students like Doe of educational opportunities based on their gender. Upon information and belief, UI's investigation and/or discipline of Doe was taken to demonstrate to Doe, DOJ, OCR, UI's largely female student body, and/or the general public that UI: (a) is aggressively disciplining male students accused of sexual assault, and (b) providing females involved in sexual misconduct proceedings with preferential treatment not provided to males.

76.     UI had actual or constructive knowledge that the investigation and/or discipline of Doe posted a persuasive and unreasonable risk of gender discrimination regarding Doe. In both his appeals to UI and the Board, Doe had informed UI and the Board of the rights he was denied in UI's Judicial Process, and the discrimination and harassment he had faced because of his gender by UI Defendants during the UI Judicial Process.

77.     UI's actions and inactions detailed above set in motion events that UI knew, or reasonably should have known, would cause UI's male students, such as Doe, to suffer unlawful gender discrimination.

78.     UI's investigation and/or discipline of Doe is discriminatory and based upon or motivated by Doe's male gender.

79.     UI unlawfully failed to exercise the authority to institute corrective measures to remedy: (a) UI's violations of Doe's rights under UI Policies, Title IX, and/or guidance promulgated by OCR; and/or (b) UI's unlawful determination that Doe violated UI Policies which UI adopted under federal laws and regulations related to Title IX.

80.     These exclusionary practices create a hostile environment against male students.

81.     As per the United States policy, a hostile environment can occur even in the absence of intent to harm or even if the hostility is not directed at a particular target.

82.     Nor does a hostile environment require sexual intent: Gender animus or hostility based on sexual stereotypes is sufficient to trigger Title IX liability (Dear Colleague Letter, 2010, p. 8).

83.     This includes situations in which "students are harassed for exhibiting what is perceived as a stereotypical characteristic for their sex". For example, men who stereotyped and vilified on account of their masculinity are protected by Title IX.

84.     UI also exhibited deliberate indifference by refusing to remedy: (a) its violations of Doe's rights under UI Policies, Title IX, and/or guidance promulgated by OCR, and/or (b) its erroneous determination that Doe violated UI Policies which UI adopted under federal laws and regulations related to Title IX.

85.     UI's deliberate indifference caused Doe to suffer sexual harassment and/or discrimination so severe, pervasive or objectively offensive it deprived Doe of access to educational opportunities or benefits and caused other harms detailed in this Complaint.

86.     Upon information and belief, UI possesses additional documentation evidencing the unlawful pattern of gender-biased decision making which preferentially treats female students who falsely accused male students like Doe of sexual misconduct.

87.     Upon information and belief, UI possesses additional documentation evidencing its refusal to discipline female students alleged to have sexually assaulted male students.

88.     Because of UI's violations of Doe's rights under Title IX and/or UI Policies, Doe has suffered and will continue to suffer the damages detailed above.

89.     UI's hostile environment, sexual harassment and/or discrimination caused Doe to be damaged in an amount to be determined at trial.

## E.     COUNT 7 Violation of Title IX – Deliberate Indifference  (Against UI)

90.     Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

91.     UI employees, including but not limited to Individual Defendants, acted with deliberate indifference towards Doe because of his male gender.

92.     UI employees, including but not limited to Individual Defendants, unlawfully failed to exercise the authority to institute corrective measures to remedy: (a) State Defendants' violations of Doe's rights under UI Policies, Title IX, guidance promulgated by OCR, and/or the Constitutions of the United States and/or Iowa; and/or (b) State Defendants' erroneous determination that Doe violated UI's policies which UI adopted under federal laws and regulations related to Title IX.

93.     Much of deliberate indifference had been pledged in this Complaint due to overlap of Title IX policies. Doe realleges deliberate indifference.

94.     UI employees, including but not limited to Individual Defendants, exhibited deliberate indifference by refusing to remedy: (a) State Defendants' violations of Doe's rights under UI Policies, Title IX, guidance promulgated by OCR, and/or the Constitutions of the United States and/or Iowa; and/or (b) UI's erroneous determination that Doe violated UI Policies which UI adopted under federal laws and regulations related to Title IX.

95.     Upon information and belief, State Defendants possess additional documentation evidencing their gender based deliberate indifference towards Doe and/or other similarly situated male students.

