IN THE UITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| JOHN DOE, | ) |
| | ) CASE NO.      3:19-CV-00047-RGE- |
| | )                          HAC |
| Plaintiff, | ) |
| | ) BRIEF IN SUPPORT OF MOTION TO |
| v. | ) TO RESIST |
| | ) |
| | ) |
| | ) |
| UIVERSITY OF IOWA, et al, | ) |
| | ) |
| Defendant. | ) |

## Table of Contents

INTRODUCTION…………………………………………………………….2

SUMMARY………………………………………………………………....2

ALLEGATIONS IN FIRST AMENDED COMPLAINT…………………….3

ARGUMENT………………………………………………………………..20

I.      RULE 12 (b) (6) STANDARD…………………………………………21

II.     QUALIFIED, QUASI JUDICIAL IMMUNITY, AND QUASI-PROSECUTORIAL IMMUNITY DO NOT APPLY TO CONSTITUTIONAL CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF UNDER SECTION 1983…………………………………………………………...22

III.    FOR MR. DOE'S MONEY DAMAGES CLAIMS, QUASI JUDICIAL IMMUNITY DOES NOT APPLY TO IRIS FROST, TIFFANI STEVENSON EARL, REDINGTON, KELLER AND BRAUN……………………………...26

IV.     DEFENDANT SCHRIVER IS NOT ENTITLED TO QUASI PROSECUTORIAL IMMUNITY FOR MONEY DAMAGES…………………..31

V.      QUALIFIED IMMUNITY DOES NOT INSULATE UNIVERSITY
DEFENDANTS FROM MONEY DAMAGES CLAIMS………………………..34


VI.     PLAINTIFF ALLEGED PLAUSIBLE TITLE IX CLAIMS……………....56

VII.    PLAINTIFF HAS ADEQUATELY PLEADED BREACH OF

CONTRACT………………………………………………………………………68

VIII.   DOE HAS RAISED A PLAUSIBLE EQUAL PROTECTION CLAIM.
CONCLUSION…………………………………………………………………...71

**CONCLUSION…………………………………………………………………..72**

### INTRODUCTION

Plaintiff respectfully submits this brief in support of his Resistance to

Defendants' Motion to Dismiss his First Amended Complaint.

### SUMMARY

John Doe, an honors student with no prior disciplinary history, was expelled

from the University of Iowa after two students in a student run sociology lab, Sally

Roe and Lisa Roe, alleged that he touched their breasts once without their consent.

Sally also alleged nonconsensual kissing while Lisa denied kissing, but alleged that

he touched her breast once without her consent.  Neither alleged any force, threats,

intimidation, or any other sexual contact.

They also alleged that he sexually harassed them and provided them beer a

few times.  Sally and Lisa made the allegations six months after they occurred.

From the outset of the Title IX investigation, Doe adamantly denied that he had

any non-consensual contact or that he harassed them.  Sally originally reported to her professor Lovaglia that the contact was consensual, but changed her mind after reporting it six months later.  Doe admitted to kissing them, but stated that the kisses were consensual and that any touch of breast was consensual as well.  Doe also denied sexually harassing them, and expressly stated any beer was barely consumed.

After he was charged, the University of Iowa "disciplinary process," which it has characterized as primarily therapeutic and educational for students, prevented Doe and his lawyer from talking with witnesses due to its anti-retaliation policy, categorically banned him from asking any questions of witnesses through cross-examination, and banned Doe from campus without hearing.   The University does not believe in a "accused centered" approached, but instead employs the trauma, victim centered method of adjudication and investigating resulting in a presumption that victims tell the truth.   With no admissions or other corroborating evidence, the case rested entirely on a credibility determination of the accusers, Sally and Lisa, and the accused, Mr. Doe.  With no means to test the credibility of accusers or investigate, Doe, with no prior record of misconduct, was found responsible on all accounts and expelled from University two months short of graduation.

## ALLEGATIONS IN FIRST AMENDED COMPLAINT

John Doe is an international student and citizen of a South Asian country. Plaintiff's Amended Complaint ("AC") ¶ 37.   Sally Roe, a Caucasian female, was a first-year college student during the relevant time period, the Fall of 2016 and January of 2017. AC ¶ 46, p. 17[1].  Lisa Roe, a Caucasian female, was a second-year student majoring in biology and art. AC ¶ 47, p. 17.  Lisa and Sally were the complaining students in this case.

In the Fall of 2016, Sally and Lisa enrolled in one of Dr. Lovaglia's sociology classes, and later joined Sociology Undergraduate Research Group ("SURG") Friday, September AC ¶ 86.  Doe met Sally and Lisa at the SURG meeting on September 2, 2016. AC ¶ 87.   SURG was not an officially registered lab at the University of Iowa. AC ¶ 44.  Doe had attended SURG as an undergraduate and to continued to attend SURG meetings after completing his undergraduate degrees in 2015 to finish the **"independent research"** project he started as an undergraduate student.  AC ¶ 45. Doe was not being paid, nor was he earning any form of assistance, or being evaluated for doing research in SURG. AC ¶ 46.

   **- Allegations of Sally Roe**

---

[1] Due to a formatting issue, Paragraphs 46 and 47 were erroneously sandwiched between Paragraphs 85 and 86 on page 17 of the Complaint.

Sally filed the original compliant about six months after the alleged sexual misconduct took place.  In February 2017, Sally filed her Complaint regarding Doe to Professor Lovaglia, who, in return, as a mandatory reporter, contacted the Title IX Coordinator (TIXC) and Office of the Sexual Misconduct Response Coordinator, OSMRC, Monique DiCarlo. AC ¶ 88**.**  The initial reports from Professor Lovaglia show that Sally's concern was that Doe was being "aggressive about data," questioning her about missing deadlines for the first time, and about "tickling" her once. AC ¶ 89.  Stevenson Earl was assigned as the Investigator for both Complainants. AC ¶ 90, 162.

After the investigative process began, Sally reported a claim of sexual assault that occurred several months earlier in September of 2016 where she alleged that Doe kissed her without her affirmative consent, and touched her breast once after she went to Doe's apartment after going on a date with him. AC ¶ 91.  Sally later met with Monique DiCarlo, and after the meeting, the UI began investigating the case as a case of sexual assault. AC ¶ 93.

**- The First Kiss**

Sally alleged that the incident occurred September 2, 2016 in Doe's apartment. AC ¶ 94.   Doe and Sally stayed after the SURG meeting for a few hours to talk and get to know each other. AC ¶ 95.  Before leaving, they exchanged numbers, and later that day, Sally sent a text message to Doe early evening. AC ¶

95.  Doe then invited Sally to see an improv comedy show with him later that evening, and she accepted.

### - "Second Kiss" and alleged breast touch.

At around 10:30 pm, after the show ended, Doe invited Sally to his apartment, and Sally accepted. AC ¶ 96.  About 30 minutes after arriving, they went out to the fire escape of the building and sat together on a beanbag. AC ¶ 97.  After they conversed at the fire escape for some time, they kissed ("First Kiss").  AC ¶ 99.  Doe told Investigator that they kissed for approximately five minutes. Id. (a).  Sally told the investigator that she participated in the kiss and then added "I didn't outright say I wasn't sure about it, but I did try to pull away when I felt uncomfortable." Id. (c).  Doe disputed that she tied to pull away. Id. (d).

Eventually, Doe and Sally moved back inside the apartment where they kissed again ("Second Kiss"). AC ¶ 100.  During the second kiss, Sally admitted that he participated in the kiss and that "she "did not say no to the kissing." AC ¶ 100 (a).  Sally further alleged that Doe touched her breast over her bra while they were kissing and that she tried to pull away when uncomfortable.  AC ¶ 100 (b).  Doe confirmed that they kissed inside, but insisted it was mutual. AC ¶ 100 (c).  Doe denied making contact with her breast. *Id*.  Around midnight, Sally suggested it was getting late, Doe agreed and then walked her home, talking about extistentialism.  Sally told investigator that she participated in the kiss. AC ¶ 100

(b).   Sally did not object to any of the kisses or indicate that through implied

actions that she did not wish to kiss Doe. AC ¶ 103 (b)

Later that night, Sally went to see her close friend from high school, who

lived a couple of doors down from her, and told him what occurred between Doe

and her. AC ¶ 106.  During the investigation, Sally said, "I think we ended up

joking about it because I didn't take it so seriously at the time." AC ¶ 107.

On or around October 10, 2016, Sally, after a meeting, mentioned to Dr.

Lovaglia, referring to the compliment over text, that she was receiving more

attention than she wished from Doe. AC ¶ 121.  She then shared with Dr. Lovaglia

the full story on what occurred the night she went on a date with Doe. AC ¶ 122

Sally expressed to Dr. Lovaglia, everything that happened in Doe's apartment on

September 2, 2016, was **<u>consensual</u>**, and she only **"changed her mind about the**

**relationship later."** (emphasis added). AC ¶ 123.  In terms of in appropriate

physical contact, that is nearly the sum total of Sally's allegations against Doe.

She did mention that Doe tickled her once in January 2017 in the lab.  During the

investigation and the hearing, Sally and her friends consistently testified that at no

time did Doe try to use any form of force to restrain her. AC ¶ 108.

### - Universities Allegations of Doe's Sexual Harassment against Doe.

After the kissing and alleged breast touch on September 2, 2016, two days

later, Sally told Doe in a text message that she was thinking more of a platonic

relationship. AC ¶ 109.  Doe said that was fine and thanked her for letting him

know. Id.  Sally reported that for about a month after the September 2, 2016

encounter, nothing inappropriate occurred with Doe. AC ¶ 117.

About one month after their date, Doe complimented her once in a text

conversation by saying it was attractive that she had a purpose early in her career.

AC ¶ 118.  Sally asked if such comments were necessary, considering she just got

a boyfriend. AC ¶ 119.  Doe did not realize that Sally committed to a relationship.

AC ¶ 120.

On or around October 10, 2016, Sally, after a meeting, mentioned to Dr.

Lovaglia, referring to the compliment over text, that she was receiving more

attention than she wished from Doe. AC ¶ 121.  She then shared with Dr. Lovaglia

the full story on what occurred the night she went on a date with Doe, indicating

that it was consensual. AC ¶ 122.

On or about October 14, 2016, a couple of days later, Dr. Lovaglia and Doe

went on a walk, a common occurrence for them to talk about Doe's research ideas.

AC ¶ 124.  During the walk, Dr. Lovaglia explained to Doe, a first-generation

graduate student with no guidance, that graduate school comes with a new role and

responsibility, and he would be subject to a different set of expectations as it

relates to sexual relationships with undergraduate students. AC ¶ 125.  Dr.

Lovaglia testified at the hearing that Doe told him he "did not realize this was an

issue." AC ¶ 126.  He also told Doe that he should have oriented Doe once he started graduate school and took responsibility for not doing so. AC ¶ 127.

### - The Tickling Incident January 20, 2017

The next allegation of inappropriate contact occurred in January 20, 2017 when Sally alleged that Doe tickled her once without her consent. AC ¶ 140.  One day in the lab Sally and Doe talked about their breaks while they were alone. *Id*. After not getting much work done, Doe suggested they clean and decorate the Lab as Professor Lovaglia said the Lab looked like a "Frat House" earlier that month. AC ¶ 141.  Throughout the afternoon, Doe, and Sally joked, laughed, and took silly pictures while they decluttered and decorated the Lab. AC ¶ 142.  Doe and Lisa took played around a little bit and Doe took some pictures.

