IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| **John Doe,**<br><br>Plaintiff;<br><br>v.<br><br>**University of Iowa, et al.,**<br><br>Defendants. | Case No. 3:19-CV-00047-RGE-HC<br><br><br>**Amended Brief Supporting Plaintiff's Resistance to Defendant's Motion to Dismiss** |

## TABLE OF CONTENTS

1.   INTRODUCTION --------------------------------------------------------------------------------------- 2

2.   BACKGROUND --------------------------------------------------------------------------------------- 2

   2.1   Plaintiff's Background --------------------------------------------------------------------------- 2

   2.2   Sally Roe Makes Allegations Against Plaintiff ---------------------------------------------------- 3

   2.3   Lisa Roe Makes Additional Allegations ---------------------------------------------------------- 5

   2.4   UI's Investigation and Doe's Expulsion --------------------------------------------------------- 7

3.   LEGAL STANDARD – MOTION TO DISMISS – FRCP 12(B)(6)------------------------------------------- 9

4.   ARGUMENT ----------------------------------------------------------------------------------------- 10

   4.1   Individual Defendants Are Not Entitled to Quasi-Judicial Immunity----------------------------- 10

   4.2   These Individual Defendants Are Not Shielded By Qualified Immunity-------------------------- 16

   4.3   Plaintiff's Due Process Rights Were Clearly Established --------------------------------------- 17

   4.4   Plaintiff's Right to be Free from Discrimination was Clearly Established ------------------------ 30

   4.5   Defendants are Liable in their Individual Capacities ------------------------------------------ 32

   4.6   Plaintiff Alleged Plausible Title IX Claims --------------------------------------------------- 45

5.   CONCLUSION --------------------------------------------------------------------------------------- 53

## 1.  INTRODUCTION

Plaintiff John Doe ("Doe") respectfully submits this brief to support his Resistance to Defendants' Motion to Dismiss his Third Amended Complaint ("TAC") pursuant to F.R.C.P. 12(b)(6). Plaintiff's TAC contends, with factual evidence, that Defendants violated Doe's Due Process, Equal Protection, § 1981, and Title IX rights after expelling Doe from The University of Iowa ("UI") based on Sally Roe ("Sally") and Lisa Roe's ("Lisa") false allegations of sexual misconduct. *See generally*, Doc. 57 (containing Doe's TAC) ("Complaint").

Complete facts and allegations are detailed in Plaintiff's TAC, filed on February 11, 2020. Despite Defendants' unfounded claims in their Motion to Dismiss (Doc. No. 60), Plaintiff's Complaint contains the legal and factual basis for claims made under the plausibility requirements of *Iqbal* and *Twombly*. As such, Plaintiff's Complaint includes sufficient particular information to survive Defendants' Motion to Dismiss. Defendants violated Doe's Due Process, Equal Protection, and Title IX rights conferred and guaranteed by the U.S. Constitution and federal statutes by manifesting: (a) gender-biased motivations against male students like Doe; (b) bias in favor of female students who accuse male students of engaging in sexual misconduct; (c) impartial and arbitrary investigations and adjudicatory hearings; and, (d) a hostile environment for accused male students. This Court should deny the Defendants' Motion to Dismiss.

## 2.  BACKGROUND

### 2.1    PLAINTIFF'S BACKGROUND

Doe is an international student. He is a citizen of a predominantly Muslim South Asian country. Doe's parents fled their home country and raised him in Kuwait. Doe has never lived in his country of citizenship and no longer possesses a Kuwaiti residency or a Kuwaiti visa. TAC ¶ 53. Despite living through both the Gulf War and the Iraq War, both of which started in Kuwait, Doe excelled in his education. After completing his secondary education, Doe researched colleges and universities around the world to determine which school offered him the best educational opportunities. Following this search, Doe, in 2008, decided to attend the University of Iowa ("UI"). After obtaining an F-1 Student Visa, Doe moved to the United States to begin his undergraduate studies at UI. Doe earned his undergraduate degrees in psychology and sociology and returned months later to pursue his master's degree, intending to attain a Doctorate in counseling psychology eventually. TAC ¶ 54.

Before the incidents discussed in these proceedings, Doe had no prior disciplinary record and was well-positioned to graduate. He maintained a GPA of 3.85. TAC ¶ 470. He has no criminal record in any jurisdiction and is not the person whom UI or the Individual Defendants have described. His plans to graduate from UI, and his career plans, were sidelined when UI unreasonably found him responsible for non-consensual sexual misconduct with Sally and Lisa and expelled him.

### 2.2   SALLY ROE MAKES ALLEGATIONS AGAINST PLAINTIFF

On September 2, 2016, Sally Roe ("Sally") joined a sociology student group that Doe was part of. Upon joining the group, Sally and Doe became friends. That same evening, Doe and Sally went on a casual date to an improv comedy show. At around 10:30 pm, after the show ended, Doe invited Sally to his apartment, and Sally accepted. Doe and Sally talked on Doe's balcony and became intimate when they kissed. Eventually, they moved back inside Doe's apartment, where additional kissing took place. During the investigation, Sally admitted that she "did not say no to the kissing." After some time, at Sally's request, Doe walked Sally back to her dorm, outside which they kissed again. After dropping her off, Doe called his friend S.B. to inform him that he went on a date. TAC ¶¶ 60-64.

About two days later, Sally sent a text message to Doe, indicating that she desired a platonic relationship. Doe accepted her decision, hoping to maintain at least a casual friendship. Nevertheless, Sally texted Doe several days later, after midnight, initiating a flirtatious conversation. TAC ¶ 69. Despite her playful demeanor, on or around October 10, 2016, Sally mentioned to a University professor that she was receiving more attention than she wished from Doe. Sally confirmed that the physical interaction with Doe was consensual, and she only "changed her mind about the relationship later." TAC ¶ 70.

Evidence from Doe's hearing on the matter confirms this idea. As if designed to confirm this very fact, shortly following the alleged sexual assault, Sally visited a close friend and neighbor, R.C., and told him what happened with Doe that night. Sally told R.C.: "I think we ended up joking about it because I didn't take it so seriously at the time." UI ignored this critical evidence. At UI's hearing into these allegations, Sally claimed that she told R.C. about Doe touching her breast. When asked about these potentially conflicting statements, R.C testified that he does not remember this, and it would have stuck out as dramatic if she said such a thing. TAC ¶¶ 65-66.

At the hearing, Sally's brought her roommate and best friend, E.J., as a witness to testify about what she told him about the events on September 2, 2016. E.J. testified that she "knew intimate parts of her relationship and stuff like that." When asked if Sally told her if Doe kissed her, she said **no**. When asked if Sally told her if Doe touched her breast, she again testified **no**. TAC ¶ 67.

Nevertheless, before the official complaints and procedures were initiated, Doe and Sally remained friendly. Should the Court allow it, Plaintiff intends to show critical evidence supporting these claims. For example, on January 20, 2017, Sally had an extended conversation with Doe about their respective winter breaks. They took photographs that day, showing Sally laughing, smiling, and in visibly good spirits. TAC ¶¶ 76-77.

While Doe remained focused on his independent research, Sally had issues in the Lab completing required work. In January 2017, Doe twice reminded Sally of the data she needed to submit for the impending deadline for his study. Sally assured him that she would give it on time. In late-January 2017, Doe again reminded Sally that she needed to submit her data for the study, and she failed to do so. This initiated an argument between Doe and Sally, and subsequently, accusations that contact during their relationship made Sally feel "uncomfortable." Specifically, Sally accused Doe of tickling her. The accusation was the only time in their entire friendship that Sally mentioned to Doe about any "uncomfortable" touching. TAC ¶ 78.

Less than one week after this argument, in January 2017, Sally told a faculty member about their argument, who, as a mandatory reporter, contacted DiCarlo, UI's Title IX Coordinator ("TIXC) and Sexual Misconduct Response Coordinator. TAC ¶ 79. Initially, Sally only complained that Doe was "aggressive about data," questioned her about missing deadlines, and "tickl[ed]" her once. *Id.*

In response to these allegations, and before a formal investigation was opened, DiCarlo met with Sally. TAC ¶ 80. During this preliminary meeting, Sally's allegations mysteriously expanded, claiming that on September 2, 2016, Doe kissed her without affirmative consent and touched her breast. UI then began investigating Doe for sexual assault. TAC ¶ 80. This was the first time these encounters were ever described as 'misconduct.' Doe said the kissing that occurred five months prior was consensual and expressly denied making any contact with her breast at any point. TAC ¶¶ 62-63. Importantly, Sally mentioned that her experience with Doe did not really affect her "schoolwork" and "academics." TAC ¶ 165.

### 2.3   Lisa Roe Makes Additional Allegations

Approximately two weeks after Sally reported alleged Doe's conduct, Lisa Roe, a friend of Sally Roe, additionally filed a report alleging Doe had also touched her breast without her consent and sexually harassed her during the Fall 2016 semester. TAC ¶ 83. These allegations changed in consistency with each retelling. Lisa provided no corroborating testimony or evidence to the investigation or to anyone at UI to support these allegations. TAC ¶ 85. As a part of her claims, Lisa was asked by UI why she filed her Complaint. Her answer is especially telling in light of the circumstances. She told Stevenson Earl that she "[c]ame forward because **after talking to Sally**, Doe was crossing the line because of Lab/student relationship." TAC ¶ 122. This reason was misguided for several reasons, most importantly, that Doe was not in an instructional or educational leadership position, nor did he possess any supervisory capacity, either directly or indirectly in the lab, as confirmed by UI's investigation. TAC ¶ 123.

The parties agree that on or about the evening of September 5, 2016, Doe and Lisa met at the Lab, sharing a casual conversation. From this initial point of agreement, the stories diverge dramatically. TAC ¶ 86. Making her initial report, Lisa made wild allegations regarding these events. She contradicted herself and the testimony of her friend, T.M., multiple times. TAC ¶ 91. UI, including DiCarlo, Stevenson Earl, Cervantes, and Frost, knew of major inconsistencies in Lisa's evolving allegations, but ignored them, assisting Lisa in nurturing bad faith allegations. TAC ¶ 92.

For example, T.M. testified that **"at first, she said that she liked it [the Lab],"** which is contradictory because Lisa claimed that Doe sexually assaulted her the first evening that she came to the Lab. TAC ¶ 107. Further, Lisa said she told T.M. about this incident at some point, yet at the hearing, **T.M. testified that she said nothing about Doe touching her "breast or body in any way."** TAC ¶ 108.

Doe also provided multiple text messages initiated by Lisa, emails, pictures, and even a video showing the two interacting after the alleged assault. Lisa was laughing and clearly appears playful in the video in response to Doe's humorous comments. The video was taken at night, in the Lab, a month after the alleged sexual assault. Lisa said she knew about this video during the interview, but then claimed she did not know about it in her sworn testimony at the hearing. TAC ¶ 111. Doe presented text conversations that occurred from November 2016 to late January 2017, showing a mutually supportive friendship in which Doe helped Lisa with her resume and applications, also directing her to mental health and academic resources when

she asked for help. TAC ¶ 114. Lisa, on the other hand, provided no evidence. In fact, at the hearing, she admitted that "I have no evidence" and "I only have my words" TAC ¶ 179.

On multiple occasions after the alleged assault, Doe said he walked Lisa home after working together late at the Lab, usually around 2 a.m. Lisa then admitted to this in her second interview and never alleged that Doe did anything inappropriate during these times. In fact, Doe remained a source of support and kindness for Lisa. TAC ¶ 113.

In January 2017, about a month before Lisa filed her Complaint, Lisa sent a text to Doe saying: "I just don't know what to do I'm basically having a panic attack" referring to her poor grades from the Fall semester. Her academic advisor was not supportive of her wanting to study medicine. Lisa felt discouraged. These were some of the last conversations between Lisa and Doe before Lisa reported Doe. Evidence shows that the last text that Lisa sent to Doe was her telling him to come to the Lab at night, which Doe did not respond to. TAC ¶ 117.

Lisa revealed another potential motive for falsely accusing Doe, discussing the impact of "rumors" about her involvement in Doe's departure from the Lab. Lisa said, "Sally told me there are rumors going around," and Lisa said, "I didn't want them to see me that way," showing that Lisa found these rumors damaging to her reputation. At least one person in the Lab, E.C., knew what occurred between Doe and Lisa, as confirmed by Sally. Stevenson Earl reported there were no witnesses to the alleged sexual assault or harassment. She also stated there was no evidence presented to suggest Doe used force, intimidation, or coercion at any time. Stevenson Earl's analysis focused on gaining affirmative consent and emphasized: a) "University policy does not require Complainant to say no," and b) "Lack of protest or resistance does not mean consent, nor does silence mean consent." TAC ¶ 181.

Through her role as a "Lead Empower Advocate Prevent Group Leader" for the "Women's Resource & Action Center," Lisa gave presentations on sexual violence for UI "students and staff" before the alleged sexual assault, and her resume confirms this involvement. If nothing else, this indicates that Lisa knew what constituted sexual assault, and should have been able to recognize such misconduct. But after her initial meeting with DiCarlo, Lisa's allegations also expanded to include sexual assault. At the hearing, Lisa said, "I didn't know it was sexual assault until I met Monique [DiCarlo]" TAC ¶ 89.

### 2.4    UI's Investigation and Doe's Expulsion

Following Lisa Roe and Sally Roe's reporting of sexual misconduct, UI began an internal investigation. On February 10, 2017, Lyn Redington ("Redington"), the University's Dean of Students, sent Doe an email informing him that Tiffini Stevenson Earl ("Stevenson Earl"), a compliance officer with UI's Office of Equal Opportunity & Diversity ("EOD"), had been appointed the Judicial Administrator & Investigator. Defendant Constance Schriver Cervantes, J.D. ("Cervantes") was another Compliance Coordinator in UI's EOD and was UI's designated Charging Officer for the hearing. TAC ¶ 16. Cervantes assisted Stevenson Earl with the investigation, both interviewing Doe during the investigation. On June 23, 2017, Stevenson Earl produced a report finding Doe responsible for violating the student conduct rules, recommending that UI suspend or expel Doe, pending the outcome of a formal hearing. TAC ¶ 120. In his TAC, Doe had accused Stevenson Earl of excluding exculpatory evidence, editing facts, and of writing a bad faith report. TAC ¶¶ 137, 326. However, Defendants decided to attach the report to their Motion to Dismiss.

Defendant Iris Frost, Esq. ("Frost"), an Associate Professor of Rhetoric at UI, serving as an allegedly neutral adjudicator, conducted the hearing for UI. TAC ¶ 152. Frost used leading questions to pressure Complainants into portraying Doe as a sexual predator. Doe criticized Frost in his appeal to the hearing decision, saying that she "blatantly led and coaxed the complainants, putting words in their mouths, through her questioning methods and found them credible and emotionally distressed." TAC ¶ 187. Doe, in his appeal, said: "Ms. Frost purposefully chose questions for complainants that shows them in a positive light while leaving out many of the crucial questions that I provided that would have cast doubt or show inconsistencies in their stories." Frost provided no reason for ignoring the questions. TAC ¶ 191.

