IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF IOWA

DAVENPORT DIVISION

| | |
|---|---|
| **John Doe,** | **Case No.:** 3:19-CV-00047-RGE-HC |
| Plaintiff; | |
| | **Brief Supporting Motion for** |
| v. | **Expedited Temporary** |
| | **Restraining Order(s) and** |
| **University of Iowa, et al.,** | **Injunctive Relief.** |
| Defendants. | |

This case challenges the unlawful disciplinary action against Plaintiff John Doe[1] ("Plaintiff") by Defendants the University of Iowa ("UI"), Board of Regents, State of Iowa ("The Board"), and their individual Defendants, culminating with Plaintiff's erroneous expulsion from UI. Plaintiff's Third Amended Complaint ("TAC"), filed on February 11, 2020, details complete facts and allegations. Plaintiff is entitled to injunctive relief because UI's discipline of Plaintiff violated his clearly established civil rights, including Due Process and Equal Protection rights established by the Fourteenth Amendment of the United States Constitution. Thus, Plaintiff moves this Honorable Court to issue a Temporary Restraining Order ("TRO") and Preliminary Injunction requiring UI to expunge his disciplinary records and failed grades arising from this unlawful disciplinary action. As discussed below, **this relief is required so Plaintiff can continue working at his new job.** While his employer wants him to apply immediately to take a certification test required by his job, Plaintiff has requested additional time, informing them that he would try his best to disclose his records to the licensure board by July 17, 2020. As such, immediate and irreparable injury, loss, or damage will result to Plaintiff. Plaintiff does want to return to UI to finish his education in Spring 2021 as his classes are offered only once a year, however, at this moment, the immediate concern is him keeping his job.

---

[1] *See generally,* John Doe's Motion to Allow Using Pseudonyms in this proceeding.

## ARGUMENT

To succeed in a request for a TRO, the movant must show: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and, (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). The decision to grant or deny the TRO is discretionary with the Court. A There are at least 19 similar types of cases where a federal court has granted an injunction or TRO.[2] TRO is necessary to prevent further irreparable injury to Plaintiff, and to allow the Court to render effective relief if Plaintiff prevails at trial.

### 1.   Plaintiff Will Suffer Irreparable Harm

"To succeed in demonstrating a threat of irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n,* 109 F.3d 418, 425 (8th Cir. 1996); *Roudachevski v. All-American Care*, 648 F.3d 701, 706 (8th Cir. 2011). Plaintiff was a student at UI, in good standing, and gaining an education to support a desire to work in the field of psychology. Following untrue and unproven allegations against him, UI expelled Plaintiff, leaving failed grades and a mark on his academic transcript from the Dean of Students following the expulsion. TAC ¶ 265. These marks continue to harm Plaintiff's academic and professional reputation and opportunities irreparably.

"A finding of responsibility for a sexual offense can have a "lasting impact" on a student's personal life, in addition to his "educational and employment opportunities," especially when the disciplinary action involves a long-term suspension." *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 400 (6th Cir. 2017). "The 'private interest that will be. affected by the official action' is therefore compelling." *Id.* A suspension after an unfair hearing may constitute irreparable harm. *Roe v. Dir., Miami Univ.,* No. 1:19-cv-136, 2019 U.S. Dist. LEXIS 55246, at *22–23 (S.D. Ohio, 2019). Logically, by extension, an expulsion would at least constitute the same harm, implicating at least the same Due Process protections. Another Court confirmed this premise: "Where

---

[2] *See* Harris, Samantha, and K. C. Johnson. "Campus Courts in Court: The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications." *New York University Journal of Legislation & Public Policy* 22, no. 1, **Case Appendix** of Table 1. (2019). There was another successful TRO after this law review article was written: *Doe v. University of Connecticut*, No. 3:20-cv-00092 (D. Conn. Jan. 23, 2020).

. . . a plaintiff's constitutional right to due process is 'threatened or impaired' the Court may presume irreparable. Moreover, Plaintiff faces the **immediate and irreparable harm** that the sexual misconduct finding will negatively impact his academic and professional **reputation**." *Doe v. Univ. of Mich.,* 325 F. Supp. 3d 821, 829 (E.D. Mich. 2018). This also happened in Plaintiff's case, and the irreparable harm is certain to occur in the near future. "Doe indicates that his current job offer is "contingent on receiving [his] degree and providing a copy of [his] transcrip[t]…Accordingly, this factor also weighs in Doe's favor." *Doe v. Rector & Visitors of Univ. of Va.,* Civil Action No. 3:19CV00038, at *13 (W.D. Va. June 28, 2019).

Plaintiff had been applying to jobs since February 2020 but has not heard back from these employers. Plaintiff quit drinking alcohol on June 28, 2018, and in May 2020, he applied for a drug and alcohol counselor position at a local institution. Plaintiff was offered this position, and he accepted the employment. He wants to help people struggling with addiction, and the new job would allow him to do that. Plaintiff's new employer assumed there would be no roadblocks in Plaintiff's application for a required temporary certified alcohol and drug counselor license. He had taken the required graduate classes in counseling. Following his acceptance of the position, Plaintiff reviewed the licensure application requirements on his second week at the job in June 2020, finding a requirement of his academic transcript being sent directly from UI to the license board. The application requires a release that gives the licensure board permission to **"investigate"** his **"background,"** with the understanding that "false or misleading statements or omissions may result in the denial or revocation of certification." *See* Attached Exhibit 3, p.4. The licensing board also "reserves the right to request further information from employers, organizations, and persons who may have pertinent information regarding this application." *Id.* Following two resignation letters from counselors in his department on July 7, 2020, his employer now wants him to get licensure immediately to be able to provide services.

The required release for licensure would expose information surrounding the unlawful expulsion. More concerning, related records would include defamatory and prejudicial comments made against Plaintiff. Thus, Plaintiff faces real and immediate danger of his professional reputation damaged and will either have to resign or face termination for not being able to fulfill the job's requirements, causing further financial harm. The primary purpose of this TRO right now is for Plaintiff to keep his current job and health insurance. Plaintiff's financial situation is especially dire due to the pending litigation required to defend his Constitutionally

protected rights. This employment would allow him to not just recover damages but independently purchase food, pay rent, and afford health insurance. Losing his job and health insurance at such a moment would be a substantial financial burden for him. Because Plaintiff is not a US citizen, he is restricted in resources and benefits available to him. For example, he is not eligible for other forms of health insurance, such as Medicaid.

The unfair discipline imposed by Defendants continues to damage Plaintiff's career prospects in professions even related to his chosen profession. It denied him the benefits of an education at his chosen school, damaged his reputation, and threatened his safety. Thus, Plaintiff seeks relief in an Order requiring UI to expunge his records, allowing his employment to continue. *See, e.g., Doe v. Purdue Univ.*, 928 F.3d 652, 666-67 (7th Cir. 2019) (remanding case to the district court for a determination if the Plaintiff had a "liberty interest" based on his demand for an "expungement."); *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (pursuing expungement of university records 'serve[s] the purpose of preventing present and future harm'); *Doe v. Cummins,* 662 F. App'x 437, 444 (6th Cir. 2016) (seeking to 'remove the negative notation from appellants' disciplinary records' is 'nothing more than prospective remedial action'); *Shepard v. Irving,* 77 F. App'x 615, 620 (4th Cir. 2003) (an 'F' grade and a plagiarism conviction 'constitute[d] a continuing injury to the plaintiff and an action to remove them was 'prospective in nature.').