96.     UI's deliberate indifference caused Doe to be damaged in an amount to be determined at trial.

WHEREFORE, regarding Counts 1-7, Doe demands judgment and relief against UI as follows: (a) Damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate Doe's past and future pecuniary and/or non-pecuniary damages caused by Defendants' conduct; (b) Order(s) requiring UI to reinstate Doe as a student and expunge Doe's official and unofficial UI files of all information related to his interactions with Sally and Lisa, including but not limited to charges and sanctions served, and prohibiting UI from disclosing such information to any third party; (c) judgment for attorneys' fees, and/or punitive damages under any applicable statute; (d) judgment for all other reasonable and customary costs and expenses incurred in pursuit of this action; (e) pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or (f) such other and further relief as this court may deem just, proper, equitable, and appropriate.

## F.     COUNT 8 Breach of Contract (Against UI)

97.     Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

98.     Doe applied to and enrolled at UI and, assisted by his parents, paid tuition and other fees and expenses. Doe did so in reliance on the understanding, and with the reasonable expectations, among others, that: (a) UI would implement and enforce UI Policies; and that (b) UI Policies would comply with the requirements of applicable law.

99.     UI Policies create an express contract or, alternatively, a contract implied in law or in fact, between UI and Doe. UI violated these contracts by engaging in the conduct detailed in this Complaint

100.    UI improperly and unlawfully applied UI's Policies in part by not affording Doe rights to which he was entitled as detailed in part in this Complaint.

101.    UI's unlawful conduct detailed in this Complaint evidences its repeated and material breaches of UI's Policies as well as estoppel and a breach of the implied covenant of good faith and fair dealing inherent in UI's Policies.

102.    Doe was expelled from UI without been given a rationale for his expulsion. Doe was entitled to a formal explanation to why he was being expelled, especially since Doe was the only student expelled from UI that year and students who had been responsible for rape had not been expelled.

103.    Doe was entitled to mental healthcare and other accommodations he had requested while going through UI's Judicial Process, which he was not provided despite requesting.

104.    UI, by being reckless in their decision making, failed to afford Doe an equitable due process.

105.    UI failed to apply the preponderance of evidence standard throughout the UI Judicial Process.

106.    UI charged him full tuition for the semester, despite unlawfully expelling him in the beginning of that semester and still wants Doe to pay an amount in excess of $24,000.

107.    Because of all the conduct mentioned above, Doe had criticized UI of breaching its contract with him in his appeal to the Board.

108.    Although UI's aforementioned breaches of UI's Policies were wrongful and without lawful justification or excuse, a judgment in Doe's favor regarding his breach of contract claim cannot fully remedy UI Defendant's violations of Doe's due process, and equal protection rights detailed above because UI Policies were drafted so as to deprive Doe of these rights.

WHEREFORE, regarding Counts 1-7, Doe demands judgment and relief against UI as follows: (a) Damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate Doe's past and future pecuniary and/or non-pecuniary damages caused by Defendants' conduct; (b) Order(s) requiring UI to reinstate Doe as a student and expunge Doe's official and unofficial UI files of all information related to his interactions with Sally and Lisa, including but not limited to charges and sanctions served, and prohibiting UI from disclosing such information to any third party; (c) judgment for attorneys' fees, and/or punitive damages under any applicable statute; (d) judgment for all other reasonable and customary costs and expenses incurred in pursuit of this action; (e) pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or (f) such other and further relief as this court may deem just, proper, equitable, and appropriate.

## G.    COUNT 9 42 U.S.C. § 1981: Discrimination Based on Race and National Origin (Against UI and/or Individual Defendants)

109.    Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

110.    The Civil Rights Act of 1964, 42 U.S.C. Section 1981 prohibits discrimination based on race and national origin, as follows:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full

and equal benefit of all laws and proceedings for the security of persons and property as enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other

111.    The phrase "to make and enforce contracts" refers to the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C.A. § 1981 (West).

112.    Defendant actions were motivated by racial animus and were taken in malicious, willful, wanton, deliberate indifference to, and reckless disregard of Doe's rights as guaranteed by 42 U.S.C. § 1981.

113.    Doe can provide many examples. Examples include, but not limited to: The Adjudicator used racial/national origin stereotypes such as "authoritarian" was used to describe Doe when no reasonable person upon seeing the text message exchange between Doe and Lisa would have found Doe to be "authoritarian."

114.    Upon information and belief, UI had expelled another Asian man for nonviolent sexual misconduct named A.V.

115.    Upon information and belief, a doctoral student, at least 40 years old at the time, who was white, was found responsible for sexual harassment due to UI's consensual relationships with students. Upon information and belief, the man, C.K. was dating undergraduate students he had power over and was not expelled and allowed to finish his degree at UI.

116.    Upon information and belief, as with Doe, students of color are found responsible at a higher rate when accused of sexual misconduct by white students.