### - Sally tickled Doe twice.

Sally tickled Doe twice that afternoon:

(1)     Doe sat on the bin first, and Sally tickled Doe in his left side and ribs as she asked him to scoot over so she could sit since Doe was taking too much space, according to her.

(2) While cleaning later that afternoon, Doe retrieved a cassette recorder sitting to the right of the Lab entryway, and Sally grabbed the the recorder away from Doe's hand and again tickled him in the ribs, trying to get him to loosen his grip of it. AC ¶ 144 (b).

**- Doe tickled Sally once**

Later, Doe wanted to put up string lights he had purchased for the Lab. Sally

started getting up on a chair to string the lights as she wanted, and because Sally

had tickled Doe to get the recorder back, Doe tickled Sally to get the lights back.

AC ¶ 145.  Sally Stevenson Earl she did not remember if she tickled him. AC ¶

146.

**- The Sexual Harassment Allegations in Fall of 2016 and Beer Incident**

Doe was also accused of inappropriate sexual conversation with Sally in

November of 2016 and offering to share a beer with her. AC ¶ 133.  In November

2016, Doe once stopped by SURG around 9 p.m. to work on his study and saw

Sally was also in the Lab. AC ¶ 134.  Doe had beer in his backpack as he planned

to sip on it while he proofread the survey he wrote. *Id.*

 Doe asked Sally if she wanted a beer while they both worked in the Lab.

Sally admitted she said yes. AC ¶ 135.  Doe and Sally each sipped on one can of

beer over an hour while they worked. *Id.*  After finishing work, they engaged in

casual conversations for about 30 minutes.  During that discussion, Sally told that

they discussed the following topics:

a) Doe shared the background of his study on objectification with Sally.

b) Sally said Doe attended a presentation by a pickup artist and told her Doe got into an argument with the pickup artist because this person was sexist toward women.

c) Unhealthy men's dating advice, was also a topic discussed in Dr. Lovaglia's class "Sociology of Self

Improvement."

d) Doe mentioned books they discussed in Dr. Lovaglia's class. They were:

   1) "The Rules," a dating advice book for women, and 2) "The Game," a New York Times bestselling dating advice book for men, written by a self-described pickup artist.

e) Doe stated when discussing "The Game," that they spoke about how unhealthy the advice was because the book objectified women, a topic Doe was researching in SURG.

When a Lab member runs a study, other members help. Doe intended to present the results of his narcissism, sexual aggression, and objectification study at a SURG meeting on January 27, 2017. AC ¶ 137.

During the disciplinary hearing, Doe produced Doe produced uncontradicted text messages from September 2, 2016 - January 27, 2017, showing:

a) Sally often initiated communications with Doe through text,

b) Doe provided many text message exchanges as evidence, which showed

that both parties were friendly to

each other; both initiated conversations and jokes,

c) They remained friends after the platonic conversation and engaged in text

conversations lasting 2-3 hours

at least twice a week.

d) Doe's provided evidence also showed that sometimes conversations went

on till 4 a.m.

e) Both parties were flirtatious in their texts, and the Adjudicator found that

to be true in the formal hearing

report.

AC ¶ 116.

**DISCIPLINARY FINDING REGARDING SALLY**

On that record, the hearing officer Iris Frost found Doe responsible for:

a) Responsible for Sexual Assault Frost found that because of these "non-

consensual acts" on September 2, 2016 – kissing Sally Roe without her prior

consent, and touching her breast over her bra once without prior consent in Doe's

off-campus apartment – Doe violated the University's Code of

Student Life Sexual Misconduct Policy – Chapter 2.2; Chapter 2.3(1)(e)(3)&(4).

b) **Responsible for Sexual Harassment**. Frost found that Doe "sexually

harassed" UI student, Sally Roe, with persistent, repeated, and unwelcomed

efforts to develop an intimate relationship; with repeated and unwanted

sexual attention; and by limiting her educational performance in violation of

Chapter 2.2;

Chapter 2.3(2)(f)(a)&(c).

c) **Responsible for Possession of Alcohol.** John Doe possessed and

consumed alcoholic beverages (beer) in the SURG Lab at Seashore Hall, a

University building on the main Iowa City campus, in the presence

of UI student Sally Roe in violation of Rule 17 that prohibits possessing and/or

consuming alcoholic beverages on campus; and Rule 13, which requires all

students to adhere to the University's rules and policy. AC ¶ 546.

- **Allegations of Lisa Roe**

About two weeks after Sally reported Doe's alleged sexual misconduct,

Sally's friend, Lisa, filed her report alleging sexual misconduct. AC ¶ 157.

Lisa alleged that on or around August 31[2], 2016, Doe touched her breast once

without her consent and sexually harassed her in the Fall 2016 semester. AC ¶ 158

160.

---

[2] Doe believes August 31, 2016 is incorrect as he did not meet her until September 2. He believes it occurred on September 5, 2016. AC 159.

**- The breast touch and kissing incident Aug. 31, 2016 (Sept. 5 according to Doe).**

On or about the evening of September 5, 2016, Doe and Lisa met at the Lab, and Lisa had a casual conversation. AC ¶ 167.  Lisa and Doe agreed up to this point. Practically everything that followed differed significantly. AC ¶ 168.

**- Lisa Version**

In her meeting with DiCarlo, which UI shared with Doe in the notice of the complaint, it said:

> "After she [Lisa] arrived at the lab, you reportedly asked her to walk with you to a neighborhood grocery store. At the grocery, you allegedly purchased two large bottles of beer for the two of you."

However, in her interview Lisa changed her story and said, "Doe left to get his books," and returned to the Lab with beer. AC ¶ 169.  Lisa said she did not leave the Lab or Seashore Hall, the building in which the Lab is located. AC ¶ 170. This is not a minor detailed as the clear thrust of the investigators and adjudicator's findings was that Doe brought alcohol to lab in an effort to relax her inhibitions. AC ¶ 171.

Doe said during the interview that after talking for about 30 minutes, Doe invited Lisa to continue their conversation over a drink, and she accepted. AC ¶ 172.  Doe indicated that they walked to Brothers, a bar to get a drink; however, Lisa realized she did not have her fake id and they decided to get a beer at convenience store Konnexion. AC ¶ 172-174.

According to Doe, he and Lisa returned to the Lab with the beer around

10:00 P.M. AC ¶ 175.  In the notice of the complaint, UI wrote to Doe, it then said

upon returning to lab:

> "According to her account, you used a bossy and condescending tone and
> encouraged her to move to the couch in the lab office. While sitting on the
> couch, you placed your face close to her face. You alleged placed your hand
> under her shirt and groped her breast without her consent.
> At this point, Ms. Kennedy texted a friend to come and get her because your
> behavior scared her. While she waited for her friend to come, you continued
> to kiss her and touch her in a sexual manner. She kept saying that she
> wanted to leave and that her friend was waiting for her, but you kept asking
> her to stay with you for five more minutes. When she became terrified of
> your actions, she quickly packed up her things and told you she was leaving.
> As she exited the building, she started to cry.
> According to Ms. Kennedy, you continued to harass her a sexual manner in
> the Sociology Lab during the remainder of the Fall 2017 semester."

AC ¶ 176.

In her interview, Lisa claimed that once Doe returned with the beer, she and

Doe sat next to each other at a table, at which time Doe allegedly offered Lisa a

beer to which she said she, "did not want to drink because it was a school night,"

and because she "did not like beer." AC ¶ 177.  Lisa then said Doe drank a better

and then opened a beer putting it to her lips for a sip. AC ¶ 178.  180. Doe

vehemently denied putting the beer can to Lisa's mouth and making her drink the

beer. AC ¶ 180.

**- The breast touch and kissing**

Doe said that during their conversation as he and Lisa sat on the couch, drank their beers, and talked. AC ¶ 182.  Doe asked Lisa if she was single. Lisa answered yes, but added it was complicated because she lived with her ex-boyfriend, T.M. AC ¶ 183.  During the conversation, Doe asked Lisa if she would like to go on a date, and Lisa said yes. AC ¶ 184. Lisa confirmed in follow up interview those topics were discussed.  AC ¶ 185.

### - According to Lisa

In describing the experience, Lisa alleged that while sitting beside each other on the couch, Doe tried to kiss her, but she leaned back away from him. AC ¶ 204. Lisa then stated Doe then placed his hands under her shirt and bra and fondled her left breast (skin to skin) for about 30 seconds, and then she removed Doe's hand from under her shirt. AC ¶ 205.  Later, when Doe tried to kiss her again, she declined and told Doe her friend was coming to pick her up.

### - According to John Doe

Doe said that once their conversation slowed, he and Lisa began kissing. AC ¶ 186.  They talked, teasing each other, and then returned to kissing, and Doe explained that it was during this intimate moment, he asked Lisa her favorite sex position. AC ¶ 187.  In response to Doe's question, Lisa told him her favorite position was "cowgirl" because she liked to "be in charge." AC ¶ 188.

Then, according to Doe, Lisa then put her legs on top of Doe's lap while facing him, and as they were kissing, lifted shirt, and invited Doe to touch her breast. AC ¶ 189.

Doe said he specifically asked for verbal consent by asking, "May I?" Lisa consented and told him yes. AC ¶ 190.  Doe lifted Lisa's bra and touched one of her breasts, and Doe asked for affirmative consent. AC ¶ 191.  Lisa did not object or indicate it made her feel uncomfortable. AC ¶ 193.  They then stopped when they heard a custodian near by. *Id*.

### - the bathroom incident

After her interview, Lisa emailed Stevenson Earl and said she forgot to add a part of the story. AC ¶ 197.    Lisa had to go the bathroom, walking into the men's restroom to urinate. AC ¶ 198.  She then said that Doe walked into the restroom and stated, "Wow I can tell you have a lot of sex by the way your pee sounds." AC ¶ 198.  Doe denied that, confirming that they both went to restroom; however, Doe indicated that he used the men's room, and Lisa used the women's room, which were on two different floors. AC ¶ 200.

### - Doe completely denied all of the key allegations relating to lab incident.

Doe repeated from the beginning that Lisa's report was completely false, and she made allegations with reckless disregard for or willful ignorance of facts. AC ¶ 163.  That is the last allegation that inappropriate sexual contact

**- The Harassment**

From the lab incident to middle of October, Lisa did not claim any unwanted sexual contact.  Sometime in the middle of October of 2016, Lisa reported that Doe said that he would like to put a collar around her neck wanted to have sex with her. AC ¶ 221.  During investigation and during hearing, Doe "adamantly denied saying anything like that and denied placing hands around her neck." AC ¶ 222.

Doe said the conversations were about Dr. Lovaglia's lecture of "sexual deviancy" he gave in Lisa's class, which he had no idea of until she told him, and that it was "weird" of Dr. Lovaglia to speak such topics. AC ¶ 223.  Doe told Investigator Stevenson Earl: "These statements are horrifically disturbing, and it makes me angry that someone could lie about something so profane." AC ¶ 224.