As there was no hearing panel, Frost had complete discretion regarding the admissibility of evidence. Frost abused this discretion. She submitted further evidence toward the end of the hearing after Doe had testified, and Sally's witnesses had not corroborated her allegations.  TAC ¶ 207.

The Notice of Hearing provided to Doe included extraordinary procedural rules. While it banned Doe's attorney from contacting parties, UI also prohibited Doe from discussing the accusations with friends—including potential witnesses to the events being alleged because of UI's "anti-retaliation policy." This policy prohibited Doe from "discuss[ing] this matter with any of your mutual friends… **Any** action

on your part to **discuss** the case with **another student** could be considered retaliation on your part." Failure to adhere to this policy could justify expulsion. In response, Doe notified UI and the Board on how these policies restricted him from contacting three witnesses. This unconstitutional gag order gave UI's investigators the benefits of *ex parte* interviews while compelling Doe to rely on Stevenson Earl's inaccurate, incomplete, and intentionally misleading report. TAC ¶ 143.

The hearing provided to Doe was a travesty of due process. Exculpatory evidence was ruled inadmissible for no apparent reason; UI deprived Doe's attorney of the chance to cross-examine the witnesses against Doe; and UI failed to use the preponderance of the evidence standard. TAC ¶ 156.

At the hearing, statements from Lisa and Sally were wildly inconsistent and often contradictory. There was never any indication that either Sally or Lisa felt uncomfortable in the presence of Doe. Following these alleged sexual assaults, but before the reporting to school officials, both Lisa and Sally allowed Doe to walk them home, often late at night. TAC ¶ 113. The Complainants frequently sent text messages between each other, indicating a friendly, comfortable relationship. TAC 69, 76, 111. Despite Doe's requests, UI investigators failed to contact or interview witnesses that possessed relevant information. *See* TAC ¶ 130.

Additionally, much exculpatory evidence was withheld from Doe before the hearing, making a reasonable defense impossible. TAC ¶ 133. For example, a month after the alleged incident between Sally and Doe, Sally admitted to a faculty member that what happened with Doe was consensual. However, it never made its way into any report produced by UI.

Doe wrote in his appeal that UI "[u]nlawfully shifted the burden to me, essentially assuming my guilt and requiring me to prove by a preponderance of the evidence that I did not sexually assault anyone" and that if UI were not "[g]ender biased, it would have investigated Sally touching me first [tickling incident] and not put the burden on me to gain consent." TAC ¶ 221.

On October 10, 2017, Redington sent Doe a copy of Frost's report and informed him that he was expelled from UI and was subject to arrest for criminal trespass if he entered the campus. Following his expulsion, Doe appealed this decision to Defendant John Keller ("Keller"). TAC ¶ 238. Keller is UI's Associate Provost for Graduate Education and oversaw the internal appeal. TAC ¶ 237.

Doe provided Braun and the Board with an "actual notice" of the discrimination he faced. Doe began his appeal by writing this was his "first proper opportunity" to tell his story. He alleged "discrimination" and "bias" from Stevenson Earl and Frost, that Frost had not allowed him to ask questions; how she "devalued" his answers; how she prejudicially edited the few questions of Doe that she did ask; and she did not ask him about clear signs of non-consent. Doe provided Keller with an "actual notice" of the "gender" discrimination he faced from UI. Keller's rejection of Doe's appeal comprised a single sentence, stating he found no violations, and that the sanction was not disproportionate. TAC ¶¶ 240, 244.

Defendant Mark Braun ("Braun"), the Executive Director of the Board, was involved in Doe's appeal to the Board[1]. TAC ¶ 245. On February 20, 2018, Doe submitted a timely and researched 35-page brief to Braun, explaining the lack of due process, discrimination, and harassment he endured. He questioned the fairness of the proceeding. TAC ¶ 253.

On June 11, 2018, the Board emailed Doe. The decision, in its entirety, read: "The Board of Regents considered the appeal of Doe on Wednesday, June 6, 2018. The Board voted to affirm the final decision of the University of Iowa in its entirety (8 in favor, 0 opposed, 1 absent)." After his expulsion from UI, Doe lost his F-1 visa. He has applied for political asylum. The Department of Homeland Security's decision on that application remains pending. Doe, who has not seen his parents in over six years, remains at risk of removal proceedings from the United States to his country of citizenship, not even the country in which he was raised and has familial contacts. TAC ¶¶ 274-275.

### 3.   LEGAL STANDARD – MOTION TO DISMISS – FRCP 12(B)(6)

To survive a motion to dismiss, a complaint must provide "a short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8 (a) (2). A plaintiff shows that he is entitled to relief by "plausibly suggesting" that he can meet the elements of his claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). A plaintiff's suggestion is plausible when it contains enough factual content that the court can reasonably infer that the defendant is liable. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Legal conclusions, "formulaic recitation[s]" of the claim's elements, and "naked assertion[s]" of liability are all insufficient. *Id.* (second alteration in original) (quoting *Twombly* at 557).

---

[1] Defendants Motion to Dismiss implies that Defendant Braun is no longer in his position as the Executive Director of the Board. However, The Board's website still has him listed as the Executive Director at the time of filing this document. As such, Doe used the information available to him at the time while writing his TAC.

The question ... is not whether [the plaintiff] might at some later stage be able to prove [a claim]; the question is whether [the plaintiff] has adequately asserted facts (as contrasted with naked legal conclusions) to support his claims. *Whitney v. Guys, Inc.,* 700 F. 3d 1118, 1129 (8th Cir. 2012). While the "plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a sheer possibility," it is not a "probability requirement." *Braden v. Wal–Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir. 2009). As such, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable and that a recovery is very remote and unlikely." *Id.*

## 4. ARGUMENT

### 4.1   INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUASI-JUDICIAL IMMUNITY

Officials seeking an "absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." *Butz,* 438 U.S. 478, 506 (1978). "Absolute immunity 'is an extreme remedy, and it is justified only where any lesser degree of immunity could impair the judicial process itself.'" *Garmon v. Cty. of Los Angeles,* 828 F.3d 837, 843 (9th Cir. 2016) (citations omitted) "The proponent of a claim to absolute immunity bears the burden of establishing the justification for such immunity." *Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429, 432 (1993); *see also Buckley v. Fitzsimmons,* 509 U.S. 259, 269 (1993); *Brooks v. Clark Cty.,* 828 F.3d 910, 915–16 (9th Cir. 2016) The justification must take care to explain why the official hoping to secure absolute immunity would not be sufficiently shielded by qualified immunity, which already affords officials considerable leeway to perform their jobs without fear of personal liability." *Brooks,* 828 F.3d at 916.

In their Motion to Dismiss, individual Defendants Stevenson Earl, Frost, Redington, Keller, and Braun maintain that they are entitled to absolute quasi-judicial immunity as members of the adjudicatory appeal process. The Court should not dismiss the individual defendants based on quasi-judicial immunity. Construing the Complaint in a light most favorable to Plaintiff, the Defendants have expressly resisted the view that Student Discipline Proceedings are "judicial" in nature. In order to get the benefit of immunity of a judge, Defendants have to act like a judge and provide rights of a judicial process akin to an administrative law judge in an agency action, i.e., a neutral, unbiased adjudicator presiding over a fair process consistent with due process clause. Defendants, in their Motion to Dismiss, provide no clear authority mandating dismissal.

### 4.1.1   *Van Horn* and *Fink* favor Plaintiff's position

Defendants' application of the holding in *VanHorn,* in this case*,* is misguided. Notably, the Court in *VanHorn* set forth due process requirements more stringent than any followed in this case. For example, *VanHorn* established (in relevant part):

> [A]ppellants are entitled to absolute, quasi-judicial immunity. The Commission consists of three members appointed by the governor and confirmed by the legislature, and one Executive Secretary hired by the Commission…The appointments are arranged so that one expires every year. When conducting disciplinary hearings, the Commission is empowered by statute to do the following…(2) admit evidence pursuant to the **rules of evidence** applicable in state court; (3) give effect to the rules of privilege recognized by law; (4) administer oaths, issue **subpoenas**, **compel the attendance of witnesses** and the production of any papers, books, accounts, documents, and testimony and cause **depositions** to be taken;…(7) render its final decision stating its findings of fact and conclusions of law; and, *inter alia*, (8) designate any person(s) to make investigations as the Commission deems necessary to assist with the determination of any matter within its jurisdiction.

Moreover, *VanHorn* set for rights of a person, subject to discipline, in pertinent part:

> (1) To remain silent; (2) To the benefit of counsel, including the opportunity to confer with counsel in preparation of a defense; (3) To a speedy and public hearing; (4) To present evidence and to testify in person at his or her hearing; (5) To **cross-examine** witnesses who testify against him or her; (6) To appear personally and be represented by counsel, or appear by and through such counsel or other personal representative; (7) A decision in writing from the Commission accompanied by findings of fact and conclusions of law;… (9) Any party aggrieved by the decision of the Racing Commission after the hearing, rehearing or denial of a rehearing may appeal to a District Court of the State.

*Id.* at 847–48. In *VanHorn*, the court found the disciplinary hearing so closely resembled a judicial setting to award quasi-judicial immunity. Here, no such semblance exists.

Defendants also cite *Fink*, where that Court found the Defendants were not entitled to quasi-judicial immunity. *Fink v. Kitzman*, 881 F. Supp. 1347, 1398 (N.D. Iowa 1995). The Court in *Fink* held:

> …the critical factor is not that the Board was elected, nor that it voted on disposition of Fink's appeal. The critical factor in an analysis of this attempt to invoke the privilege is that the Board both acted as the appellate body and had originally promulgated the regulations whereby Fink brought her complaint before the Board. Thus, the Board was not properly insulated from the regulations in question... The Board is left free to apply whatever standards it deems appropriate to the particular grievance before it, and that broad discretion was granted by the resolution the Board itself enacted…

*Id.* at 1398 (Emphasis added). Similarly, the Defendants here are not entitled to quasi-judicial immunity.

This rule against quasi-judicial immunity has been extended to include suits in a defendants' personal capacity. In § 1983 actions, courts have imposed "personal liability on a school official who acted sincerely

and in the utmost good faith, but who was found — after the fact — to have acted in ignorance . . . of settled, indisputable law." *Wood v. Strickland*, 420 U.S. 308, 327-28 (1975). As such, the Supreme Court's holding is that a "school official must be held to a standard of conduct based not only on good faith but also on knowledge of the basic, unquestioned constitutional rights of his charges." *Id.* at 322. The Supreme Court expressly held that "actual malice is presumed where one acts in ignorance of the law; thus, it would appear that even good-faith reliance on the advice of counsel is of no avail." *Id* at 329, n. 2.

*Wood v. Strickland* stands for the proposition that school officials reviewing disciplinary complaints and deciding whether to expel students were not entitled to absolute immunity when acting in that adjudicatory capacity. *Id.* at 320. The Supreme Court stated this principle clearly:

> [A]bsolute immunity would not be justified since it would not sufficiently increase the ability of **school officials** to exercise their discretion in a forthright manner to warrant the absence of a remedy for students subjected to intentional or otherwise inexcusable deprivations. *Id.*

In *Butz*, the Supreme Court had little trouble extending that principle to federal administrative law judges. Like real judges presiding over civil or criminal trials, it noted that besides subpoena power, the "proceedings are adversary in nature," a trial of fact insulated from political influence, and a party can present his case by oral or documentary evidence. *Id. See* 5 U.S.C. §555(b) (1976 ed.). They are conducted before a trier of fact insulated from political influence. *See* §554(d). The parties are entitled to know the findings and conclusions on all the issues of fact, law, or discretion presented on the record. Most importantly, the Court noted that it was structured to assure that the "hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency." *Butz* at 2894, 2914–15.

The Defendants have failed to show the factors used to determine whether public officials are entitled to quasi-judicial immunity. These factors "characteristic of the judicial process" to determine whether a public official should be afforded quasi-judicial immunity are:

> (a) [T]he need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal. *Cleavinger v. Saxner*, 474 U.S. 193, 202, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) (summarizing the factors set forth in *Butz*, 438 U.S. at 512, 98 S.Ct. 2894).

- 12 -

Courts have held that the *Butz* factors are to be applied holistically and that the scope of the inquiry is not whether each factor is present but whether the balance of all the factors favors immunity. *See, e.g., Russell v. Town of Buena Vista,* No. 10–cv–00862–JLK–KMT, 2011 WL 288453, at 19 (D. Colo. 2011) (balancing all six *Butz* factors to determine that a town's board of trustees was entitled to absolute immunity regarding its decision to remove the town's mayor from office).

### 4.1.2   *Arkansas* cannot be reconciled with analogous Supreme Court precedent

The Defendants cite one district court case of a university in Arkansas to support their position. (citing *Doe v. University of Arkansas*, No. 5:18-CV-05182 2019 WL at 11 (W.D. Ark. April 24, 2019) (holding that board members were entitled to quasi-judicial immunity). *See* Defendant's Brief at p. 7. However, that case was recently argued before 8th Circuit and remains pending on appeal.[2] Even so, Doe's case here is easily distinguishable from the principles laid out in that case. Whereas Plaintiff, in that case, failed to raise objections to the faulty hearing procedures until much later, Doe made challenges and objections contemporaneously with his appeal. These objections included that the Adjudicator harassed him TAC ¶ 257, that Defendants had a conflict of interest when they hired Frost, a UI employee, as the Adjudicator (and thus were not insulted from political influence) TAC ¶ 262. The pool of potential Adjudicators that Defendants chose from were all prosecutors (and rejected applications of defense lawyers) TAC ¶ 239. The evidence showed how there was no correctability of errors on appeal. TAC ¶ 273.

Additionally, in *Arkansas-Fayetteville,* the investigation could be appealed immediately, which is then heard by a "three-member hearing panel." *Arkansas-Fayetteville* at 4. Following the appeal, *Arkansas-Fayetteville* then formed another "hearing panel" for a formal hearing. "The hearing panel consists of a mixed-gender panel of individuals" who may be members of "other specifically designated and trained members of the Northwest Arkansas legal community." *Id.* "The hearing panel confers and votes to determine" the outcome. *Id* at 5.  In 2017, UI had no such appeal process after the investigation. Instead, UI employed a single, hostile Adjudicator who was a professor at the university. Frost did not have sufficient independence to insulate herself from campus or institutional pressures. Frost's CV indicates that she only received a Continuing Education Unit in Sexual Misconduct in September 2017, the same

---

[2] In the Eighth Circuit appeal, the Plaintiff argued, *inter alia*, that the factors above were not considered when the District Court allowed Defendants both qualified and quasi-judicial immunity.

month in which she Adjudicated Doe's hearing. TAC ¶ 147.

The crux of the Doe's Complaint is that the entire expulsion process was never designed to be fair, nor does it bear any of the hallmarks of a "judicial adversarial process" warranting quasi-judicial immunity. Doe's TAC alleges a partial process with a biased judge with none of the protections formally associated with a judicial process, to wit: a) UI and Frost did not allow cross-examination of witnesses. TAC ¶ 154. Such a process prevented Doe from asking pertinent follow-up questions or from confronting his accusers. Without the back-and-forth of adversarial questioning, his attorney could not reasonably probe the Complainants' story. b) UI and Cervantes prohibited Doe from contacting not only reporting parties but any friends, including potential witnesses. TAC ¶ 144. c) UI's Start by Believing Process creates an immediate presumption that reporting parties are telling the truth while assuming the accused are guilty. TAC ¶¶ 156-157. d) By providing a whole array of resources including advocates and a personal attorney while providing none to the accused. TAC ¶¶ 156-157. e) There is no compulsory process, and the lawyer's ability to participate in the proceeding is minimal. TAC ¶¶ 144 and 154.