## 2.  The Balance of Harms Clearly Favors Plaintiff

The harms and potential harms implicated by issuing this TRO must be considered. Defendants have prevented Plaintiff from completing his education, left him distressed, and is making him wait for years to graduate. He is trying to find incentive to continue his education career. In the best of circumstances, he will have a four-year time gap on his resume if allowed to graduate from the program. Granting injunctive relief will cause no harm and injury to Defendants because Defendants have no cognizable interest in Plaintiff's unlawful discipline, nor will they be deprived of anything with Plaintiff working at a local institution that is off-campus. "Doe is no longer enrolled at the University, and he is no longer on campus. Therefore, there is no basis to believe…[he] would pose a risk of harm to students or employees of the University." *Doe v. Rector & Visitors of Univ. of Va.*, Civil Action No. 3:19CV00038, at *13 (W.D. Va. June 28, 2019). The harm to Plaintiff substantially outweighs any potential harm to any Defendant.

### 3.   Plaintiff is Likely to Succeed on the Merits

"State universities must afford students minimum due process protections before issuing significant disciplinary decisions." *Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017). There is good cause to believe that Defendants have engaged in acts or practices that violated the Constitution and anti-discrimination laws.

### 3.1      14th Amendment Due Process Violations

Due process requires that the procedures by which laws are applied must be evenhanded so that individuals are not subjected to the arbitrary exercise of government power. *Marchant v. Pennsylvania R.R.,* 153 U.S. 380, 386 (1894), or have cases not decided "on the basis of an erroneous or distorted conception of the law or the facts." *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242 (1980). It is deeply rooted in the Nation's history and traditions and is the only right guaranteed twice by the U.S. Constitution. "[t]he precise nature of the private interest involved in this case is the right to remain at a public institution of higher learning in which the plaintiffs were students in good standing. It requires no argument to demonstrate that education is vital and, indeed, basic to civilized society." *Dixon v. Alabama State Bd. of Ed.,* 294 F.2d 150, 157 (5th Cir. 1961). The stakes are high as an erroneous outcome would mean that Plaintiff "would not be able to earn an adequate livelihood, to enjoy life to the fullest, or to fulfill as completely as possible the duties and responsibilities of good citizens." *Id.* at 157. Students must be afforded due process before they are deprived of their education, which was defined as a **property** interest and a **liberty** interest. *Goss v. Lopez*, 419 U.S. 565, 575 (1975). This applies to students in higher education. *Woodis v. Westark Community College,* 160 F.3d 435, 440 (8th Cir. 1999) (cited *Goss* in finding that due process applied to a college student.)

"There is no question but that the Due Process Clause of the Fourteenth Amendment to the United States Constitution gives rights to a student who faces expulsion for misconduct at a tax-supported college or university." *Henderson State Univ. v. Spadoni*, 41 Ark. App. 33, 35 (Ark. Ct. App. 1993). Indeed, UI's academic rules and regulations guaranteed that UI could not remove students without providing due process. The 8th Circuit assumed that this property interest arose from the contractual relationship between University and Student outlined in grievance procedures, giving Plaintiff the right to nonarbitrary grading. *Ikpeazu v. Univ. of Nebraska*, 775 F.2d 250, 253 (8th Cir. 1985); *Monroe v. Arkansas State Univ.*, 495 F.3d 591, 595 (8th Cir. 2007). Additionally, the 8th Circuit also held that "the deprivation of the right to attend public school was…based

upon their ineligibility under state law…However, because "education is perhaps the most important function of state and local governments," (quoting *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)), we believe a student's right to public education is a protected property interest in either case." *Horton v. Marshall Public Schools,* 769 F.2d 1323 (8th Cir. 1985).

Plaintiff had a protected liberty interest in protecting his good name and in securing future employment. School discipline threatens a person's "good name, reputation, honor, or integrity." *Goss,* 419 U.S. at 574 (quoting *Wisconsin v. Constantineau,* 400 U.S. 433, 437 (1971). *See also Doe v. Univ. of Arkansas at Fayetteville,* No. 5:18-CV-05182, at *11 (W.D. Ark. 2019). Charges of misconduct "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." *Goss* at 575. "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005).

Plaintiff was expelled on October 10, 2017, and suffered damage to his reputation due to baseless accusations and systemic rejection of his pleas of innocence. TAC ¶¶ 236-275. As it relates to **liberty**, "[i]t goes without saying, and needs no elaboration, that a record of expulsion…constitutes "a lifetime stigma." *Givens v. Poe,* 346 F. Supp. 202, 208 (W.D. N.C. 1972) (quoting *Vought v. Van Buren Public Schools,* 306 F. Supp. 1388, 1393 (E.D. Mich. 1969). "It is **well settled** that an expulsion from college is a **stigmatizing** event which implicates a student's protected **liberty** interest." *Donohue v. Baker* 76 F. Supp. 136, 145 (D.N.Y. 1997); accord *Gorman* 837 F.2d 7, 12 (1st Cir. 1988); *Hart v. Ferris State Coll.,* 557 F. Supp. 1379,1382 (W.D. Mich.1983); *Nzuve v. Castleton State College,* 133 Vt. 225, 335 A.2d 321 (1975); *Gagne v. Trustees of Ind. Univ.,* 692 N.E.2d 489,493 (Ind. Ct. App. 1998); *Nickerson v. University of Alaska Anchorage* 75 P.2d 46 (Alaska 1999) ("dismissal from a graduate program for allegedly "hostile," "abrasive," "intimidating," and "unprofessional" behavior sufficiently stigmatizes a person's professional reputation in a chosen career field to constitute an infringement of a liberty interest."); *Jaksa v. Regents of Univ. of Mich.,* 597 F. Supp. 1245, 1247(E.D. Mich. 1984) (citing *Constantineau*); *Guse v. University Of South Dakota*, CIV. 08-4119-KES, at *16 (D.S.D. Mar. 30, 2011)

Courts have continued to find that students have a protected liberty interest in recent cases. The effect of a finding of responsibility for sexual misconduct on 'a person's good name, reputation, honor, or integrity' is

profound. *Doe v. Miami Univ.,* 882 F.3d 579, 600 (6th Cir. 2018) (citation omitted) (quoting *Univ. of Cincinnati,* 872 F.3d at 399 (quoting *Cummins,* 662 Fed.Appx. at 445)). As such, "[t]ime and again, this Circuit has reiterated that students have a **substantial** interest at stake when it comes to school disciplinary hearings for sexual misconduct . . . [b]eing labeled a sex offender by a university has both an immediate and lasting impact on a student's life . . . [such as] difficulty obtaining educational and employment opportunities down the road, especially if  he is expelled." *Doe v. Baum,* 903 F.3d 575, 582 (6th Cir. 2018); *Doe v. Univ. of Arkansas at Fayetteville,* No. 5:18-CV-05182, at *11 (W.D. Ark., 2019) ("[D]oe has a protected liberty interest here because the adverse disciplinary decision impugned his good name, reputation, and honor.")

UI's discipline changed Plaintiff's student status from a full-time student in good standing to an **expelled** student. TAC ¶ 347. Plaintiff's chosen field of employment triggers a legal obligation to disclose UI's discipline of Plaintiff to: (a) graduate schools; and/or (b) state and/or federal entities that issue licenses to practice counseling. TAC ¶ 372. A stigmatizing statement is "made public" if there is at least "a likelihood that **prospective employers**" would see the damaging information. *Doe v. Rector & Visitors of George Mason University,* 132 F.Supp.3d 712, 724 (E.D. Va. 2015). Defendants also damaged relationships with his professors. TAC ¶ 381. His advisor informed Plaintiff to think of a different career. *Id.* In summary, "The interests of students in completing their education, as well as avoiding unfair or mistaken exclusion from the educational environment, and the accompanying stigma are, of course, paramount." *Gorman* 837 F.2d 7, 14 (1st Cir. 1988).