117.    Upon information and belief, regardless of guilt, students of color found responsible for sexual misconduct are given harsher sanctions than white students.

118.    Upon information and belief, regardless of guilt, students of color found responsible for other forms of misconduct (such as alcohol violations) are given harsher sanctions than white students.

119.    Upon information and belief, UI suspends or expels international Asian men students who would struggle to file lawsuits against them. This is because their F-1 status expires as soon as they are expelled, forcing them to leave the country right away. Chances of returning from many Asia countries are slimmer due to visa restrictions.

120.    Upon information and belief, white students sufficiently similar to Doe who engaged in similar offenses were treated more favorably by UI. Upon information and belief, the difference in treatment was because of his race and/or national origin.

121.    Upon information and belief, white students are given accommodations, such as mental health counseling, when they ask for them as they go through UI Judicial Process.

122.    Doe had informed UI and the Board what the consequences of finding him falsely responsible because of their discrimination would be. UI and the Board showed indifference to Doe's credible fears and instead said that Doe was trying to gain sympathies.

123.    UI caused Doe to go through a lot of unnecessary anxiety and suffering that came from Doe losing his F-1 status, applying for political asylum, which has a backlog, and hoping every day they do not deport him.

124.    Doe's family wants to visit him in the U.S., especially since this investigation ended. They could not see him for over four years. They do not want complications in the U.S. visa as that may jeopardize his younger sister's career who dreams of coming to the U.S. to attend college in Fall 2020. Doe cannot

leave the country either as it is highly advisable to stay in the country from the time one applies for political asylum.

125.    As a direct, foreseeable and proximate result of Defendants' intentional illegal racial and national origin discrimination, Doe has suffered damages, including punitive damages, in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## H.    COUNT 10 Unjust Enrichment (Against UI)

126.    Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

127.    Before beginning his second year of Master's program, Doe paid UI over $40,000 in tuition for his first year. He had also paid UI expenses from his undergraduate studies.

128.    After expelling Doe without justification, and without credible evidence he had violated UI's policies and procedures, UI retained Doe's tuition.

129.    Doe was expelled within weeks of his starting a new semester and before he could receive credit for the courses he took during his previous semester for his incompletes.

130.    Doe did not have accommodations/resources available to him as the UI's sexual misconduct website did not have a link for resources available to respondents when Doe went through UI's investigation and hearing. The accommodations would have helped Doe finish his incompletes from the previous semester.

131.    Upon information and belief, UI added resources for respondents after Doe raised his concern in the Board appeal about not having accommodations available to him during UI Judicial Process.

132.    Doe's transcript was permanently marked.

133.    It was unjust for UI to retain Doe's tuition, under these circumstances.

134.    Because of the foregoing, Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## I.    COUNT 11 Injunctive Relief   (Against UI, Angie Reams, and Keller)

135.    Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

136.    Based on the facts articulated above and below, Doe is entitled to injunctive relief because UI and/or State Defendants' discipline of Doe is unlawful and violates Doe's rights under UI's policies, federal and/or state laws.

137.    UI and/or State Defendants' unlawful discipline of Doe will cause irreparable harm which is certain, great, actual and not theoretical.

138.    Doe will have to continue his education from Fall 2019 by enrolling in classes offered only in the Fall semester as his classes are offered only once a year. The longer the break from his education, the lower the chances of him retaining his knowledge already acquired in his degree will be for when he takes the comprehensive exam and his licensure exams required to complete his degree.

139.    Doe will also suffer irreparable harm if Doe does not re-apply for his F-1 visa back again soon.

140.    As a direct and proximate result of the Defendants' violations of Doe's constitutional rights, Doe, in the absence of injunctive relief will suffer severe and substantial damages. These damages include but

not limited to diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, immigration issues, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress, and other compensatory damages, in an amount to be determined by a jury and the Court

141.    UI and/or State Defendants' unlawful discipline of Doe cannot be remedied by an award of monetary damages because of difficulty or uncertainty in proof or calculation.

142.    Based on the facts articulated above, Doe is entitled to injunctive relief which includes, but is not limited to an Order requiring UI and/or State Defendants expunge Doe's official UI files of all information including but not limited to information related to all his interactions with Lisa and Sally, any records kept by the Dean of Students.

143.    Granting injunctive relief will cause no harm to UI and/or State Defendants because these defendants have no cognizable interest in the unlawful discipline of Doe.

144.    Granting injunctive relief will advance a significant and appreciable public interest by protecting members of the public – like Doe –from having their fundamental rights threatened by unlawful government action.