Additionally, Lisa alleged that Doe hugged her too frequently. AC ¶ 4.  In particular, Frost stated the following was harassment under UI Policy:

1.     Doe hugged her throughout semester.

2.     In addition to the question about kinkiest sex act, Frost also found it harassing that Doe asked Lisa about the "the cutest gift she received for the holidays throughout the Fall 2016 and Spring 2017 semesters."

3.     Doe placed a PDF filed labeled "sexual [L]isa on computer lab file."

**- During period of alleged harassment, Lisa frequently contacted Doe.**

On multiple occasions after the alleged assault, Doe had walked Lisa home late at night after working together late at the Lab.  AC ¶ 224.  These were usually around 2 a.m. Doe walked Lisa home in the Iowa cold winters so she can feel safe as it was the time for bar close, and people were coming out of the bars during then. AC ¶ 225.

From November 2016 to late January 2017, Doe presented multiple text message conversations to and from Lisa, showing a mutually supportive friendship in which Doe helped Lisa with resume, with applications, general advice, and did everything he could to support her academically. AC ¶ 226.  This relationship continued through January.  For example, on December 20, 2016, they met up in the lab, discussed her resume, career goals and then went to Chipotle to get something to eat. AC ¶ 229.  Doe also identified several texts initiated by Lisa to him as late as January of 2017. AC ¶ 230.

- **Adjudicator Iris Frost Finding**

As for Lisa's report, Frost found Doe:

a) **Responsible for Sexual Assault**. Frost found that Doe "sexually assaulted" UI student Lisa Roe by engaging in acts of sexual intimacy without obtaining prior consent." "By kissing Lisa Roe without her

prior consent, and caressing her breast without her prior consent in the SURG Lab at the UI—John Doe violated the University's Sexual Misconduct Policy, Chapter 2.2; Chapter 2.3(1)e(3)&(4)."

b) **Responsible for Sexual Harassment**. Frost found that Doe "sexually harassed" UI student Lisa Roe in the Fall of 2016 and Spring of 2017 with persistent, repeated and unwelcomed efforts to develop an intimate relationship; with repeated and unwanted sexual attention; and by limiting her educational performance, in violation of Chapter 2.2; Chapter 2.3(f)(2)(a)(b)&(c).

c) **Responsible for Consuming Alcoholic Beverages and Possession the Same** in the SURG Lab on August 31, 2016, in violation of UI Coe Rule 17 and 13.

AC ¶ 230.  In conclusion, Lisa alleged Doe also touched her breast once without her consent, kissed her without her consent once, simulated a sexual deviancy technique, provided her beer, and engaged in harassment throughout the semester. AC ¶ 239.

For this violation and Sally's violation, Doe was expelled from the University. AC ¶ 239 and 240.  The rest of relevant facts will be set forth will be set forth of argument.

**ARGUMENT**

## I.      RULE 12 (b) (6) STANDARD

To survive a motion to dismiss, a complaint must provide "a short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8 (a) (2). A plaintiff shows that he is entitled to relief by "plausibly suggesting" that he can meet the elements of his claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). And a plaintiff's suggestion is plausible when it contains enough factual content that the court can reasonably infer that the defendant is liable. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Legal conclusions, "formulaic recitation[s]" of the claim's elements, and "naked assertion[s]" of liability are all insufficient. Id. (second alteration in original) (quoting Twombly, 550 U.S. at 557). When evaluating a complaint's sufficiency, courts use a three-step process. First, the court must accept all of the plaintiff's factual allegations as true. ere a decision granting a motion to dismiss, and therefore must accept as true all the factual allegations in the complaint. *See United States v. Gaubert*, 499 U.S. 315, 327, 111 S.Ct. 1267, 1276, 113 L.Ed.2d 335 (1991).   Second, the court must draw all reasonable inferences in the plaintiff's favor. Id. And third, the court must take all of those facts and inferences and determine whether they plausibly give rise to an entitlement to relief. *Iqbal*, 556 U.S. at 679. If it is at all plausible (beyond a wing and a prayer) that a plaintiff would succeed if he proved everything in his

complaint, the case proceeds.  A complaint is "plausible," as that term is used by

Twombly, turns not on whether the alleged conduct is unlikely, but on whether the

complaint contains sufficient nonconclusory factual allegations to support a

reasonable inference that the conduct occurred. *See Ashcroft v. Iqbal*, No. 07-1015,

slip op. at 14 (U.S. May 18, 2009).  Thus, this Court must look for "non-

conclusory" factual allegations to support a reasonable inference.

## II.     QUALIFIED, QUASI JUDICIAL IMMUNITY, AND QUASI-PROSECUTORIAL IMMUNITY DO NOT APPLY TO CONSTITUTIONAL CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF UNDER SECTION 1983.

In Ground II, Defendants argue for quasi-judicial immunity for Stevenson-

Earl, Frost, Redington, Keller, and Braun.  (Although she is not mentioned by

Defendants, Doe also seeks injunctive relief against Angie Reams, who replaced

Redington as "Associate Vice President and Dean of Students for

Student Affairs.").  In Ground III, Defendants argue that Constance Schriver is

entitled to quasi-prosecutorial immunity.  Ground IV (a), Defendants argue that all

state actors are entitled to qualified immunity.  Plaintiff will address in two

sections: (1) immunity and injunctive relief and (2) separately whether immunity

shields Defendant from money damages claims.

### A.     <u>Stevenson-Earl, Frost, Redington (Reams), Keller, Braun are not entitled to quasi-judicial immunity for injunctive claims against them in their official capacities</u>.

Stevenson-Earl, Frost, Redington, Keller, and Braun are sued in their

individual and official capacities.   Yes, Doe is seeking monetary damages for

violating of his due process and equal protections as set forth in Counts 1, and 7

but he is also seeking injunctive and declaratory relief as this is an ongoing

controversy.  He is actively seeking readmission to University of Iowa.  He seeks

among other things: (a) An order of arbitrary and capricious determination (b)

Order(s) requiring UI to reinstate Doe as a student and expunge Doe's

official and unofficial UI files of all information related to UI's Judicial Process

and disciplinary record, his interactions with Sally and Lisa Roe, any records kept

by the Dean of Students, including but not limited to charges and sanctions served,

and prohibiting UI from disclosing such information to any third party: a

permanent injunction prohibiting UI from: (i) Enforcing discipline that resulted

from the unconstitutional hearing, and (ii) Subjecting Doe to further disciplinary

proceedings; (iii) Removing any and all of records and restrictions placed on Doe

from applying to jobs, such as applying to on jobs on campus. See Count 10, AC

page129.

The 8th Circuit has confirmed that quasi-judicial immunity does not apply to

claims against state actors in their official capacities for declaratory and injunctive

relief.  Thus, the 8th Circuit had no trouble finding that quasi-judicial immunity did

not apply to Commissioners in a State Racing Commission. *VanHorn v.*

*Oelschlager*, 502 F.3d 775, 776 (8th Cir. 2007).  *VanHorn* quoted following cases:

> We have previously indicated that immunity only extends to claims against government employees sued in their individual capacities. Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir.1999) *779 ("Qualified immunity is not a defense available to governmental entities, but only to government employees sued in their individual capacity."); Davis v. Hall, 375 F.3d 703, 710 n. 3 (8th Cir.2004) (approving of the district court's conclusion that neither qualified immunity nor absolute immunity was available to a government employee sued in his official capacity).

*Id*. *VanHorn v. Oelschlager*, 502 F.3d 775, 778–79 (8th Cir. 2007).  Judicial

immunity does not even apply to state court judges. *Pulliam v. Allen*, 466 U.S. 522,

536–37, 104 S. Ct. 1970, 1978 (1984) (finding that judicial immunity did not bar

injunctive or declaratory relief in a Section 1983 claim against a state court judge).

Thus, to the extent that this Court finds that any of these Defendants were

acting in a judicial capacity, judicial or quasi judicial immunity does not bar claims

for injunctive or declaratory relief set forth in Count 10 for ongoing controversy

arising out of Counts 1, 7 and 8.

### B.     Defendant Constance Schriver Cervantes is not entitled to Quasi-Prosecutorial Immunity for Injunctive and Declaratory Relief.

For the same reasons, Ms. Cervantes is also not entitled to quasi-

prosecutorial capacity for any claim of injunctive relief against her.  She is also a

necessary party for any claim to enjoin her or her successor from maintaining

sanctions against Doe as requested in Count 10, among other things.  Prosecutors

enjoy absolute immunity from damages liability, *Imbler v. Pachtman*, 424 U.S.
409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), but they are natural targets for § 1983
injunctive suits since they are the state officers who are threatening to enforce and
who are enforcing the law. *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43
L.Ed.2d 54 (1975), is only one of a myriad of such cases since Ex parte Young,
209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), decided that suits against state
officials in federal courts are not barred by the Eleventh Amendment. *Supreme
Court of Virginia v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 736–37, 100 S.
Ct. 1967, 1977, 64 L. Ed. 2d 641 (1980) ("If prosecutors and law enforcement
personnel cannot be proceeded against for declaratory relief, putative plaintiffs
would have to await the institution of state-court proceedings against them in order
to assert their federal constitutional claims."). *See Monroe v. Arkansas State Univ.*,
495 F.3d 591, 594 (8th Cir.2007) ("While under the doctrine set forth in Ex Parte
Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), state officials may be
sued in their official capacities for prospective injunctive relief without violating
the Eleventh Amendment, the same doctrine does not extend to states or state
agencies

### C.  Qualified immunity does not apply to claims of injunctive and declaratory relief against State actors in their official capacities.

Similarly, qualified immunity does not bar declaratory or injunctive relief claims.  Mr. Doe expressly seeks injunctive and declaratory relief against Defendants for violations of his due process and equal protection rights. Qualified immunity extends to claims against government employees sued in their individual capacities. *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir.1999) ("Qualified immunity is not a defense available to governmental entities, but only to government employees sued in their individual capacity."); *Davis v. Hall*, 375 F.3d 703, 710 n. 3 (8th Cir.2004) (approving of the district court's conclusion that neither qualified immunity nor absolute immunity was available to a government employee sued in his official capacity).

## III.   FOR MR. DOE'S MONEY DAMAGES CLAIMS, QUASI JUDICIAL IMMUNITY DOES NOT APPLY TO IRIS FROST, TIFFANI STEVENSON EARL, REDINGTON, KELLER AND BRAUN.

The Court should not dismiss on this basis for two reasons.  First, the most closely analogous case law, student discipline, does not support a finding that these Defendants were "quasi-judicial."  Secondly, construing the Complaint most favorably to Plaintiff, the Defendants have expressly resisted in their own proceeding any view that these are "judicial" adjudicative proceedings.

### A.   <u>These officials are most closely akin to school board officials reviewing disciplinary complaints</u>.

This is not a well developed area of law in the University discipline context relating to either judicial or quasi judicial immunity for hearing officers.  The Defendants cite one district court case out of Arkansas to support their position that is closely on point. Defendants Brief at p. 7 (citing Doe v. University of Arkansas, No. 5:18-CV-05182 2019 WL at 11 (W.D. Ark. April 24, 2019) (holding that board members were entitled to quasi judicial immunity)[3].