Additionally, Defendants cannot benefit from quasi-judicial immunity since UI has expressly refused to characterize its process as a judicial process. For example, in November 2018, the Secretary of Education issued proposed rules strengthening due process protections for students accused of sexual misconduct. TAC ¶ 355. DiCarlo issued comments in response to these proposed rules on behalf of UI. *Id.* DiCarlo, **"on behalf"** of UI, expressly and vigorously resisted these proposed rules because it would turn an "Institution of Higher Education's grievance procedures into **quasi-court systems**." TAC ¶ 32.

On the one hand, UI argues that these proceedings are quasi-judicial by nature in their Motion to Dismiss, yet ignored federal guidance designed to create a system defined as quasi-judicial. UI cannot have it both ways – argue that they will not increase protection for the accused because it will turn their process into a quasi-judicial system, while simultaneously claiming quasi-judicial immunity when sued for not providing adequate due process. The law and the facts are clear. Here, under these circumstances, the individual defendants do not possess an absolute quasi-judicial immunity for their actions. UI's disciplinary process is not a "quasi-court system" in light of DiCarlo's express fear that it would become one if the Secretary of Education's proposed reforms were implemented. If it is not quasi-court, it thus cannot have a "quasi" judge or prosecutor or other titles that come from quasi-judicial processes. As such, no individual

Defendants are entitled to absolute quasi-judicial immunity.

Recent courts have agreed. Defendants at the University of Michigan, who were members of the adjudicatory appeal panel, attempted to convince the Court of "quasi-judicial immunity." *Doe v. Baum,* 227 F. Supp. 3d 784, 795 (E.D. Mich. 2017).[3] There, the District Court distinguished that case from *Butz* and clearly indicated how courts presented with this question should respond. Referring to the Supreme Court decision in *Wood* that had already clearly answered the question of quasi-judicial immunity, the Court stated that "With such clear contrary precedent from the nation's highest court, one wonders why these defendants advanced this argument." *Baum,* 227 F. Supp. 3d at 795; See also *Harris v. Victoria Independent Sch. Dist.,* 168 F.3d 216, 224–25 (5th Cir.1999)(members were not entitled to absolute, quasi-judicial immunity for affirming in a grievance hearing); *Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1507–08 (11th Cir.1990)(noting that the Supreme Court in *Wood* "explicitly declined to extend absolute judicial immunity protection") To state it clearly, as the *Baum* Court did for the members of the adjudicatory appeal panel, "[i]n all events, defendants … are not entitled to absolute immunity from Doe's lawsuit." *Id.*

### 4.1.3    Cervantes is Not Entitled to Individual Quasi-Prosecutorial Immunity

Without restating the case law above, if the Court agrees with the Plaintiff's analysis that the disciplinary hearing is not designed to be an adversarial, judicial process, then it can hardly be said that Defendant Cervantes acted as a prosecutor. If her role was not prosecutorial by nature, then to claim quasi-prosecutorial immunity is an absurdity and should be rejected outright.

Even assuming Cervantes acted as a "prosecutor" during this "Start by Believing" process, traditional prosecutors are only entitled to absolute immunity for traditional prosecutorial tasks. *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984 (1976) (granting absolute immunity for absolutely prosecutorial functions). Instead, actual prosecutors are entitled only to qualified immunity for their work in conducting criminal investigations, similar to police officers. *Buckley* at 259, 269. ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.) (internal quotation and citation omitted).

Cervantes bypassed Doe's presumption of innocence when she banned Doe from campus based solely

---

[3] Overturned by the Sixth Circuit on other factors, including lack of cross-examination.

on limited interviews with limited people. Cervantes impaired Doe's ability to defend himself by preventing him from investigating and gathering evidence as she warned him that he could be held responsible for violating UI's ant-retaliation policy if he did. TAC ¶ 143. In that capacity, Cervantes was not acting in the capacity of a prosecutor. If Defendants afford the accused none of these rights, it would be a farce to call any related proceeding 'judicial.'

The Supreme Court discussed the evidentiary burdens in this type of situation in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). The Court held that when government officials seek absolute exemption from personal liability for unconstitutional conduct, they must bear the burden of showing that public policy requires an exemption of that scope. *Fitzgerald*, 457 U.S. at 800; 807–08. Thus, in the pending Motion to Dismiss, Cervantes bore the burden of establishing that her acts in imposing interim sanction without hearing were related to her alleged role as a prosecutor. The record is wholly insufficient and entirely lacking, at the pleadings stage, to carry her burden. Individual Defendant Cervantes should not be entitled to quasi-prosecutorial immunity.

### 4.2   THESE INDIVIDUAL DEFENDANTS ARE NOT SHIELDED BY QUALIFIED IMMUNITY

Defendants' spurious claims of Quasi-Judicial and Quasi-Prosecutorial Absolute Immunity appear to be a mere distraction from the fact the individual Defendants violated clearly established laws. To establish official-capacity liability under § 1983, "a plaintiff must show either that the official named in the suits took an action under an unconstitutional governmental policy or custom, **or** that he or she possessed final authority over the subject matter at issue and unconstitutionally used that authority." *Nix v. Norman,* 879 F.2d 429, 433 (8th Cir. 1989). Defendants do not dispute that Doe's injunctive and declaratory relief is within Ex Parte Young's purview when violations of federal law are threatened or ongoing.

As it relates to personal capacity claims, Defendants state in their Motion to Dismiss that "Even if Defendants are not entitled to qualified immunity at this stage, **most** of Plaintiffs individual capacity claims fail as a matter of law." Defendants then leave out Defendants Stevenson Earl and Defendant Frost from their list, not disputing that they violated § 1983 but mention only that it was not clearly established.

"Qualified immunity protects government officials performing discretionary functions from liability for damages so long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Curry v. Crist*, 226 F.3d 974, 977 (8th Cir. 2000) (quoting

*Fitzgerald*, 457 U.S. at 800; 818.) In addition, and importantly, "[q]ualified immunity is an affirmative defense," and thus, can be upheld in a motion to dismiss only when the immunity can be established on the face of the complaint. *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996)).

For this analysis, the Court must undertake a "fact-intensive inquiry" to determine if the "right was clearly established[4] at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted." *Moore v. Indehar*, 514 F.3d 756, 759 (8th Cir. 2008) (citations omitted). When assuming Plaintiffs' factual allegations are true and drawing all reasonable inferences in their favor, a court should look at all available decisional law, including decisions of state courts, other circuits, and district courts. *Norfleet by & Through Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289, 291 (8th Cir. 1993). Once a court determines that "the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing [the official's] conduct." *Harlow*, 457 U.S. at 818–19. Unlawful enforcement of an otherwise valid statute demonstrates unreasonable behavior depriving the government official of qualified immunity. *Pierce v. Multnomah Cty.*, Or., 76 F.3d 1032, 1037 (9th Cir. 1996).

These statements of law are implicated with the facts of the instant matter, and the mind struggles to find any circumstance where Doe's violated and protected constitutional rights could not be seen as "clearly established."

### 4.3    PLAINTIFF'S DUE PROCESS RIGHTS WERE CLEARLY ESTABLISHED

The Due Process Clause encompasses two distinct forms of protection: 1) Procedural due process, requiring the state to employ fair procedures when depriving a person of a protected interest; and, 2) Substantive due process, which guarantees a state cannot deprive a person of a protected interest for certain reasons. Doe has alleged that he was deprived of both such forms of protection.

At a minimum, due process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). "The "right to be heard before being condemned to suffer grievous loss of any kind, even though it may **not** involve the stigma and hardships of a criminal conviction, is a principle basic to our society." *Id.* [D]ue process is flexible and calls for such

---

[4] For guidance as to when prior law unmistakably establishes a right in such a situation, see *Bator v. Hawaii*, 39 F.3d 1021, 1028 n.7 (9th Cir. 1994) (finding Title VII case law relevant to the determination of clearly established rights under Equal Protection Clause because both are directed at ending gender discrimination).

procedural protections as the particular situation demands. 424 U.S. at 334 (citations omitted).

To determine the due process rights of students accused, the *Mathews* test requires that the courts balance those three factors. For each element of due process, for example, the right to cross-questions to witnesses, through counsel, against the accused, the courts should weigh 1) the importance of the student's interest in not erroneously being found responsible for committing a sex offense; 2) the likelihood of an erroneous decision if a student is deprived of procedural protections and the degree to which allowing the accused student afforded these protections makes an erroneous decision less likely; and 3) The government's interest in not allowing the student such protections against him, including the fiscal and administrative burdens that would entail. *Univ. of Cincinnati,* 872 F.3d at 399. (citing *Eldridge,* 424 U.S. at 334–35).

### 4.3.1  Mathews Test – What was due?

#### 4.3.1.1  Mathews Factor 1: The Student's Interest

In *Goss v. Lopez,* the Supreme Court recognized that accused students have a property interest ("[t]he State is constrained to recognize a student's legitimate entitlement to a public education as a **property interest** which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause") *Goss v. Lopez,* 419 U.S. 565, 574 (1975), and a **liberty interest** ("The Due Process Clause also forbids arbitrary deprivations of liberty . . . [School discipline] could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment.") *Id* at 565, 575. *Goss* held that even a 10-day suspension, which interrupted a student's education and damaged his reputation, was sufficient injury to trigger due process protections. A short suspension is, of course, a far milder deprivation than expulsion. But, "education is perhaps the most important function of state and local governments," *Brown v. Board of Education,* 347 U. S. 483 (1954); *Goss v. Lopez,* 419 U.S. 576 (1975).

The Seventh Circuit in *Doe v. Purdue University,* 17-3565 (7th Cir. 2019) cited The Due Process Clause and Students: The Road to A Single Approach of Determining Property Interests in Education, 65 U. KAN. L. REV. 651, 659–60 (2017) to illuminate how each circuit defines a person's interest in their education. As it relates to a property interest in higher education, the Fifth and Eighth Circuits have assumed that such a property interest exists. As such, Plaintiff had a clearly established **property** interest

in continuing his education, including his "right to enrollment at UI free from arbitrary and biased expulsion," arising from the "policies, course of conduct, practices and understanding established by UI under color of state law" and "the express and implied contractual relationship he had with UI." *Goss*, 419 U.S. at 565; *Monroe v. Arkansas State U.*, 495 F.3d 591, 595 (8th Cir. 2007) (assuming that student's interest in pursuing his education at state university constituted a constitutionally protected interest); *Ikpeazu v. Univ. of Nebraska*, 775 F.2d 250, 253 (8th Cir. 1985) (assuming that a property interest arose from contractual relationship between University and Student outlined in grievance procedures, giving plaintiff right to nonarbitrary grading). Defendants do not seem to dispute the existence of these constitutionally protected rights.

Besides his right to be free from arbitrary expulsion, Doe also has a clearly established protected **liberty** interest in protecting his good name and securing future employment. *Doe v. Univ. of Ark.-Fayetteville,* No. 5:18-CV-05182, at *11 (W.D. Ark. Apr. 3, 2019) ([t]he Court accepts that Doe has a protected liberty interest here because the adverse disciplinary decision impugned his good name, reputation, and honor. Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice, and an opportunity to be heard are essential. (citing *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)). Here, Defendants do not dispute that Doe had a clearly established protected interest in liberty and property.

#### 4.3.1.1.1        Disruption of Education and Damage to Reputation

*Goss* recognized the disruptive impact of even a 10-day suspension from high school. Expulsion from college is far more disruptive. It also means the loss of a semester's out-of-state/international tuition – a tremendous burden for students who are already struggling to pay for the costs of college. *Goss* recognized the reputational damage from a suspension. *Goss* at 574.

The reputational damage is far worse for a student (erroneously) found responsible for sexual assault. Courts have recognized that "[i]t goes without saying, and needs no elaboration, that a record of expulsion constitutes "a lifetime stigma," *Givens v. Poe*, 346 F. Supp. 202, 208 (W.D. N.C. 1972) (quoting *Vought v. Van Buren Public Schools*, 306 F. Supp. 1388, 1393 (E.D. Mich. 1969). Thus, a finding of responsibility for sexual assault will have a profound impact on a student's ability to transfer, find employment, or pursue graduate degrees.

This is because American institutions of higher education with reputations for excellence routinely reject applications of students who disclose sexual misconduct disciplinary findings in applications for admission. *See e.g., Doe v. Baum*, 903 F.3d 575, 582 (6th Cir. 2018)(noting "[t]ime and again, this circuit has reiterated that students have a substantial interest at stake when it comes to school disciplinary hearings for sexual misconduct . . . [b]eing labeled a sex offender by a university has both an immediate and lasting impact on a student's life . . . [such as] difficulty obtaining educational and employment opportunities down the road, especially if he is expelled…Providing Doe with the opportunity for cross-examination of the Complainant would have cost Defendants very little.); *Doe v. University of Cincinnati*, 872 F.3d 393, 400 (6th Cir. 2017) (a student's expulsion for a sexual offense can have a lasting impact on his personal life and educational and employment opportunities). *Marshall v Indiana Univ.* 170 F.Supp.3d 1201, 2016 (S.D. Ind. Mar. 15, 2015)(discussing the implication of disclosing a sexual misconduct disciplinary finding as being the 'inability to re-enroll at another university . . . [because any] subsequent university to which a student may apply always knows of the reasons for his prior dismissal. If he leaves without having earned his degree, the student must make an affirmative showing to any subsequent university to which he applies that he left the original university in good standing') *King v. DePauw Univ.*, 14- cv-70, 2014 WL 4197507 *13 (S.D. Ind. Aug. 22, 2014)("[t]he Court finds it inevitable that [plaintiff] would be asked to explain [the discipline to] future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct by *DePauw*. Successfully seeing this lawsuit to its conclusion will not erase the gap or the transfer; the question will still be raised, and any explanation is unlikely to fully erase the stigma associated with such a finding."); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 573, 607 (D. Mass. 2016) (noting sexual misconduct finding "may permanently scar [a student's] life and career," as he or she would be "marked for life as a sexual predator"). *Furey v. Temple Univ.*, 884 F.Supp.2d 223, 247-48 (E.D.Pa.2012) ('[e]xpulsion denies the student the benefits of education at his chosen school. Expulsion also damages the student's academic and professional reputation, even more so when the charges against him are serious enough to constitute criminal behavior. Expulsion is likely to affect the student's ability to enroll at other institutions of higher education and to pursue a career.'); *Greenhill v. Bailey*, 519 F.2d 5, 8 (6th Cir. 1975) (acknowledging expulsion of medical student effectively destroyed his chance of practicing medicine).

As a federal court has held: "The interests of students in completing their education, as well as avoiding unfair or mistaken exclusion from the educational environment, and the accompanying stigma are, of course, paramount." *Gorman v. University of Rhode Island*, 837 F. 2d. 714 (1988).