Plaintiff did not "shed [his] Constitutional rights . . . at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506 (1969). At a minimum, the Constitution requires due process to provide notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976). In the 8th Circuit, "[p]rocedural due process must be afforded on the college campus by way of adequate notice, definite charge, and a hearing with an opportunity to present one's own side of the case and with all necessary protective measures." *Jones v. Snead,* 431 F.2d 1115, 1117 (8th Cir. 1970). In an academic case[3] against UI, the 8th Circuit held that an opportunity to be heard would include "the opportunity

---

[3] Academic dismissal cases call for "less stringent procedural requirements" than misconduct cases. *See Bd. of Curators of the Univ. of Mo. v. Horowitz,* 435 U.S. 78, 86 (1978). However, even in such circumstances, a student is entitled to a **"careful and deliberate"** review.  *Id* at 85.

to characterize his conduct and put it in what he deems the proper context." *Greenhill v. Bailey,* 519 F.2d 5 (8th Cir. 1975) (citing *Goss,* 419 U.S. at 584, 95 S.Ct. at 741) (emphasis added).

"As *Dixon* makes clear, a public university student accused of misconduct is entitled to "a statement of the **specific** charges" against him. 294 F.2d at 158." *Doe v. Rector & Visitors of George Mason Univ.,* 149 F. Supp. 3d 602, 615 (E.D. Va. 2016). *Dixon* discussed that the nature of the hearing would vary depending upon the circumstances of the case. *Dixon v. Alabama State Bd. of Ed.,* 294 F.2d 150, 158 (5th Cir. 1961). The Court held that a hearing that allows the college to hear **both** sides in **considerable detail** is best suited to protect the rights of all involved. *Id.* at 158–159. Courts have adopted the standard in *Dixon* as guidance for determining what process a university must provide. *See Gorman* 837 F.2d 7, 13 (1st Cir. 1988) (citing *Dixon*); *Jones v. Snead,* 431 F.2d 1115, 1117 (8th Cir. 1970) (stating that notice and opportunity to be heard are essential factors.)

Despite precedent requiring such due process guarantees, Defendants did not provide Plaintiff with a meaningful opportunity to be heard in his own defense. Defendant Frost manipulated the narrative, selectively choosing what questions to ask, while aggressively questioning, even harassing, Plaintiff to reduce his credibility while bolstering the credibility of the Complainants. TAC ¶ 367. Plaintiff complained that he was not heard in the first paragraph of UI's appeal, saying that the appeal was his **"first proper opportunity"** to tell his story and to describe how Frost **"devalued"** his input. TAC ¶ 239. In his Board appeal, Plaintiff said how "[n]o one in UI was **listening** to me or my concerns." TAC ¶ 244. He also noted how Frost "[d]id not ask me the kinds of questions that would have elicited details about consent as defined by UI policies, even though neither the law nor UI policy required just verbal consent be obtained." TAC ¶ 201. Thus, Plaintiff was not heard, and UI's "model" procedure "[f]ell short of what even a high school must provide to a student facing a days-long suspension." *Purdue Univ.,* No. 17-3565, at *17 (7th Cir. 2019).

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands" *Mathews v. Eldridge,* 424 U.S. 319, 321 (1976). It is implied that the goal is to seek the truth, not satisfy Complainants. Seeking truth, by its very nature, is not a "therapeutic" process. TAC ¶ 158. "The more serious the deprivation, the more demanding the process." *Univ. of Cincinnati,* 872 F.3d 393, 400 (6th Cir. 2017). The *Mathews* test requires a balance of factors to determine the appropriate due process protections. For each element, (for example, the right to cross-examine witnesses through counsel) the Court should weigh 1) the

importance of the student's interest in not erroneously being found responsible for committing a sex offense; 2) the likelihood of an erroneous decision if a student is deprived of procedural protections and the degree to which allowing the accused student afforded these protections makes an erroneous decision less likely; and 3) The Government's interest in not allowing such protections against him, including the fiscal and administrative burdens that would entail.

Defendants prevented Plaintiff from defending himself, partially because he was prevented from an effective opportunity to confront witnesses. TAC ¶ 153. Due process requires "an **effective** opportunity to defend by confronting any adverse witnesses" *Goldberg v. Kelly,* 397 U.S. 254, 269 (1970), and that "[w]here important decisions turn on questions of fact, due process requires an opportunity to **confront** and cross-examine adverse witnesses." *Id.* Defendant Frost intentionally ignored critical questions and manipulated the record by rephrasing Plaintiff's requested questions, rendering them as useless. TAC ¶¶ 167, 188-189. This was not reasonable cross-examination, and as such, Plaintiff maintains that he could not cross-examine. Plaintiff's case required an opportunity to defend through effective cross-examination. *See Jaksa*, 597 F.Supp. at 1252; *Winnick v. Manning*, 460 F.2d 545, 549 (2d Cir. 1972); *Donohue v. Baker*, 976 F.Supp. 136, 147 (N.D.N.Y. 1997); *Marin v. University of Puerto Rico,* 377 F. Supp. 613, 623 (D.P.R. 1974); *Furey v. Temple U.,* 884 F. Supp. 2d 223, 251-252 (E.D. Pa. 2012) *Coulter v East Stroudsburg University,* 2010 WL 1816632 (M.D.PA 2010); *Neal v. Colo. State Univ.-Pueblo*, 2017 WL 633045 (D. Colo. 2017).

"In the case of competing narratives, "cross-examination has always been considered a most effective way to ascertain truth." *Watkins v. Sowders*, 449 U.S. 341, 349, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981) (footnote omitted). But cross-examination can be valuable not only to Plaintiff because "his strategy may also backfire, provoking the kind of confident response that makes the witness appear more believable to the fact finder than he intended." *Id.* at 345, 348–49, 101 S.Ct. 654. Where a disciplinary proceeding depends on a choice between believing an accuser and an accused … cross-examination is not only beneficial but **essential** to due process. *Doe v. Ohio State Univ.,* 219 F. Supp. 3d 645, 660 (S.D. Ohio 2016) (citing *Flaim* 418 F.3d 629, 641 (6th Cir. 2005)). The 6th Circuit held that "if a public university has to choose between competing narratives to resolve a case, the university must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder" *Doe v. Baum,* 903 F.3d, 578 (6th Cir.

2018). This right was "clearly established" in "2017" by the decision of the Court of appeals in *University of Cincinnati*, 873 F.3d 393 (6th Cir. 2017). *Doe v. Univ. of Mich.*, No. 18-11776, at *18 (E.D. Mich. Mar. 23, 2020) (quoting *Doe v. Baum*, No. 16-13174, 2019 WL 4809438, at *14 (E.D. Mich. Sept. 30, 2019)). Plaintiff used the decision in *Univ. of Cincinnati*, 873 F.3d 393 (2017) in his Board appeal when he said he could not cross-examine in such circumstances. TAC ¶ 262.