WHEREFORE, Doe prays judgment as hereinafter set forth.

## J.    COUNT 12 Declaratory Judgment - (Violation of Due Process Provisions of United States and Iowa Constitutions) (Against UI, The Board, and/or Individual Defendants)

145.    Doe realleges and incorporates all the allegations contained in the preceding paragraphs of the Complaint as though fully rewritten herein.

146.    Section 9, Article I, Iowa Constitution, guarantees that no person shall be deprived of life, liberty, or property without "due process of law." The Due Process Clauses of the Iowa and United States Constitutions are implicated by higher education disciplinary decisions, including the disciplinary decisions under UI's Policies.

147.    As detailed above, Doe and/or Individual Defendants have a dispute about whether the UI Policies as applied to Doe violated the Due Process Clauses of the United States Constitution, the Due Process of Law Clause of the Iowa Constitution, and the requirement that any hearing process be consistent with the customs of a free society.

148.    Doe is entitled to a declaration that UI Policies, as applied to Doe, violate the Due Process Clause of the United States Constitution and the Due Course of Law Clause of the Iowa Constitution, and entitled Doe to reinstatement at UI.

149.    Further, as detailed in this Complaint, Doe also has a legal tangible interest in requiring UI to administer UI Policies, Title IX, and/or OCR guidelines in a lawful manner.

150.    As detailed in this Complaint, UI is opposing Doe's aforementioned legal tangible interest in part because of UI's violations of Doe's rights under Title IX and/or UI Policies.

151.    Therefore, an actual controversy also exists between Doe and UI concerning said legal tangible interests.

152.    Judicial intervention is required because unless UI is enjoined, its unlawful acts will cause irreparable harm to Doe which includes, but is not limited to: (a) denying Doe the benefits of his education at UI; (b) damage to Doe's academic and professional reputation; and/or (c) Doe's inability to enroll at other institutions of higher education and to pursue his chosen career.

WHEREFORE, regarding Count 12, Doe demands a Declaratory Judgment that UI violated Doe's rights under UI Policies, Title IX and/or OCR regulations.

153.    Doe demands judgment and relief against UI as follows:

(A)     Compensatory and punitive damages in an amount to be determined at trial.

(B)     (a) Order(s) requiring UI to reinstate Doe as a student and expunge Doe's official and unofficial UI files of all information related to his interactions with Sally and Lisa, including but not limited to any records kept by the Dean of Students, charges and sanctions served, and prohibiting UI from disclosing such information to any third party; (b) judgment for attorneys' fees under any applicable statute; (c) a permanent injunction prohibiting UI from: (i) enforcing discipline that resulted from the unconstitutional hearing, and (ii) subjecting Doe to further disciplinary proceedings; (d) a declaration that (i) UI violated Doe's due process rights and its actions were motived by gender (ii) UI violated Doe's due process rights and its actions were motivated by race (iii) Doe was unjustly sanctioned by UI (iv) UI's lack of due process hurts minorities and people of color the most (d) Judgment for all other reasonable and customary costs and expenses incurred in pursuit of this action; (e) Pre-judgment interest as may be permitted by law and statute; and/or (f) such other and further relief as this court may deem just, proper, equitable, and appropriate.

## K.     COUNT 13 1st and 14th Amendments - (Violation of First Amendment Free Speech Protections of 1st and 14th Amendments) (Against Frost)

154.    Doe reasserts all of the above allegations as set forth herein.

155.    Frost's Report found that Mr. Doe sexually harassed Lisa Doe based upon, among other things, wishing her a Christmand and asking her about "the cutest gift she received for the holidays."

198

156.    That text exchange was not unwelcome, or sexually based.

157.    Doe had a 1st Amendment right to engage in such speech with other persons such as Roe.

158.    Doe was punished, in part, based upon that statement that was not hostile, sexually based, or imminently threatening.

159.    It was protected speech and Frost violated his right by sanctioning him in part based upon that speech.

**PRAYER FOR RELIEF**

160.    For the above reasons, Doe seeks nominal, compensatory damages, and attorney fees under 42 U.S.C. Section 1988.

Respectfully submitted,

RESPECTFULLY SUBMITTED,
/s/ Rockne Cole

_____
ROCKNE COLE
Cole Law Firm, PC
209 E. Washington, Ste. 304
Iowa City, IA  52240
(319)519-2540
(319)359 4009   FAX
rocknecole@gmail.com
Iowa Pin AT1675
**ATTORNEY FOR PLAINTIFF**