Given the paucity of case law in University cases, the most analogous caselaw is school board members adjudicating student discipline cases.  School board officials reviewing disciplinary complaints and deciding  whether  to  expel students  are not  entitled  to  absolute  immunity when  acting  in  that adjudicatory capacity. *See Wood v. Strickland*, 420U.S. 308 (1975)[4].  In that case, the Court stated that "absolute immunity would not be justified since it would not sufficiently increase the ability of school officials to exercise their discretion in a forthright manner to warrant the absence of a remedy for students subjected to intentional or otherwise inexcusable deprivations."

Three years later, the Court concluded that administrative law judges were entitled absolute judicial immunity.  In reaching that result, the Court put heavy weight on that the fact that administrative law judge were "functionally

---

[3] Oral arguments are currently set on that case for January 15, 2020.

[4] Overruled on other grounds by Harlow v. Fitzgerald, 102 S.Ct. 2727 (1982). (overruled on other ground)

comparable" to real judges. *Butz v. Economou*, 438 U.S. 478, 512–14, 98 S. Ct. 2894, 2914–15, 57 L. Ed. 2d 895 (1978).  First, explaining the reason for judicial immunity, the Court cited, inter alia, subpoena power, cross-examination, insulation from political influence, and the adversarial process.  "Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decision making process, there is a less pressing need for individual suits to correct constitutional error." *Id*.

With those principles, it had little trouble extending that principle to federal administrative law judges.  Like real judges presiding over civil or criminal trials, it noted that the present of subpoena power, the "proceedings are adversary in nature," a trial of fact insulated from political influence, and a party is able to present his case by oral or documentary evidence. *Id*.  See 5 U.S.C. § 555(b) (1976 ed.). They are conducted before a trier of fact insulated from political influence. See § 554(d). A party is entitled to present his case by oral or documentary evidence, § 556(d), and the transcript of testimony and exhibits together with the pleadings constitute the exclusive record for decision. § 556(e). The parties are entitled to know the findings and conclusions on all of the issues of fact, law, or discretion presented on the record.

Most importantly, the courted that noted that the structure in place was structured to assure that the "hearing examiner exercises his independent judgment

on the evidence before him, free from pressures by the parties or other officials within the agency." *Butz v. Economou*, 438 U.S. 478, 512–14, 98 S. Ct. 2894, 2914–15, 57 L. Ed. 2d 895 (1978).   Prior to the Administrative Procedure Act, there was considerable concern that persons hearing administrative cases at the trial level could not exercise independent judgment because they were required to perform prosecutorial and investigative functions as well as their judicial work, *see, e. g., Wong Yang Sung v. McGrath*, 339 U.S. 33, 36–41, 70 S.Ct. 445, 447–450, 94 L.Ed. 616 (1950), and because they were often subordinate to executive officials within the agency, see *Ramspeck v. Federal Trial Examiners Conference*, 345 U.S. 128, 131, 73 S.Ct. 570, 572, 97 L.Ed. 872 (1953).  Finally it noted that administrative law judges could only be removed for good cause. Id.   They may be removed only for good cause established and determined by the Civil Service Commission after a hearing on the record. § 7521.

### B.     Ms. Frost and other officials were much more like the school board members in Wood rather than an administrative law judge in Butz

The crux of the Doe's Complaint is that the entire expulsion process is not even designed to be fair nor does it bear any of the hallmarks of "judicial adversarial process" warranting quasi-judicial immunity.  Instead it is designed to be "therapeutic" to avoid trauma to persons reporting abuse.  Indeed, the

University has vigorously resisted any effort to allow cross-examination or to make the process "adversarial."

For example, as alleged in the Amended Complaint, November of 2018, Secretary of Education Betsy Devoss issued a series of proposed rules strengthening due process protections for students accused of sexual abuse. Plaintiff's Amended Complaint ("AC" ¶ 355). Defendant Monique DiCarlo issued a series of comments in response on behalf of Defendant University of Iowa. In those comments, she characterized the UI's policies related to Title IX sexual misconduct that were in effect at the time of Mr. Doe's disciplinary process in the Summer and Fall of 2017. https://osmrc.uiowa.edu/university-iowa-submits-comments-new-proposed-title-ix-regulations-sexual-misconduct. AC ¶355 (a). DiCarlo, on behalf of the University, resisted Devoss proposed rule requiring clear and convincing evidence standard and instead, requested "flexibility to choose an evidentiary standard that best meets our unique campus pedagogical and research missions, resources, and community's shared governance standards." AC ¶ 355 (b).

The University also vigorously resisted DeVoss's proposal for cross-examination, which has been described as " 'greatest legal engine ever invented for the discovery of truth.' " California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (footnote and citation omitted). According to Defendant

DiCarlo, cross-examination is bad because it "IHE's grievance procedures into **<u>quasi-court systems</u>**."   AC   ¶ 355 (c) (emphasis added).   DiCarlo feared that cross-examination would "discourage individuals from reporting sexual misconduct as well as from serving as witnesses," resulting in fewer "individuals will seek assistance from their institutions, weakening our ability to address sex-based discrimination and keep our campuses safe." AC   ¶ 426.   She expressly resisted losing the "the institution's control over student and employee conduct by creating a venue in which parties conduct their own civil trials while we as the institution are relegated to serve only as referees." AC   ¶ 355 (i).

It is plausible to infer at this stage that the disciplinary process is not a "quasi-court system" in light of DiCarlo's express fear that it would become one if DeVoss's proposed reforms were implemented.   If is not quasi-court, it cannot have a "quasi" judge or prosecutor.   As such, the Motion should be overruled.

## IV.   DEFENDANT SCHRIVER IS NOT ENTITLED TO QUASI PROSECUTORIAL IMMUNITY FOR MONEY DAMAGES.

Defendant Schriver is not entitled to prosecutorial immunity for multiple reasons.

First, without restating all of the caselaw above, if the Court agrees with the Plaintiff's analysis above that the disciplinary hearing is not designed to be an adversarial, judicial process promoting accurate fact finding, ie that it is a therapeutic victim centered approach, then it can hardly be said that Cervantes acted as a prosecutor in a process where the adjudicator is not considered to be acting in a judicial capacity.

Secondly, even assuming Schriver is was acting as a "prosecutor" during the victim centered therapeutic process, even traditional prosecutors are only entitled to absolute immunity for traditional prosecutorial tasks. *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984 (1976) (granting absolute immunity for absolutely prosecutorial functions).  However, prosecutors are entitled to only qualified immunity for their work in conducting criminal investigations, just like a police officer has. *Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S. Ct. 2606, 2613, 125 L. Ed. 2d 209 (1993) ( "When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.) (internal quotation and citation omitted).  Nor are they entitled to absolute immunity for statements made during press conferences. *Id*. (While [s]tatements to the press may be an integral part of a prosecutor's job … [b]ut in these respects a prosecutor is in no different position than other executive officials who deal with the press, and, as noted above, supra, at 2612–2613, 2617, qualified immunity is the norm for them."

Mr. Doe makes two constitutional claims against Cervantes, that she has other Defendants deprived Doe of his procedural due process and equal protection rights under the 5th and 14th Amendments to the US Constitution. See Count I and Count VII.  For the Due Process claim, Doe claims that Cervante directly violated this due process rights because:

32

> Cervantes banned Doe from the entire campus before the formal hearing even though Doe strictly followed his interim sanctions for the seven months before the ban and had no violations. A       reasonable person would conclude Doe was not a threat to the campus. UI did not provide Doe   academic accommodations when Cervantes increased his interim sanctions; Mills asked Cervantes to provide   him   additional hours in the Lindquist Center, a reasonable accommodation. Cervantes said   she would "entertain the idea" and never responded.

Pl. Comp. ¶ 108 (b).  Doe specifically referred to those interim sanctions without a hearing at Count I, Paragraph 32 (c). Complaint at p. 90.  Doe reasserted that by declaring Cervantes impaired his ability to defend himself by banning him from campus without hearing, preventing him from investigating witnesses. See Complaint ¶ 32 (c) at p. 91 ("Her conduct expressed UI's predetermined outcome of effectively removing Doe from campus.") and See Complaint ¶ 35 (alleging Cervantes deprived Defendant of his ability to Defend himself.).  In that capacity, Cervantes was clearly not acting as a prosecutor.  She directly deprived Doe his ability to Defend himself, gather evidence, talk to witnesses, and prepare for trial.

For Count VII, Doe alleges equal protection of Cervantes intentionally discriminated against him on account of his race. Complaint, Count VII at p. 148.     Directly, related to that allegation of failure to provide accommodation, Doe alleged that upon information and belief, Lisa received accommodations while going through UI's Judicial Process. Complaint ¶ 148.  at p. 108.  However, UI constantly refused or ignored providing any accommodations to Doe despite him requesting reasonable accommodations multiple times.  Doe directly complained of Cervantes failure to provide accommodations, banning

him from campus without hearing and increasing sanctions without providing a rationale. See Complaint ¶ 367 (a) and (b).

These do not allege any prosecutorial tasks but rather discretionary decisions by a state actor.  As such, any immunity for Ms. Cervantes would be qualified. *See Harlow v. Fitzgerald*, 457 U.S. 800, 807–08, 102 S. Ct. 2727, 2732–33 (1982) (stating that qualified immunity is the "norm" for government actors performing discretionary functions).  The Court also noted that government officials who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope. Id.  Thus, in her Reply, Cervantes bears burden of establishing that her acts in imposing interim sanction without hearing were prosecutorial tasks.  The record is simply insufficient that at the pleadings stage to carry her burden.

## V.    QUALIFIED IMMUNITY DOES NOT INSULATE UNIVERSITY DEFENDANTS FROM MONEY DAMAGES CLAIMS.

### A.    <u>Plaintiff has a clearly established due process right to protect his enrollment in the  University of Iowa and protecting his reputation</u>.

Plaintiff has a clearly established property right in his right to enrollment at the University of Iowa and his in protecting his good name, honor, and reputation.

### 1.    Property right in enrollment

Plaintiff has alleged a property interest in his continuing education, including his "right to enrollment at University of Iowa free from arbitrary and biased expulsion," arising from the "policies, course of conduct, practices and

understanding established by University of Iowa under color of state law" and

"the express and implied contractual relationship he had with University of

Iowa." *See Goss v. Lopez*, 419 U.S. 565 (1975); *Monroe v. Arkansas State U.*, 495

F.3d 591, 595 (8th Cir. 2007) (assuming without deciding that student's interest in

pursuing his education at state university constituted a constitutionally protected

interest); *Ikpeazu v. Univ. of Nebraska*, 775 F.2d 250, 253 (8th Cir. 1985)

(property interest arose from contractual relationship between University and

Student set forth in grievance procedures, giving plaintiff right to nonarbitrary

grading).  Defendants do not seem to dispute that.

### 2.    Right to due process where allegation involves allegation seriously damaging professional reputation.

In addition to his right to be free from arbitrary expulsion, Doe also has a

protected property and liberty interest in protecting his good name.  IN *Paul v.