### 4.3.1.1.2        Loss of Career Opportunities

Doe's chosen field of employment triggers his legal obligation to disclose – often under penalty of perjury – UI's discipline of Doe to: (a) graduate schools; and/or (c) state and/or federal entities that issue licenses to practice counseling. As a federal court has observed:

> To be sure, plaintiff's disciplinary records are considered confidential under the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, but this information can be shared with plaintiff's authorization. Thus, if plaintiff seeks education or employment with institutions or organizations that require disclosure of such records, plaintiff's only options are to forgo opportunities with those institutions or organizations or to authorize the dissemination of records that would likely foreclose plaintiff's ability to pursue such opportunities because of the allegedly defamatory nature of the records.

*Doe v. Rectors of George Mason University*, 149 F. Supp. 3d 602, 616 n. 9 (E.D. Virginia, 2016).

If Doe failed to report UI's discipline on applications to graduate schools, and/or licensing boards – and Doe's failure was subsequently revealed – it is more likely than not that the academic and licensing institutions would impose sanctions which could include, but not be limited to, expulsion from the academic institutions and/or licensed professions.

UI also placed a notation on his transcript that Doe notified the Board of. TAC ¶ 265. His advisor, the head of UI's counseling department, told him to think of a different career after Defendants notified his department that he was expelled. TAC ¶ 381.

### 4.3.1.1.3        Deportation

Expelled international students are required by the federal government to leave the United States immediately, and the only reason Doe is still here is due to the Department of Homeland Security accepting his asylum petition that he has a reasonable fear of being tortured or killed if he has to deport the United States to the country of his citizenship. TAC ¶¶ 275, 284. Doe has never lived in his country of citizenship. TAC ¶ 53. Defendants were made aware of these grave dangers that Doe faced yet were indifferent to it despite Doe providing examples of how arbitrary his expulsion was. TAC ¶ 377. UI Counsel even responded to his fears by saying that Doe was "playing to the sympathies of the Board" and that "Doe has made his bed and now he must lie in it." TAC ¶ 270.

A college panel found an international student, Arishi, responsible for sex with an underage female. *Arishi v. Washington State Univ.,* 196 Wash. App. 878, 894, 385 P.3d 251, 258 (2016). The student was forced to return to Saudi Arabia just one year short of completing his degree. *Id.* at 894. Eventually, the college's decision was vacated by the courts. *Id.* at 912–13. Applying Washington State administrative law, an appellate court found that the college panel procedures were so lacking in due process that *Arishi* had demonstrated "a reasonable probability that had he been provided with all of the rights and safeguards available in full adjudication, the result of the proceeding would have been different." *Id.* at 907. The *Arishi* ruling was based on state law and has no effect outside of Washington State. However, it shows the serious issues that international students, such as Doe, face in such situations, although in Doe's case, no one was underage, and no one had sex or even attempted to have sex. Additionally, Saudi Arabia is also a much safer country than the country that Doe fears being deported to.

In sum, many important interests are at stake here. Doe's ability to graduate, find employment in his field of choice, attend graduate school to earn a Ph.D. in counseling psychology that he once dreamed of, avoid tremendous reputational damage, avoid deportation, and avoid coerced confessions because of the leading, loaded and incriminating questions Frost used, all of which that could have been used against him if he did not recognize what this supposedly neutral Adjudicator, an experienced prosecutor, was attempting to do, and challenge her on it.

### 4.3.1.2 Mathews Factor 2: The Likelihood of Erroneous Outcome

UI's lack of due process, including biased training, significantly increased the likelihood of an erroneous outcome. Doe is not suggesting the student disciplinary proceedings require the adoption of the rules of criminal procedure, as Defendants suggest. Instead, Doe rightfully and plausibly claims he was not given adequate notice, that the hearing conducted was unfair and biased, and that he was not given a proper opportunity to be heard. "Due Process Clause guarantees **fundamental fairness** to state university students facing long-term exclusion from the educational process." *University of Cincinnati*, 872 F.3d at 396.

School disciplinary decisions are subject to these constitutional protections. Regarding the interest that Plaintiff seeks to protect here, the 5th Circuit has confirmed the applicability of the due process and equal protection clauses, holding that "[t]he precise nature of the private interest involved in this case is the right

to remain at a public institution of higher learning in which the plaintiffs were students in good standing. It requires no argument to demonstrate that education is vital and, indeed, basic to civilized society." *Dixon v. Alabama State Bd. of Ed.,* 294 F.2d 150, 157 (5th Cir. 1961). The *Dixon* Court's specific statements were to guide the parties to the case if the university continued its efforts to expel the students: "For the guidance of the parties in the event of further proceedings, we state our views on the nature of the notice and hearing required by due process prior to expulsion from a state college or university. They should, we think, comply with the following standards." The *Dixon* Court then laid out certain specifics on due process. The Court began by discussing the need for some type of hearing, the specifics of which would vary with the circumstance of each case: The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the Board of Education. The nature of the hearing should vary depending upon the circumstances of the particular case. *Id.* at 158. In such circumstances, a hearing that allows the board or the administrative authorities of the college to **hear both sides in considerable detail** is best suited to protect the rights of all involved." *Id.* at 158–159.

While the *Goss* Court held that he was entitled to "some kind of hearing," it then added: "We stop short of construing the Due Process Clause to require, countrywide, that hearings in connection with **short suspensions** must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." *Id.* at 583. A student being expelled from college for a sex offense that will be part of his permanent academic record has far more at stake than the student in *Goss* and deserves significantly more protection from inaccurate outcomes. It also held that the due process clause requires that students be afforded at least notice of the charges they face and an opportunity to be heard. *Goss,* 419 U.S. at 577 (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481 (1972). In the Eighth Circuit, "procedural due process must be afforded on the college campus by way of adequate notice, definite charge, and a hearing with an opportunity to present one's own side of the case and with all necessary protective measures." *Jones v. Snead,* 431 F.2d 1115, 1117 (8th Cir. 1970).

Doe was not provided with a meaningful opportunity to be heard in his own defense or present his side of the case as the Adjudicator attempted to manipulate the narrative through "leading, loaded and

incriminating questions." TAC ¶ 152. Doe complained that he was not heard in the first paragraph of his internal appeal, a complaint that continued throughout the policies and procedures implemented by and through defendants. In the internal appeal, Doe began by writing this was his "first proper opportunity" to tell his story and to describe how Frost "devalued" his responses. TAC ¶ 239. In his Board appeal, Doe said how "[n]o one in UI was listening to me or my concerns." TAC ¶ 244. He also noted how Frost "[d]id not ask me the kinds of questions that would have elicited details about consent as defined by UI policies, even though neither the law nor UI policy required verbal consent be obtained." TAC ¶ 201. Considering that consent lies at the crux of the issue, one wonders what Frost did for three full business days while she held the hearing. Doe's hostile environment count addresses those issues later. A reasonable person would have known that if they do not ask questions about the details of consent, yet find that person responsible for sexual misconduct, that person would not be heard.

#### 4.3.1.2.1    Plaintiff has a clearly established right to an impartial process

Supreme Court decisions from the realm of administrative law address due process requirements stated that "an impartial decisionmaker is essential" to due process. *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970). The Supreme Court has spoken to the question of an impartial decision-maker, establishing the principle that "a biased decision-maker (is) constitutionally unacceptable (and) 'our system of law has always endeavored to prevent even the probability of unfairness.'" Among these cases are those in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him. *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975) (quoting *In Re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942.) Courts have described several situations that can indicate or implicate so much as a potential bias as being too high for constitutional viability. *Id.* As such, the principle, establishing the right to an impartial decision-maker applies to the context of higher education. *See Doe v. Miami University*, 882 F.3d 579, 604 (6th Cir. 2018). The incident in *Miami Univ.* happened in Fall 2014. This right was also established in the OCR Guidance, Dear Colleague Letter (the "2011 DCL"). The 2011 DCL required the impartial investigation and adjudication of sexual misconduct allegations, noting "a school's investigation and hearing processes cannot be equitable unless they are impartial." *Id.* at p. 12. The 2011 DCL further states, "Public and state-supported schools must provide due process to the alleged perpetrator." *Id.* Thus, under all circumstances,

due process "requires a fair and unbiased tribunal, regardless of whether that tribunal is in the context of a court hearing or some other administrative hearing." *C. Line, Inc. v. City of Davenport,* 957 F.Supp. 2D at 1040 (collecting cases).

### 4.3.1.2.2   In Fall 2017, Defendants could not categorically ban cross-examination

At the hearing, Doe was accompanied by counsel, but his counsel was not allowed to actively participate. TAC ¶ 153. This meant that the Adjudicator screened all of Doe's questions. But Frost ignored many of his important questions and chose not to ask reasonable follow-up when answers were evasive or unresponsive. When Complainants, especially Lisa, changed their stories in significant ways, they were not reasonably questioned about the discrepancies. Without the back-and-forth of adversarial questioning, his attorney could not reasonably probe the Complainants' story. *Id.* In Fall 2017, Defendants were on notice that they could not categorically ban cross-examination, especially where the credibility determination involves a choice between the accuser and the accused.

The Supreme Court has held that principles of due process require "an effective opportunity to defend by confronting any adverse witnesses." saying that "in almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg* at. 254, 269. "It is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy." *Greene v. McElroy,* 360 U.S. 474, 496 (1959). As mentioned earlier, the Supreme Court held that a high school student had a due process right to a hearing, even where the suspension was less than ten days. *Goss* at 740–41. On the one hand, it noted that cross-examination was probably impractical in every case. On the other hand, it clearly noted that even in suspensions of less than ten days, cross-examination may be necessary. Applying *Goss,* the 8th Circuit had little trouble finding that a student's procedural due process rights were violated when they were not able to call a teacher accusing the student of a rule violation so the teacher could be questioned. *Dillon v. Pulaski Cty. Special Sch. Dist.,* 594 F.2d 699, 700–01 (8th Cir. 1979). In his concurring opinion, Judge Benson viewed this as clearly applying the principle set forth in *Goss.*

In Fall 2017, Defendants were all on notice that they could not ban cross-examination, especially where the credibility of witness testimony was conflicting: "where a disciplinary proceeding depends on a choice

between believing an accuser and an accused … cross-examination is not only beneficial, but **essential** to due process." *Doe v. Ohio State Univ.*, No. 2:15-CV-2830, 2016 WL 6581843 (S.D. Ohio 2016) at 10; *Dillon v. Pulaski Cty. Special Sch. District*, 594 F.2d 699, 700 (8th Cir. 1979).[5]

Other Courts have also reached similar conclusions before Doe's hearing, providing clearly established authority that state actors cannot categorically ban cross-examination, especially when a university needs to make a credibility determination between conflicting narratives. *See Flaim v. Medical College of Ohio*, 418 F.3d 629, 641 (6th Cir. 2005) (involving credibility determination between the accuser and accused, cross-examination is essential to due process); *See also Winnick v. Manning*, 460 F.2d 545,550 (2d Cir. 1972); *Doe v. Brandeis U.*, 177 F. Supp. 3d 561,604 (D. Mass. 2016) ("the ability to cross-examine is most critical when the issue is the credibility of the accuser"); *Furey v. Temple U.*, 884 F. Supp. 2d 223, 251-252 (E.D. Pa. 2012)("due process required that the plaintiff be able to cross-examine witnesses." *Doe v. U. of Cincinnati*, 872 F.3d 393,401 (6th Cir. 2017).

Cross-examination has been declared as "the greatest legal engine ever invented" for uncovering the truth. *Doe v. Baum,* 903 F.3d 575, 581 (6th Cir. 2018) (citing *Univ. of Cincinnati*, 872 F.3d at 401–02 (citation omitted). Plaintiff begs the Court's forgiveness for the length of the following paragraph, but as of the date of drafting, at least twenty-three courts have determined students like Doe have a right to cross-examination in Title IX disciplinary proceedings involving such allegations. *Baum*, 903 F.3d, 578 (6th Cir. 2018) (holding "if a public university has to choose between competing narratives to resolve a case, the university must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder")(emphasis added); *Doe v. N. Mich. Univ.,* No. 2:18-CV-196, 2019 WL 2269721, *5-6 (W.D.Mi. May 28, 2019)(rejecting motion to dismiss Due Process claim even though plaintiff admitted engaging in some non-consensual sexual contact with his accuser Jane Roe in part because "Plaintiff has plausibly argued that he was entitled to some form of cross-examination of Roe" since it would have "[a]llowed [adjudicators] to 'choose between competing narratives' in making its findings."); *Smock v. Bd. of Regents of the Univ. of Mich.* 353 F.Supp.3d 651, 657-58 (E.D. Mich. 2018)(rejecting motion to dismiss procedural Due Process claims based on university

---

[5] The ruling was affirmed by the Eighth Circuit, and one judge, in a concurring opinion, stated that the rationale of *Goss* required that the student be allowed to cross-examine the teacher as to the facts of the situation.

prohibiting plaintiff from cross-examining witnesses in disciplinary proceeding involving allegations of sexual misconduct); *Powell v. Montana State Univ.*, No. 2:17- cv-15 SEH, 2018 WL 6728061, *7 (MT Dec. 21, 2018)(citing lack of cross-examination as a basis for rejecting university's summary judgment motion to dismiss a Due Process claim because "[i]f a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination in order to satisfy Due Process."); *Doe v. Univ. of Colorado, Boulder*, No. 1:18-cv-02243-LTB, 2019 WL 764568, *15 (D. Co. 2019) (rejecting motion to dismiss Due Process claim because "the lack of a full hearing with cross-examination provides evidence supporting a claim for a violation of [plaintiff's] Due Process rights."); *Doe v. Univ. of Mississippi*, 361 F.Supp.3d 597, 611-13 (S.D. Miss. 2019)(rejecting motion to dismiss Due Process claim based on university prohibiting plaintiff from cross-examining "witnesses whose accounts of the evening led to his discipline."); *Frost v. Univ. of Louisville*, 3:19-CV-227-CRS, 2019 WL 2288453, *12 (W.D. Ky. May 29, 2019) (Requiring cross-examination in university sexual misconduct disciplinary proceedings); *Doe v. Rhodes College*, No.2:19-cv-2336-JTF, PageId.256 (W.D. Tenn. June 14, 2019)(unreported)(same); *Univ. of Cinn.* No.16-4693, 2017 WL 4228791, *5 (6th Cir. 2017) (finding cross-examination required in certain types of Title IX disciplinary proceedings); *Nokes v. Miami Univ.*, No. 1:17-cv-482, 2017 WL 3674910, *10-12 (S.D.OH. Aug. 25, 2017)(same); *Doe v. Penn. State. Univ.*, No.17-cv-1315, 2017 WL 3581672, *7-8 (M.D.Pa. Aug. 18, 2017) (same); *Doe v. The Penn. State Univ.* No. 4:18-cv-164, Page Id.15-18 of 19, (M.D. Pa. Aug. 21, 2018)(unreported)(rejecting university's motion to dismiss the male student's Due Process claim based on concerns about lack of meaningful cross-examination); *Oliver v. Univ. of Tx. Southwestern Med.* No. 3:18-CV-1549-B, 2019 WL 536376, 13 (N.D. Tx. 2019) (rejecting motion to dismiss procedural Due Process claim in part because university did not provide plaintiff with an opportunity to cross-examine plaintiff's accuser in a "live hearing.*"); Doe v. Univ. of Southern Mississippi*, No.2:18-cv-153, Docket 35, p.5-7 (S.D.E.D. Miss., Sept. 26, 2018)(unreported)(enjoining ongoing sexual misconduct disciplinary proceeding because university violated plaintiff's Due Process rights by denying plaintiff the right to cross-examination); *Jane Roe v. Javaune Adams-Gaton,* Case No. 17- cv-945-EAS-CMV (S.D.E.D. Oh. April 17, 2018) (unreported)(enjoining university from imposing Title IX disciplinary sanctions against plaintiff because her procedural Due Process rights were violated since she was unable to cross-examine her accusers and/or adverse witnesses during her university-level disciplinary hearing); *Doe v. Univ. of Mich.,*