"The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel…Counsel can help delineate the issues, present the factual contentions in an orderly manner, **conduct cross-examination**, and generally safeguard the interests of [Plaintiff]." *Goldberg* at 270-71. Additionally, the decisionmaker's conclusion…must rest solely on the legal rules and evidence adduced at the hearing. *Id.* at 271. When a student faces expulsion, the 8th Circuit has held that due process requires that the student be permitted right to counsel and the right to **confront** the school official or teacher having primary knowledge of the facts relevant to the disciplinary proceeding. *Strickland v. Inlow,* 519 F.2d 744 (8th Cir. 1975) on Remand from *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Fielder v. Board of Education of School District of Winnegago,* 346 F. Supp. 722 (D.Neb. 1972); *Black Coalition v. Portland School Dist.* No. 1,484 F.2d 1040 (9th Cir. 1973); *Gonzales v. McEuen,* 435 F. Supp. 460, 467 (C.D.Cal. 1977); *Graham v. Knutzen,* 362 F. Supp. 881(D.Neb. 1973) (supplemental opinion); *Dillon v. Pulaski Cty. Special Sch. Dist.,* 468 F. Supp. 54, 58 (E.D. Ark. 1978). In his concurring opinion in *Dillon*, Judge Benson viewed this as clearly applying the principle outlined in *Goss*. See also *Gonzales,* 435 F. Supp. 460, 467 (C.D. Cal. 1977) ("*Goss* **clearly** anticipates that where the student is faced with the severe penalty of expulsion, he shall have the right to be represented **by and through counsel**, to present evidence on his own behalf, and to confront and cross-examine adverse witnesses.")

Plaintiff's case parallels *Dillon* in many ways. Under requirements defined there, Defendant's should have given Plaintiff's attorney the ability to cross-examine Dr. Lovaglia, a witness with relevant, direct, and independent evidence of a Complainants' story. TAC ¶¶ 192-193. In *Dillon*, the student's attorney could not cross-examine the teacher who was a witness. *Dillon* at 56. The Court ordered the student's reinstatement on procedural due process grounds and expunged the student's discipline record. *Id* at 54, 58, 59. This is precisely the situation where Plaintiff finds himself and the exact relief he seeks. The interest in counsel having a more

active role is high for accused students as Adjudicators who attempt to intimidate and elicit coerced confessions, risk that testimony being admissible in a criminal proceeding. It is unreasonable to bring an experienced prosecutor and expect an international student to defend himself without active participation from his counsel. "The cost to defendants is very low, considering that they already allow counsel to be present during the hearing and guide students during the course of hearing. Allowing counsel or a representative to ask questions in the circumstances presented by this case would not likely hamper the University in any significant manner." *Coulter v. East Stroudsburg University*, CIVIL ACTION No. 3:10-CV-0877, at *5 (M.D. Pa. May 5, 2010). "[t]he limiting of questions in this case curtailed the right of confrontation **crucial** to any definition of a fair hearing.") Minute Order at 2, *Regents of the Univ. of Cal.-San Diego,* No. 37-2015- 00010549-CU-WM-CTL. Here, Frost aggressively examined Plaintiff but took great care not to embarrass Complainants when she asked them softball questions. TAC ¶ 152. The lack of cross-examination allowed Defendant Frost to "influence and even predetermine the outcome" TAC ¶ 191.

Defendants process involved biased training, vague definitions in policies, commitment to "Start by Believing," refusal to allow reasonable cross-examination, and an improper burden of proof. TAC ¶¶ 318-323, 535, 41, 153, 221. While using affirmative consent standard, the process then operated under the lowest standard of proof, and significantly increased the likelihood of an erroneous outcome. TAC ¶ 277. UI then allows limited participation of an accused's attorney, while the Adjudicator is a UI employee. TAC ¶¶ 145, 153. UI faced pressures from internal and external sources, making the validity and reliability of their process questionable. An investigation that "Starts by Believing" accusers and ends with "preponderance of the evidence" is not an impartial investigation as much as a display of implicit and confirmation bias.

The "preponderance of evidence" standard is too low. *See, e.g., Lee v. Univ. of New Mexico,* No.1:17-cv-01230, Doc. 36, p.2-3 (N.M. 2018); *Doe v. Univ. of Mississippi,* No.3:18-cv-138-DPJ-FKB, Docket 60, p.15-21 (S.D.N.D. Miss. 2019). A higher standard of proof is necessary to safeguard the rights of accused students.[4] Civil violations generally lack the moral reprehensibility and societal stigma typical in sexual assault cases. A

---

[4] Using the Preponderance of the Evidence standard in student cases has also been challenged by the American Association of University Professors ("AAUP") in 2016. *See* Lieberwitz, Risa L., et al. "The History, Uses, and Abuses of Title IX." *Academe* 102.4 (2016): 69-99. Available at: https://www.aaup.org/report/history-uses-and-abuses-title-ix

higher burden reflects the necessity of certainty before convicting a student of the highly stigmatizing offense of sexual assault. Even though Title IX was intended to address sex discrimination in athletics, UI now adjudicates it similar to criminal prosecution but with the least protection to the accused. *Doe v. University of Kentucky,* 860 F.3d 365, 369-370 (6th Cir. 2017). Evidence of this includes Defendants attempting to immunize Defendant Cervantes as a prosecutor in their motion to dismiss, UI's pool of Adjudicators being all former prosecutors, and UI providing training three days before Plaintiff's hearing titled "Reading Victims and Judging Credibility: Best Practices in Promoting Victim Centered Investigations and **Prosecutions**." Consistent with the training, the evidence showed that Frost also acted more as a prosecutor than a neutral Adjudicator. TAC ¶¶ 150, 321.

Even under fair procedures, a preponderance of evidence standard still comes with an extremely high risk of an erroneous outcome in sexual misconduct cases. Under the **most conservative version of the model**, the low "preponderance standard" in Title IX investigations issue a probability of finding an **innocent** student *erroneously* responsible 33% of the time. TAC ¶ 219. This measure dropped to 4% when using the "beyond a reasonable doubt" standard.[5] He argued that between the "preponderance" standard of proof and "reasonable doubt," the **"clear and convincing"** standard in Title IX is appropriate.



Despite Defendant DiCarlo stating that UI's process was "evidence-based," TAC ¶ 322 UI administered biased and lawsuit-avoidance training programs that had "no evidence" as per Lyles', Iowa State University

---

[5] *See* Villasenor, John. "A Probabilistic Framework for Modelling False Title IX 'Convictions' Under the Preponderance of the Evidence Standard." *Law, Probability and Risk* 15.4 (2016): 223-237. Available at: https://academic.oup.com/lpr/article/15/4/223/2549058.

Title IX Coordinator, research findings.[6] TAC ¶ 320.[7] Such ideologically motivated dogma used statistics and measurements that were **not** "scientifically sound" [8] and instead put "social grievances" ahead of the truth-finding process.[9] In *Doe v. Ohio State Univ.,* 219 F. Supp. 3d 645, 658 (S.D. Ohio 2016), the Court rationalized how biased sexual misconduct training can overcome the "presumption" that university employees acted with "honesty and integrity." UI received sexual assault training that was not balanced with training for protecting the due process rights of accused students. TAC ¶ 323. *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016). "Believing" accusers is not recognized as a standard of proof in the United States. UI's process in determining this outcome, along with UI's commitment to "Start by Believing," and UI President's comments of "believing" when allegations were made show the effects of such groupthink. TAC ¶ 289.

Next, UI used an overbroad and vague definition for sexual harassment and sexual assault:[10] For sexual assault, it included "[a]ny other intentional unwanted bodily contact of a sexual nature." TAC ¶ 44. The Adjudicator found Plaintiff responsible for violating this policy. TAC ¶ 200. Defendants enforced UI's affirmative consent policy in a way that made it impossible to prove. UI essentially used affirmative consent as an affirmative defense. The Adjudicator also included "tickling" of the arm on the "continuum" of "sexual assault." TAC ¶ 203. If the definition of consent turns on subjectivity to this extent, then a low standard of proof significantly increases the risk of arbitrary enforcement and thus an erroneous outcome. The

---

[6] Lyles commented on her study by saying "As investigators we are **neutral** fact-finders. We do **not** advocate for **any** party. It is our **job** to be impartial and unbiased. It is **important** that the process **not** advantage or disadvantage **any** party." *See* Meissner, Christian, and Adrienne Lyles. "Training for Title IX Investigators Lacks Tested, Effective Techniques." Report by Angie Hunt, 2019. https://www.news.iastate.edu/news/2019/10/28/titleix.