Davis*, the Supreme Court made clear that injury to reputation alone is not

sufficient to state a § 1983 claim. 424 U.S. 693, 712, 96 S.Ct. 1155, 47 L.Ed.2d

405 (1976) ("[I]nterest in reputation ... is neither 'liberty' nor 'property'

guaranteed against state deprivation without due process of law."). The Court

intimated, however, that reputational harm coupled with "some more tangible

interests such as employment," can together be "sufficient to invoke the

procedural protection of the Due Process Clause." Id. at 701, 96 S.Ct. 1155. See,

e.g., *Owen v. City of Independence, Mo.*, 560 F.2d 925, 935 (8th Cir.1977) ("In

determining whether a government employer has deprived its employee of a liberty interest in the termination of employment, the crucial issue is whether the government employer, in connection with the termination of government employment, including a refusal to rehire or reemploy, makes a charge which might seriously damage the employee's standing and reputation in the community."), vacated and remanded on other grounds, 438 U.S. 902, 98 S.Ct. 3118, 57 L.Ed.2d 1145 (1978). *Jones v. McNeese*, 746 F.3d 887, 898 (8th Cir. 2014). 'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' the minimal requirements of the Clause must be satisfied. *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971); *Board of Regents v. Roth*, supra, 408 U.S. at 573, 92 S.Ct. at 2707.

At a minimum, due process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). In the Eighth Circuit, "procedural due process must be afforded on the college campus by way of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case and **with all necessary protective measures**." *Jones v. Snead*, 431 F.2d 1115, 1117 (8th Cir. 1970) (emphasis added). In Fall of 2017, Plaintiff had a clearly established right to heightened due process protections because he faced expulsion as an outcome in

the University's Title IX disciplinary proceedings.

Here, the University accused of Doe in essence of sexual assault and sexual harassment, including repeated unwanted advances as well as non consensual sexual contact with Lisa Roe and Sally Roe. Defendant do not seem to dispute that due process was due.

### 3. Plaintiff has a clearly established right to an impartial process.

It is now well established that "a biased decisionmaker (is) constitutionally unacceptable (and) 'our system of law has always endeavored to prevent even the probability of unfairness.' " *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712, quoting In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942.  The right to impartial decision makers also applies to Universities. *Doe v. Miami University*,882 F.3d 579, 604 (6th Cir. 2018).  The right to an impartial tribunal was also clearly established by OCR Guidance in effect since 2011, more specifically, the April 4, 2011 Dear Colleague Letter (the "2011 DCL"). The 2011 DCL expressly required the impartial investigation and adjudication of sexual misconduct allegations, noting "a school's investigation and hearing processes cannot be equitable unless they are impartial." Id. at p. 12. The 2011 DCL further stated, "Public and state-supported schools must provide due process to the alleged perpetrator." Id. Given the well-established law of the Circuit, as well as the applicable OCR guidance, Defendants Frost, Stevenson Earl, DiCarlo, Cervantes, Keller, Redington and Braun knew or should

have known that their victim centered, therapeutic start by believing approach

violated Plaintiff's well established procedural due process right to be free from

bias during the adjudication stage.

### 5.    Plaintiff Had A Clearly Established Right to Review the Evidence Against Him

As set forth by the United States Supreme Court in Goss v. Lopez, 419 U.S.

at 581, in disciplinary cases in which a student denies the charges against him,

due process requires "an explanation of the evidence the authorities have and an

opportunity to present his side of the story." Id. See Miami U, 882 F.3d at 603

(failing to provide disciplinary file relied upon in drafting report

was equivalent of failure to explain evidence); *See Norris v. CU Boulder*,

2019 WL764568, at** 8-9 (D. Colo. 2019). (delay in providing

access to evidence against plaintiff plausibly alleged due process violation).

### 6.    The right to cross-examination was clearly established in the Fall of 2017.

In the seminal case involving the student suspensions, the Court held that a

high school student had a due process right to a hearing, even where the suspension

was less than 10 days. *Goss v. Lopez*, 419 U.S. 565, 583–84, 95 S. Ct. 729, 740–41

(1975).  Even in that limited context, the Court recognized that cross-examination

was part of the equation. On the one hand, it noted that cross-examination was

probably impractical in every case, noting that such procedures "might well

overwhelm administrative facilities in many places and, by diverting resources,

cost more than it would save in educational effectiveness." *Id*.  On the hand, it

clearly noted that even in suspensions of less than 10 days, cross-examination may

be necessary.  In certain cases, he may "determine himself to summon the accuser,

permit cross-examination, and allow the student to present his own witnesses," and

in "more difficult cases, he may permit counsel." *Id*.   As of Fall of 2017, Plaintiff

had a clearly established right to conduct a cross-examination

at his hearing.

Applying *Lopez*, the 8th Circuit had little trouble finding that a student's

procedural due process rights were violated when they were not able to call a

teacher accusing the student of a rule violation so the teacher could be questioned.

*Dillon v. Pulaski Cty. Special Sch. Dist.*, 594 F.2d 699, 700–01 (8th Cir. 1979).  In

his concurring opinion, Judge Benson viewed this as a clear application of

principle set forth in Goss v. Lopez.

> Although the teacher was present at the hearing before the school board, she
> was not asked to    testify and the student was denied the opportunity to have
> her questioned. Under the circumstances and pursuant to the rationale  of
> *Goss v. Lopez*, 419 U.S. 565, 577-584, 95 S. Ct. 729, 42 L.Ed.2d 725
> (1975), the student should have been given an opportunity to conduct a
> limited examination of the teacher as to what she observed and heard, and
> whether she did in fact    interpret the alleged remark as being directed to
> alleged remark as being directed to her and as being defiant.

*Dillon v. Pulaski Cty. Special Sch. Dist.*, 594 F.2d 699, 700–01 (8th Cir. 1979).

Counsel could find little caselaw indicating that the right to cross-examination in

*Dillon* and Lopez do not apply in the University context, or are somehow less

when the stakes a significantly higher, permanent expulsion from school and

accusations of criminal conduct.

The 6th Circuit found that the right to cross-examine was part of procedural

due process especially where the case came down to a credibility context being

accuser and accused. *Doe v. Baum*, 903 F.3d 575, 581 (2018) (If a "university is

faced with competing narratives about potential misconduct, the administration

must facilitate some form of cross-examination in order to satisfy due

process.") *Id.* at 402.  Other federal courts have also confirmed the right to cross-

examine. *See also Flaim v. Medical College of Ohio,* 418 F.3d 629, 641 (6th Cir.

2005) (where case involves choice between accuser and accused cross-examination

is essential to due process); *Winnick v. Manning,* 460 F.2d 545,550 (2d Cir. 1972);

*Doe v. Ohio State U.,* 219 F. Supp. 3d 645,

663 (S.D. Ohio 2016) (same); *Doe v. Brandeis U.,* 177 F. Supp. 3d 561,604 (D.

Mass. 2016) ("the ability to cross-examine is most critical when the issue is the

credibility of the accuser"); *Furey v. Temple U.,* 884 F. Supp. 2d 223, 251-252

(E.D. Pa. 2012)("due process required that the plaintiff be able to cross-examine

witnesses." *Doe v. U. of Cincinatti,* 872 F.3d 393,401 (6th Cir. 2017); *Norris,* 2019

40

WL 764568, at* 15).  The one case not favoring this approach is Doe v. University

of Arkansas, No. 5:18-CV-05182 (WD Ark. April 3, 2019).

In direct contrast, the UI system categorically bans cross-examination, and

even presents the lawyers from directly asking question witnesses. AC ¶ 318. It

also prevented face to face confrontation, another central tenet of confrontation.

AC ¶ 319.  It completely prevents an accused from interviewing witnesses, and

discussing case with 3rd parties under the anti-retaliation policy. See AC ¶ 22. UI

enforces these policies as UI contacted R.F. and had an interview with him to see if

Doe violated the policy.   The consequences here are far more severe than the

temporary suspension.  Plaintiff was permanently expelled from the University of

Iowa.

**B.     As applied to this case, Doe has pleaded sufficient facts to
Overrule Motion to Dismiss as to Frost, Cervantes, Stevenson, Earl,
Redington, Keller, Reams DiCarlo, and Braun on Due Process.**

If the Court finds that there are structural due process problems with UI

disciplinary process, it should find that the persons responsible for ensuring

compliance with constitution are responsible.   It is their job to ensure a reliable,

accurate, impartial process to both sides.

**- Monique DiCarlo is the key person responsible for ensuring
compliance with due process, including hearing in which Mr. Doe was
found responsible.**

This is not a case where the court has to read the "read the tea leaves" to infer intent of DiCarlo and other UI Defendants. AC ¶ 27. Defendant Monique DiCarlo was UI's "Sexual Misconduct Response Coordinator" (OSMRC) and the "Deputy Title IX Coordinator" when Doe's investigation began. AC ¶ 27.  In July 2017, UI appointed DiCarlo as the "Title IX Coordinator" (TIXC) after one of the other Title IX Coordinators left her position. DiCarlo became directly involved in this Judicial Process as she first spoke with both the Complainants before the investigation. AC ¶ 27.

For example, in November of 2018, Secretary of Education Betsy Devoss issued a series of proposed rules strengthening due process protections for students accused of sexual abuse. Plaintiff's Amended Complaint ("AC" ¶ 355).  Defendant Monique DiCarlo issued a series of comments in response on behalf of Defendant University of Iowa.  In those comments, she characterized the UI's policies related to Title IX sexual misconduct that were in effect at the time of Mr. Doe's disciplinary process in the Summer and Fall of 2017, which is the time of Doe's Complaint. https://osmrc.uiowa.edu/university-iowa-submits-comments-new-proposed-title-ix-regulations-sexual-misconduct. AC  ¶355 (a).  DiCarlo, on behalf of the University, resisted Devoss proposed rule requiring clear and convincing evidence standard and instead, requested "flexibility to choose an evidentiary

42

standard that best meets our unique campus pedagogical and research missions, resources, and community's shared governance standards." AC ¶ 355 (b).

The University also vigorously resisted DeVoss's proposal for cross-examination, which has been described as " 'greatest legal engine ever invented for the discovery of truth.' " *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (footnote and citation omitted).  According to Defendant DiCarlo, cross-examination is bad because it "IHE's grievance procedures into quasi-court systems."  AC ¶ 355 (c).  DiCarlo feared that cross-examination would "discourage individuals from reporting sexual misconduct as well as from serving as witnesses," resulting in fewer "individuals will seek assistance from their institutions, weakening our ability to address sex-based discrimination and keep our campuses safe." AC ¶ 426.  She expressly resisted losing the "the institution's control over student and employee conduct by creating a venue in which parties conduct their own civil trials while we as the institution are relegated to serve only as referees." AC ¶ 355 (i).

Notably absent was any concern about the reliability of the disciplinary proceeding. In none of DiCarlo's comments did she comment on the rights of the accused, the risk of an erroneous outcome, or the well being of the accused. AC ¶ 431.  DiCarlo's comments expressly demonstrate that the purpose of the Title IX disciplinary proceedings is not to protect rights of accused commensurate with a

quasi court tribunal, but to provide therapeutic educational experience for all involved.  She did not even express the slightest concern about taking away essential truth seeking functions of a hearing such as cross-examination or compulsory process.

Finally, this investigative process also employs the "start by believing" investigative and adjudicative approach.   In 2017, **DiCarlo** collaborated with **RVAP**, and **Levin**, to deliver a 12-hour **training to UI's investigators, Adjudicators, appeal officers, and decision-makers**. AC ¶ 357.    They provided training on topics that included **trauma-informed response**, **due process**, and an investigative framework. See. "Training." *Office of the Sexual Misconduct Response Coordinator* https://osmrc.uiowa.edu/about-us/2017-annual-report/training and "2016 In-Service Training." *Office of the Sexual Misconduct Response     Coordinator*,     https://osmrc.uiowa.edu/anti-violence-coalition/service-training/2016-service-training. AC ¶ 358.  Victim-centered methods go by a variety of names, including Start by Believing, trauma-informed, and Forensic Experiential Trauma Interview (FETI). AC ¶ 358.