No.2:18- cv-11776-AJT-EAS, Page Id.743, 739 (E.D.S.D. Mich. July 6, 2018)(unreported)(enjoining disciplinary proceeding because university violated plaintiff's Due Process rights by not providing "the opportunity for a live hearing" where plaintiff could submit cross-examination questions to adjudicators to be asked of witnesses because "[w]ithout a live proceeding, the risk of an erroneous deprivation of [p]laintiff's interest in his reputation, education, and employment is significant."); *Lee v. Univ. of New Mexico,* No.1:17-cv-01230, Doc. 36, p.2-3 (N.M. Sept. 20, 2018)(unreported)(rejecting motion to dismiss the student's Due Process claim in part because university prohibited him from cross-examining witnesses in "formal or evidentiary hearing"); *Doe v. Marymount Univ.,* 297 F.Supp.3d 573, 584 (E.D.VA. Mar. 14, 2018)(rejecting motion to dismiss Title IX claim at private university in part because private university denied plaintiff right to cross-examine his accuser in Title IX proceeding); *Doe v. University of Southern California,* 28 Cal.App.5th 26 (2018)(granting male plaintiff's writ of administrative mandate because university did not allow cross-examination during Title IX disciplinary proceeding); *Doe v. Claremont McKenna College,* 236 Cal.Rptr.3d 655, 656 (2018)(same); *Doe v. Westmont College,* 34 Cal.App.5th 622 (2019)(same); *Doe v. The Regents of The Univ. of Cali.,* 28 Cal.App.5th 44 (2018)(same); *Doe v. Allee,* 30 Cal.App.5th1036, 1061 (2019)("We also agree with Baum's holding extending the right of cross-examination to the questioning of witnesses other than the complainant where their credibility is critical to the fact-finder's determination.")

In direct contrast, the UI system categorically bans counsel from directly asking questions of witnesses. TAC ¶ 153. When DiCarlo showed a profound resistance to cross-examination in January 2019, at least twenty of the above cases were decided. UI's Process does not comply with any norm of due process, primarily because to support the Due Process Clause, "a hearing must be a real one, not a sham or pretense." *Doe v. Purdue Univ.,* 928 F.3d 652, 658, 661 (7th Cir. 2019) (internal citations omitted.)

The Individual Defendants' Due Process violations are similar to conduct identified in decisions ruling in favor of male plaintiffs alleging universities subjected them to unlawful sexual misconduct disciplinary proceedings. In *Doe v. The Penn. State University,* for example, the Court relied on the university's investigative model requiring all testimony to be filtered through the investigation packet, making all testimony used to appear in paraphrased form, with no quotes, and no standards as how the investigators edited the testimony in order to find due process violations. *Doe v. The Penn St. Univ.* No.4:18-cv-164, **Page Id.15-18**

of 19 (M.D. Pa. Aug. 21, 2018) (unreported)

### 4.3.1.3  Mathews Factor 3: Government Interest

In general, while the university might have an abstract interest in upholding discipline, it has a higher interest "in securing **accurate** resolutions of student complaints," because its educational mission would be undermined by ejecting "**innocent** students who would otherwise benefit from, and contribute to, its academic environment." *Doe v. Penn. State Univ.,* No. 4:18-CV-164, 2018 U.S. Dist. LEXIS 141423 at *12. Ironically, Doe was adding value to the academic environment by researching factors that contribute to sexual assault.

Doe disagrees with a complete ban on cross-examination as it relates to expulsion. However, even if UI's intentions for not allowing cross-examination were to protect the accused from being re-traumatized, Doe finds it difficult to understand why he was not allowed, through his counsel, to cross-examine other witnesses. For example, the faculty member to which the original complaint was made, Dr. Lovaglia, reported the incident to DiCarlo. He had direct involvement and knowledge of the event as Sally told him what occurred. TAC ¶ 193. He was not a complainant, and the risk of being re-traumatized was not at issue.

The same applies to the friends of the accused, many of whom did not even know Doe. This would have been especially important since Doe accused Frost of bias and discrimination and provided examples such as how she did not ask many of his critical questions. TAC ¶ 191. It was clearly established during the time of the hearing that not asking critical questions that the accused requests or not probing inconsistencies of the accuser was unlawful. *See Doe v. Wash. & Lee Univ.,* 6:14-cv-00052 (W.D. Virginia, August 5, 2015). According to the judge, the panel's questions and lack of follow-up effectively prevented the accused student from asking the accusing student to explain the inconsistencies in her version of the events. Additionally, this view of the re-traumatization of victims does not consider the trauma that an innocent person has to deal with when found responsible for sexual assault and are expelled for it.

The Government has an interest in following clearly established law that existed at the time of the infringing action. *Navato v. Sletten*, 560 F.2d 340, 346 (8th Cir. 1977)(establishing right to sufficient notice); *Eldridge*, 424 U.S. at 319 (improper placement of burden on respondent); *Thompson v. City of Louisville*, 362 U.S. 199, 205 (1960)(conviction of defendant without evidence); *Plamp v. Mitchell Sch. Dist.* No. 17-2,565

F.3d 450, 461 (8th Cir. 2009)(failure to properly train); *Smyth v. Lubbers,* 398 F. Supp. 777, 798 (W.D. Mich. 1975); *Doe v. Columbia Univ.,* 831 F.3d 46, 57 (2d Cir. 2016) (failure to properly investigate claim).  Because Doe alleges that Defendants violated clearly established due process and constitutional rights, the Individual Defendants are not entitled to qualified immunity.

### 4.4   PLAINTIFF'S RIGHT TO BE FREE FROM DISCRIMINATION WAS CLEARLY ESTABLISHED

#### 4.4.1   §1983 Equal Protection Clause

The Equal Protection Clause prevents arbitrary gender-based discrimination. *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (finding that "[t]o give a mandatory preference to members of either sex over members of the other, is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause"). Further, Discrimination based on "gender-based generalizations" is violative of the Equal Protection Clause. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 645, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975). Here, this means that state-sponsored educational institutions may not discriminate based upon an alleged gender stereotype. *See Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982).

The right of equal protection "is violated when the state distinguishes between individuals based on unreasonable, arbitrary, or capricious differences that are irrelevant to a legitimate government objective." *Bernheim v. Litt,* 79 F.3d 318, 323 (2d. Cir.1996) (quotation marks omitted). For example, the gender-based stereotypes Frost employed during her questioning of Doe and throughout the adjudicatory process violated Doe's right to equal protection. Equal Protection claims do not require the loss of a Due Process liberty/property interest. *See, e.g., DeWalt v. Carter*, 224 F.3d 607, 613 (7th Cir. 1999). *Triad Asso., Inc., v. Robinson* 10 F.3d 492, 500 (7th Cir. 1993) ("governmental disregard of the fundamental dictate of equal treatment is the beginning and end of the Equal Protection inquiry")

The Sixth Circuit found that an accuser and accused are similarly situated when university officials "had credible information that both students had potentially violated the University's sexual misconduct policy" but choose "not to pursue disciplinary action against" one of the students. *Miami Univ.,* 882 F.3d at 596. Further, as to the personal capacity claims, *Miami Univ.* concluded that the analogous facts were sufficient to overcome a qualified immunity defense. *Id.* at 604. The Sixth Circuit stated summarily that the "right to freedom from invidious [gender] discrimination under the Equal Protection Clause was

certainly clearly established at all times pertinent to this action." Id. (quoting *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011)).

Defendants do not dispute Plaintiff's 42 U.S.C. § 1983 Equal Protection Count. Examples of what Plaintiff alleged under his 42 U.S.C. § 1983 Equal Protection Count include:

a) UI Defendants violated Doe's clearly established right not to be discriminated against based on **sex, race, national origin, alienage or immigration status, and/or status as student accused of sexual misconduct**, in violation of the Fourteenth Amendment and 42 U.S.C. § 1983. TAC ¶ 487.

b) DiCarlo knew or should have known of the violations since she was copied in the reports. TAC ¶ 493.

c) As it relates to **all** Defendants, intentional gender discrimination and/or harassment by persons acting under color of state law violates the Equal Protection Clause and is actionable under § 1983. *Ottman* at 751, 756 (8th Cir. 2003).

d) Stevenson Earl gained knowledge from the international office about Doe's visa before she produced her report. She discriminated against him here based on alienage. TAC ¶ 494.

e) Doe faced an unequal, intentional, arbitrary, and capricious discrimination at the hands of state actors who knew or should have known that they had no justification, based on their public duties, for singling him out for unfavorable treatment, with discriminatory intent and effect. TAC ¶ 497

Since Defendants do not dispute that Plaintiff suffered intentional discrimination and/or harassment based on sex by individual Defendants, none of Plaintiff's Title IX counts should be dismissed. Additionally, Defendants do not dispute Plaintiff's claim about Stevenson Earl discriminating against him based on his alienage or immigration status. Defendants also do not deny that they are in possession of additional information relating to the allegations made by and against UI Defendants.

### 4.4.2   §1981 – Race Discrimination

Defendants argue that a federal action to enforce rights under "§1981 against a state actor may only be brought pursuant to §1983." *Artis v. Francis Howell North Band Booster Ass'n, Inc.,* 161 F.3d 1178, 1181 (1998) (citing *Johnson v. Railway Express Agency,* 421 U.S. 454, 459-60 (1975).) Even if this is true, Plaintiff's TAC expressly alleges racial discrimination under §1983 in his complaint. Further, Defendants' Motion to Dismiss appears to imply that Plaintiff made no allegations regarding racial discrimination in his Complaint. Again, this is patently and demonstrably false, evidenced by the Complaint itself.

Defendants' actions were motivated, in part, by Doe's race and national origin, including the

Defendants favoring the credibility of the Caucasian/white accusers despite no corroborating evidence of sexual assault from the multiple people. In fact, the evidence contradicted it thoroughly. TAC ¶ 466.

Doe, a protected minority, was accused of wrongdoing by white females and found responsible contrary to evidence, which led to severe repercussions. Frost intentionally misapplied UI's definition of consent to hold him responsible. But the Caucasian Complainants were given the opposite treatment. They were even asked about both verbal and nonverbal consent. Thus, Doe could not defend under UI policies, while Sally and Lisa – white females – could. TAC ¶ 467.

Cervantes, a UI employee, knew or should have known of this discriminatory conduct, did not report, and was deliberately indifferent.

Defendants departed from standard procedures by not providing Doe with a rationale for his expulsion. TAC ¶ 473. Importantly, Doe provided Keller and the Braun actual notice Frost's harassing conduct, including explicit allegations of discrimination and harassment as it related to race. They were deliberately indifferent, took no reasonable actions to address, or even show any concern, adding to the hostile environment. In fact, Braun was even given notice that a previous student of Frost made allegations regarding her discrimination toward people of color. TAC ¶ 474.

Defendant's argue that Plaintiff's allegation of race discrimination against Stevenson Earl should be dismissed. However, Plaintiff has not sued Stevenson Earl under race discrimination. Defendants' Motion to Dismiss should be rejected because it is based on allegations that Doe did not make.

### 4.5   DEFENDANTS ARE LIABLE IN THEIR INDIVIDUAL CAPACITIES

All Individual Defendants are liable in their individual capacities under § 1983 due process and equal protection clauses as they have violated clearly established laws mentioned above. The discrimination Doe experienced here was unjustifiable as to be violative of due process.

**Defendants purposely failed to correct false statements:** "[i]f the Administrators knew that Jane Roe lied about the timing of her accommodation at the hearing and permitted her testimony to stand unrebutted, that plausibly violated John Doe's right to a fundamentally fair hearing." *Doe v. Ohio State Univ.,* 219 F. Supp. 3d 663 (S.D. Ohio 2016) In that case, the Defendant who knew about the lie yet permitted the testimony to stand unrebutted was denied qualified immunity. Doe alleged that "UI, including DiCarlo, Stevenson Earl, Cervantes, and Frost, knew of major inconsistencies in Lisa's evolving allegations. UI

ignored them and assisted Lisa in nurturing bad faith allegations." TAC ¶ 92. There, the accused was also denied the right to "effectively cross-examine" his accuser when OSU withheld information about the academic accommodations the complainant received. *Ohio State Univ.*, No. 2:15-cv-2830, at \*14. If true that Lisa used accommodations in bad faith, Doe could have used this information to impeach Lisa's false allegations. As Doe said in his Complaint, it was "no coincidence" that right after Lisa asked him for his "help and support both in person and over text messaging as evidenced by the exhibits, she filed for sexual misconduct." TAC ¶ 183.

**Defendant Stevenson Earl and Frost purposefully excluded exculpatory evidence and edited facts** throughout the investigatory and adjudicatory process. Doe alleged a malicious and reckless investigation. TAC ¶ 137. "An allegation that a defendant has "purposefully ignored evidence that strongly tended to exonerate" the plaintiff can support a § 1983 failure-to-investigate claim." *McKay v. City of St. Louis,* No. 4:15-cv-01315-JAR, at \*12 (E.D. Mo. Sep. 2, 2016) (citing *Moran v. Clarke,* 296 F.3d 638, 648 (8th Cir. 2002). As such, Defendant Stevenson Earl and Frost should be held responsible for failure to investigate and conducting a reckless investigation.

**4.5.1 - Stevenson Earl:** During her interview, Sally said she did not remember if she had tickled Doe and Doe provided pictures of Sally before and after the tickling. TAC ¶ 77. But Stevenson Earl found Doe responsible and did not further investigate if Sally may have been responsible. Stevenson Earl had information from Dr. Lovaglia that Sally told him what occurred between Doe and her was mutual and consensual and that Sally "had initially been okay, but she changed her mind." TAC ¶ 133. Thus, this situation equally supported the claim that Sally could have been responsible for not gaining Doe's consent. Yet Stevenson Earl found Doe responsible for sexual assault for kissing without consent.

Stevenson Earl wrote that she had "no reason for not believing" Lisa in accordance with the "Start by Believing" methodology. TAC ¶¶ 41, 129, 261, 319. She likewise discredited Doe's version of events. TAC ¶ 129. She determined that Doe was not credible because his version of events "was extremely different from Complainant's [Lisa's] account, both when he was questioned about minor details related to the incident on or around August 31, 2016, and about behaviors that are potentially prohibited by university policy, i.e., behaviors that are sexual in nature." *Id.* It cuts both ways, why did Stevenson Earl not discredit Lisa because her version differed from Doe's? The burden is on Lisa to prove that there was a lack of

consent. It is plausible to infer the "Start by Believing" training and/or other training provided were biased, which presumes accusers are telling the truth while placing the burden on the accused to prove they are not. TAC ¶ 261. This, in no uncertain terms, puts a thumb on the scales of justice for the accuser and against the accused, and against every tenant of the values that drive the American justice system, a presumption of innocence until proven guilty.