[7] *See also* Vrij, Aldert, and Ronald P. Fisher. "Nonverbal cues to deception in Title IX investigations." *Journal of Applied Research in Memory and Cognition* 8.4 (2019): 417-419. Available at: https://doi.org/10.1016/j.jarmac.2019.07.006

[8] *See* Moylan, Carrie A., Courtney Hatfield, and Jenna Randall. "Campus Sexual Assault Climate Surveys: A Brief Exploration of Publicly Available Reports." *Journal of American College Health* 66.6 (2018): 445-449. Available at: https://www.tandfonline.com/doi/abs/10.1080/07448481.2018.1431914

[9] *See* Melchior, Jillian Kay. "Fake News Comes to Academia: How Three Scholars Gulled Academic Journals to Publish Hoax Papers on 'Grievance Studies.'" *The Wall Street Journal*, October 5, 2018. https://www.wsj.com/articles/fake-news-comes-to-academia-1538520950.

[10] In 2018, Justice Ginsberg, in an interview, has added to the criticisms of "college codes of conduct," saying that due process cannot fall by the wayside in the pursuit of "gender equality." *See* Rosen, Jeffery, Ruth Bader Ginsburg Opens Up About #MeToo, Voting Rights, and Millennials (2018), *The Atlantic.*, https://www.theatlantic.com/politics/archive/2018/02/ruth-bader-ginsburg-opens-up-about-metoo-voting-rights-and-millenials/553409/

Complainants here were autonomous adults, even if Defendants patronizingly did not treat them as such. TAC ¶ 173. During the investigation, Sally admitted that she participated in the kissing and then added that she did not say no to it. TAC ¶¶ 62, 64. Assuming *arguendo,* that the kissing was non-consensual (which Plaintiff vehemently denies), this alleged incident of "[n]on-consensual kissing—while unacceptable—does not rise to the level of sexual harassment [that is] so severe, pervasive, and objectively offensive that it could be said to deprive…access to the educational opportunities or benefits provided by the school." *Doe v. Miami Univ.,* 882 F.3d 579, 591 (6th Cir. 2018). The 6th Circuit saw the evidence provided in that case and considered this kind of allegation to be sexual harassment, not sexual assault.

Vague rules and policies would also implicate substantive due process, and void for vagueness. If UI governs intimate behavior among young adults to this extent, they need to provide examples of what **objectively** constitutes different forms of sexual misconduct, so that the accused can hold them accountable for applying its policies in a fair and logical, rather than an ideological manner. Given the grave consequences of being declared a sex offender, UI should be required to show that the alleged lack of enthusiasm in Sally's consent here was "clear." Also, given the lack of procedural protections, a clear and convincing standard would provide protection against such erroneous decisions.[11] Circuit Judge, Edith Jones, in a dissent opinion, stated: "Sexual assault is not plagiarism . . . [i]ts ramifications are more long-lasting and **stigmatizing** in today's society. The University wants to have it both ways, degrading the integrity of its factfinding procedures while congratulating itself for vigorously attacking campus sexual misconduct. Over-prosecution is nothing to boast about." *Plummer v. Univ. of Houston,* 2017 WL 2704014, *13 (5th Cir. 2017). She noted that "[e]levating the standard of proof to clear and convincing…would maximize the accuracy of factfinding." *Id.* at 782 & n.11 (Jones, J., dissenting).

Plaintiff wrote in his Board appeal that UI "[u]nlawfully shifted the burden to me, essentially assuming my guilt and requiring me to prove by a preponderance of the evidence that I did not sexually assault anyone." TAC ¶ 221. This unlawfully tips the scales of justice. Requiring "the accused to affirmatively prove consent .

---

[11] *See* Tyra Singleton, Conflicting Definitions of Sexual Assault and Consent: The Ramifications of Title IX Male Gender Discrimination Claims Against College Campuses, 28 *Hastings Women's L.J.* 155 (2017). Available at: https://repository.uchastings.edu/hwlj/vol28/iss2/3.

. . is flawed and untenable if **due process** is to be afforded." *Mock v. Univ. of Tenn. at Chattanooga.*, No. 14-1687-II. (Tenn. Ch. Ct. 2015). It **"erroneously shifted the burden of proof"** to the accused. *Id.* "[t]he ability of an accused to prove the complaining party's consent strains credulity and is illusory." *Id.*

"To establish its failure to train theory, [the plaintiff] must show that the Board's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of the students." *Plamp v. Mitchell Sch. Dist.* No. 17-2, 565 F.3d 450, 461 (8th Cir. 2009). Such "deliberate indifference" is established where they had "notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *Id.* Notice for deliberate indifference (1) can be implied when a "failure to train officers or employees is so likely to result in a violation of constitutional rights that the need for training is patently obvious" or (2) where "the plaintiff can establish that a pattern of violations put the policymaking body on notice that the school's response to regularly occurring situations was insufficient to prevent the unconstitutional conduct." *Id.* The TAC provides facts that show Defendants woeful disregard for the presumption of innocence TAC ¶¶ 219-221, the need for evidence to support its conclusions TAC ¶ 215, the proper standard of proof TAC ¶ 215, 227, the proper burden of proof TAC ¶ 220-221, training on the conduct that would constitute sexual misconduct TAC ¶ 203, how to evaluate evidence and weigh it impartially TAC ¶¶ 208-219, how to determine credibility *Id.*, the proper conclusion when the preponderance of the evidence is insufficient to establish a violation *Id.* , the purpose of an appeal TAC ¶¶ 238-275, and the appropriate manner the accused should be treated. TAC ¶¶ 222-228, 233-235, 244, 252, 254-258, 270. The DCL, which UI used as guidance during Plaintiff's investigation and refusing to apply the interim measures, clearly indicated that it was the Title IX Coordinator's (DiCarlo's) responsibility to provide appropriate and adequate training. Failure to properly train in these fundamental areas is "so likely to result in a violation of constitutional rights that the need for training is patently obvious," and accordingly, deliberate indifference can be inferred. *Larkin v. St. Louis Hous. Auth. Dev. Corp.,* 355 F.3d 1114, 1117 (8th Cir. 2004).

Cross-examination through counsel, along with a higher burden of proof, would structurally take away unlimited discretion from an Adjudicator. Because UI did not have these structural supports, it allowed the Adjudicator to abuse the discretion given to her. Plaintiff should be able to present his case with the assurance that the arbiter is not predisposed to find against him. *Marshall v. Jerrico,* 446 U.S. 238, 242 (1980). "An impartial

- 15 -

decisionmaker is essential" to due process. *Goldberg* 397 U.S. 254, 271 (1970). "a biased decisionmaker (is) constitutionally unacceptable (and) 'our system of law has always endeavored to prevent even the probability of unfairness.'" *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). Plaintiff provides enough facts that indicate how Frost was partial. TAC ¶¶ 162-230.