Based upon information and belief, the Investigator Stevenson and Adjudicator Frost used a trauma formed approach both in terms of its investigation and also **adjudication** of the sexual assault allegations against Mr. Doe. AC ¶ 357.  This trauma informed approached also seemed to translate into "**not** asking the most important questions" to avoid any unnecessary trauma for complainants. AC ¶ 358.

Merely three days before Doe's hearing, the UI conducted a training session for all adjudicators, investigators entitled "**Reading Victims and Judging Credibility: Best Practices in Promoting Victim Centered Investigations and Prosecutions**" on September 15, 2017, **three days** before Doe's hearing. (emphasis added) See AC ¶ 474 (b). "2017 In-Service Training." *Office of the Sexual Misconduct Response Coordinator*, https://osmrc.uiowa.edu/anti-violence-coalition/service-training/2017-service-training. Accessed 11 July 2019.

Victim centered Investigations and Prosecutions?  What does that mean?

At this stage, it at least "plausible" to infer that the DiCarlo employed  a training system centered on avoiding trauma to victims and that both prosecutions and investigations are "victim centered."   If the victim is central to investigation, it is reasonable to infer that the accused are not centered.   In the public comments resisting additional due protections by DeVoss, DiCarlo did not express concerns about the rights of the accused or the even greater trauma of being falsely found responsible.

At this pleading stage, this is enough to warrant further development of record to whether DiCarlo directly contributed to due process violation or was deliberately indifferent to the procedural due process and equal protections rights such as Doe. *Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir.2012) (noting that a supervising official can be found responsible if they directly participate in violation or if not, where they " (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was

deliberately indifferent to or authorized those acts."). Without being able to conduct a deposition or further discovery, it not reasonable for Doe to know about whether DiCarlo knew of the ongoing concerns about due process rights for accused students.

### - Stevenson Earl - Pre-Hearing Investigation

It is plausible to infer that Stevenson Earl used the training techniques embraced by DiCarlo, a victim centered approach designed to avoid trauma to the victims. This begins by "start by believing" victims. That is precisely what she did. In her June 23, 2017, report finding Doe for sexual assault and harassment and impermissible use of alcohol.

### - Lisa

Stevenson Early wrote that she had "no reason for not believing" Lisa Doe. AC ¶ 265. For example, she used start by believing to discredit Doe. She found that Doe was not credible because "was extremely different from Complainant's [Lisa's] account, both when he was questioned about minor details related to the incident on or around August 31, 2016, and about behaviors that are potentially prohibited by university policy, i.e., behaviors that are sexual in nature." AC ¶ 267. Of course, this cuts both ways, why did Stevenson Earl not discrete Lisa because her version was different than Mr. Doe's? It is plausible to infer because the start by believing victim approach presumes accusers are telling truth while placing

46

burden on the accused to prove they didn't do it, clearly placing the thumb on the scale for victims.

**- Sally**

Stevenson Earl even credited Sally's version when she made statements to Dr. Lovaglia that her encounter with Mr. Doe was consensual.  When she reported to Lovaglia in October of 2016, she reported that what happened in Doe's apartment was consensual. AC ¶ 289 (e).  Importantly, Dr. Lovaglia testified at the hearing that **Sally told him** what happened in Doe's apartment was **consensual**. He said he did **not** know about any alleged touching of Sally's breast or any form of touching. *Id*.

Stevenson Earl's own notes show that Sally reported the contact with Doe in apartment was mutual.  As for Sally's alleged sexual assault at Doe's apartment, Stevenson Earl's investigative notes stated: "I think we ended up joking about it because I didn't take it so seriously at the time," (emphasis added) when she discussed her conversation with her friend, R.C., immediately following the alleged touching incident in Doe's apartment. AC ¶ 286 (a).  More tellingly, Dr. Lovaglia reported that Sally told him about the events in Doe's apartment. Stevenson Earl's notes stated, **"mutual attraction, and she had initially been okay, but she changed her mind."** (emphasis added), AC ¶ 286 (b).  She also

47

falsely claimed that the tickling incident was reported to Lovaglia in October when it that incident clearly occurred in January of 2017. AC ¶ 289.

At this stage, it is plausible to assume that Stevenson Earl was biased in favor of victims because she has been trained on the start by believing victims and "victim centered" investigation to avoid further trauma to victims.  It is plausible to infer that she may have avoided confronting Sally with her statements of consent to Lovaglia because she wanted to avoid further trauma.  It is further plausible that such confrontation about prior inconsistent statements may have run afoul of DiCarlo's concerns techniques similar to cross examination that may evoke further trauma and possibly give rise to additional discrimination.

### - Cervantes

Prior to hearing, the hearing officer, Cervantes, who Defendant's also seek to immunize as prosecutor, deprived without hearing, Mr. Doe's ability to stay on campus, complete his education, and most importantly, interview fact witnesses under the UI Anti-retaliation.  AC ¶ 298-305.  Instead of considering his request to continue educational opportunities, Cervantes banned him from campus. AC 303. Coupled with the anti-relation policy, this deprived him of educational experience without a hearing and due process.

During the prehearing process, Stevenson Earl, Redington, and DiCarlo made it difficult to participate in  interviewing the accusers or even 3rd parties.

Under this policy.  UI's Judicial Procedure prohibited Doe and Mills from

contacting or interviewing material witnesses because of UI's "anti-retaliation

policy," hampering the gathering evidence and testimony, stating: "do not discuss

this matter with any of your mutual friends because the University's Anti-

Retaliation Policy applies to your case. Any action on your part to discuss the case

with another student could be considered retaliation on your part." (emphasis

added).

This led to Cervantes being able to conduct full interviews of any witnesses

without any concern about anti-retaliation or sanction, depriving Doe of a fair

opportunity to prepare. AC ¶ 307.  As noted, Cervantes enjoyed the benefit of

preparation while Doe had to rely upon the biased and inaccurate investigative

report to prepare. AC ¶ 307.

### - The adjudicator Iris Frost was biased in favor of "victim centered" approach
It is also plausible that the adjudicator, Iris Frost, employed a victim

centered trauma informed approach to adjudication, which is consistent with

training provided by DiCarlo.

Frost, Additionally, her method of questioning clearly revealed that she was

"cross-examining" Doe with leading and loaded questions. AC ¶ 332.

For Lisa and Sally, she asked opened ended softball questions without ever

questioning about past inconsistent statements. AC ¶ 333. For example, she did not

even fully question Sally about her report to Lovaglia about her contact with Doe as being consensual. AC ¶ 331.  This is not a minor omission as the UI and Frost used both their reports to corroborate each other. AC ¶ 334.   She did not ask any questions about past inconsistent statements that about Lisa made about location of alcohol, how it was introduced, her continuing contact with Doe after the "assault," her possible motives for filing the report, the location of the kisses, her delay in reporting, whether she had any conversations with Sally. AC ¶ 335.

As noted above, the UI categorically deprives lawyers of the ability to ask questions and instead, entirely places responsibility about the adjudicator.   As for cross-examination, Frost deprived Doe of the ability to cross-examine any witnesses. AC ¶ 317.  It also prevented face to face confrontation, another central tenant of cross-examination. AC ¶ 318-319.  This materially affected Doe's ability to defend himself. For example, Doe could not fully probe:

A.     Sally's statement about her statement to Dr. Lovaglia that she viewed the encounter as consensual,

B.     the fact that both Doe and Sally were tickling each other during the January incident or fully explore why she continued to initiate text conversations with him throughout the semester,

C.      why she failed to waited nearly six months to report to the University,

and any motives she have had in reporting the abuse such as the conflict she had

with Mr. Doe about untimely work being submitted the lab.

AC ¶ 321. Doe could also could not ask the Lisa why she waited so long, the

multiple inconsistent statements Lisa made or why she also continued to initiate a

significant amount of contact with Doe, even while she was claiming that he was

harassing her. AC ¶ 322.

At this stage, it is plausible to infer that perhaps Frost's victim centered

training discouraged her from asking extensive questions about inconsistent

statements to avoid similar fears expressed by DiCarlo about "discourage

individuals from reporting sexual misconduct as well as from serving as

witnesses," resulting in fewer "individuals will seek assistance from their

institutions, weakening our ability to address sex-based discrimination and keep

our campuses safe." AC  ¶ 426.   DiCarlo expressly does not want "quasi-court

systems.

Further, Frost used Frost used ethnic stereo types describing Doe as

"authoritarian" without any support in the record for that. AC ¶ 336.  She asked

Doe's witness, S.B., whether Doe was made any sexist comments in his presence

without asking similar questions about the accusers if they had made sexist related

comments during the relevant time period in fall of 2016. AC ¶ 337.

Frost discredited Doe's statement about reporting that Lisa liked "cowgirl" and jumped did that act to Doe by describing it as merely fantasy. AC ¶ 338. No one, not even, Lisa described Doe as someone engaging in merely "fantasy." AC ¶ 339.

Further, unlike the administrative appeals judges entitled to quasi-judicial immunity, Frost did not have sufficient independence to insulate herself from campus or institutional pressures. Doe believes that this was Frost's first, first Title IX hearing Frost adjudicated. AC ¶ 340.  Upon information and belief, Frost lacked the required Title IX knowledge, training, and experience necessary to conduct a fair and competent hearing, and her conduct will make it clear. AC ¶ 341.  Frost's CV indicates that she only received a Continued Education Unit in Sexual Misconduct in September 2017, the same month in which she Adjudicated Doe's hearing.  The UI website describes Frost as "Associate Professor" and states, "Ms. Frost joined the Department after ten years as a prosecutor with the Johnson County Attorney's office, where she concentrated on felony and misdemeanor crimes, including vehicular homicide, impaired driving, arson, bank robbery, and murder." See "Iris Frost." Rhetoric. https://clas.uiowa.edu/rhetoric/people/iris-frost. AC ¶ 343.  Doe's attorney Mills was particularly concerned because not only because of her prior prosecutorial

experience, but also because he had to entirely depend upon Frost to ask questions during the hearing. AC ¶ 343-344.

### - Keller, Redington, and Braun

Keller, Redington, and Braun were all active decision makers in the judicial process.  Keller, Redington, and Braun were all key decision makers, who were responsible for ensuring the disciplinary process complied with due process and equal protection.  See AC ¶¶ 23, 26, 28.  Those concerns were raised in Paragraphs 562-571 (Redington), 571-589 (Keller), and 585-594 (Braun) with actual notice of the claims that Doe's due process rights were violated.

Additionally, it is plausible to assume that UI Decision makers, Frost, Keller, Redington, and Braun were concerned about lawsuits if they exercised their discretion favorably for Doe. After Doe's investigation began, UI received substantial criticism in the public media of 1) Discriminating against females. 2) Not taking seriously complaints of female students alleging sexual assault by male students. AC ¶ 607.  Upon information and belief, UI's pressure associated with press coverage in 2017 regarding two lawsuits filed by Newkirk Zwagerman, in part, caused UI's discrimination against Doe:

a) On May 19, 2017, while Doe's investigation was ongoing, UI paid $6.5 million to settle a Title IX lawsuit that alleged sex/gender discrimination toward females

b) On October 16, 2017 just one day before Doe's hearing, UI settled another Title IX lawsuit that alleged gender discrimination against two females for mishandling sexual misconduct allegations, this time for $2.68 million. AC ¶ 609. The second involved John Keller, who initially suspended the male till she graduated, but later reduced it to a one-year suspension, so he can graduate.