Stevenson Earl edited Sally's version, particularly regarding her confirmed statement to a faculty member that her encounter with Doe was consensual, to align the facts with what she alleged. TAC ¶¶ 133-137. When Sally discussed these events to a faculty member in October 2016, she said in no uncertain terms that what happened in Doe's apartment was mutual and consensual. *Id.* Stevenson Earl's own notes show that Sally reported the contact with Doe in the apartment was consensual. *Id.* As for Sally's alleged sexual assault at Doe's apartment, Stevenson Earl's investigative notes stated: "I think we ended up joking about it because I didn't take it so seriously at the time," when she discussed her conversation with her friend, R.C., immediately following the alleged touching incident in Doe's apartment. *Id.* More tellingly, the faculty member told Stevenson Earl precisely how Sally described the events in Doe's apartment. Stevenson Earl's notes stated, "mutual attraction, and she had initially been okay, but she changed her mind." *Id.* But Stevenson Earl excluded all this exculpatory evidence when she wrote her report, along with others mentioned in the TAC. It was established during the investigation that flawed disciplinary proceeding occurs in part because of "critical omissions" by university investigators in preparing witness summaries. *See Doe v. Wash. & Lee Univ.,* 2015 WL 4647996, *10. *See also Doe v. Univ. of Miss.,* No.3:16-cv-63-DPS-FKB, PageId.10-12 of 23 (S.D.N.D. Miss. July 24, 2018) which rejected a university's motion to dismiss plaintiff's Title IX claims in part because university's investigator omitted exculpatory evidence from investigator's report.

Additionally, Stevenson Earl gained knowledge from the international office about Doe's visa before she produced her report. She discriminated against him here based on alienage. TAC ¶ 494. Defendants do not dispute Plaintiff's claim about Stevenson Earl discriminating against him based on his alienage or immigration status.

Stevenson Earl's glaring critical omissions were abundant and significant, shows bias, and she deprived Doe of his right to due process. Stevenson Earl is not entitled to qualified immunity.

**4.5.2 - Cervantes** - Prior to the hearing on this matter, Cervantes, the hearing officer who Defendants also seek to immunize as a prosecutor, violated Doe's due process and/or equal protection rights when she deprived Doe's ability to receive reasonable accommodations, his ability to gather evidence and witnesses by discussing the allegations with friends, including potential witnesses, and his right to a notice that contained the full scope of charges against him.

After the investigation, Cervantes, under various UI policies and procedures, prohibited Doe from contacting or interviewing material witnesses because of UI's "anti-retaliation policy," which prohibited Doe from "discuss[ing] this matter with any of your mutual friends… **Any** action on your part to **discuss** the case with **another student** could be considered retaliation on your part." Failure to adhere to this policy could justify expulsion. Cervantes, under various UI policies and procedures, thus conducted full interviews of any witnesses with no concern about anti-retaliation or sanction, depriving Doe of a fair opportunity to prepare. TAC ¶ 307. Cervantes enjoyed the benefit of *ex parte* preparation, while Doe had to rely upon only the biased and inaccurate investigative report to prepare. TAC ¶ 307. This gag order also hampered Doe's right to present witnesses at the hearing, and Doe has made the allegation in his appeal that it did not allow him to contact three possible witnesses. It also violates OCR's policies as Doe was not given an equal right to present witnesses due to this limitation imposed by UI.

Cervantes imposed further interim sanctions on top of the ones imposed by Redington. Other than attending only his classes, she banned Doe from the entire campus before a final determination from his hearing. This was an extreme interim sanction, without the possibility of appeal, on penalty of immediate expulsion. Cervantes gave no explanation. Doe requested UI allow him in the Lindquist Center, the building he had classes in, a few extra hours after his classes. The accommodation would enable him to complete his internship and finish his homework on a computer station, a reasonable accommodation. Complainants had no classes there. Cervantes said she would "entertain the idea" but never replied. As a result, Doe was forced to abandon his internship. The U.S. Department of Education had stated that interim measures in sexual misconduct cases must be "appropriate," and that "every effort" must be made to "avoid depriving any student" of access to education. TAC ¶ 141. Cervantes' conduct was discriminatory, objectively unreasonable, and arbitrary because she did not make a good faith attempt at reasonable accommodations. She unreasonably denied Doe access to education before UI adjudicated the

hearing and by failing to explain the outcome of any risk and safety analysis or threat assessments to justify Doe's removal as required by the OCR." TAC ¶ 142.

Cervantes also failed to provide Doe with a notice that contained the full scope of charges against him. Doe was not informed that he would be charged with something as daunting as the educational mission of the Complainants when the investigation found him to have no such role either directly or indirectly. TAC ¶¶ 213, 370. She had no legitimate interest in not providing Doe with all charges and all the evidence that will be used against him before the hearing. Every reasonable official would understand that lack of notice, along with Doe's right to be heard at a meaningful time and in a meaningful manner, violates clearly established law. TAC ¶ 370. In *Doe v. Rector & Visitors of George Mason Univ.*, 179 F. Supp. 3d at 586 (2016), the Court ruled that the University failed to afford Plaintiff with constitutionally adequate process—it did not provide Plaintiff with notice of the full scope of the charges against him, which in turn impacted his opportunity to be heard and put on evidence that addressed the context in which the charges arose. The issue also included facts where Administrators had off-the-record and *ex parte* meetings with the Complainant without informing the Plaintiff of what had transpired. Additionally, sanctions were also imposed on Plaintiff without a basis for the decision.

Doe also had a clearly established right to review the evidence against him. Cervantes admitted new evidence that was withheld until after Doe had testified. The Constitution does require, at a minimum, that the student be provided the evidence against him. TAC ¶ 368. *Univ. of Cincinnati*, 872 F.3d at 399-400. Thus, to the extent any of the evidence was used against him at the hearing, and Doe was not provided this evidence, he has alleged a cognizable due-process violation. *See Miami University*, 882 F.3d at 603. Such conduct would also violate Title IX regulations as Doe should be provided with any evidence that will be used against him a few days before the hearing, not after he testified. *See also Norris v. CU Boulder*, 2019 WL764568, at** 8-9 (D. Colo. 2019) (delay in providing access to evidence against plaintiff plausibly alleged due process violation).

**4.5.3 - Frost** - Defendants have compared Frost's role in the proceedings to that of a judge. The procedures employed by Frost fail to consider even the minimum amount of impartiality required to be a 'neutral factfinder.' Frost asked all the questions, and Doe, in his Board appeal, said that Frost's "questions (or lack thereof when she questioned the complainants) and comments were designed to deflate

[plaintiff's] credibility while inflating the complainants' credibility," TAC ¶ 367, though as the adjudicator was required to act impartial and unbiased. *See, e.g., Miami Univ.*, 882 F.3d at 601. (internal citations omitted) (determining plaintiff advanced a valid procedural due process claim related to university employee alleged to have "dominated the hearing and that her remarks were designed to reduce [plaintiff's] credibility while bolstering [complainant's] credibility.")

Frost's method of questioning indicated that she was "cross-examining" Doe, with leading, hostile and loaded questions. TAC ¶ 152. But the accusers, Lisa and Sally, were asked only opened ended softball questions without ever questioning about past inconsistent statements. *Id.* For example, she did not adequately question Sally about her report to a faculty member about her contact with Doe as being consensual. *Id.* 203. This is not a minor omission as UI and Frost used both their reports to corroborate each other. *Id.*

Doe wrote in his Board appeal that UI/Frost "[u]nlawfully shifted the burden to me, essentially assuming my guilt and requiring me to prove by a preponderance of the evidence that I did not sexually assault anyone" TAC ¶ 221. Frost made Doe prove affirmative consent, but Court decisions clearly established at the time of the hearing that requiring an accused to prove affirmative consent violates due process. *See, e.g., Doe v. Cummins*, 662 F. App'x 437, 449 (6th Cir. 2016). *Id.*

Frost violated the equal protection clause as she criticized Doe for tickling Sally, even though she tickled him first. Frost's comments indicated that even if Sally tickled him first, he could retaliate against her. TAC ¶ 228 (j). Frost concluded: "The tickling, on a continuum with the other instances of sexually assaultive behavior," rises "to the level of Sexual Harassment." TAC ¶ 203. In his Board appeal, Doe said that if UI/Frost were not "[g]ender biased, it would have investigated Sally touching me first [tickling incident] and not put the burden on me to gain consent." TAC ¶ 221. Frost also insisted that Doe had "never verbally told" Sally that he didn't want her in the improv group, even though he had told her "leave me alone" when referring to Sally joining the group yet she did not require Sally or Lisa to verbally insist anything, including consent. TAC ¶ 202. Disparate treatment is the hallmark of equal protection and due process, and the facts pled plausibly illustrate this treatment completely. Doe criticized Frost for multiple things, including her assumption that Doe initiated the kissing even though evidence showed that it was consensual. TAC ¶ 201. He also criticized her because she "changed the content of the violation after the

hearing to find me responsible and did not make a note of it." TAC ¶ 211.

Further, Frost used racial stereotypes describing Doe as "authoritarian," which did not match the context of the situation. TAC ¶¶ 226-227. She asked Doe's witness, S.B., whether Doe was made any "sexist" comments in his presence without asking similar questions about the accusers if they had made "sexist" related comments. TAC ¶ 227, 495.

Doe was entitled an opportunity to present his side of the story before an unbiased decisionmaker. *Heyne v. Metro. Nashville Pub. Sch.,* 655 F.3d 556, 565-66 (6th Cir. 2011) (citing *Goss v. Lopez,* 419 U.S. 565, 581 (1975). Doe's procedural-due-process right to an impartial adjudicator and access to the evidence used against him has also been clearly established. In *Miami University,* the Court held that when "viewing the allegations in the light most favorable to Plaintiff, [they] conclude that a reasonable person in [Defendant's] position should have known that she was partial." *Miami University,* 882 F.3d at 604.

The plaintiff in *Purdue* established that his proceeding was a "sham or pretense" because the adjudicator "decided [plaintiff] was guilty based on the accusation rather than the evidence." *Id.* Doe's disciplinary process was similarly flawed since the Adjudicator's bias caused them to make more than a dozen concrete errors in finding that Complainants was more creditable than Doe.

Frost did not act as a reasonable neutral adjudicator in questioning about past inconsistent statements Complainants made about various subjects. Doe's attorney requested Frost to ask about six text conversations, from separate dates, between Lisa and Doe. Each conversation showed either Lisa's eagerness to join Doe at the lab or Lisa's friendliness and playfulness with Doe, including: "lol but I am free Monday later…is eight too late for you?" and a more direct message: "Come to Lab!" *Id.* After displaying much hesitancy, Frost asked a pro forma question about just one of the six text messages. TAC ¶ 189. She specifically chose the only one with no date at the top. After Lisa failed to respond, Frost commented that there was no date on it and excused her soon after. *Id.* Without basis, Frost discredited Doe's statement about Lisa, describing it as mere fantasy. TAC ¶ 214. No one, not even Lisa, described Doe as someone engaging in mere "fantasy." An accused student should be entitled to ask his accuser about texts such as these before he gets labeled as a sexual predator, expelled from the university, losing his visa, and losing his freedom to choose his desired career.

The facts indicate that Doe's procedural due process rights to an impartial adjudicator and access to

evidence to be used against him were not considered and that she violated Doe's equal protection rights. As such, Frost is not entitled to qualified immunity.

**DiCarlo, Redington, Keller, and Braun**

Regarding their Motion to Dismiss, specifically regarding the Individual Defendants, Defendants describe and define each defendant as outside the sphere of Doe's discipline, as if they were not involved enough to be a named defendant. Each individual Defendant named either created, furthered, or upheld the deprivation of Plaintiff's constitutional rights. Redington, Keller, and Braun were all key decision-makers, responsible for ensuring the disciplinary process complied with due process and equal protection. They failed to do so on either count. These concerns were raised in Doe's TAC, with actual notice of the claims that Doe's due process rights were violated.

A supervisor incurs liability under § 1983 for violating a federally protected right when the supervisor is personally involved in the violation, or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation. In actions under § 1983, "Government officials are personally liable only for their own misconduct." *S.M. v. Krigbaum,* 808 F.3d 335, 340 (8th Cir. 2015). For a superior to be held responsible for the acts of a subordinate, "The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see." *Ottman v. City of Indep.,* 341 F.3d 751, 761 (8th Cir. 2003) (alteration in original) (citations omitted). A supervising official can be found responsible if they directly participate in violation or if not, where they (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts. *Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir.2012).

To establish official-capacity liability under § 1983, a plaintiff must show either that the official named took an action pursuant to an unconstitutional governmental policy or custom, **or** that he or she possessed final authority over the subject matter at issue and used that authority in an unconstitutional manner. The facts pled in the TAC demonstrate the applicability of this rule to Plaintiff's case. Other universities have given the accused new hearings on appeal when it was demonstrated that there were procedural errors. *See Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d at 604 ("[P]laintiffs' first hearings were riddled with procedural errors as they claim, they both appealed and were granted new hearings.").

**Substantive Due Process Claim**: To establish a substantive due process claim, the plaintiff must

demonstrate that the government's conduct in depriving him of his education is so outrageous that it shocks the conscience, offends judicial notions of fairness, or is offensive to human dignity. *See Moran* at 643. Plaintiff has alleged that Defendants violated substantive due process. In TAC ¶ 377, he alleged that "Defendants were made aware that Doe had a credible fear of being tortured or killed if he lost his visa and had to leave the United States to the South Asian country. Yet they ignored all exculpatory evidence, did not provide him an opportunity to be heard, harassed him, and even edited facts to find him responsible. Keller and Braun were then deliberately indifferent during their appeals to Doe's many allegations of due process violations, the consequences of the irreparable damage he faced, and of the severe discrimination he experienced. *Id.* Doe has a right to a complete and thorough investigation under substantive due process. Additionally, Doe's allegations of anecdotal evidence suggesting systematic race discrimination in university discipline support his claim of violation of substantive due process. Defendants do not deny violating Doe's substantive due process. TAC ¶¶ 333-336.

4.5.4 - **DiCarlo** was UI's "Sexual Misconduct Response Coordinator" and the "Title IX Coordinator" TAC ¶ 18. She was a UI Title IX trainer in 2017. DiCarlo became directly involved in this Judicial Process as she first spoke with both the Complainants before the investigation even began. TAC ¶ 81. UI, including DiCarlo…knew of major inconsistencies in Lisa's evolving allegations. UI ignored them and assisted Lisa in nurturing bad faith allegations. TAC ¶ 92. Additionally, DiCarlo was copied in the reports. TAC ¶ 493.

Doe alleges her of putting institutional pressures on UI's decision-makers to reject Doe's exculpatory evidence and confirm the pre-determined decision to expel Doe. *Miami Univ.,* 882 F.3d at 602. The decision-makers, to avoid procedural due process issues, should have recused themselves when they knew DiCarlo caused them to be biased here. *Id* at 604. TAC ¶ 358. Doe also accused DiCarlo of pressuring the Complainants to view and portray the consensual encounter with Doe as sexual assault. TAC ¶ 359.