Plaintiff has a right to know and be provided the opposing evidence. "Certain principles have remained relatively **immutable** in our jurisprudence. One of these is that where **governmental** action seriously injures an individual…the evidence used to prove the government's case **must** be disclosed to the individua[l]." *Greene v. McElroy,* 360 U.S. 474, 496 (1959)." Thus, the Constitution does require, at a minimum, that Plaintiff be given the right to inspect, review, and be provided the evidence against him in a timely manner. *See Norris v. CU Boulder,* 2019 WL764568, at** 8-9 (D. Colo. 2019) (delay in providing access to evidence against Plaintiff plausibly alleged due process violation). *See also Doe v. Rector & Visitors of George Mason Univ.,* 149 F. Supp. 3d 602, 616 (E.D. Va. 2016); *Doe v. Regents of Univ. of Cal.,* 28 Cal. App. 5th 44, 57 (2018); *Miami University,* 882 F.3d at 603. This is important as it would allow Plaintiff "a meaningful opportunity to **prepare** for the hearing," which he is entitled to. *Flaim v. Med. Coll. of Ohio,* 418 F.3d 629, 638 (6th Cir. 2005). "An accused student's rights must be **guaranteed**—not left open for interpretation." *Doe v. Univ. of Mich.*, No. 18-11776, at *29 (E.D. Mich. 2020). The OCR also emphasized that there must be **timely** and equal access to *any* information that will be used during informal and formal disciplinary meetings and hearings. (2017 Q&A on Campus Sexual Misconduct, p.4, available at https://www2.ed.gov/about/ofces/list/ocr/docs/qa-title-ix-201709.pdf). Cervantes included new evidence regarding Plaintiff's sense of humor at the end of the hearing after Plaintiff had testified. TAC ¶ 207. The evidence was available before the hearing but not entered until Sally's witnesses failed to corroborate her allegations, and Dr. Lovaglia testified that Sally told him what occurred was consensual. Such tactics have no place in sexual misconduct proceedings. Despite Plaintiff not admitting to this evidence, Frost, predictably, used it against him. *Id.* The conduct violated UI and Title IX policies as Plaintiff should have been given evidence **before** the hearing. Additionally, despite Stevenson Earl's investigation finding no instructional or supervisory responsibility directly or indirectly, and despite providing no notice, Cervantes argued for it. Frost then falsely concluded that he was in such a position. TAC ¶ 213.

"An allegation that a Defendant has "purposefully ignored evidence that strongly tended to exonerate" the Plaintiff can support a § 1983 failure-to-investigate claim." *McKay v. City of St. Louis,* No. 4:15-cv-01315-JAR, at *12 (E.D. Mo. 2016) (citing *Moran v. Clarke,* 296 F.3d 638, 648 (8th Cir. 2002). Stevenson Earl's and Frost's repeated exclusion of exculpatory evidence rise to a failure to investigate and a reckless investigation. TAC ¶¶ 133-137, 162-166, 179, 181, 183, 188, 189, 191-196, 202, 204, 215, 217, 218, 223, 239, 256.

Plaintiff said in his appeal that Defendant Redington not providing a rationale for the expulsion violated not only UI policies but also the Constitution. TAC ¶ 260. The 4th Circuit held that due process requires reasoning provided for disciplinary action taken to satisfy due process. *Jones v. Board of Governors of University of North Carolina,* 704 F.2d 713 (4th Cir. 1983). Under the 2017 Q&A, the Office of Civil Rights also required a rationale for the result and the sanctions (p. 6). A rationale is necessary to permit the student to challenge the determination in appeals effectively and to ensure that the sanction was not excessive.

A dismissed student can succeed on a substantive-due-process claim if he shows "that the university's decision was not careful and deliberate." *Guse v. Univ. of S.D.,* No. 08-4119, 2011 WL 1256727, at *13 (D.S.D. Mar. 30, 2011) (citing *Schuler v. Univ. of Minn.,* 788 F.2d 510, 516 (8th Cir. 1986). Under the careful and deliberate standard, "a court's role is limited to examining the record of University proceedings to determine whether there was substantial evidence to support its determination." *Id.* (quoting *Agarwal v. Regents of the Univ. of Minn.,* 788 F.2d 504, 508 (8th Cir. 1986). "Executive action shocks the conscience when it is "arbitrary, or conscience shocking, in a constitutional sense." *Miami Univ.,* 882 F.3d 579, 599 (6th Cir. 2018). Defendants' conduct and continual deliberate indifference of known constitutional violations was motivated by bad faith or ill, and it shocks the conscience. TAC ¶ 378. *See Neal v. St. Louis County Bd. of Police Comm'rs,* 217 F.3d 955, 958 (8th Cir. 2000) ("[W]here a state actor is afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action, the chosen action will be deemed 'conscience shocking' if the action was taken with 'deliberate indifference.'").

The accumulation of mistakes at each step of the process and failures violated due process. *See Furey v. Temple Univ.,* 884 F. Supp. 2d 259 (E.D. Pa. 2012). Thus, Plaintiff is likely to succeed in his 14th Amendment Due Process Count.

### 3.2    Title IX Violations

### 3.2.1    Title IX - Erroneous Outcome Claim

Plaintiff needs to: "allege facts, [that] if true, raise a plausible inference that the university discriminated against [Plaintiff] 'on the basis of sex.'" *Purdue*, 928 F.3d, at 668 (citations omitted); *Doe v. Univ. of Scis.*, No. 19-2966, at *9 (3d Cir. May 29, 2020). Plaintiff has satisfied this requirement. To demonstrate an articulable doubt as to the accuracy of the outcome, a plaintiff "must demonstrate evidentiary weaknesses behind the finding of the offense such as a motive to lie, particular strengths of the defense, or procedural flaws affecting the record." *Doe v. Univ. of Arkansas-Fayetteville*, No. 5:18-cv-05182, 2019 WL 1493701, at *12 (W.D. Ark. 2019). A plaintiff can also show articulable doubt by "challenging the overall sufficiency and reliability of the evidence." *Doe v. Marymount Univ.*, 297 F. Supp. 3d at 584. Throughout his TAC, Plaintiff casts doubt on the accuracy and fairness of the disciplinary proceedings. For example, Sally confirmed that everything that happened in Plaintiff's apartment on September 2, 2016, was "consensual," and she only "changed her mind about the relationship later." TAC ¶ 123. Excluding this alone should demonstrate articulable doubt.

Plaintiff must also show "particular circumstances suggesting that gender bias was a **motivating factor** behind the erroneous finding." *Rossley v. Drake Univ.*, 342 F. Supp. 3d. (S.D. Iowa 2018). Such circumstances may include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also **tend to show** the influence of gender." *Doe v. Grinnell College*, 4:17-cv-00079, SJ Opinion, ECF No. 159, at pp. 24-27. Additionally, "[w]hen the degree of doubt passes from "articulable" to grave, the merits of the decision itself, as a matter of common sense, can support an inference of sex bias." *Doe v. Oberlin Coll.*, No. 19-3342, at *12 (6th Cir. June 29, 2020). Other ways in which gender bias may also be inferred are where an adjudicator possesses "outdated and discriminatory views of gender and sexuality." *Id.* Plaintiff has provided facts on the statements made by Frost used to show the influence of gender, including "outdated and discriminatory views of gender and sexuality." TAC ¶¶ 223, 228. Further, Redington chose Plaintiff's sanction, and she was one of the speakers for UI's sexual assault summit program that focused just on "men," TAC ¶ 306, showing that UI assumed guilt based on identity. "Any number of federal constitutional and statutory provisions reflect the proposition that, in this country, we determine guilt or innocence **individually**—rather than collectively, based on one's identification with some demographic

group." *Oberlin Coll.,* No. 19-3342, at *2 (6th Cir. 2020). The Rape, Abuse & Incest National Network ("RAINN") also warned universities against such identity politics in 2014. TAC ¶ 305.