Based upon Doe's investigation, it also appears that the UI refuses to hire any qualified hearing officers if they have defense related experience. 325. For example, Doe's former attorney, Davis Foster, was so concerned about prosecutorial bias on the part of the adjudicators that he requested their credentials and adjudicative outcomes for students accused of accused of sexual misconduct. AC ¶ 325.  In a July 24, 2018 public records request, Mr. Foster learned the following:

a) He learned that in the cases arising out of the 2016-7 academic year there were 5 adjudicatory hearings, and in all 5 cases the student was found responsible.

b) In the 2017-8 academic year there were zero adjudicatory hearings.

c) The logical conclusion is that students knew that they would lose at such a hearing and so

d) no one wasted their time and money by demanding a hearing.

e) Through the public records request, Foster learned that there are four currently approved adjudicators, and all four, including Ms. Frost were former prosecutors.

f) When he asked for credentials, the University confirmed that there were no criteria.

g) This is particularly problematic because Foster had asked to be on the list of adjudicators and was first told that he could only be on the list if he agreed that he and his son would no longer take student misconduct cases.

h) He then cleared his practice of such cases, and the University refused to hire him, citing a new rule preventing anyone with an active law practice

i) Foster inferred that the reason the University made a decision not to hire him was because of his prior experience representing students accused of sexual misconduct.

AC ¶ 326.   Based upon information and belief, the University's disciplinary process deliberately seeks to hire only adjudicators with a predisposition towards believing accusers and a bias towards persons accused of sexual assault.

   **- The UI Process does not comply with any norm of due process.**

   To support the Due Process Clause, "a hearing must be a real one, not a sham or pretense." *Doe v. Purdue Univ.*, 928 F.3d 652, 658, 661 (7th Cir. 2019).

(internal citations omitted.  Frost completely dominated the hearing, asking all of the questions.  *See, e.g., Doe v. Miami Univ.,* 882 F.3rd 579, 601 (6th Cir. 2018) (determining plaintiff advanced a valid procedural due process claim related to university employee named Vaughn alleged to have "dominated the hearing and that her remarks were designed to reduce [plaintiff's] credibility while bolstering Jane's credibility.")

 Doe has raised a plausible claim of a sham process with a completely biased decision maker.  He pleaded facts that the UI only hires adjudicators with a defense background.  All of the adjudicators are trained to focus on believing victim and preventing trauma to them while ignoring the rights of the accused.  Doe could not ask questions, and could not independently investigate witnesses.  A biased and unfair proceeding does not comport with due process.

Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.' *In re Murchison*, supra, 349 U.S., at 136, 75 S.Ct., at 625; cf. Tumey v. Ohio, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927). In pursuit of this end, various situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable. Among these cases are those in which the

adjudicator has a pecuniary interest in the outcome14 and in which he has been the target of personal abuse or criticism from the party before him.

Withrow v. Larkin, 421 U.S. 35, 47, 95 S. Ct. 1456, 1464, 43 L. Ed. 2d 712 (1975)

## VI.   PLAINTIFF ALLEGED PLAUSIBLE TITLE IX CLAIMS.

### A.   <u>Plaintiff has pleaded sufficient facts under erroneous outcome theory.</u>

Under an "erroneous outcome" theory, the Plaintiff claims that he was innocent and wrongly found to have committed an offense. In order to establish a violation of Title IX under an "erroneous outcome" theory, a plaintiff must show (i) that there are sufficient facts to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding; and (ii) a particularized causal connection between the flawed outcome and gender bias. *See Yusuf v. Vassa Coll.,* 35 F.3d 709, 715 (2d Cir. 1994).  A Title IX plaintiff need only plead "specific facts that support a *minimal plausible inference* of [gender] discrimination." *Doe v. Columbia U,* 831 F.3d 46, 56 (2d Cir. 2016) (emphasis added). In that regard, *"Iqbal* does not require that the inference of discriminatory intent supported by the pleaded facts be *the most plausible* explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is plausible." *Id* at 57. Accordingly, "alternative explanations [ for the University's findings] are not fatal

to [Plaintiff]'s ability to survive a Rule 12(b) (6) motion." *Doe v. Baum,* 903 F.3d

575,587 (6th Cir. 2018).

### i.   Plaintiff cast articulable doubt on the disciplinary proceeding.

### a.   Sally

### - Sexual assault

Sally's very first report about what happened with Doe indicate it was

consensual. On or around October 10, 2016, Sally, after a meeting, mentioned to

Dr. Lovaglia, referring to the compliment over text, that she was receiving more

attention than she wished from Doe. AC ¶ 121.  She then shared with Dr.

Lovaglia the full story on what occurred the night she went on a date with Doe.

AC ¶ 122.  Sally expressed to Dr. Lovaglia, everything that happened in Doe's

apartment on September 2, 2016, was consensual, and she only "changed her

mind about the relationship later." (emphasis added). AC ¶ 123.  In terms of in

appropriate physical contact, that is nearly the sum total of Sally's allegations

against Doe.  She did mention that Doe tickled her once in January 2017 in the

lab.  As noted above, Stevenson Early described this as "mutual" and had in her

notes, but nevertheless left out of her report.  Frost completely failed to include

that in her adjudication decision.

Sally was very ambiguous about the kiss.  Sally told the investigator that she

participated in the kiss and then added "I didn't outright say I wasn't sure about

it, but I did try to pull away when I felt uncomfortable." AC ¶ 99. (c).  During the second kiss, Sally admitted that he participated in the kiss and that "she "did not say no to the kissing." AC ¶ 100 (a).

**- Harassment**

During the disciplinary hearing, Doe produced Doe produced uncontradicted text messages from September 2, 2016 - January 27, 2017, showing:

a) Sally often initiated communications with Doe through text,

b) Doe provided many text message exchanges as evidence, which showed that both parties were friendly to

each other; both initiated conversations and jokes,

c) They remained friends after the platonic conversation and engaged in text conversations lasting 2-3 hours

at least twice a week.

d) Doe's provided evidence also showed that sometimes conversations went on till 4 a.m.

e) Both parties were flirtatious in their texts, and the Adjudicator found that to be true in the formal hearing

report.

AC ¶ 116.  The undisputed record indicates that she waited nearly six months to report the harassment, and reported it only after Doe expressed disappointment with timely submission of projects. AC ¶ 321.

### b.    Lisa

As it relates to Lisa, Stevenson Earl corroborated her version in part because it was consistent.  She provided three different versions of whether she went with Doe to get a beer or whether Doe brought beer back to lab. See AC ¶ 166-174. This is not a minor detailed as the clear thrust of the investigators and adjudicator's findings was that Doe brought alcohol to lab in an effort to relax her inhibitions. AC ¶ 171.  Doe completely denied any non-consensual contact with Lisa and never made any admissions relating to non-consensual contact.

Because he could not cross-examine, he could not ask about accommodations given to Lisa, any contacts about whether Lisa and Sally coordinate testimony. AC ¶ 413. Doe also was not able to effectively cross-examine about Lisa's motives to testify falsely against Doe, including possible accommodations given to her, any contacts between Sally and Lisa, any possible embarrassment about the consensual activity in the lab.  These are obviously tough topics to broach, but is also tough to be accused of something as despicable as sexual assault, something that Doe spent his entire academic studies studying and fighting against. AC ¶ 414.  Lisa admitted that she did not know she was

sexually assaulted until she spoke to DiCarlo. AC ¶ 416.

Finally, Lisa's affirmative testimony was not overwhelming about sexual assault. In describing the experience, Lisa alleged that while sitting beside each other on the couch, Doe tried to kiss her, but she leaned back away from him. AC ¶ 204. Lisa then stated Doe then placed his hands under her shirt and bra and fondled her left breast (skin to skin) for about 30 seconds, and then she removed Doe's hand from under her shirt. AC ¶ 205. Later, when Doe tried to kiss her again, she declined and told Doe her friend was coming to pick her up. *Id*.

Stevenson Early wrote that she had "no reason for not believing" Lisa Doe. AC ¶ 265. For example, she used start by believing to discredit Doe. She found that Doe was not credible because "was extremely different from Complainant's [Lisa's] account, both when he was questioned about minor details related to the incident on or around August 31, 2016, and about behaviors that are potentially prohibited by university policy, i.e., behaviors that are sexual in nature." AC ¶ 267. Of course, this cuts both ways, why did Stevenson Earl not discrete Lisa because her version was different than Mr. Doe's? It is plausible to infer because the start by believing victim approach presumes accusers are telling truth while placing burden on the accused to prove they didn't do it, clearly placing the thumb on the scale for victims.

### ii.    Plaintiff has pleaded a connection between the erroneous outcome and gender bias.

Gender bias may be shown through the statements of members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that tend to show the influence of gender. *Yusuf,* 35 F. 3d at 715. *See also Doe v. Miami U,* 882 F.3d 579, 592-93 (6th Cir. 2017). For instance, "where the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side" it may be inferred that the evaluator has been influenced by bias. *Columbia U,* 831 F .3d at 57. *See Norris v. CU Boulder,*

2019 WL764568, at** 8-9 (D. Colo. 2019). Gender bias may also be inferred where an adjudicator possesses "outdated and discriminatory views of gender and sexuality." *Doe v. Marymount U,* 297 F. Supp. 3d 573, 586 (E.D. Va. Mar. 14, 2018). *See Doe v. Grinnell College,* 4:l 7-cv-00079, SJ Opinion, ECF No. 159, at pp. 24-27.

At

**- The University Lawsuits**

While Doe investigation was pending, Mr. Doe identified two different lawsuits relating to UI's handling of sexual harassment claims. See AC ¶ 414. Evidence that a college has been placed under federal investigation, severely criticized for its failure to protect female sexual assault victims and is under pressure to correct its perceived tolerance of the sexual assault of female students

provides a "backdrop" for gender bias or sex related bias. *Doe v. Baum*, 903 F.3d 575, 586-587 (6th Cir. 2018) (external pressure combined with hearing board's credibility determinations in favor of females on a cold record raised plausible inference of gender bias). *See also Miami U.*, 882 F.3d at 592-93 (plausible inference of gender bias where inter alia university faced pressure to zealously "prosecute" male respondents after facing lawsuit by female student).

According to the Iowa City Press Citizen, the lawsuit sought orders requiring UI to make "several changes," including, surveying students about its handling of complaints, analyzing investigations and decisions to monitor for bias, and boosting training on gender-based violence. AC ¶ 612.  The lawsuits provided gender was a clear motivating factor when it argued that UI's response remained inadequate because the changes did not address "biases that can lead to institutional hostility against female accusers and support for perpetrators." *Id*.