DiCarlo, as UI's TIXC, is also liable under all § 1983 claims herein for deliberate indifference as she knew or should have known of a substantial risk of serious harm from her continual comments and actions that opposed due process protections. TAC ¶ 358. In November 2018, Secretary of Education issued proposed rules strengthening due process protections for students accused of sexual abuse. TAC ¶ 338. In response to these comments, DiCarlo issued comments on behalf of UI characterizing UI's policies related to Title IX sexual misconduct in effect at the time of Doe's Complaint. DiCarlo, on behalf

of the University, resisted the Secretary of Education's proposed rules. *Id.*

Although at least 20 courts ruled in favor of an accused's right to cross-examination by January 2019, DiCarlo expressed that cross-examination would turn "Institution of Higher Education's grievance procedures into quasi-court systems" during that month. TAC ¶ 32. These increased due process protections would apparently create "a venue in which parties conduct their own civil trials while we as the institution are relegated to serve only as referees." TAC ¶ 229. Notably absent was any concern about the reliability or constitutionality of the disciplinary proceeding.

DiCarlo's apparent attitude about UI's obligations to ensure a fair process and a truthful outcome are troubling: in none of her comments did she comment on the rights of the accused, the risk of an erroneous outcome, or the wellbeing of the accused. TAC ¶ 34. Her response implies that creating fairer adjudication procedures will harm campus survivors of sexual assault. This mindset contradicts longstanding Anglo-American principles of due process and fairness. Such beliefs will frustrate the interests of survivors as well: no one can have confidence in a system that fails, at a structural level, to treat both sides fairly.

In 2017, DiCarlo collaborated with RVAP to deliver a 12-hour training to UI's investigators, Adjudicators, appeal officers, and decision-makers. TAC ¶ 318. DiCarlo was responsible for implementing the constitutionally faulty training program. She violated the Fourteenth Amendment by not properly implementing evidence-based training against public university standards under §1983. This training focused on topics that included trauma-informed response, due process, and an investigative framework. TAC ¶ 319. Victim-centered methods go by a variety of names, including Start by Believing, trauma-informed, and Forensic Experiential Trauma Interview (FETI). *Id.*

Evidence of this includes that Adrienne Lyles, the senior deputy Title IX Coordinator of Iowa State University ("ISU"), a similarly situated employee as DiCarlo, collaborated with a colleague in ISU's psychology department to evaluate the available Title IX training programs. Their comprehensive study published in the "Journal of Applied Research in Memory and Cognition" found:

a)   Title IX training to be focused on lawsuit-avoidance considerations and ideology. TAC ¶ 320.

b)   "A search of the available research literature yielded **no published, peer-reviewed studies on the efficacy or effectiveness of FETI**... We know of **no scientific studies** that support this contention

of neurobiological response differences between perpetrators and victims." *Id.*

c)   "[n]o evidence to support the effectiveness of approaches where investigators try to determine the veracity of a Title IX complaint by watching the behavior of the responden[t]." *Id.*

UI provided their decision-makers training on FETI, through EVAWI in Fall 2016. Perhaps coincidentally, but tellingly, three days before Doe's hearing, on September 15, 2017, UI conducted a training session for all adjudicators and investigators entitled "Reading Victims and Judging Credibility: Best Practices in Promoting Victim Centered Investigations and Prosecutions" three days before Doe's hearing. (emphasis added). TAC ¶ 321.

In *Doe v. Brown University*, a critical question was why the university's Title IX tribunal discounted exculpatory evidence, as they did in Doe's case here. The decisive vote in the *Brown* tribunal was "[b]ecause of a possibility that it was a response to trauma." *Doe v. Brown University*, 210 F. Supp. 3d 310, 327 (D.R.I. 2016)  U.S. District Judge William Smith held that this testimony showed a failure of Brown's training, since "it appears what happened here was that a training presentation was given that resulted in at least one panelist completely disregarding an entire category of evidence." *Id.* at 342. *See also Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 658 (S.D. Ohio 2016) which found biased sexual misconduct training can overcome the "presumption" that university employees acted with "honesty and integrity" in disciplining a student for alleged sexual misconduct; *Doe v. Univ. of Mississippi*, No. 3:16-CV-63-DPJ-FKB, 2018 WL 3570229, *4-7 (S.D. Miss. July 24, 2018) which refused to dismiss a Title IX claim, in part, because the university's Title IX training materials "might suggest bias" favoring accusing students.

DiCarlo met with Sally (and Lisa) before the formal investigation. Due to her high interest in the investigation's outcome, she has motive and opportunity to pressure Sally Roe and Lisa Roe to inflate or falsify accusations. TAC ¶ 81. During her initial meeting, Sally's allegations were indiscriminately expanded to state that on September 2, 2016, Doe kissed her without affirmative consent and touched her breast. Only at that point did UI begin investigating Doe for sexual assault. TAC ¶ 82. As it pertains to Lisa, she was part of a "Lead Empower Advocate Prevent Group" for the "Women's Resource & Action Center," Lisa used to give presentations on sexual violence for UI "students and staff" before the alleged sexual assault, and her resume dictates it as well. Lisa, therefore, knew well what constituted sexual assault. TAC ¶ 89. But after her initial meeting with DiCarlo, Lisa's allegations also expanded to include sexual assault.

At the hearing, Lisa even claimed, "I didn't know it was sexual assault until I met Monique [DiCarlo]" TAC ¶ 90.

In his TAC, Doe plausibly alleged that the University failed to train its employees, acting in deliberate indifference to the rights of its students because the University had "notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *Plamp*, 565 F.3d at 461. TAC ¶ 361.

At this pleading stage, this is enough to warrant further development of record of whether DiCarlo directly contributed to due process violation and/or was deliberately indifferent to the procedural due process and equal protection rights. Without conducting a deposition or further discovery, it not reasonable for Doe to know the extent of DiCarlo's knowledge and/or involvement in the ongoing concerns about due process rights for accused students.

**4.5.5 - Redington –** Defendant Redington was responsible for the decision to expel Plaintiff, failing to provide any rationale as to why. Defendants cite to the TAC's well plead and plausible accusations. They admit that it was this Redington's decision to expel Doe (Motion to Dismiss at p. 12). Indeed, in his TAC, Plaintiff complained that Redington "violated UI Policies and Doe's constitutional rights" by "failing to provide a rationale for her decision." *Id.* at ¶ 473. Redington is referenced throughout the TAC for her participation in emailing documents to the various individuals involved, and for designating Defendant Stevenson Earl as Judicial Administrator/Investigator. Defendants argue that this Defendant had the discretion to act as she did, and even if true and accepted, this very discretion serves as the basis of Plaintiff's due process and equal protection violations. TAC ¶ 146. The expulsion was an extreme sanction, and regardless of guilt or innocence, Doe believes that this sanction was motivated by his gender and race as the sanctions imposed in more serious cases of penetrative sexual assault were less. TAC ¶ 471.

In his appeal to the Board, Doe wrote that UI expelled another Asian/Middle Eastern, graduate student named A.V., about a year before they expelled Doe. Upon information and belief:

a) A.V.'s sanction, like Doe, was grossly disproportionate from what UI found him responsible for, and like Doe, A.V. lost his visa.

b) Similarly situated Caucasian/white students are treated differently than Asian/Middle Eastern students like Doe and A.V.

c) Therefore, Doe alleges that 1) Asian males are found responsible by UI when a complaint has been filed against them at a rate higher than white counterparts. 2) Redington's and/or Keller's decision making shows a pattern of discrimination against Asians/Middle Eastern

students. TAC ¶ 472.

Additionally, the TAC alleges, "On October 17, 2017, Doe emailed Redington, stating his intent to appeal the decision, and requested permission to enter the campus to have access to the University Counseling Service. TAC ¶ 233. Redington acknowledged receiving the email but ignored Doe's request for mental health counseling. TAC ¶ 234. In his appeal, Doe emphasized Redington's "indifference" and failure to provide "basic health services," such as counseling, despite charging full tuition. Doe said it caused "immense suffering." TAC ¶ 235.

While Doe has alleged that UI refuses to hire any qualified hearing officers if they have defense-related experience, Doe believes that Redington participated in this conduct. However, without discovery, Doe cannot learn the full capacity of what occurred.

**4.5.6 - Keller** – After Doe's investigation began, UI received substantial criticism in the public media of 1) Discriminating against females. 2) Not taking seriously complaints of female students alleging sexual assault by male students. Upon information and belief, UI's pressure associated with press coverage in 2017 regarding two lawsuits filed by Newkirk Zwagerman, in part, caused UI's discrimination against Doe/ TAC ¶ 281:

> a) On May 19, 2017, while Doe's investigation was ongoing, UI paid $6.5 million to settle a Title IX lawsuit that alleged sex/gender discrimination toward females
>
> b) On October 16, 2017, just one day before Doe's hearing, UI settled another Title IX lawsuit that alleged gender discrimination against two females for mishandling sexual misconduct allegations, this time for $2.68 million. TAC ¶ 609. The second involved the Dean of Graduate College, Keller, who initially suspended the male till she graduated, but later reduced it to a one-year suspension so that he can graduate.

Defendants argue that Keller is accused of only upholding the University's decision and writing a "single sentence stating he found no violations, and the sanction was not disproportionate." TAC ¶ 244. This Defendant's callous refusal to consider the evidence on (and omitted from) the record, along with his rubber-stamping of the findings of a biased process, confer not only his liability for his actions but also a deprivation of Plaintiff's due process rights. Plaintiff accused him of violating the 14th amendment due process and equal protection clauses. TAC ¶¶ 376, 502. It does not matter if Plaintiff accused him of violating UI's policies that Defendants are so concerned about. Defendant Keller is accused of deliberate and indifference and violating Doe's equal protection under §1983, which is what he is being sued under here. Discovery will be needed to gain knowledge on the decision that led to the lawsuit where the Dean

of Graduate College, Keller, overturned a decision of expulsion where the male was found responsible for rape, and how that decision affected the manner in which he approached Doe's appeal. TAC ¶ 281. It is again important to note that a person found responsible for rape did not suffer expulsion while Doe did.

**4.5.7 - Braun** - Doe's notice of appeal to the Board argued there was a disagreement in facts and that UI's Adjudicatory Process was, therefore, unconstitutional. Doe questioned, among others, the severity of the expulsion. For immediate relief, Doe outlined how his loss of visa would endanger his physical safety and provided evidence of recent militant attacks targeting people like him. TAC ¶ 246. On January 23, 2018, Braun upheld Levin's opinion and denied a stay. Braun was objectively unreasonable when he said Doe's potential loss of "visa status" was "speculative." Doe lost his visa, a known consequence of an expelled international student. The fear and irreparable harm Doe experiences from his loss of visa were neither trivial nor "speculative." TAC ¶ 250.

Braun also claimed Doe did not provide evidence and argument of allegations in his "notice" of appeal, even though the Board limits the notice to short and specific questions, with a brief to explain later. TAC ¶ 251. Braun denied Doe's reasonable request that he be allowed to write up to 50 pages, even though each complainant was allowed up to 25 pages. Doe said that 50 pages would illustrate "equal opportunity." Braun limited Doe to 35 pages, which Doe said was insufficient. TAC ¶ 252. On February 20, 2018, Doe submitted a timely and well-researched 35-page brief to Braun, explaining the lack of due process, discrimination, and harassment he endured. Throughout his brief, Plaintiff questioned the fairness of the proceeding. TAC ¶ 253. On June 11, 2018, the Board emailed Doe. The decision, in its entirety, read: "The Board of Regents considered the appeal of Doe on Wednesday, June 6, 2018. The Board voted to affirm the final decision of the University of Iowa in its entirety (8 in favor, 0 opposed, 1 absent)." TAC ¶ 272. Doe was denied an impartial review. These meaningless, discriminatory, and objectively unreasonable appeals took over eight months, yet UI and the Board showed no possibility for correcting errors on appeal. TAC ¶ 273. Because of UI's and the Board's actions or inactions, Doe lost his F-1 visa. TAC ¶ 274.

### 4.6    PLAINTIFF ALLEGED PLAUSIBLE TITLE IX CLAIMS

#### 4.6.1   Title IX – Erroneous Outcome

Defendants seek to dismiss Plaintiff's Title IX Claim of Count 2 because: 1) Plaintiff has failed to plausibly allege an erroneous outcome claim[6] because he did not adequately plead that gender bias was a motivating factor in UI's decision to expel him; and 2) he cannot allege a selective enforcement claim based on information and belief. These arguments fail, and the Court should deny Defendants' motion to dismiss. To establish Title IX liability, Doe needed to: "allege facts, [that] if true, raise a plausible inference that the university discriminated against [Doe] 'on the basis of sex." *Purdue*, 928 F.3d, at 668 (citations omitted). Under any plain reading of the TAC, Doe has satisfied this requirement.

Courts have held that to demonstrate an articulable doubt as to the accuracy of the outcome of a disciplinary proceeding, a plaintiff "must demonstrate evidentiary weaknesses behind the finding of the offense such as a motive to lie, particular strengths of the defense, or procedural flaws affecting the record." *Doe v. Univ. of Arkansas-Fayetteville*, No. 5:18-cv-05182, 2019 WL 1493701, at *12 (W.D. Ark. Apr. 3, 2019); *Univ. of Arkansas-Fayetteville*, 2019 WL 1493701, at *12 (determining plaintiff failed to sufficiently allege hearing panel's finding that he lacked credibility raised an articulable doubt on the accuracy of the hearing. A plaintiff can also show an articulable doubt as to the outcome of the disciplinary proceeding by "challenging the overall sufficiency and reliability of the evidence." *Marymount Univ.*, 297 F. Supp. 3d at 584 (noting a plaintiff can show an articulable doubt as to the outcome of the disciplinary proceeding by "challenging the overall sufficiency and reliability of the evidence").

### 4.6.1.1    Articulable Doubt

Throughout his TAC, Plaintiff casts doubt on the accuracy and fairness of the disciplinary proceedings. The entire TAC, along with this document, detail the accusers' potential motivations to lie. This begins with Sally's account of the alleged sexual assault. Her initial report about the encounter with Doe indicates that sexual contact was consensual. On or around October 10, 2016, Sally, after a meeting, mentioned to a faculty member, referring to the compliment over text, that she was receiving more attention than she wished from Doe. TAC ¶ 121. She then shared with the faculty member the full story on what occurred the night she went on a date with Doe. TAC, ¶ 122. Sally said that everything that

---

[6] In his TAC, Doe said that he denied all charges as it relates to violating its UI's policies. However, Defendants still claimed in their Motion to Dismiss that Doe did not claim that he did not violate UI's sexual misconduct policy. Additionally, the legal standard generally used is claiming that one was innocent and wrongly found responsible for sexual misconduct.

happened in Doe's apartment on September 2, 2016, was consensual, and she only "changed her mind about the relationship later." TAC ¶ 123. Excluding this fact alone should demonstrate articulable doubt. The chart that Doe produced as the summary of the hearing shows articulable doubt. TAC ¶ 215.