"Three of our sister circuits have found that alleged university overreaction to Department of Education or other public **pressure** is relevant to alleging a plausible Title IX discrimination claim." *Univ. of Scis.,* No. 19-2966, at *10 (3d Cir. 2020). Plaintiff alleged that UI was motivated to avoid further negative publicity, and he had accused UI of scapegoating him because of highly publicized lawsuits right before his hearing. TAC ¶ 266. The slanting of a process to cope with campus culture issues or influence politically motivated change (such as UI's programming of "masculinity" TAC ¶ 300) is an unjustifiable use of authority. The effects of such instrumentalization and objectification can be seen in Frost's lack of basic respect for Plaintiff. Congress never intended Title IX to be about the "programming" or social engineering of any form of "masculinity." DiCarlo is also a pertinent university official, and her comments (and actions) here tend to show the influence of gender. Plaintiff is likely to succeed under Title IX erroneous count.

### 3.2.2   Title IX - Hostile-Environment Claim

In a Title IX hostile environment claim, a person's educational experience was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions" of his educational environment. *Miami Univ.,* 882 F.3d at 589. In her report, Defendant Frost showed keen animosity towards Plaintiff. TAC ¶ 222. Plaintiff's advisor, the head of UI's mental health counseling department, provided a letter on behalf of all of Plaintiff's professors in the department, showing their support for Plaintiff's character. After reading and denying him this recognition, Frost wrote in her report: "It should be noted that John Doe continues to work with students/clients with disabilities, a vulnerable population, as part of his counseling duties in the UI Department of Education." TAC ¶ 223. It should also be noted that a comment like this was unwarranted, and not required by law nor UI policy. *Id.* There were no eyewitnesses, and Plaintiff provided enough facts in his TAC to show that the evidence did not support the allegations under a preponderance of the evidence. In this situation, the comment was not out of noble concern for people with disabilities because: 1) Frost had no evidence of Plaintiff in a counseling environment while all his professors, who were supportive of him, did. 2) Frost knew that if she found him responsible, that he would be suspended or expelled and would no longer be working with this population in

any case, but she did not stop there. That a public university official asked about a student's life goals and interests and then attempted to lower their sense of self-worth by defeating it, is unjustifiable. Frost even had evidence that showed Plaintiff being supportive of Lisa's educational and career goals, even while Lisa felt discouraged after a conversation with her advisor at UI. TAC ¶ 117. Despite Plaintiff complaining about such harassment, UI and the Board have yet not investigated nor condemned any of it. Frost also shows that the "therapeutic process" only applied to these "female accusers," and overcomes the comments made by DiCarlo that their investigative process was supposedly "educational." A student cannot get any "educational" value from being harassed or expelled for something they did not do. Further, expulsion is punitive in any sense of the word. Plaintiff has included examples of Frost intentionally harassing him based on his sex, creating a hostile environment TAC ¶ 228. He never stated this was a full list. Plaintiff is likely to succeed in his Title IX hostile environment count.[12]

### 3.2.3   Title IX - Deliberate Indifference Claim

Under Title IX's deliberate indifference, the Court must consider whether UI and the Board were: (1) deliberately indifferent; (2) to known acts of discrimination; (3) which occurred under its control. *Maher v. Iowa State University,* No. 18-1559 (8th Cir. 2019) (internal citations omitted). *See also Mallory v. Ohio Univ.,* 76 F. App'x. 634, 638 (6th Cir. 2003). In *Davis v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629, 645 (1999), the Supreme Court held that an institution's deliberate failure to respond to discrimination is tantamount to intentional discrimination. A recipient's response will amount to deliberate indifference only if it is "clearly unreasonable in light of the known circumstances." Defendants have never responded to any of Plaintiff's allegations of discrimination and harassment. Levin responded to his appeal and ignored all the allegations of discrimination and harassment, and essentially continued where Frost left off. TAC ¶ 270.

UI exercised substantial control over Frost. Plaintiff alleged that Frost's harassment was severe, and he requested mental health counseling right after he read her bad faith, highly inaccurate, and objectively offensive report. Redington then failed to provide Plaintiff with the requested counseling services. Frost's/UI's conduct substantially interfered with Plaintiff's right to receive an education free from discrimination and harassment;

---

[12] *See e.g.,* Henrick, Stephen, A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses (April 18, 2013). *Northern Kentucky Law Review,* 2013. Available at SSRN: https://ssrn.com/abstract=2126340

- 20 -

it had a concrete and negative effect on Plaintiff's ability to participate in his education, and his ability to benefit from the services, activities, or privileges provided by UI. TAC ¶¶ 425-426. Defendant Keller, Dean of Graduate College and Graduate Provost, had the vast authority to institute corrective measures, and Defendant Braun had the most authority as executive director of the Board. *See Hill v. Cundiff*, 797 F.3d 948, 963, 969–70 (11th Cir. 2015) (concluding that a reasonable jury could find in favor of the Plaintiff on the school board's actual notice.) Keller's deliberate indifference meant that Plaintiff was vulnerable to further discrimination from the Board, which Plaintiff ended up experiencing. TAC ¶ 224. Levin was given the power to request a stay for Plaintiff. Each had significant control of Plaintiff's fate after the hearing. They had actual notice and were deliberately indifferent to the allegations under its control. TAC ¶ 444. Plaintiff has a right to obtaining safety, and he had expressed how UI's actions will threaten his life. Levin responded to this notice, saying that Plaintiff was "playing to the sympathies of the Board" and that "[Plaintiff] has made his bed and now he must lie in it." TAC ¶ 270. He then added hugs to Frost's sexual assault list. The response to the discrimination was clearly unreasonable, given the known circumstances. TAC ¶¶ 445-448.

UI's deliberate indifference added to the severity, perversity, and objective offensiveness. Plaintiff then failed in his classes. Harassment reaches the severity or pervasiveness required for a viable Title IX claim, where it adversely affects educational opportunities. *Doe v. Brown Univ.*, C.A. No. 16-562 WES, 11 (D.R.I. Jan. 16, 2018). The facts, plausibly plead in the TAC, confirm that UI failed the three prongs of the test detailed in *Maher*, and Plaintiff is likely to succeed in his Title IX deliberate indifference count.

### 3.3    Equal Protection Violations

#### 3.3.1    Section 1981 Violation

Frost subjected Plaintiff to harassment when she used terms such as "authoritarian," "sexist," and the rhetoric of Plaintiff being sexually aggressive; and sustained non-credible allegations of sexual assault and harassment against him based on these stereotypes. *Id.* Defendants' actions were motivated, in part, by Plaintiff's race, including the Defendants favoring the credibility of the Caucasian/white accusers despite having no corroborating evidence of sexual assault from the multiple people. TAC ¶ 466. Plaintiff alleged that less than two years before the hearing, that a student who took Frost's class at UI criticized her for discriminating against multiple "student of color" and of saying "many problematic things." TAC ¶ 258.

- 21 -

Redington expelled Plaintiff, a sanction disproportionate to both the severity of the alleged conduct (even if proven and true) and the sanctions imposed in more serious cases of penetrative sexual assault. Extreme sanctions are offensive to human dignity. These actions were motivated, in part, by Plaintiff's race and national origin. TAC ¶ 471. Defendants departed from standard procedures by not providing Plaintiff with a rationale for his expulsion. TAC ¶ 473. Plaintiff provided Braun actual notice of the harassing conduct, including explicit allegations of discrimination and harassment related to race. He was deliberately indifferent and took no reasonable actions. TAC ¶ 258. Plaintiff is likely to succeed in his Section 1981 race discrimination count.