### - Office of Civil Rights Investigations by Department of Education

During the investigation and adjudications, there were at least   UI had an extraordinary number of seven (7) open investigations with the OCR when UI expelled Doe. See: Groeger, Lena. "Has Your School Been Investigated for Civil Rights Violations?" ProPublica.

https://projects.propublica.org/graphics/civil-rights-violations. AC ¶ 616 (b).  Upon

information and belief, 2016 and 2017 were especially troubling years for UI with

the OCR as it related to discrimination against females. AC ¶ 616 (c).

These allegations, and the allegations set forth supra together create a

sufficient backdrop to infer gender bias.  In *Miami University*, 882 F.3d at 594, the

Court found that the plaintiffs allegations of pressure placed on the university by

the federal government, a lawsuit brought by a femaleNotably, the 2014 Guidance

advised universities to conduct hearings in a manner that does not cause additional

trauma for the complainant.  See also *Harnois v. University of Mass*. at

Dartmouth, 2019 WL 5551743, at *4 (D. Mass Oct. 28, 2019).

- **The Use of a Trauma-Informed Approach Supports an Inference of Gender Bias**
The UI outlined victim centered prosecution and investigation approach.

Those training procedures are outlined in Paragraphs 467-477.  It specific

approach is outlined in Paragraph 474.

A trauma-informed approach may support an inference of gender bias if

there is evidence of gender bias in its application. *Rossley v. Drake U*, 344

F. Supp. 3d 927-928 (S.D. Iowa 2018). Recently, in *Norris v. CU Boulder*, 2019

WL 764568, at *9, the court found that allegations that a university administrator

"improperly used a trauma-informed approach" and overlooked inconsistencies in

a complainant's account, were facts that supported a claim of gender bias at the

motion to dismiss stage.

### - Impact of Trauma Informed Approach Frost and Stevenson Earl

Remarkably, neither Frost nor Stevenson Earl even mentioned Sally's statement to Lovaglia that the conduct with Doe was consensual or mutual. Neither mentioned Lisa's statement that she did not know that she had been assaulted until she talked with University Officials.

Stevenson Earl expressly discounted Doe's version of what happened because it differed from Lisa's version.  She failed to use that standard with either Lisa or Sally, ie that they were not credible because their versions differed from Joe's.

Frost used different questioning techniques, asking softball opened questions to Lisa and Sally while asking leading cross-examination type questions to Doe. For example, she did not even fully question Sally about her report to Lovaglia about her contact with Doe as being consensual. AC ¶ 333.  This is not a minor omission as the UI and Frost used both their reports to corroborate each other. AC ¶ 333.

It is plausible that she did not ask about past inconsistent statements to avoid further traumatizing Lisa.  She did not ask any questions about past inconsistent statements that about Lisa made about location of alcohol, how it was introduced, her continuing contact with Doe after the "assault," her possible motives for filing

the report, the location of the kisses, her delay in reporting, whether she had any conversations with Sally. AC 335.

Similar to the plaintiff in *Norris*, Plaintiff, here, has alleged that Defendant UI was required to adopt a trauma-informed approach in response to OCR Guidance, that the administrators involved in his Title IX proceedings were trained in this approach and that the manner in which they employed this approach was gender-biased because it caused them to discredit Plaintiffs statements to Stevenson Earl and Frost while completely ignoring past inconsistencies by Lisa and Sally.  At this stage of the action, these allegations are sufficient to support Plaintiffs claim of gender bias.

While a smoking gun admission of gender bias is difficult, Frost came pretty close.  Frost discredited Doe's statement about reporting that Lisa liked "cowgirl" and jumped did that act to Doe by describing it as merely fantasy. AC ¶ 338. There was no evidentiary support for that.  Doe did not admit to any fantasy nor did Lisa report that he seemed like he was fantasizing. AC ¶ 339.  She seemed to assume, based upon her own bias about gender and sex, that Doe was merely fantasizing.

Frost also asked Doe's witness, whether Doe made any sexist comments in his presence without asking similar questions about the accusers if they had made sexist related comments during the relevant time period in fall of 2016.

More concrete examples by Frost include she asked Lisa and Sally about whether they feared Doe hitting them or punching them, in spite of the fact that they had never made that claim through proceedings. AC ¶ 106 (a).  At one point, she apparently tried to impugn Lovaglia's testimony when claiming "boys will be boys" because Dr. Lovaglia took a moment to explain the situation from Doe's perspective.  AC ¶ 106 (b).  Dr. Lovaglia replied no.  Finally, in hearing and in her adjudication finding, Frost gratuitously insulted Doe by suggesting that Doe would have trouble controlling his sexual desires and "should be removed from a "vulnerable population" as it related to Doe helping students at UI with disabilities. AC ¶ 106 (g).

All of the above are sufficient to create an inference of gender bias.

### B.    <u>Selective Enforcement</u>

A Title IX selective enforcement claim is premised on the allegation that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." Yusuf, 35 F.3d at 715. To support a claim of selective enforcement, Plaintiff "must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University." *Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 931 (S.D. Iowa 2018).  At the pleading stage, the plaintiff is not required to provide statistics, nor does the court need to consider "what

degree of consistency in outcome would constitute a relevant pattern." Requiring

a male student to prove at the pleading stage that females accused of sexual

assault were treated differently is "practically impossible and inconsistent with

the standard used in other discrimination contexts" *Doe v. Brown*, 166 F.Supp.3d

177, 189 (D.R.I. 2016)

Additionally, UI only inquired if Doe gained verbal consent to kiss, and

sanctioned Doe. UI did not question if Sally gained consent. The outcome equally

supported disciplinary proceedings against Sally for also violating the Sexual

Misconduct Policy. Yet UI treated Sally, a female student, preferentially. Such

allegations also sufficiently support a selective enforcement claim. *See Doe v.*

*Rollins Coll.*, 352 F. Supp. 3d 1205, 1211 (M.D. Fla. 2019).

## VII. PLAINTIFF HAS ADEQUATELY PLEADED BREACH OF CONTRACT.

The Court should deny that portion of Defendants' motion seeking to dismiss

Plaintiff's reach of contract claim. Defendants argue, without basis, that Plaintiff

failed to allege the existence of a contract in support of his breach of contract

claim (Count IX). Moving Br. at 20-25. It is well settled that "[t]he relationship

between a university and student is contractual in nature" and that the policies and

procedures set forth in a student handbook, or other statement of policy,

constitute an enforceable contract. *Corso v. Creighton U.*, 731 F.2d 529 (8th Cir.

1984) (applying federal case law). See Ikpeazu v. U. of Nebraska, 775 F.2d

250,254 (8th Cir. 1985) (relying on Corso); Rossley v. Drake U., 342 F. Supp. 3d

904, 944-945 (S.D. Iowa 2018) (denying summary judgment on breach of

contract claim which alleged that University breached sexual misconduct policy

by failing to conduct equitable investigation and apply correct burden of proof).

*Warren v. Drake University*, 886 F. 2d 200 (8th Cir. 1989), supports

Plaintiff's breach of contract claim and goes against dismissal because "the issue

of what documents constitute a contract is ... properly one for the jury to decide."

*Warren*, 886 F.2d at 201 (emphasis added). See Moving Br. at 25-26.

Accordingly, Defendants' argument that the Court should determine, as a matter

of law, that there is no contract is not only meritless. Moving Br. at 26. Notably,

in *Warren*, the jury found that that honor code and the student handbook were

part of the plaintiff's contract with the university.

*Slaughter v. Brigham Young University*, 514 F.2d 622 (10th Cir. 1975), also

analyzed a contract claim against a private university invoking similar principles.

Plaintiffs allegations that University's of Iowa's Student Conduct Code and

Sexual Misconduct Policy created a contract between Plaintiff and University of

Iowa sufficiently allege the existence of a contract at this stage of the action.

Defendants also argue that Plaintiff failed to "allege what his performance

obligations were under the terms of the contract" or that he performed the terms

and conditions required of him under the contract. Moving Br. at 22. On the

contrary, Plaintiff alleged that: (i) he paid his tuition (AC ¶ 195 ); (ii) at the time

of Lisa and Sally's allegations he was a student in good standing at

University of Iowa (AC ¶ 51); and (iii) Plaintiff was innocent of the charge that

he violated University of Iowa Sexual Misconduct Policy (AC ¶ ¶ 67, 435, AC ¶

617).   He also alleged an express contract as well as a contract implied in law in

the alternative. AC ¶ 197.

 *Harvey v. Palmer College of Chiropractic*, 363 N. W.2d 443 (Iowa Ct. App.

1984) is also distinguishable because it was not a breach of contract action.

Rather, the court addressed the requirements imposed on private universities vis-

a-vis their students under the common law. The court held that private

universities have common law obligations which parallel due process under

the Fourteenth Amendment, and, for this reason, analyzing the relationship of a

private university under either the law of contracts or the law of associations is

not a perfect fit. The court agreed "with those courts which hold that a student at a

private school should be able to rely upon the school to follow the established

procedures it voluntarily promulgated" and found that the issue of whether the

university substantially complied with its written regulations should have been

submitted to the jury. Id. at 446. Slaughter v. Brigham Young University, 514

F.2d 622 (10th Cir. 1975), also analyzed a contract claim against a private

university invoking similar principles to the Harvey court.

Tibbetts v. Yale Corporation, 47 Fed. App'x 648 (4th Cir. 2002), concerned

one chapter of a university's student handbook which the Court found did not

constitute a contract because it

merely expressed the university's "overriding commitment to free expression."

Id. The Court did not find that there were no contractual obligations with respect

to the plaintiff but, as alleged by the plaintiff, the university breached no

contractual obligations with the plaintiff.

## VIII.      DOE HAS RAISED A PLAUSIBLE EQUAL PROTECTION CLAIM.

Doe has raised plausible claims of an equal protection claim against

Defendants Frost, Redingon, Keller, and DiCarlo.

The Equal Protection Clause to prevent arbitrary gender-based

discrimination. *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225

(1971) (finding that "[t]o give a mandatory preference to members of either sex

over members of the other, is to make the very kind of arbitrary legislative choice

forbidden by the Equal Protection Clause"). In addition, discrimination based on

"gender-based generalizations" is violative of the Equal Protection Clause.

*Weinberger v. Wiesenfeld*, 420 U.S. 636, 645, 95 S.Ct. 1225, 43 L.Ed.2d 514

(1975). This means that state sponsored educational institutions may not

discriminate based upon an alleged gender stereotype. *See Mississippi Univ. for*

*Women v. Hogan*, 458 U.S. 718, 725, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982).

As demonstrated above, Frost continually employed gender based stereotypes during her questioning and her ultimately adjudication.  She impugned Lovaglia's statement that appeared favorable to Doe by stating boys will be boys, she asked Lisa and Sally about acts of violence by Doe when they even never alleged such violence to them, apparently assuming young men may be violent.  Assuming that Doe adequately pleaded a claim on Counts II and III, that should also establish a violation of equal protection rights.

**CONCLUSION**

For the above reasons, Doe moves to overrule the Motion to Dismiss.

RESPECTFULLY SUBMITTED,

/s/ Rockne Cole

_____

ROCKNE O. COLE
Cole Law Firm, PC
209 E. Washington, Ste. 304
Iowa City, IA  52240
(319)519-2540
(319)359-4009   **FAX**
rocknecole@gmail.com
Iowa Pin AT1675
**ATTORNEY FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**
I hereby certify that on January 16, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to the parties or attorneys of record.
/s/ Rockne Cole
_____