### 4.6.1.2    Gender Bias Affected the Outcome

In addition to demonstrating an articulable doubt in the outcome of the proceeding, the plaintiff must show "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994); accord *Rossley v. Drake Univ.,* 342 F. Supp. 3d. (S.D. Iowa 2018). Such circumstances may include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." Accordingly, "alternative explanations [ for the University's findings] are not fatal to [Plaintiff]'s ability to survive a Rule 12(b) (6) motion." *Doe v. Baum,* 903 F.3d 575,587 (6th Cir. 2018).

Defendants also claim that Plaintiff has failed to plead a connection between the erroneous outcome and gender bias. Even a cursory review of the TAC would reveal the outright falsity of this claim. Gender bias may be shown through the statements of members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that tend to show the influence of gender. *Yusuf,* 35 F. 3d at 715. *See also Doe v. Miami U,* 882 F.3d 579, 592-93 (6th Cir. 2017). Doe has provided facts on the language Frost used to show the influence of gender. TAC ¶¶ 223, 228.

Additionally, Doe's case shows that the evaluator has been influenced by bias as it is similar to the case in Columbia University "where the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side," *Columbia U,* 831 F .3d at 57. *See Norris v. CU Boulder,* 2019 WL764568, at** 8-9 (D. Colo. 2019). Gender bias may also be inferred where an adjudicator possesses "outdated and discriminatory views of gender and sexuality." *Marymount U,* 297 F. Supp. 3d at 586. *See Doe v. Grinnell College,* 4:17-cv-00079, SJ Opinion, ECF No. 159, at pp. 24-27.

Historically, UI has struggled to confront sexual assault. In a 2007 investigation, the Board hired an outside firm to investigate the matter. Following an investigation, the Special Counsel report noted UI's "confusing, overlapping and ambiguous policies" and, among other things, criticized Stevenson Earl of being "irritated" and sounding "abrasive" while questioning the female survivor. In fact, the report found that Stevenson Earl made multiple "distressing" comments. TAC ¶ 324.

Since the 2007 incident, the only other time Stevenson Earl received critical media attention was when on April 27, 2017, *The Gazette* reported about how Stevenson Earl co-authored a UI investigative report, apparently providing an unnecessary opinion and advice, separate from the findings of no guilt, which eventually resulted in a UI female staff being fired.  UI paid $6.5 million to settle a Title IX lawsuit that alleged gender discrimination. Upon information and belief, Stevenson Earl, under pressure because of her own failures as it relates to investigating female complaints, then intentionally discriminated against Doe as she called D.L. for his second interview in June 2017 and edited the information that D.L. knew of Sally before she produced the discriminatory and bad faith report during the same month. TAC ¶ 326.

The second lawsuit alleged that a female student struggled because UI's response to her report of sexual assault was unreasonable. On October 16, 2017, just one day before Doe's hearing, UI settled this Title IX lawsuit involving sexual misconduct allegations against two females for $2.68 million The *Iowa City Press-Citizen* reported that sex/gender was clearly a motivating factor as the lawsuit argued that UI's response did not address "biases that can lead to institutional hostility against female accusers and support for perpetrators." The lawsuits found that gender was a clear motivating factor when it argued that UI's response remained inadequate because the changes did not address **"biases that can lead to institutional hostility against <u>female accusers</u> and support for perpetrators."** TAC ¶ 282.

During the investigation and adjudications, there were at least seven (7) open investigations involving UI with the Office of Civil Rights ("OCR") when UI expelled Doe. TAC ¶ 616 (b). Upon information and belief, 2016 and 2017 were especially troubling years for UI with the OCR as it related to discrimination against females. TAC ¶ 616 (c). These allegations and the allegations set forth supra together create a sufficient backdrop to infer gender bias. In *Miami University,* 882 F.3d at 594, the Court noted Plaintiff's allegations of pressure placed on the university by the federal government by a lawsuit brought by a female.

Evidence that a college has been placed under federal investigation, severely criticized for its failure to protect female sexual assault victims, and is under pressure to correct its perceived tolerance of the sexual assault of female students provides a **"backdrop"** for gender bias or sex-related bias. *Baum*, 903 F.3d at 586-587 (external pressure combined with hearing board's credibility determinations in favor of females on a cold record raised a plausible inference of gender bias). *See also Miami U.*, 882 F.3d at 592-93 (plausible

inference of gender bias where, *inter alia*, the university faced pressure to zealously "prosecute" male respondents after facing a lawsuit by a female student).

The entirety of Doe's "Background" section is about how gender not only affected this proceeding, but that UI created a hostile environment for males in 2017/2018. TAC ¶¶ 276-332

*Iqbal* does not require that the inference of discriminatory intent supported by the pleaded facts be the most plausible explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is plausible." *Id.* At 57. Accordingly, "alternative explanations [for the University's findings] are not fatal to [Plaintiff]'s ability to survive a Rule 12(b)(6) motion." *Baum*, 903 F.3d at 587. Plaintiff's case here, through his TAC, more than crosses this threshold.

In other words, and in no uncertain terms, the rule in *Baum* should control this analysis. That rule, stated clearly by the Court, is that "[i]f it is at all plausible (beyond a wing and a prayer) that a plaintiff would succeed if he proved everything in his complaint, the case proceeds." *Doe v. Baum,* 903 F.3d at 581. The TAC provides more than a wing and a prayer and provides concrete, detailed, factual information sufficient to survive a heightened pleading standard.

Besides the fact that the evidence fails to support Sally's and Lisa's allegations, the investigation report contains facts that suggest that the Title IX investigators had outdated and discriminatory views about gender and sexuality. The totality of these circumstances plausibly alleges that gender bias was a motivating factor in UI's decision to expel Plaintiff and Defendants' motion to dismiss should be denied.

### 4.6.2   Title IX - Selective Enforcement

Defendants argue that Doe's implied selective enforcement count should be dismissed. Doe has not included a selective enforcement count in his TAC, and thus all arguments regarding selective enforcement should be ignored as it is based on claims not contained in Doe's TAC. While Doe believes that regardless of innocence or guilt, that the sanction was inappropriate and motivated by his sex/gender, he has pled the severity of his sanction under the 14th amendment equal protection clause, where public universities are obliged to apply the same rules in a standardized and consistent manner to people in similar circumstances.

### 4.6.3   Title IX - Hostile Environment

To assert a Title IX hostile-environment claim, Plaintiff must allege that his educational experience

was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions" of his educational environment.  *Miami Univ.,* 882 F.3d at 589.

In her report, Frost showed keen animosity towards Doe. She wrote about how "appalling" Doe was. TAC ¶ 222.

Doe's advisor, the head of UI's counseling department, provided a letter on behalf of all of Doe's professors in the department, showing their support for Doe's character. After reading and rejecting it, Frost wrote in her report: "It should be noted that John Doe continues to work with students/clients with disabilities, a vulnerable population, as part of his counseling duties in the UI Department of Education." A comment like this was gratuitous, unwarranted, and not required by law nor UI policy. Frost knew that Doe cared about working with people with disabilities as she asked him about his goals in life. TAC ¶ 223.

Defendants have ignored this entire section of Doe's complaint: Examples of Frost harassing Doe based on his sex and creating a hostile environment are included in TAC ¶ 228.

Doe wants to note that while he made serious allegations regarding Stevenson Earl of discriminating against him in her report, his TAC mentions nothing about Stevenson Earl harassing him when she questioned him over the six hours or so that she did. He also never alleged that she did not treat him with respect and dignity when she questioned him. Frost adjudicated over the same allegations, and yet Doe alleged that she did not treat him with respect and dignity and that she harassed him. Thus, finding whether Doe violated UI's policies required none of the conduct mentioned above regarding Frost.

Frost's unwanted and unwelcome conduct was directed at Doe and discriminatory based on his sex/gender and unnecessary to determine Doe's responsibility for sexual misconduct. Doe, in his appeal, wrote: "I have never experienced anything like this ever in my life." TAC ¶ 420.

Frost's severe and objectively offensive discrimination did not end at the hearing, which lasted over three full business days, over 24 hours, which was sufficiently continuous and concentrated. She took three weeks to write a report where she intentionally excluded all exculpatory evidence, fabricated evidence, and created a narrative of a sexual predator in over 30 pages. TAC ¶ 422.

Defendants argue that Doe reasserts his selective enforcement count in his hostile environment count. First, Doe does not have a selective enforcement count. Second, even if he did, harassment based on sex/gender, the crux of Doe's hostile environment count, is a completely different argument from the

fact that regardless of guilt or innocence, that severity of the sanction was motivated by his sex/gender. Doe said how Frost dehumanized him and provided evidence that UI used such a narrative in their "masculinity" programs that were being released during then.

### 4.6.4   Title IX - Deliberate Indifference

Under Title IX, the court would need to consider whether UI and the Board were: (1) deliberately indifferent; (2) to known acts of discrimination; (3) which occurred under its control. *Maher v. Iowa State University,* No. 18-1559 (8th Cir. Feb. 15, 2019) (internal citations omitted).

Two Supreme Court decisions, together, set out the requirements for establishing an educational funding recipient's liability under Title IX: *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 290-91 (1998) and *Davis Next Friend LaShonda D. v. Monroe County Board of Education.* The Court's liability standard premises an institution's Title IX liability for harassment based on the institution's "deliberate indifference" in responding to the knowledge of that conduct. Thus—and critical to understanding a Title IX private right of action for damages—an educational institution is not strictly liable for harassment of a student. Liability attaches only if a plaintiff establishes that the funding recipient's response to its "actual" knowledge of the discrimination was deliberately indifferent.

Put another way, under the Court's remedial scheme, liability under Title IX is based on the funding recipient's "own failure to act" adequately in response to known misconduct, not the misconduct itself. (*See, e.g., Davis v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629, 645 (1999) Thus, an institution will not be liable absent showing deliberate indifference, regardless of whether the conduct committed could be characterized as egregious. *See, e.g., Doe ex rel. Doe v. Dallas Indep. Sch. Dist.,* 220 F.3d 380, 381–82, 384, 388 (5th Cir. 2000) (finding no Title IX liability by the school district for third-grade teacher's sexual molestation of numerous male students over four years; explaining that a school district is liable for damages under Title IX only when a plaintiff can show the school district acted with deliberate indifference in response to its knowledge of the allegation.)

In *Davis*, the Supreme Court held that an institution's deliberate failure to **respond** to known harassment is tantamount to intentional discrimination on the institution's part. A recipient's response to harassment will amount to deliberate indifference only if it is "clearly unreasonable in light of the known circumstances." Defendants have not responded to Doe's allegations of discrimination and harassment.

Doe's Complaint alleges that Frost's harassment was severe, and Doe requested mental health counseling from Redington right after he read Frost's bad faith, highly inaccurate, and objectively offensive report. Redington then failed to provide Doe with the requested counseling, adding to the hostile environment that Doe experienced. Frost's/UI's conduct substantially interfered with Doe's right to receive an education free from discrimination and harassment; it had a concrete and negative effect on Doe's ability to participate in his education, and his ability to benefit from the services, activities, or privileges provided by UI. TAC ¶¶ 425-426.

Doe was two months away from graduating with his master's degree in Rehabilitation and Mental Health Counseling. Considering that Doe received no accommodations despite requesting them, he took 'Incomplete' grades for all classes for the previous term. Doe had until the end of Fall 2017 to complete his incomplete grades from the semester before his expulsion. He could not complete them due to his distress from the hostile environment, resulting in the 'Incomplete' grades being converted to failing "F" grades on his permanent transcript. If allowed to return, Doe plans to retake the Spring semester, a semester in which he was a mere two months from completing. On the best of outcomes, one where Doe could return to UI, his graduation date will have been delayed by at least 4 years. This unfair outcome also effectively destroyed his chances of attaining a Ph.D. as graduate programs Doe wanted to apply to are not forgiving of such failures. TAC ¶ 427.

The facts, plausibly plead in the TAC, confirm that UI failed the three prongs of the test detailed in *Maher*. UI and the Board persisted in its inaction after it had actual knowledge of the discrimination, harassment, and hostile environment that Doe suffered. Doe notified UI and the Board of Stevenson Earl's, Frost's, and Redington's sex-based discrimination, Frost's sex-based harassment and hostile environment she created, and of UI's overall hostile environment for people like Doe, and of how Frost applied UI's facially gender-neutral policy on consent, in a gender-biased way. Doe backed the allegations with a plethora of quoted examples TAC ¶ 442. If given the opportunity at trial, he will proffer substantially more facts, circumstances, and proof of his properly plead claims.

Doe wrote in his Complaint that Keller, Braun, and Levin were "appropriate" people. TAC ¶ 443. Keller, Dean of Graduate College and Graduate Provost, had much authority to institute corrective measures, and Braun had the most authority as executive director of the Board. Levin was given the power

to request a stay for Doe. Each had significant control of Doe's fate after the hearing. *Id.* They had actual notice and were deliberately indifferent to the allegations under its control. TAC ¶ 444. In TAC ¶ 224, Doe wrote about how Keller's deliberate indifference meant that Doe was vulnerable to further discrimination from the Board, which Doe ended up experiencing.

Levin, a UI employee, then added Doe's hugs to Frost's sexual assault list. Defendants had actual notice and were deliberately indifferent to the allegations under their control. They failed to "take immediate and effective steps" or respond adequately and use corrective opportunities to Doe's allegations of Title IX discrimination, harassment, and hostile environment. The response to the discrimination was clearly unreasonable, given the known circumstances. TAC ¶¶ 445-448.

UI's intentional, deliberate indifference caused Doe to suffer sexual harassment/hostile environment and/or discrimination that was severe, pervasive, and objectively offensive, it deprived Doe of access to educational opportunities or benefits and caused other harms detailed in the TAC ¶ 453. Additionally, "Expulsion denies the student the benefits of education at his chosen school." *Marshall v. Ind. Univ.,* 170 F. Supp. 3d 1201, 1206 (S.D. Ind. 2016).

While each case has its own unique facts and circumstances, accused males have succeeded under Title IX's deliberate indifference. *See, e.g., Doe v. Amherst College* 238 F.Supp.3d 195, *Wells v. Xavier University*, 7 F. Supp. 3d 746, and *Harnois v. Univ. of Mass.,* No. 19-10705-RGS (D. Mass. Oct. 28, 2019). Doe meets the requirements of deliberate indifference.

**Breach of Contract**

For the breach of contract count, Defendants have made arguments that makes sense to Plaintiff. As such, he will drop his breach of contract count.

## 5. CONCLUSION

Based on the factual and legal positions detailed above, the lack of due process and discrimination that Doe experienced in UI's judicial process precluded a fair evaluation of the witnesses' credibility. Doe respectfully requests this Court to reject Defendants Motion to Dismiss.

Respectfully Submitted,

/s/ Rockne Cole

ROCKNE COLE
Cole Law Firm, PC
209 E. Washington, Ste. 304
Iowa City, IA  52240
(319)519-2540
(319)359-4009   Fax
rocknecole@gmail.com
Iowa Pin AT1675

**Attorney for Plaintiff**

CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2020, I electronically filed the foregoing with the Clerk of the Court

using the ECF system, which will send notification of such filing to the parties or attorneys of record.

/s/ Rockne Cole

_____