### 3.3.2    14th Amendment Equal Protection Violation

Plaintiff's allegations from due process, section 1981, and Title IX counts carry forward to this count. TAC ¶ 487. "[t]he concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive…discrimination may be so unjustifiable as to be violative of due process" *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

Defendants acted with an intent or purpose to discriminate against him based on his membership in a protected class. *Patel v. U.S. Bureau of Prisons,* 515 F.3d 807, 815 (8th Cir. 2008). Intentional gender discrimination and/or harassment violates the Equal Protection Clause. *Ottman v. City of Independence,* at 751, 756 (8th Cir. 2003). Additionally, the Constitution does not allow "gender-based generalizations." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 645, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975). Here, this means that state educational institutions may not discriminate based upon an alleged gender stereotype. *See Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 725, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982). The gender-based stereotypes Frost employed throughout the adjudicatory process violated the equal protection clause. UI's "masculinity" programs, TAC ¶ 300, generalized all of masculinity as unhealthy, and in need of "programming" by DiCarlo's office. What About Me(n) Summit also support this narrative. TAC ¶ 309. It is discriminatory, distract males from their education experience, creates a culture where males are assumed to be dangerous and presumed guilty as seen here, and satisfies overbroad gender-based generalizations.

Whether "discriminatory purpose was a motivating factor" in a decision include (1) "the impact of the official action" and whether it "bears more heavily on" a protected group; (2) "[t]he historical background of

the decision"; (3) "[t]he specific sequence of events leading up to the challenged decision"; (4) "[d]epartures from the normal procedural sequence"; and (5) "[s]ubstantive departures too," "particularly if factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 267 (1977). "In a protected-class equal protection analysis, a plaintiff must show that 'defendants acted with a nefarious discriminatory purpose and discriminated against him based on his membership in a definable class.'" *Doe v. Purdue Univ.,* CAUSE NO.: 4:19-CV-56-TLS-JPK, at *22 (N.D. Ind. June 1, 2020) (quoting *Nabozny v. Podlesny,* 92 F.3d 446, 453 (7th Cir. 1996)). "As a general matter, a single discriminatory act against one individual can amount to intentional discrimination for equal protection purposes." *Id.; Vill. of Arlington Heights* 429 U.S. 252, 266 n.14 (1977)). "It is well settled law that departures from established practices may evince discriminatory intent." *Nabozny*, 92 F.3d at 455. Furthermore, "selective inaction can be strong evidence of discriminatory intent." *Locke v. Haessig,* 788 F.3d 662, 671 (7th Cir. 2015). *Id.* at *22-23. "[d]uring the disciplinary proceedings, [the Defendant] posed questions and made comments based upon sex-based stereotypes…Such gender-based stereotyping allows a reasonable inference that the "defendants acted with a nefarious discriminatory purpose and discriminated against him based on his membership in a definable class.'" *Id.* at *26. (citing *Word*, 946 F.3d at 396))

Here, when Plaintiff and Complainant kissed or tickled, they engaged in a similar conduct. UI's Title IX disciplinary proceedings involved the same criteria, standards, and policies, and Defendants acted under the same set of operative facts. *See Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000) (holding that for individuals to be similarly situated there must be "relevant similarity," but there need not be "exact correlation"). The 6th Circuit found that an accuser and accused are similarly situated when university officials "had credible information that both students had potentially violated the University's sexual misconduct policy" but choose "not to pursue disciplinary action against" one of the students. *Miami Univ.,* 882 F.3d at 596. As one example, Plaintiff said during the interview that Sally tickled him first, but Sally responded by saying that she did not remember if she had tickled Plaintiff during the interview. Plaintiff provided Defendants pictures of Sally before and after the tickling. TAC ¶ 77. However, Stevenson Earl found Plaintiff responsible and did not investigate if Sally may have been responsible or offer him information regarding scheduling a meeting with DiCarlo. Thus, she presumed Complainants' allegations as true, and the outcome was a foregone conclusion.

Importantly, she had information that Sally told Dr. Lovaglia what occurred between Plaintiff and her was mutual and that Sally "had initially been okay, but she changed her mind." TAC ¶ 133. Thus, this situation equally supported the claim that Sally could have been responsible for not gaining Plaintiff's consent. However, Defendants, including Stevenson Earl, then put the burden on Plaintiff to gain consent and found him responsible for sexual assault for kissing without consent. TAC ¶ 121. While Plaintiff was not allowed to investigate how Complainants' accommodation requests were handled, he believes that Defendants likely did not keep rejecting reasonable accommodations if Complainants requested them. Additionally, Defendant Braun denied Plaintiff's reasonable request he be allowed to write up to 50 pages, even though **each** Complainant was allowed up to 25 pages. Plaintiff said that 50 pages would illustrate "equal opportunity." While Defendants took the Complainant's accusations seriously, they wholly ignored Plaintiff's allegations of harassment that he made. TAC ¶ 273.

As per UI's published statistics of 2017-2018, there were 26 investigations involving sexual misconduct, 15 of which were for sexual assault, and 11 were for sexual harassment. UI expelled only **one** student that year, Plaintiff. TAC ¶ 259. Notably, Plaintiff's expulsion happened right after high profile Title IX lawsuits regarding mishandling female complaints. TAC ¶¶ 281-284. The indifferent appeals showed that these Defendants were motivated by discriminatory animus, intending to expel Plaintiff, and proximately caused Plaintiff's expulsion. "[w]hen a state provides a right to appeal, it must meet the requirements of due process and equal protection. *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); *Griffin v. Illinois,* 351 U.S. at 18, 76 S.Ct. at 590. Plaintiff is likely to succeed in his 14th Amendment Equal Protection Count.

## 4   The Public Interest Favors Granting Plaintiff's Injunctive Relief

The public has an interest in a fair, impartial, and reliable process for determining sexual misconduct charges by higher education institutions. There is always a public interest in avoiding violations of constitutional rights; thus, there is an interest in ensuring that accused students do not lose access to education unlawfully. Additionally, the Complainants' statutory rights (in Title IX/UI Policies) do not override Plaintiff's constitutional rights ("[w]hile the public has a competing interest in the enforcement of Title IX, that interest can **never** override individual constitutional rights. U.S. Const. art. VI, cl.2." *Univ. of Cincinnati*, 872 F.3d 393,

407 (6th Cir. 2017)). The public interest also favors granting a higher standard of proof. The Supreme Court identified three compelling public interests—the Defendant's liberty, to protect the innocent from stigma, and to give confidence that the procedure protects the presumption of innocence. *In re Winship*, 397 US 358, 364 (1970); *Addington v. Texas,* 441 U.S. 418, 423 (1979). Similarly, the public here favors such interests. Without a fair, impartial, and reliable process, public confidence and trust in the adjudicatory system erode, leaving all students less likely to participate or respect its outcomes.

## CONCLUSION

The 4 factors contemplated in *Dataphase* favor granting Plaintiff's request for injunctive relief.

WHEREFORE, Plaintiff prays for Order(s) requiring (a) UI to expunge Plaintiff's official and unofficial records UI files and transcript of all information related to UI's Process that occurred from the outcome, his two failed grades, his disciplinary file, including, his interactions with Sally and Lisa Roe, any records kept by the Dean of Students, including but not limited to charges and sanctions served, and prohibiting UI from disclosing such information to third parties; and/or (b) such other and further relief as this Court may deem just, proper, equitable, and appropriate.

Respectfully submitted,
/s/ Rockne Cole
ROCKNE COLE
Cole Law Firm, PC
209 E. Washington, Ste. 304
Iowa City, IA 52240
(319) 519-2540   phone
(319) 359-4009   fax
rocknecole@gmail.com
Iowa Pin AT1675

Attorney for Plaintiff.