IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| JOHN DOE,<br><br>      Plaintiff,<br><br>v.<br><br>UNIVERSITY OF IOWA; BOARD OF REGENTS, STATE OF IOWA; TIFFINI STEVENSON EARL; IRIS FROST; LYN REDINGTON; ANGIE REAMS; CONSTANCE SCHRIVER CERVANTES; JOHN KELLER; MONIQUE DICARLO; and MARK BRAUN,<br><br>      Defendants. | **No. 3:19-cv-00047-RGE-HCA**<br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT** |

## I.    INTRODUCTION

Plaintiff John Doe sues the University of Iowa, the Board of Regents of the State of Iowa, and several University and Board officials for allegedly violating his rights under state and federal law during a sexual misconduct investigation that led to his expulsion from the University. Now before the Court is Defendants' motion to dismiss Doe's third amended complaint. For the reasons set forth below, the Court grants in part and denies in part Defendants' motion.

## II.    BACKGROUND

### A.    Factual Background

The Court accepts the facts alleged in Doe's third amended complaint as true for the purpose of considering Defendants' motion to dismiss. *See Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008). Doe's third amended complaint exceeds seventy pages, with almost fifty pages of factual allegations. ECF No. 57. Essential allegations are summarized below.

At the time of the events giving rise to this lawsuit, Doe was an international graduate

student in the University's sociology department. *Id.* ¶¶ 9, 54–55. Doe was born and raised in Kuwait, and he is a citizen of a predominantly Muslim South-Asian country. *Id.* ¶¶ 53, 459. In 2017, two female undergraduate students accused Doe of sexual misconduct. *Id.* ¶¶ 58, 60–117. Doe met the two students through an undergraduate research group organized by the University's sociology department. *Id.* ¶¶ 56, 59. The Court refers to these students as "Complainant #1" and "Complainant #2," or "Complainants."[1] The Complainants accused Doe of touching their breasts without their consent, making inappropriate remarks, and bringing alcohol to the research group. *Id.* ¶¶ 3, 82–83. Complainant #1 further accused Doe of kissing her without her consent. *Id.* ¶ 82. The Complainants filed their initial complaints about Doe with Dr. Michael Lovaglia, a professor in the University's sociology department. *See id.* ¶¶ 55, 79, 83. Lovaglia reported the complaints to Defendant Monique DiCarlo, the University's Sexual Misconduct Response Coordinator and Title IX Coordinator. *Id.* ¶¶ 18, 79.

After the Complainants reported Doe's alleged misconduct, Defendant Lyn Redington, the University's then-Assistant Vice President and Dean of Students for Student Affairs, informed Doe that Defendant Tiffini Stevenson Earl, a compliance officer with the University's Office of Equal Opportunity and Diversity, was investigating the complaints against Doe. *Id.* ¶¶ 12, 14, 118. Defendant Constance Schriver Cervantes, another compliance officer in the Office of Equal Opportunity and Diversity, assisted in the investigation. *Id.* ¶ 16. After an investigation lasting several months, Stevenson Earl produced a report finding Doe had violated the University's student conduct rules. *Id.* ¶ 120. Stevenson Earl's report found Doe responsible for sexual assault and sexual harassment. *Id.* ¶ 121. Stevenson Earl recommended the University suspend or expel

---

[1] Doe's third amended complaint uses the pseudonyms "Sally Roe" and "Lisa Roe" and refers to the Complainants by their pseudonymous first names throughout. ECF No. 57. To avoid referring to the Complainants by pseudonymous first names, the Court refers to Sally Roe as "Complainant #1" and Lisa Roe as "Complainant #2."

Doe if a formal hearing confirmed her finding of sexual assault. *Id.* ¶ 126. Schriver Cervantes banned Doe from campus pending a hearing and final determination on the allegations. *Id.* ¶ 139. Doe alleges Stevenson Earl was biased against him, discounted and withheld exculpatory evidence, and violated his due process rights. *Id.* ¶¶ 131–37. Doe alleges Schriver Cervantes's interim sanction was "discriminatory, objectively unreasonable, arbitrary, and capricious" because she did not act in good faith and failed to consider less severe sanctions that would have accommodated his educational needs. *Id.* ¶ 142.

Defendant Iris Frost, a professor of rhetoric at the University of Iowa and a former prosecutor, served as the adjudicator of Doe's hearing. *Id.* ¶ 145. The Complainants, Doe, and Dr. Lovaglia testified at the hearing, among other witnesses. *Id.* ¶¶ 162–207; *see also id.* ¶ 215. Frost found Doe responsible for sexually assaulting and sexually harassing both Complainants, and for possessing and consuming alcohol in a University building. *Id.* ¶¶ 209–10. Based on Frost's findings, Redington expelled Doe from the University. *Id.* ¶ 231. Doe alleges Frost had a conflict of interest, exhibited bias against him, ignored and excluded exculpatory evidence, and reached a conclusion unsupported by and contrary to the evidence. *Id.* ¶¶ 145, 152, 156, 162–230. Doe alleges the University did not allow him to meaningfully cross-examine witnesses. *Id.* ¶¶ 153–54. Doe also alleges the University's "anti-retaliation policy," which prevented him from speaking with potential witnesses before the hearing, deprived him of due process. *Id.* ¶¶ 143–44. He further alleges Redington's sanction of expulsion was grossly disproportionate to his alleged misconduct. *Id.* ¶¶ 231–35.

Doe appealed the hearing decision and sanction. *Id.* ¶ 238. Defendant John Keller, the University's Associate Provost and Dean of the Graduate College, reviewed Doe's first appeal. *Id.* ¶ 237. Keller upheld the hearing decision and sanction in a one-sentence decision. *Id.* ¶¶ 243–44. Doe alleges Keller was indifferent to Doe's rights because Keller provided no

rationale for his decision. *Id.* ¶ 244. Doe next appealed to the Board. *Id.* ¶ 245. Doe argued the proceedings below had been conducted in a biased, discriminatory, hostile, and unconstitutional manner. *Id.* ¶¶ 253–69. Defendant Mark Braun, the Board's Executive Director, denied Doe's request for a stay pending the appeal. *Id.* ¶¶ 19, 245–49. Ultimately, the Board affirmed the hearing decision and sanction. *Id.* ¶ 272. The Board did not explain its decision. *See id.*

Doe alleges that, at the time of these events, several factors created a hostile environment for male students at the University. *Id.* ¶ 276. First, Doe alleges the University felt pressure to disregard the rights of male students. *Id.* ¶¶ 277–90. Doe alleges this pressure stemmed in part from the United States Department of Education's Office for Civil Rights (OCR) and its 2011 "Dear Colleague Letter," which threatened to end federal funding for universities that did not adequately discipline male students who committed sexual assault. *Id.* ¶¶ 26, 277–79.[2] He further alleges that lawsuits and ongoing OCR investigations related to the University's discrimination against females, as well as related criticism, prompted the University to overcorrect and disregard the rights of male students. *Id.* ¶¶ 280–90, 324–32. Second, Doe alleges the University used biased statistics to help raise money for a campaign to fight campus sexual assault. *Id.* ¶¶ 291–301. Third, Doe alleges the University "pathologized" masculinity by equating it with "rape culture." *Id.* ¶¶ 302–17. Fourth, Doe alleges the University used biased sexual assault training programs that favored of alleged victims of sexual assault. *Id.* ¶¶ 318–23. He alleges DiCarlo was responsible for these training programs. *See id.* Fifth, Doe alleges the University fostered a hostile environment for minorities and male students of color. *Id.* ¶¶ 333–36. He cites

---

[2] As Doe recognizes, the OCR withdrew the 2011 Dear Colleague Letter in 2017. ECF No. 57 ¶ 28; U.S. Dep't Educ., Office Civil Rights, Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) ("The district court may take judicial notice of public records and may thus consider them on a motion to dismiss.").

alleged protests about the University's treatment of students of color and a reported decline in international students' enrollment at the University. *Id.*

Additional facts are discussed below as necessary.

### B.     Procedural Background

Doe sues the University, the Board, Stevenson Earl, Frost, Schriver Cervantes, Keller, Braun, DiCarlo, Redington, and Redington's successor, Defendant Angie Reams. *See id.* ¶¶ 10–19. He sues all the individual Defendants except Reams in their official and individual capacities. *See id.* ¶¶ 12–14, 16–19. Doe sues Reams in her official capacity only. *Id.* ¶ 15.

Doe sues the University and the Board for sex discrimination as prohibited by Title IX of the Education Amendments of 1972, alleging claims of erroneous outcome (Count 2), hostile environment (Count 3), and deliberate indifference (Count 4). *Id.* ¶¶ 389–456. He also sues the University and the Board for breach of contract (Count 7). *Id.* ¶¶ 511–30. Doe sues all individual Defendants under 42 U.S.C. § 1983 for violations of procedural and substantive due process (Count 1) and equal protection (Count 6). *Id.* ¶¶ 339–88, 484–510. He also sues Frost, Schriver Cervantes, Redington, Keller, and Braun for race discrimination under 42 U.S.C. § 1981 (Count 5). *Id.* ¶¶ 457–83. Finally, in addition to monetary damages, Doe seeks a declaratory judgment and injunction (Count 8). *Id.* ¶¶ 531–47. Doe requests the Court declare the University's sexual misconduct policies unconstitutional, prohibit the University from pursuing further disciplinary proceedings against him, and require the individual Defendants to reinstate him as a student and clear his record. *Id.*

Defendants move to dismiss Doe's third amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). ECF No. 60. Defendants argue Stevenson Earl, Frost, Schriver Cervantes, Keller, and Braun are absolutely immune from suit in their individual capacities. *Id.* ¶ 10; Defs.' Br. Supp. Mot. Dismiss Third Am. Compl. 6–9, ECF No. 67. Defendants

further argue that all Defendants sued in their individual capacities should receive qualified immunity on the procedural due process component of Doe's due process claim (Count 1). ECF No. 67 at 9–12. On the merits, Defendants challenge the sufficiency of Doe's Title IX claims (Counts 2 through 4), race discrimination claim under § 1981 (Count 5), and breach of contract claim (Count 7). ECF No. 60 ¶¶ 2–9; ECF No. 67 at 15–27. As explained below, Defendants do not properly move to dismiss the substantive due process component of Doe's due process claim (Count 1), Doe's equal protection claim (Count 6), or Doe's request for declaratory judgment (Count 8). Doe does not resist Defendants' motion to dismiss as to his breach of contract claim (Count 7). Pl.'s Am. Resist. Defs.' Mot. Dismiss Third Am. Compl. 53, ECF No. 87. Doe resists Defendants' motion to dismiss in all other respects. *See generally id.* Neither party requests a hearing and the Court concludes no hearing is necessary. *See* Fed. R. Civ. P. 78(b).

## III.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). "The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party 'fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.'" *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999)). The Court must accept as true all factual allegations in the complaint, but not its legal conclusions. *Iqbal*, 556 U.S. at 678–79 (citing *Twombly*, 550 U.S. at 555–56).

A plausible claim for relief "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. A plaintiff must "nudge[ ] their claims

across the line from conceivable to plausible, [else] their complaint must be dismissed." *Twombly*, 550 U.S. at 570. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## IV.   DISCUSSION

First, the Court addresses the uncontested aspects of Defendants' motion to dismiss and Doe's third amended complaint. The Court grants Defendants' motion to dismiss as to Doe's breach of contract claim (Count 7); Doe does not resist dismissal of that claim. The Court denies Defendants' motion to dismiss as to the substantive due process component of Doe's due process claim (Count 1) and Doe's equal protection claim (Count 6) because Defendants fail to contest those claims in their briefing. The Court does not consider Defendants' argument that Doe cannot obtain injunctive relief against most of the individual Defendants because Defendants make this argument for the first time in their reply brief. Doe's request for declaratory and injunctive relief in Count 8 survives in part.

Next, the Court addresses Defendants' claims of absolute and qualified immunity. None of the individual Defendants are entitled to absolute immunity. But all individual Defendants sued in their individual capacities are entitled to qualified immunity on the procedural due process component of Doe's due process claim (Count 1). Therefore, the Court grants Defendants' motion to dismiss as to Doe's procedural due process claim to the extent Doe seeks damages on that claim.

Finally, the Court considers Defendants' arguments as to the merits of Doe's claims. Doe alleges a plausible erroneous outcome claim but fails to allege plausible claims for hostile environment or deliberate indifference. Thus, the Court denies Defendants' motion to dismiss as to Doe's erroneous outcome claim (Count 2) but grants it as to Doe's hostile environment and

deliberate indifference claims (Counts 3 and 4). The Court also grants Defendants' motion to dismiss as to Doe's § 1981 claim (Count 5), finding Doe does not allege a plausible claim for race discrimination.

### A.     Uncontested Aspects of Motion to Dismiss

Doe does not resist Defendants' motion to dismiss as to his breach of contract claim (Count 7). ECF No. 87 at 53. The Court grants this unresisted aspect of Defendants' motion to dismiss. Doe also clarifies that he is not pursuing a selective enforcement claim under Title IX. ECF No. 87 at 49. Therefore, the Court does not address Defendants' arguments as to selective enforcement. *See* ECF No. 67 at 17–19.

### B.     Claims Defendants Fail to Contest

#### 1.     Substantive due process component of due process claim (Count 1)

Doe brings both procedural and substantive due process claims in Count 1. ECF No. 87 at 17; ECF No. 57 ¶¶ 339–88. Although Defendants move to dismiss Count 1 in its entirety, they provide no argument as to why Doe fails to plead a substantive due process claim. *See* ECF No. 67. In his resistance, Doe claims "Defendants do not deny violating Doe's substantive due process [rights]." ECF No. 87 at 40. Defendants do not respond to this statement in their reply brief. *See* Defs.' Reply Pl.'s Am. Resist. Mot. Dismiss Third Am. Compl., ECF No. 92. Therefore, the Court construes Defendants' due process arguments as limited to Doe's procedural due process claim. *See Spann v. Lombardi*, 960 F.3d 1085, 1087–88 (8th Cir. 2020) (holding district court did not abuse its discretion in declining to address defendants' qualified immunity argument because defendants failed to brief the issue).

#### 2.     Equal protection claim (Count 6)

Defendants nominally move to dismiss Doe's equal protection claim (Count 6). ECF No. 60 ¶ 8. But they provide no argument on this point in their opening brief. *See* ECF No. 67.

8

Under the "due process" section of their brief, Defendants argue the individual Defendants' actions were objectively reasonable and "cannot plausibly support Plaintiff's claim that [any individual Defendant] was directly responsible for depriving him of his constitutional rights." *Id.* at 13; *see also id.* at 9–15. Nowhere in their opening brief do Defendants mention Doe's equal protection claim. *See generally* ECF No. 67; *cf. Spann*, 960 F.3d at 1088 ("The officials' motion for summary judgment does not even mention the term 'qualified immunity.'"). In their reply brief, Defendants argue for the first time Doe fails to allege a plausible equal protection claim and the individual Defendants are entitled to qualified immunity on the equal protection claim. ECF No. 92 at 21.

Local Rule 7(d) provides: "For every motion, the moving party must prepare a brief containing a statement of the grounds for the motion and citations to the authorities upon which the moving party relies." To the extent Defendants move to dismiss Doe's equal protection claim, they violate this local rule by failing to include any argument in their opening brief as to why the Court should dismiss it. *Cf. Spann*, 960 F.3d 1088 ("If any of the officials sought a ruling on qualified immunity as to any particular claim or claims in the pending complaint, then they should have argued the point in their motion."). The Court does not consider the arguments Defendants make for the first time in their reply brief. *See* LR 7(g) (allowing reply briefs "to assert newly-decided authority or to respond to new and unanticipated arguments made in the resistance"); *McGhee v. Pottawattamie Cty.*, 547 F.3d 922, 929 (8th Cir. 2008) ("The district court did not abuse its discretion or otherwise commit error by following the [Southern District of Iowa's] local rule prohibiting new arguments submitted in a reply brief.").

### 3.    Declaratory judgment (Count 8)

In Count 8, Doe seeks 1) a declaratory judgment that the University's sexual misconduct policies, both on their face and as applied to him, violate the Due Process Clause of the Fourteenth Amendment and analogous provisions of the Iowa Constitution; and 2) an injunction requiring the

individual Defendants to reinstate him as a student and clear his record and restraining the University from implementing further disciplinary proceedings. ECF No. 57 ¶¶ 531–47. Doe alleges the University's policies are unconstitutionally vague and overbroad. *Id.* ¶¶ 535, 537, 539. He also alleges the University's policies violated his procedural due process rights. *Id.* ¶¶ 541–43.

In their reply brief, Defendants argue for the first time that Doe's claims for injunctive relief against most of the individual Defendants should be dismissed because the individual Defendants are no longer involved in the University's disciplinary process and therefore have "no power to implement any prospective injunctive relief." ECF No. 92 at 4–5. The Court does not consider this argument, to which Doe had no opportunity to respond. *See* LR 7(g); *McGhee*, 547 F.3d at 929.

On the merits, Defendants do not contest Doe's allegation that the University's policies are unconstitutionally vague or overbroad. Therefore, Count 8 survives to the extent Doe seeks declaratory and injunctive relief on that basis. Count 8 further survives to the extent Doe's procedural due process claim survives on the merits. As the Court concludes below, Doe does not plausibly allege he was denied 1) the right to adequate notice of the charges against him or 2) the right to review the evidence against him before his disciplinary hearing. Therefore, Doe is not entitled to any relief based on those alleged procedural due process violations. Count 8 survives to the extent it relates to other alleged procedural due process violations. As explained below, the individual Defendants are entitled to qualified immunity on Doe's procedural due process claim. The Court bases this determination primarily on Doe's failure to allege the violation of any clearly

established rights. Defendants concede qualified immunity does not bar injunctive or declaratory relief. ECF No. 92 at 12 n.6.[3]

### C.      Absolute Immunity

Defendants move to dismiss Stevenson Earl, Frost, Keller, Braun, and Schriver Cervantes in their individual capacities based on absolute immunity. ECF No. 67 at 6–9. They argue Stevenson Earl, Frost, Keller, and Braun are entitled to quasi-judicial immunity, while Schriver Cervantes is entitled to quasi-prosecutorial immunity. *Id.* Doe disputes that either quasi-judicial immunity or quasi-prosecutorial immunity shields any of the individual Defendants. ECF No. 87 at 10–16.

Absolute immunity is a high bar. The Supreme Court has been "quite sparing in [its] recognition of absolute immunity, and [has] refused to extend it any further than its justification would warrant." *Burns v. Reed*, 500 U.S. 478, 487 (1991) (internal quotation marks and citations omitted). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Id.* at 486. "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Id.* at 486–87. As explained below, Defendants fail to demonstrate that any of the individual Defendants should receive absolute immunity.

#### 1.      Quasi-judicial immunity

Judges are absolutely immune from lawsuits premised on their judicial acts. *Pierson v. Ray*, 386 U.S. 547, 554 (1967); *Schottel v. Young*, 687 F.3d 370, 373 (8th Cir. 2012). The same absolute immunity extends to non-judges who perform "quasi-judicial functions." *Dunham v. Wadley*,

---

[3] Doe also seeks various forms of declaratory and injunctive relief in Counts 1 through 7. ECF No. 57 ¶¶ 388, 412, 437, 456, 483, 510, 530. Those requests for relief survive to the extent the underlying counts survive on the merits.

195 F.3d 1007, 1010 (8th Cir. 1999). Quasi-judicial immunity "is appropriate when an official's functions are similar to those involved in the judicial process, an official's actions are likely to result in lawsuits for damages by disappointed parties, and sufficient safeguards exist in the regulatory framework to control unconstitutional conduct." *Id.* (citing *Butz v. Economou*, 438 U.S. 478, 512–16 (1978)). Absolute immunity is necessary to "protect[] the independence of judges" and "officials with similar duties." *Anton v. Getty*, 78 F.3d 393, 395–96 (8th Cir. 1996).

The Supreme Court has identified six non-exhaustive factors to determine whether an official should receive quasi-judicial immunity. *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985); *see also Krueger v. Lyng*, 4 F.3d 653, 656 (8th Cir. 1993). These factors are:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger*, 474 U.S. at 202 (citing *Butz*, 438 U.S. at 512).

Applying these factors, the Supreme Court held in *Butz* that federal administrative law judges are entitled to quasi-judicial immunity. 438 U.S. at 512–14. The Court reasoned "federal administrative law requires that agency adjudication contain many of the same safeguards as are available in the judicial process" and an administrative law judge's role is "functionally comparable to that of a judge." *Id.* at 513. For similar reasons, the Eighth Circuit held members of certain state administrative bodies presiding over disciplinary proceedings are entitled to quasi-judicial immunity. *See, e.g.*, *Dunham*, 195 F.3d at 1011 (holding members of the Arkansas Veterinary Medical Examining Board had quasi-judicial immunity from suit by disciplined veterinarian). On the other hand, the Supreme Court denied quasi-judicial immunity to members of a federal prison's discipline committee who heard and decided cases about inmate infractions.

*Cleavinger*, 474 U.S. at 206. The Court reasoned the committee members, as prison employees, were "under obvious pressure to resolve a disciplinary dispute in favor of the institution and their fellow employees" and prison disciplinary proceedings lacked many of the procedural safeguards guaranteed by federal administrative law. *Id.* at 203–06.

Most pertinently, the Supreme Court denied quasi-judicial immunity to school board members who found two high school students had violated school policy and imposed sanctions. *Wood v. Strickland*, 420 U.S. 308, 320 (1975), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982). In *Wood*, a teacher and principal reported the students to the school board and recommended a sanction. *Id.* at 312. The principal suspended the students pending the school board's review. *Id.* At a hearing, the school board found the students had violated the school's alcohol policy and expelled them for the remainder of the school year. *Id.* at 312–13. The students sued the school board members under § 1983, alleging due process violations. *Id.* at 309–10. The Supreme Court held the school board members were entitled to qualified rather than absolute immunity, reasoning "absolute immunity would not be justified since it would not sufficiently increase the ability of school officials to exercise their discretion in a forthright manner to warrant the absence of a remedy for students subjected to intentional or otherwise inexcusable deprivations." *Id.* at 320.

Many lower federal courts have applied *Wood* in the context of university disciplinary proceedings. *Doe v. Univ. of Neb.*, No. 4:18CV3142, 2020 WL 1666180, at *30 (D. Neb. Apr. 3, 2020) (collecting cases). Based on *Wood*, these courts have overwhelmingly denied quasi-judicial immunity to university officials involved in the disciplinary process. *See id.* at *30–31; *but see Doe v. Univ. of Ark.-Fayetteville*, No. 5:18-CV-05182, 2019 WL 1493701, at *13 (W.D. Ark. Apr. 3, 2019) (ruling university's appeal hearing panel members were entitled to quasi-judicial immunity without mentioning *Wood*).

Defendants argue Stevenson Earl, Frost, Keller, and Braun are entitled to quasi-judicial immunity because each served "an important quasi-judicial role" in Doe's disciplinary proceedings: Stevenson Earl investigated the complaints, interviewed witnesses, gathered documents, and compiled the hearing record; Frost adjudicated and directed the proceedings, heard evidence, excluded or admitted evidence, examined witnesses, reviewed documents, and issued a decision; Keller reviewed Doe's internal appeal considering University policies and the record below and issued a decision upholding the hearing decision and sanctions; and Braun reviewed Doe's Board appeal, reviewed the record and evidence below, directed the parties to submit briefing, and affirmed the hearing decision and sanctions. ECF No. 67 at 7.[4] Defendants argue these functions are quasi-judicial and are likely to result in lawsuits by disappointed students. *Id.* at 7–8. Defendants contend the rights of students like Doe are otherwise protected by Title IX and the requirements of due process. *Id.* at 8. Defendants further contend the safeguards inherent in the University's disciplinary process, such as the use of "precedential" policies based on past cases and the availability of appeals and lawsuits against the University and Board, reduce the need for private civil actions. ECF No. 92 at 9–10.

In response, Doe argues Stevenson Earl, Frost, Keller, and Braun should not receive quasi-judicial immunity because they did not act as impartial decisionmakers presiding over a fair, adversarial hearing process. ECF No. 87 at 10–11, 14. For example, he claims Frost, as a University employee and former prosecutor, had a conflict of interest and lacked independence. *Id.* at 13–14. Additionally, Doe stresses that the University limited the role of his attorney at the

---

[4] Defendants assert in their opening brief that Redington is entitled to quasi-judicial immunity, but they provide no argument on this point. ECF No. 67 at 6–8. Defendants do not argue in their reply brief that Redington is entitled to quasi-judicial immunity. *See* ECF No. 92 at 6–11. The Court deems this argument abandoned and does not consider it. *See* LR 7(g); *Spann*, 960 F.3d at 1088–89.

hearing; prevented him from contacting potential witnesses before the hearing; and used a "Start by Believing Process" that "create[d] an immediate presumption that reporting parties are telling the truth while assuming the accused are guilty." *Id.* at 14. Doe also claims the University has "expressly resisted" the view that its disciplinary proceedings are "judicial" in nature. *Id.* at 10. He alleges DiCarlo publicly criticized the OCR's 2018 proposed rule changes, arguing they would turn an "Institution of Higher Education's grievance procedures into quasi-court systems." *Id.* at 14 (citing ECF No. 57 ¶ 32).

Defendants fail to carry the burden of demonstrating Stevenson Earl, Frost, Keller, or Braun are entitled to quasi-judicial immunity. The Supreme Court's decision in *Wood* controls. While *Harlow* modified the qualified immunity standard articulated in *Wood*, it left intact *Wood*'s holding that the school board members were not entitled to absolute immunity. *Compare Harlow*, 457 U.S. at 817–18 & n.30, *with Wood*, 420 U.S. at 322; *see also Cleavinger*, 474 U.S. at 204–05 (relying heavily on *Wood*, after *Harlow* was decided, and citing it for the proposition that school board officials receive only qualified, and not absolute, immunity).

Defendants' attempts to distinguish *Wood* are unconvincing. Defendants argue "the *Wood* Court did not explicitly examine whether University administrators exercising discretion throughout the course of a student disciplinary proceeding which could result in expulsion should be entitled to quasi-judicial immunity." ECF No. 92 at 8. But the Supreme Court did examine whether high school administrators should receive quasi-judicial immunity for analogous actions, and it held they should not. *Wood*, 420 U.S. at 320. Defendants argue a different rule should govern university administrators because "university officials today are being sued in their individual capacities with great frequency by both complainants and respondents who are dissatisfied with the outcome of their student disciplinary proceedings." ECF No. 92 at 9. But Defendants provide no support for this assertion, and they fail to explain how frequent lawsuits prevent university

15

administrators from "exercis[ing] their discretion in a forthright manner." *Wood*, 420 U.S. at 320. Lower courts applying *Wood* to university disciplinary proceedings are near-unanimous in concluding that university administrators are not entitled to quasi-judicial immunity. *See Univ. of Neb.*, 2020 WL 1666180, at *30. *University of Arkansas-Fayetteville* is an outlier. 2019 WL 1493701. Moreover, the analysis in *University of Arkansas-Fayetteville* does not mention *Wood* or the myriad of lower federal court cases applying it. *See id.* at *13.

Setting aside *Wood*, an application of the six *Cleavinger* factors confirms that quasi-judicial immunity is inappropriate here. *See* 474 U.S. at 202. Two factors weigh against quasi-judicial immunity for each individual Defendant. First, Defendants appear to concede that Stevenson Earl, Frost, Keller, and Braun were not insulated from political influence. *See* ECF No. 92 at 9 (arguing Doe's allegations of outside political pressure "demonstrate[] a need for insulation" from political influence for the individual Defendants). Second, Defendants have not explained how precedent played a role in any of the individual Defendants' determinations. *See Cleavinger*, 474 U.S. at 202. Defendants argue the University's sexual misconduct policies were "precedent." ECF No. 92 at 10. But generally applicable policies prescribing what constitutes a violation are more akin to legislative statutes than fact-based judicial precedent. *See, e.g., Brown v. Griesenauer*, 970 F.2d 431, 437 (8th Cir. 1992) (describing the difference between legislative and judicial acts).

Other factors counsel against quasi-judicial immunity on an individualized basis. As to Stevenson Earl, Defendants have not shown her actions were subject to judicial safeguards or the adversarial process. *See Cleavinger*, 474 U.S. at 202. As the University's "Judicial Administrator/ Investigator," Stevenson Earl investigated the complaints against Doe, interviewed witnesses, produced a report finding Doe responsible for violating University policies, and recommended sanctions. ECF No. 57 ¶¶ 12, 118–37. This type of informal, preliminary investigation and

16

recommendation does not resemble judicial decision-making. *Cf. Butz*, 438 U.S. at 512–14 (discussing the extensive procedures that govern adjudications by administrative law judges); *Darnell v. Ford*, 903 F.2d 556, 560–61 (8th Cir. 1990) (rejecting the argument that "state officials should be absolutely immune from liability for recommending that a co-worker be disciplined").

With respect to Frost, some of her duties resemble those of a trial judge. As adjudicator, Frost presided over Doe's disciplinary hearing. *See* ECF No. 57 ¶¶ 152–61. In that role, she heard evidence, made evidentiary rulings, and produced a report explaining her findings as to whether Doe violated University policies. *See id.* ¶¶ 152, 156, 228(k). A familiar judicial standard of proof—preponderance of the evidence—governed the procedures. *See id.* ¶ 155.

However, Defendants do not show Frost cannot "perform [her] functions without harassment or intimidation." *Cleavinger*, 474 U.S. at 202. Doe alleges his misconduct hearing was the first one Frost presided over. ECF No. 57 ¶ 147. Doe does not allege, and Defendants do not contend, that Frost continues to adjudicate sexual misconduct hearings with such frequency that she faces harassment or intimidation from lawsuits by disappointed students. Additionally, Defendants do not respond to Doe's allegation that Frost, as a University employee, had an institutional conflict of interest. ECF No. 57 ¶ 146; *see Cleavinger*, 474 U.S. at 203–04. Finally, while the adjudication was adversarial in some respects, it was not in others. For example, Doe's lawyer was not allowed to cross-examine witnesses directly. ECF No. 57 ¶ 153. Instead, Frost examined witnesses, and she had discretion over whether, and how, to ask the parties' written questions. *Id.* Thus, while Frost acted like a judge in some respects, Defendants do not demonstrate that the *Cleavinger* factors as a whole warrant quasi-judicial immunity for her. *See Univ. of Neb.*, 2020 WL 1666180, at *31 (denying quasi-judicial immunity because individual defendants were university employees who were not bound by precedent and the plaintiff's lawyer was not allowed to play a significant role or directly examine witnesses).

As for Keller and Braun, Defendants do not show their review was governed by the type of procedures and safeguards that ensure meaningful error-correction on appeal. *See Cleavinger*, 474 U.S. at 202. Keller reviewed Doe's first appeal. ECF No. 57 ¶ 17. Keller had the power to "affirm, modify, remand, reverse or demand further hearing." *Id.* ¶¶ 236, 241. Doe submitted a written brief to Keller in support of his appeal. *Id.* ¶¶ 238–39. Keller affirmed the decision below in a one-sentence order. *Id.* ¶ 244. Doe next appealed to the Board. *Id.* ¶ 245. Doe alleges "Board decisions consist of granting a stay" and making a "final decision after considering the record and appeal." *Id.* ¶ 245. Doe requested a stay, which the University's Deputy Counsel opposed. *See id.* ¶¶ 246–48. Braun, the Board's Executive Director, denied Doe's request for a stay. *Id.* ¶¶ 19, 249. Doe submitted a thirty-five-page brief in support of his Board appeal. *Id.* ¶¶ 253-69. The University's Deputy Counsel submitted an opposing brief. *Id.* ¶ 270. It appears the Complainants also submitted briefs. *Id.* ¶ 252. The Board had the power to "affirm, modify, remand, or reverse all or any part of the final institutional decision." *Id.* ¶ 271. The Board affirmed the decisions below in a two-sentence summary order. *Id.* ¶ 272. Although these appeals resemble judicial proceedings in some respects, the absence of written decisions and reasoning at both levels leaves the review process and standards largely unclear. *Cf. Fink v. Kitzman*, 881 F. Supp. 1347, 1398 (N.D. Iowa 1995) (reasoning the county board of supervisors' "appeal procedure bears many of the marks of an adjudicatory function, including . . . written findings and conclusions"). Additionally, Defendants do not respond to Doe's argument that Keller, like Frost, had a conflict of interest as a University employee. ECF No. 57 ¶¶ 236–37; *see Cleavinger*, 474 U.S. at 203–04.

For these reasons, Stevenson Earl, Frost, Keller, and Braun are not entitled to quasi-judicial immunity.

### 2.    Quasi-prosecutorial immunity

Prosecutors have absolute immunity for actions that are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). By contrast, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). To determine whether absolute immunity applies to a given function, courts ask: 1) whether there is a historical or common law tradition of immunity for that function; and, if so, 2) whether the policy considerations behind the common law immunity "likewise countenance absolute immunity under § 1983." *Imbler*, 424 U.S. at 422, 424. A defendant seeking absolute prosecutorial immunity "bears the burden of showing that such immunity is justified for the function in question." *Burns*, 500 U.S. at 486.

Applying this test, the Supreme Court has held prosecutors may not be sued for initiating prosecutions, presenting the government's case in court, or participating in probable cause hearings. *Imbler*, 424 U.S. at 431; *Burns*, 500 U.S. at 492. On the other hand, prosecutors may be sued, subject to qualified immunity, for providing legal advice to the police, for allegedly fabricating evidence during the preliminary investigation of a crime, and for making allegedly false statements at a press conference announcing an indictment. *Burns*, 500 U.S. at 496; *Buckley*, 509 U.S. at 275, 278. The Eighth Circuit has held other state officials are entitled to a quasi-prosecutorial immunity if their roles are "functionally comparable to that of a prosecutor." *Thomason v. SCAN Volunteer Servs., Inc.*, 85 F.3d 1365, 1373 (8th Cir. 1996).

Schriver Cervantes was the "Charging Officer" for Doe's disciplinary hearing. ECF No. 57 ¶ 16. In that role, she assisted Stevenson Earl with the initial investigation by interviewing Doe and corresponding with the Complainants about evidence; imposed an interim sanction on Doe

pending the hearing; considered but did not grant Doe's request for an accommodation to finish his coursework pending the hearing; accompanied the Complainants at the hearing; and submitted questions at the hearing. *Id.* ¶¶ 16, 119, 139–40, 157, 161, 170. Doe seeks to hold Schriver Cervantes responsible for five discrete actions: 1) ignoring inconsistent or exculpatory testimony during her investigation, *id.* ¶¶ 92, 368; 2) providing Doe inadequate notice of the charges, *id.* ¶ 370; 3) failing to provide Doe timely notice of certain evidence she introduced at the hearing, *id.* ¶ 370; 4) banning Doe from campus and unreasonably denying his request for an accommodation, *id.* ¶¶ 139–42, 370, 451; and 5) being deliberately indifferent to, and failing to report, the alleged race discrimination that Doe suffered at the hearing, *id.* ¶¶ 469, 500.

Defendants argue Schriver Cervantes should receive quasi-prosecutorial immunity because she "was the functional equivalent of a prosecutor in the University's student misconduct process." ECF No. 67 at 8. They argue she "built a case against Plaintiff based on the evidence provided to her, drafted a direct examination to be provided to the Adjudicator, presented evidence at the hearing, and generally represented the interests of the University in maintaining a safe campus environment for students." *Id.* They further contend that Doe's allegations against Schriver Cervantes frame her actions as prosecutorial. *Id.* at 8–9. Doe argues Schriver Cervantes did not act as a prosecutor because the disciplinary proceeding was not the type of judicial, adversarial proceeding in which prosecutors operate. ECF No. 87 at 15. He further argues that, even if Schriver Cervantes acted as a prosecutor in some ways, she should not receive absolute immunity for her non-prosecutorial acts—*i.e.*, her investigation of the complaints, her interim sanction decision, and her warning to Doe that he should not to speak with witnesses before the hearing. *Id.* at 15–16.

Defendants fail to carry the burden of demonstrating that Schriver Cervantes should receive quasi-prosecutorial immunity. Defendants do not explain why Schriver Cervantes is entitled to quasi-prosecutorial immunity for each of the specific actions she is sued for, which is required

under the Supreme Court's functional approach. *See Burns*, 500 U.S. at 486. Instead, Defendants argue Schriver Cervantes generally behaved like a prosecutor. *See* ECF No. 67 at 8–9. As such, the specific functions relevant to Doe's claims are neither identified nor sufficiently analyzed. Therefore, Schriver Cervantes is not entitled to quasi-prosecutorial immunity. *See Borkowski v. Baltimore Cty.*, 414 F. Supp. 3d 788, 807 (D. Md. 2019) (concluding defendants "have not established that they are entitled to absolute prosecutorial immunity" because they "merely argue that all of their actions relate to the exercise of a prosecutor's judgment about which cases to prosecute and against which individuals, and make no effort to differentiate the nature of the functions performed" (internal quotation marks and citation omitted)).

### D. Procedural Due Process Component of Due Process Claim (Count 1)

Doe sues the individual Defendants under 42 U.S.C. § 1983 for allegedly violating his procedural due process rights. ECF No. 57 ¶¶ 339–88. Defendants argue the individual Defendants are entitled to qualified immunity on this claim. ECF No. 67 at 9–12. Doe responds none of the individual Defendants should receive qualified immunity. ECF No. 87 at 16–30. For the reasons explained below, the individual Defendants are entitled to qualified immunity on Doe's procedural due process claim.

"Section 1983 provides a remedy against 'any person' who, under color of state law, deprives another of rights protected by the Constitution." *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992) (quoting 42 U.S.C. § 1983). The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Doe alleges the individual Defendants deprived him of "liberty" and "property" interests. ECF No. 87 at 19. The Court will assume, without deciding, that Doe has a protected "liberty" or "property" interest at stake. *See Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) (assuming without deciding that university student had a

constitutionally protected interest in his education). The next question is "what process [was] due" prior to the alleged deprivations. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Due process is a flexible concept. *Id.* at 334. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The Eighth Circuit has held "procedural due process must be afforded [to] a [disciplined] student on the college campus 'by way of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case and with all necessary protective measures.'" *Jones v. Snead*, 431 F.2d 1115, 1117 (8th Cir. 1970) (quoting *Esteban v. Cent. Mo. State Coll.*, 415 F.2d 1077, 1089 (8th Cir. 1969)).

State actors sued under § 1983 may assert qualified immunity. *See Goffin v. Ashcraft*, 957 F.3d 858, 861 (8th Cir. 2020). Under this doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. To prevail at the motion to dismiss stage, "defendants must show that they are entitled to qualified immunity on the face of the complaint." *Bradford v. Huckabee*, 394 F.3d 1012, 1015 (8th Cir. 2005). "Although the defendant bears the burden of proof for this affirmative defense, the plaintiff must demonstrate that the law was clearly established." *Monroe*, 495 F.3d at 594.

Qualified immunity analysis has two steps. One: a court must decide whether the facts alleged make out a violation of a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Two: "the court must decide whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* (internal quotation marks and citation omitted). Both requirements must be met. *See id.* The steps need not be addressed in the order identified. *Id.* at 236.

22

A right is clearly established if, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This requires "controlling authority" or "a robust 'consensus of cases of persuasive authority'" establishing the right. *Id.* at 741–42 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). Rights may not be defined "at a high level of generality." *Id.* at 742. The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (internal quotation marks and citation omitted).

Focusing on the second step of qualified immunity, Defendants argue Doe does not allege the violation of any "clearly established" procedural due process rights. ECF No. 67 at 11–12. They argue Doe defines his rights too generally and fails to demonstrate they were clearly established. ECF No. 92 at 13–21. Defendants also contend the actions of each individual Defendant were "objectively reasonable" and "cannot plausibly support" Doe's claims that the individual Defendants were "directly responsible for depriving him of his constitutional rights." ECF No. 67 at 12–15. Doe articulates several "rights" he claims were "clearly established" at the time of the disciplinary proceedings. *See* ECF No. 87 at 17–30, 34, 36–37. He also argues the third amended complaint plausibly alleges violations of these rights. *Id.* at 32–45.

For most of the "rights," Doe fails to carry the burden required of him at this stage: identifying specific rights the individual Defendants violated and providing case law demonstrating those rights were established "beyond debate." *Ashcroft*, 563 U.S. at 741; *see Monroe*, 495 F.3d at 594. To begin, Doe defines some of his "rights" too broadly. Doe argues he was denied "a meaningful opportunity to be heard in his own defense [and] present his side of the case." ECF No. 87 at 23–24. At a general level, Doe is correct that he had a

right to a meaningful opportunity to defend himself against the complaints. *See, e.g., Mathews*, 424 U.S. at 333. But Doe fails to articulate a specific right that was violated, by reference to the individual Defendants' conduct, or provide case law clearly establishing that right. *Cf. Ashcroft*, 563 U.S. at 742 (reasoning the "general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established"). Doe goes on to argue "[a] reasonable person would have known that if they do not ask questions about the details of consent, yet find that person responsible for sexual misconduct, that person would not be heard." ECF No. 87 at 24. But he cites no case law for this more concrete proposition. Doe's argument that he had a "clearly established right to an impartial process" is also too general. *Id.*; *see Kim v. Univ. of N. Iowa*, No. 19-CV-2037 CJW-KEM, slip op. at 26 (N.D. Iowa Mar. 19, 2020) ("[A]lthough there is a clearly established right to due process and that process should generally be impartial, it is not clearly established in a more particularized sense that [defendants'] actions violated plaintiff's Fourteenth Amendment Due Process Rights."); Def.'s Ex. 1 Supp. Reply Pl.'s Am. Resist. Mot. Dismiss Third Am. Compl. 26, ECF No. 92-1.

With slightly more specificity, Doe argues he had a clearly established right to at least some form of cross-examination and the individual Defendants could not categorically ban it. ECF No. 87 at 25–29. Doe alleges in the third amended complaint that he was not allowed to directly cross-examine witnesses, but instead had to submit his questions to Frost to be asked at her discretion. ECF No. 57 ¶¶ 153, 364. Doe appears to argue he had a clearly established right to directly cross-examine witnesses at his disciplinary hearing. *See* ECF No. 87 at 28 (arguing "the UI system categorically bans counsel from directly asking questions of witnesses"). Doe's case citations do not clearly establish this right.

For controlling authority, Doe cites *Goldberg v. Kelly*, where the Supreme Court stated: "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." 397 U.S. 254, 269 (1970). *Goldberg* establishes that due process may often require cross-examination, but it does not establish a categorical right to cross-examination, nor does it speak to what forms of cross-examination are permissible in university disciplinary proceedings. Doe also cites *Dillon v. Pulaski County Special School District*, where the Eighth Circuit held an expelled student was denied procedural due process when he was not allowed to call the teacher who accused him of violating school rules as a witness at his expulsion hearing. 594 F.2d 699, 700 (8th Cir. 1979) (per curiam). This holding was case-specific and did not establish a general right to cross-examination in school disciplinary proceedings. *See id.* (Benson, Chief District Judge, concurring). Moreover, Doe does not allege he could not call witnesses at his disciplinary hearing. To the contrary, it appears he did call witnesses. *See* ECF No. 57 ¶ 215 (providing a chart with a column for "Doe's witness"). Thus, Doe fails to provide controlling authority demonstrating he had a clearly established right to directly cross-examine witnesses at his disciplinary proceeding. *See Kim*, No. 19-CV-2037 CJW-KEM, slip op. at 27 ("[T]he Court finds there is not a clearly established right for a plaintiff to cross-examine adverse witnesses in a university's disciplinary proceeding."); ECF No. 92-1 at 27.

Doe's persuasive authority likewise fails to clearly establish a right to directly cross-examine witnesses at a university disciplinary hearing. Doe cites precedent from two circuits. First, he cites *Winnick v. Manning*, where the Second Circuit opined in dicta, "if this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing." 460 F.2d 545, 550 (2d Cir. 1972). If anything, *Winnick* undercuts Doe's argument because it implies the issue is unresolved—not clearly established. Doe also cites Sixth Circuit case law. The Sixth Circuit has indeed held that some form of cross-examination

is essential in cases that present "a choice between believing an accuser and an accused." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 641 (6th Cir. 2005); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399–404 (6th Cir. 2017); *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018). But the Sixth Circuit has also approved of universities allowing only a "circumscribed" form of cross-examination, whereby the accused may submit questions to the hearing panel, to be asked at the panel's discretion. *Univ. of Cincinnati*, 872 F.3d at 403; *Doe v. Cummins*, 662 F. App'x 437, 448 (6th Cir. 2016) (unpublished).

In short, Doe identifies one court of appeals that has held some form of cross-examination is required at university disciplinary proceedings where credibility is at issue. The same court, however, has approved of the very method of cross-examination Doe was granted. *See* ECF No. 87 at 26. Doe's remaining citations are to district court and state court cases. *See* ECF No. 87 at 26–28. Many of these cases are from district courts within the Sixth Circuit. *See id.* The remaining cases do not clearly establish a right to directly cross-examine witnesses at a university disciplinary hearing. For example, Doe quotes *Furey v. Temple University* for the proposition that "due process required that the plaintiff be able to cross-examine witnesses." *Id.* at 26 (quoting 884 F. Supp. 2d 223, 252 (E.D. Pa. 2012)). But he omits the second half of the sentence, where the court concluded, "the plaintiff was afforded that right because the plaintiff was able to cross examine the witnesses by posing questions through the Chair." 884 F. Supp. 2d at 252. Doe did not have a clearly established right to directly cross-examine witnesses at the disciplinary hearing.[5]

---

[5] In May 2020, the OCR announced the issuance of new Title IX regulations requiring federally funded colleges and universities to allow accused students to directly cross-examine witnesses through their advisors. U.S. Dep't Educ., *Secretary DeVos Takes Historic Action to Strengthen Title IX Protections for All Students* (May 6, 2020), https://www.ed.gov/news/press-releases/secretary-devos-takes-historic-action-strengthen-title-ix-protections-all-students; U.S. Dep't Educ., Summary of Major Provisions of the Department of Education's Title IX Final

Doe specifically articulates other "rights," but fails to demonstrate they were clearly established. For example, Doe argues "[i]t was clearly established during the time of the hearing that not asking critical questions that the accused requests or not probing inconsistencies of the accuser was unlawful." ECF No. 87 at 29. He also argues "[i]t was established during the investigation that flawed disciplinary proceeding occurs in part because of 'critical omissions' by university investigators in preparing witness summaries." *Id.* at 34. In support of these rights, Doe cites two district court cases, both of which are inapposite. *Id.* at 29, 34 (citing *Doe v. Washington & Lee Univ.*, No. 6:14–CV–00052, 2015 WL 4647996, at *9 (W.D. Va. Aug. 5, 2015) (finding due process did not apply because defendant was a private university) and *Doe v. Univ. of Miss.*, No. 3:16-CV-63-DPJ-FKB, 2018 WL 3570229, at *5–7 (S.D. Miss. July 24, 2018) (finding plaintiff alleged plausible Title IX claim based in part on omission of exculpatory evidence from investigator's report)).

Next, Doe argues Frost violated his clearly established rights by requiring him to prove he had affirmative consent for the alleged sexual activity. *Id.* at 37 (citing *Cummins*, 662 F. App'x at 449). In *Cummins*, the court reasoned in dicta that "placing the burden of proof on the [accused] may have proven constitutionally suspect due to the potentially detrimental effect on the accuracy of the hearing and the minimal burden of an alternate procedure." 662 F. App'x at 449. But it found no due process violation on the facts before it. *Id.* The Sixth Circuit's tentative dicta about something that "may" violate due process does not clearly establish any rights.

Finally, Doe fails to allege violations of certain rights, even if they were clearly established. Doe argues Schriver Cervantes's "fail[ure] to provide Doe with a notice that contained the full

---

Rule 7, https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf (summarizing new cross-examination requirements); *see also Stahl*, 327 F.3d at 700. Because the Court looks to what was clearly established "at the time of the challenged conduct," this policy change has no impact on the Court's analysis. *Ashcroft*, 563 U.S. at 735.

scope of charges against him" violated clearly established law. ECF No. 87 at 36. To be sure, Doe had the right to "adequate notice" and a "definite charge." *Jones*, 431 F.2d at 1117 (internal quotation marks omitted) (quoting *Esteban*, 415 F.2d at 1089). If Schriver Cervantes failed to notify Doe of the specific charges against him, she might not be entitled to qualified immunity. *See, e.g., Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 615–18 (E.D. Va. 2016) (holding a student was denied due process when he was charged with multiple instances of sexual misconduct but received notice as to only one of the instances). But that is not what Doe alleges. Doe alleges Schriver Cervantes failed to inform him "that he would be charged with something as daunting as the educational mission of the Complainants when the investigation found him to have no such role either directly or indirectly." ECF No. 87 at 36 (citing ECF No. 57 ¶ 370). The Court does not know what this means. Nor do Defendants. ECF No. 92 at 16 n.11. With no clear indication of how Schriver Cervantes failed to provide adequate notice—or how the allegedly inadequate notice prejudiced Doe's ability to defend against the complaints—it is not possible to infer Schriver Cervantes violated Doe's due process rights. *See George Mason Univ.*, 149 F. Supp. 3d at 615–18. Therefore, Doe fails to allege a plausible procedural due process claim based on inadequate notice.

Doe also contends Schriver Cervantes violated his "clearly established right to review the evidence against him." ECF No. 87 at 36; *see also Doe v. Miami Univ.*, 882 F.3d 579, 603 (6th Cir. 2018) ("The Constitution does require . . . that the student be provided the evidence against him."). Doe claims Schriver Cervantes "admitted new evidence that was withheld until after Doe had testified." ECF No. 87 at 36. In support of this argument, Doe cites paragraph 368 of the third amended complaint, but paragraph 368 does not contain this allegation about Schriver Cervantes. *Id.*; *see* ECF No. 57 ¶ 368. As Defendants note, Doe may be referencing paragraph 207 of the third amended complaint. ECF No. 92 at 17 n.12. In that paragraph, Doe alleges Frost "allowed

[Complainant #1] to submit further evidence toward the end of the hearing after Doe had testified." ECF No. 57 ¶ 207. He further alleges "Frost violated Title IX policies since Doe should be provided any new evidence at least ten days before the hearing, not after he testified." *Id.* Elsewhere in the third amended complaint, Doe alleges the Complainants were accompanied by Schriver Cervantes at the hearing. *Id.* ¶ 157. Assuming, without deciding, that Doe had a clearly established right to view all the evidence against him before his disciplinary hearing, the third amended complaint does not allege any individual Defendant violated this right. The third amended complaint mentions the "new evidence" only once, in the factual background section, and alleges it violated Title IX policies. *Id.* ¶ 207. Therefore, the third amended complaint does not allege either Schriver Cervantes or Frost violated Doe's due process rights by introducing or allowing this evidence at the hearing.

For these reasons, the individual Defendants are entitled to qualified immunity on Doe's procedural due process claim. As a result, none of the individual Defendants are liable for monetary damages on Doe's procedural due process claim. Defendants concede qualified immunity does not bar injunctive or declaratory relief. ECF No. 92 at 12 n.6.

E.     **Title IX Claims (Counts 2 through 4)**

Title IX prohibits federally funded universities from engaging in gender discrimination during disciplinary proceedings. *See* 20 U.S.C. § 1681(a); *Roe v. St. Louis Univ.*, 746 F.3d 874, 881 (8th Cir. 2014). Courts recognize several distinct theories of liability available to Title IX plaintiffs challenging university disciplinary proceedings. *Miami Univ.*, 882 F.3d at 589. Doe relies on three of these theories here: 1) erroneous outcome; 2) hostile environment; and 3) deliberate indifference. ECF No. 57 ¶¶ 389–456. As explained below, Doe alleges a plausible

erroneous outcome claim, but he fails to allege plausible hostile environment and deliberate indifference claims.

### 1.    Erroneous outcome (Count 2)

To plead a violation of Title IX under the erroneous outcome theory, a plaintiff must allege: 1) facts illustrating an "articulable doubt" as to the accuracy of the outcome of the proceeding; and 2) particular circumstances showing gender bias was a motivating factor in the erroneous outcome. *Miami Univ.*, 882 F.3d at 592; *see Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (1994); *see also Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 990 (D. Minn. 2017). To plead an articulable doubt, a plaintiff may point to "particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or . . . particular procedural flaws affecting the proof." *Yusuf*, 35 F.3d at 715. A plaintiff may illustrate gender bias by identifying "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.* "As a general rule, Title IX is not an invitation for courts to second-guess disciplinary decisions of colleges or universities." *Univ. of St. Thomas*, 240 F. Supp. 3d at 989.

Defendants contend Doe fails to link any of the alleged deficiencies in the disciplinary proceedings to his gender. ECF No. 67 at 17. In response, Doe claims various allegations in the third amended complaint cast doubt on the fairness and accuracy of the proceedings and demonstrate the Complainants' motives to lie. ECF No. 87 at 46–47. As evidence of gender bias, Doe points to Frost's statements during the hearing, the evidence supporting his version of the events, and alleged pressure and criticism against the University arising from its past mishandling of sexual misconduct cases. *Id.* at 47–49.

Doe alleges a plausible erroneous outcome claim. First, Doe alleges facts creating an articulable doubt as to the accuracy of the proceedings. Doe alleges Frost omitted from her report Dr. Lovaglia's testimony that Complainant #1 initially described her encounters with Doe as consensual. ECF No. 57 ¶¶ 70, 135, 193–94, 215; *cf. Doe v. Oberlin Coll.*, No. 19-3342, 2020 WL 3495298, at *6 (6th Cir. June 29, 2020) (concluding hearing panel's failure to comment on "flat contradiction" between accuser's statements at hearing and her statements during investigation supported erroneous outcome claim). Doe further alleges Stevenson Earl omitted from her report that Complainant #1's boyfriend initially said he had no knowledge of Doe touching Complainant #1's breast but changed his answer three months later and said he did know about it. ECF No. 57 ¶¶ 133, 326. Doe alleges Stevenson Earl included the altered account in her report without mentioning the initial account. *Id.* ¶ 133. Additionally, Doe alleges, with specificity, that Complainant #2's account of her interactions with Doe evolved over time, had significant inconsistencies, and was contradicted at times by non-testimonial evidence. *See id.* ¶¶ 83–117. Doe alleges Frost and Stevenson Earl ignored these issues with Complainant #2's testimony. *Id.* ¶¶ 92, 217–18. He alleges Stevenson Earl concluded there was "no reason for not believing [Complainant #2's] account" and discredited Doe's account for being "extremely different" from Complainant #2's. *Id.* ¶ 129.

Further, Doe plausibly alleges the Complainants had motives to lie. He alleges Complainant #1 was "resentful" after a dispute with Doe over her failure to submit data for a project. *Id.* ¶¶ 78, 127. And he alleges Complainant #2 was motivated to falsely accuse him because she was concerned there were rumors circulating about her and Doe. *Id.* ¶ 181. Accepting Doe's allegations as true, and drawing all reasonable inferences in his favor, these "particular evidentiary weaknesses" raise an "articulable doubt" about the accuracy of the proceedings. *Yusuf*, 35 F.3d at 715.

31

Second, Doe plausibly alleges gender bias was a motivating factor behind the claimed erroneous outcome. To begin, Doe alleges a combination of the Dear Colleague Letter and the threat of a loss of federal funding, seven open OCR investigations, two Title IX lawsuits alleging gender discrimination against females—all around 2017—and related public criticism pressured the University to overcorrect and disregard the rights of male students accused of sexual misconduct. ECF No. 57 ¶¶ 276–90. Standing alone, Doe's general allegations of pressure from the federal government are insufficient to show gender bias. *See, e.g.*, *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 92 (1st Cir. 2018); *Doe v. Univ. of Colo., Boulder ex rel. Bd. of Regents of Univ. of Colo.*, 255 F. Supp. 3d 1064, 1078 (D. Colo. 2017); *Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 929 (S.D. Iowa 2018). But Doe also makes particularized allegations of University-specific pressure that plausibly influenced the actions of certain individual Defendants.

For example, Doe alleges Stevenson Earl received negative media coverage in April 2017 related to a lawsuit against the University for gender discrimination against a female staff member. *Id.* ¶¶ 281, 326. He alleges this lawsuit settled for $6.5 million in May 2017, while Stevenson Earl was investigating the complaints against Doe. *Id.* Upon information and belief, Doe alleges these events contributed to Stevenson Earl's decision to re-interview Complainant #1's boyfriend in June 2017 and allow him to change his prior statement. *Id.* Doe alleges a second lawsuit, which arose out of Keller's allegedly inadequate sanctions for a male student found responsible for sexual misconduct, settled for $2.68 million the day before Doe's hearing. *Id.* ¶¶ 281–82. Based on this lawsuit, Doe alleges Keller was "motivated to appear in favor of female students accusing male students of sexual misconduct" when he considered Doe's internal appeal. *Id.* ¶ 237. These particularized allegations of pressure, coupled with the allegations of federal pressure, contribute to a plausible inference of gender bias. *Compare Doe v. Columbia Univ.*, 831 F.3d 46, 57–58 (2d Cir. 2016) (finding plausible inference of gender bias where university and university's

investigator had received "substantial criticism" for their handling of sexual assault allegations against male students), *with Cummins*, 662 F. App'x at 453 (rejecting plaintiffs' allegations of gender bias based on Dear Colleague Letter because plaintiffs did not allege university administrators "had faced public criticism for their handling of Title IX investigations" prior to plaintiffs' hearings or that the university was under federal investigation).

Doe also points to "statements by pertinent [U]niversity officials" and University programs that plausibly support an inference of gender bias. *Yusuf*, 35 F.3d at 715. Around the time the University was under the alleged pressure described above, Doe alleges the University's "It's On Us" campaign—for which Stevenson Earl served as a panel member—used inaccurate statistics about the prevalence of sexual assault and portrayed male students as sexual predators in promotional materials. ECF No. 57 ¶¶ 291–92. He alleges DiCarlo later spoke at a faculty senate meeting and described it as a "common misconception" that male students were being denied due process rights and suggested the University expand "programming" on "masculinity." *Id.* ¶ 300. Doe further alleges the University "specifically targeted males and masculinity in their programs." *Id.* ¶ 306. For example, he alleges Redington spoke at a 2016 sexual assault summit where the focus was "men." *Id.* He also alleges the University held a "What About Me(n) Summit" in February 2018, while his Board appeal was pending, which it described as an opportunity for men to consider how masculinity "impact[s] rape culture and perpetuates an overall culture of violence." *Id.* ¶ 309.

Finally, Doe alleges the University created new programs for survivors of sexual assault, but did not welcome male participation. *Id.* ¶ 331. He further alleges the University restricted its "Nite Ride" service to female students. *Id.* He alleges the University settled a case brought by the Iowa Civil Rights Commission based on this "practice of gender discrimination" in its programs.

*Id.*; *cf. Rossley*, 342 F. Supp. 3d at 928 (rejecting argument that victim-centered approach showed gender bias because policy was gender-neutral).

Taking these allegations together and accepting them as true, Doe's complaint plausibly alleges that gender bias was a motivating factor behind the alleged erroneous outcome. Thus, the Court denies Defendants' motion to dismiss as to Count 2.

### 2.      Hostile environment (Count 3)

Courts analogize Title IX hostile environment claims to hostile environment claims under Title VII of the Civil Rights Act of 1964. *Miami Univ.*, 882 F.3d at 590; *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007). To succeed on a hostile environment claim, a plaintiff must show he or she was subjected to sexual harassment that was "sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity." *Jennings*, 482 F.3d at 695; *accord Doe v. Perry Cmty. Sch. Dist.*, 316 F. Supp. 2d 809, 833 (S.D. Iowa 2004); *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (articulating the same standard for claims of hostile environment under Title VII). "Sexual harassment occurs when the victim is subjected to sex-specific language that is aimed to humiliate, ridicule, or intimidate." *Jennings*, 482 F.3d at 695; *accord Miami Univ.*, 882 F.3d at 590; *see Harris*, 510 U.S. at 21. Additionally, there must be "a basis for imputing liability to the institution." *Jennings*, 482 F.3d at 695; *see Perry Cmty. Sch. Dist.*, 316 F. Supp. 2d at 833. Defendants claim Doe's allegations of gender bias during the disciplinary proceedings do not rise to the level of severe or pervasive sexual harassment. ECF No. 67 at 19–20. They further argue Doe fails to connect any alleged harassment he suffered to his gender. *Id.* at 20.

Doe bases his hostile environment claim on Frost's alleged behavior and statements during and after the hearing and other Defendants' alleged failures to take remedial action. *See* ECF No. 57 ¶¶ 413–37. He points to various statements by Frost as "[e]xamples of Frost

harassing Doe based on his sex and creating a hostile environment." ECF No. 87 at 50 (citing ECF No. 57 ¶ 228). Doe alleges Frost's actions led him to seek mental health counseling from Redington, which Redington failed to provide. ECF No. 57 ¶ 425. Doe alleges Redington's failure to provide him mental health counseling "add[ed] to the hostile environment that Doe experienced." *Id.* Doe alleges the University and Board "ignored his complaints" and failed to remedy the hostile environment. *Id.* ¶¶ 428–30. He further alleges the University's Deputy Counsel added to the hostile environment by submitting a brief to the Board in support of Frost's findings stating Doe committed additional acts of sexual assault by hugging the Complainants. *Id.* ¶ 428. Doe argues the University's "masculinity" programs and its "lack of policies and procedures and failure to properly investigate and/or address sex discrimination" further contributed to the hostile environment. *Id.* ¶ 431; ECF No. 87 at 51. Together, Doe alleges these factors "substantially interfered with [his] right to receive an education free from discrimination." ECF No. 57 ¶ 426. He alleges the "distress" caused by the hostile environment prevented him from completing his coursework. *Id.* ¶ 427.

Doe does not plead a plausible hostile environment claim. Of all the allegations Doe makes about Frost, only three arguably relate to his gender. *See id.* ¶ 228 (listing various statements made by Frost throughout the hearing). First, Doe alleges Frost asked Complainant #2 whether she was afraid Doe would hit or punch her, even though there was no evidence Doe was violent. *Id.* ¶¶ 185, 228(b). Doe alleges this question relied on an "offensive, stereotype-based narrative of male violence." *Id.* ¶ 228(b). Second, Doe alleges Frost used the word "sexist" when asking questions about Doe's character during the hearing. *Id.* ¶ 228(c). Third, Doe alleges Frost "stereotyp[ed] and vilif[ied] him as sadistic and barbaric, without conscience" in her report, suggesting Doe, "as a male, mindlessly pursued sexual gratification but contrasted the Complainants['] narrative through the lens of 'great innocence' and purity." *Id.* ¶ 228(l).

35

The alleged actions by Frost are not "'sufficiently severe or pervasive [so as] to alter the conditions of the [Doe's] educational environment.'" *Miami Univ.*, 882 F.3d at 590 (first alteration in original) (quoting *Harris*, 510 U.S. at 21). The first two allegations relate to questions Frost asked during the hearing. Doe may have found these questions offensive or overly suggestive, but he does not claim the answers to the questions were irrelevant to the adjudication. An adjudicator serving as the factfinder at a sexual misconduct hearing does not "intimidat[e], ridicule, or insult" an accused student by asking relevant questions at the hearing. *Cf. Miami Univ.*, 882 F.3d at 587, 590 (rejecting hostile environment claim where accused student alleged university official told him at the hearing, "I'll bet you do this [i.e., sexually assault women] all the time"). And the third allegation is a wholly conclusory summary of Frost's report. Doe does not support this allegation with any specific excerpts from the report. *See* ECF No. 57 ¶ 228(l). Without specific examples from the report of "sex-specific language that is aimed to humiliate, ridicule, or intimidate," Doe's conclusory allegations about the report cannot establish a plausible hostile environment claim. *Jennings*, 482 F.3d at 695; *see Braden*, 588 F.3d at 594 (noting "some factual allegations may be so indeterminate that they require 'further factual enhancement' in order to state a claim" (quoting *Twombly*, 550 U.S. at 557)).

Doe alleges Frost made other gender-based statements at the hearing. *See* ECF No. 57 ¶ 228. But even as Doe summarizes them, the statements are not plausibly gender-based. *See, e.g., id.* ¶ 228(d) (alleging Frost "[e]mbarrassed Doe based on his sex/gender when she questioned Doe on the definition of sexual harassment" and told him the Supreme Court disagreed with him after he said both "intention" and "perception" were important ); *id.* ¶ 228(f) (alleging Frost "[a]bused Doe, when she gaslighted him by repeating he deserved a rigorous defense while constantly undermining him through her own manipulative, offensive, and

suggestive questions, Doe started incorrectly believing he had caused great harm in the lives of others").

Doe's remaining allegations, based on other Defendants' actions, also fail to plead a hostile environment claim. Doe alleges Redington denied him mental health counseling, but he does not allege his gender motivated her decision. *Id.* ¶ 425. Similarly, Doe does not allege his gender motivated the University's Deputy Counsel to state Doe committed sexual assault when he hugged the Complainants. *Id.* ¶ 428. Finally, Doe fails to plead a hostile environment claim based on the University's allegedly inadequate sexual misconduct policies and procedures or its alleged programming on "masculinity." *Id.* ¶ 431. Inadequate or discriminatory procedures, standing alone, do not create a hostile environment. *See Miami Univ.*, 882 F.3d at 590; *Doe v. Salisbury Univ.*, 107 F. Supp. 3d 481, 488 (D. Md. 2015). And Doe's allegations about the University's "masculinity" programming are too general to state a hostile environment claim. Doe alleges the programming contributed to an anti-male environment on campus, but he does nothing to particularize its effects to him, as opposed to any other male on campus. *See Salisbury Univ.*, 107 F. Supp. 3d at 488–89 (dismissing hostile environment claim based on allegedly discriminatory sexual assault policies because the plaintiff's allegations did "not involve the sex-specific language or conduct designed to humiliate, ridicule, intimidate, or insult, necessary to state a claim for harassment"). For these reasons, Doe fails to plead a hostile environment claim. Thus, the Court grants Defendants' motion to dismiss as to Count 3.

### 3. Deliberate indifference (Count 4)

A recipient of federal funding is liable for deliberate indifference if it is "(1) deliberately indifferent (2) to known acts of discrimination (3) which occur under its control." *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 782 (8th Cir. 2001). A plaintiff must allege the recipient's indifference caused him or her to suffer sex discrimination. *See K.T. v. Culver-Stockton Coll.*,

865 F.3d 1054, 1057–58 (8th Cir. 2017); *Davis ex. rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 644–45 (1999); *see also Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 864–67 (8th Cir. 2011).

Defendants argue Doe's deliberate indifference claim fails because he does not allege an appropriate person at the University had prior knowledge, and could have prevented, any alleged discrimination he suffered. ECF No. 67 at 21–22. Doe argues the University and Board demonstrated deliberate indifference by failing to act after receiving actual knowledge of the "discrimination, harassment, and hostile environment that Doe suffered" from the actions of Redington, Stevenson Earl, and Frost. ECF No. 87 at 52. He argues Keller and Braun were "appropriate people" who learned of the discrimination he suffered when they reviewed his appeals. *Id.* at 53. He further argues that Keller's indifference caused him to experience further discrimination during his Board appeal. *Id.*

Doe does not plead a plausible deliberate indifference claim. First, Doe bases his deliberate indifference claim solely on the alleged discrimination he suffered during his disciplinary proceedings. Many courts have expressed doubt that gender discrimination during disciplinary proceedings, standing alone, can form the basis of a deliberate indifference claim. *See, e.g., Doe v. Washington Univ.*, 434 F. Supp. 3d 735, 756–57 (E.D. Mo. 2020) (collecting cases). For example, the Sixth Circuit held that only sexual harassment gives rise to a deliberate indifference claim. *Miami Univ.*, 880 F.3d at 591. Here, Doe's deliberate indifference claim stems entirely from the disciplinary proceedings themselves—not any freestanding sexual harassment. *See* ECF No. 57 ¶¶ 438–56. Moreover, as explained above, Doe does not plausibly allege he was sexually harassed during the disciplinary proceedings.

Second, Doe does not plausibly allege any indifference by the University and Board caused him to suffer sex discrimination. Almost all the discrimination Doe alleges occurred in connection

with the disciplinary hearing. *See id.* ¶¶ 438–56. Even if Keller and Braun learned of the alleged discrimination during Doe's appeals, they did not cause it because they had only after-the-fact knowledge of it. *Cf. Culver-Stockton Coll.*, 865 F.3d at 1058 (holding plaintiff did not plead deliberate indifference claim because defendant's allegedly inadequate response to sexual assault did not cause the sexual assault). Doe's only argument for causation is that Keller, who learned of the alleged discrimination when he reviewed Doe's initial appeal, failed to prevent Doe from suffering further discrimination during his Board appeal. ECF No. 87 at 53. But Doe does not plausibly allege he suffered sex discrimination during his Board appeal. Doe alleges the University's Deputy Counsel submitted a brief in support of the decision below stating Doe committed sexual assault when he hugged the Complainants. *Id.*; ECF No. 57 ¶¶ 270, 445. But, as discussed above, Doe does not explain how that statement plausibly related to his gender. Therefore, Doe fails to plead a deliberate indifference claim. Thus, the Court grants Defendants' motion to dismiss as to Count 4.

## F.    Race Discrimination Under 42 U.S.C. § 1981 (Count 5)

Defendants move to dismiss Doe's claim for race discrimination under 42 U.S.C. § 1981 for two reasons. First, they argue that only § 1983, and not § 1981, provides a remedy against state actors. ECF No. 67 at 23. Second, they argue Doe's conclusory allegations of race discrimination fail as a matter of law. *Id.* at 23–24. In response, Doe claims the third amended complaint "expressly alleges racial discrimination under §1983." ECF No. 87 at 31. He further claims the third amended complaint contains various factual allegations of race discrimination. *Id.* at 31–32.

Only intentional race discrimination violates § 1981. *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982). "To establish a right to relief under § 1981, a plaintiff must show (1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in

§ 1981, including the right to make and enforce contracts." *Rodgers v. Univ. of Mo. Bd. of Curators*, 56 F. Supp. 3d 1037, 1050 (E.D. Mo. 2014), *aff'd as modified sub nom. Rodgers v. Curators of Univ. of Mo. Sys.*, 634 F. App'x 598 (8th Cir. 2015) (unpublished). Defendants argue Doe fails to plead the second element. *See* ECF No. 67 at 23–24.

As an initial matter, Defendants correctly point out that § 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989); *accord Artis v. Francis Howell N. Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1181 (8th Cir. 1998). Doe's third amended complaint asserts § 1981 and § 1983 claims separately. *Compare* ECF No. 57 ¶¶ 339–88 (asserting a due process claim under § 1983), *and id.* ¶¶ 484–510 (asserting an equal protection claim under § 1983), *with id.* ¶¶ 457–83 (asserting a race discrimination claim for damages and other relief under § 1981). Nevertheless, the Court construes Doe's third amended complaint liberally to include a § 1983 damages claim based on violations of § 1981. *See Lockridge v. Bd. of Trs. of Univ. of Ark.*, 315 F.3d 1005, 1007 (8th Cir. 2003) ("Because we have held that a claim alleging a violation of § 1981 may not be brought directly against a state actor, but must be brought under § 1983, we liberally construe [plaintiff's] complaint as including claims for violations of . . . § 1981 brought under § 1983.").

Even so, Doe does not plausibly allege any individual Defendant intentionally discriminated against him based on his race. Doe was born and raised in Kuwait. ECF No. 57 ¶¶ 53, 459. He is a citizen of a predominantly Muslim South-Asian country. *Id.* He alleges males from these regions are stereotyped as being "[s]exist, oppressive, rapists, including gang rapists, and most notably, authoritarian." *Id.* ¶ 460. He alleges Frost knew he was South Asian and Arab and harassed him by describing him with the terms "authoritarian" and "sexist;" by employing rhetoric to suggest he was "sexually aggressive;" and by sustaining non-credible

allegations of sexual misconduct against him because of these stereotypes. *Id.* ¶ 463. He alleges Frost's "labels did not fit the context of the situation." *Id.* Additionally, Doe alleges Redington expelled him because of his race, and Cervantes, Keller, and Braun were deliberately indifferent to the race discrimination he suffered. *Id.* ¶¶ 469, 471, 474. Finally, Doe alleges "Asian males are found responsible by [the University] when a complaint has been filed against them at a rate higher than white counterparts." *Id.* ¶ 472.

Beginning with Doe's allegations against Frost, the third amended complaint largely contradicts Doe's assertion that Frost's alleged comments "did not fit the context" of the sexual misconduct adjudication. *See id.* ¶ 463. Frost allegedly used the word "sexist" when asking questions about Doe's character at the hearing. *Id.* ¶ 228(c). Doe provides no additional context for Frost's question, but he does not suggest—nor could he—that the answer to this question was irrelevant to an adjudication about whether he sexually harassed and assaulted two female undergraduate students. Frost allegedly wrote in her report that Doe appeared "authoritarian" because, when Complainant #2 failed to show up for a meeting, Doe texted her saying, "for future reference, *please* let me know earlier if you cannot make it." *Id.* ¶ 226. Doe did not supervise Complainant #2, so Frost's comment makes at least some sense in context. *See id.* ¶ 123. Finally, Frost allegedly "creat[ed] a narrative that Doe was sexually aggressive, oppressive, and dangerous to women" in her report finding him responsible for sexual harassment and sexual assault. *Id.* ¶ 226. Doe challenges Frost's findings, but he does not explain why her alleged narrative did not comport with her findings.

Even stripped of context, Frost's comments are not plausibly racially discriminatory. Frost's alleged comments were race-neutral, so any inference of discriminatory intent is necessarily speculative. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). Accepting as true Doe's allegation that males

of his race are stereotyped as being "[s]exist, oppressive, rapists, including gang rapists, and most notably, authoritarian," the third amended complaint provides no basis for inferring that Frost was relying on those stereotypes, as opposed to the facts and evidence before her, when making the alleged comments. *See* ECF No. 57 ¶ 460. Standing alone, Frost's alleged comments do not support a plausible claim of race discrimination. *Cf. Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 225 (1st Cir. 2012) (holding female plaintiff described as "'fragile,' 'immature,' 'unable to handle complex and sensitive issues,' engaged in 'twisting the truth,' and exhibiting 'lack of judgment'" failed to plead a gender discrimination claim because the "admittedly unflattering" terms were "gender-neutral"); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 44 (2d Cir. 2000) (holding employer's use of the words "'nice'" and "'nurturing'" provided "no evidence" of gender discrimination against female plaintiff).

Doe also fails to plausibly allege race discrimination by Redington. Doe alleges Redington discriminated against him based on his race when she expelled him without explanation. ECF No. 57 ¶¶ 471, 473. He alleges expulsion was disproportionate to the severity of his alleged misconduct, and to the sanctions imposed "in more serious cases of penetrative sexual assault." *Id.* ¶ 471. He provides statistics indicating that, in the years surrounding his expulsion, the University rarely expelled students found responsible for sexual misconduct or sexual assault, even in cases involving forced penetration. *See id.* ¶ 259. For example, he alleges fifteen students were found responsible for sexual assault in the 2017–18 school year, but he was the only student expelled. *Id.* ¶ 259(c). Upon information and belief, Doe alleges the University expelled another "Asian/Middle Eastern" graduate student about a year before it expelled Doe, and that student's sanction was also "grossly disproportionate" to his alleged misconduct. *Id.* ¶ 472. Doe further alleges, upon information and belief, that the University treats "Asian/Middle Eastern" students differently than similarly situated white students, and that "Asian males are found responsible by

42

[the University] when a complaint has been filed against them at a rate higher than white counterparts." *Id.* Based on these allegations, Doe alleges "Redington's and/or Keller's decisionmaking shows a pattern of discrimination against Asians/Middle Eastern students." *Id.*

Even assuming Doe's sanction was disproportionate to his alleged misconduct and more severe than the sanctions received by other students committing comparable or more serious acts of sexual misconduct, Doe fails to connect the disproportionate sanction to his race. For example, Doe does not allege the students who received less severe sanctions for the same or worse conduct were all white. He alleges one other "Asian/Middle Eastern" graduate student received a disproportionately harsh sanction. *Id.* ¶¶ 471–72. The statistics Doe references do not support his conclusory allegations about a pattern of race discrimination. Without factual support, Doe's allegation that "similarly situated" white students are "treated differently" than Asian/Middle Eastern students is a legal conclusion the Court need not accept as true. *See id.* ¶ 472; *Iqbal,* 556 U.S. at 678–79; *Whitehead v. Univ. of Ark. ex rel. Chairman of the Bd. of Trs.,* No. 5:13-CV-05305, 2014 WL 11531068, at *3 (W.D. Ark. Nov. 21, 2014) ("[Plaintiff's] characterization of other employees being 'similarly situated' to her is a legal conclusion."), *aff'd sub nom.,* 615 F. App'x 392 (8th Cir. 2015) (unpublished).

Doe's allegation that "Asian males are found responsible by [the University] when a complaint has been filed against them at a rate higher than white counterparts" is not aimed at specific individual Defendants. ECF No. 57 ¶ 472. Doe alleges Redington made the expulsion decision, but he does not allege she was involved in making any factual determinations of guilt. *See id.* ¶ 14. As the adjudicator, Frost determined Doe was responsible for sexual harassment and sexual assault. *Id.* ¶¶ 145, 208. But Doe alleges his "hearing was the first Title IX hearing Frost adjudicated." *Id.* ¶ 147. Thus, Doe does not appear to allege Frost engaged in a pattern of discrimination against Asian males. Because Doe does not connect the alleged pattern of

43

discrimination to any of the other individual Defendants, he fails to allege a plausible claim of race discrimination based on it. Further, Doe provides no statistics or other factual support for the alleged pattern, so the Court cannot determine if the pattern is significant.

Because Doe does not plausibly allege that either Frost or Redington discriminated against him based on his race, Doe's allegations that Cervantes, Keller, and Braun were deliberately indifferent to Frost's and Redington's discrimination also fail. *See id.* ¶¶ 469, 474. Doe's remaining allegations against the individual Defendants are entirely speculative. He asks the Court to infer the individual Defendants intentionally discriminated against him because: 1) he is a racial minority; 2) the Complainants are white females; and 3) the individual Defendants were biased toward the Complainants and decided against him at various stages of the disciplinary process. *See* ECF No. 87 at 32–33; ECF No. 57 ¶¶ 463–70, 473–74. "A mere factual assertion of unequal treatment or race-motivated conduct is insufficient to survive a Rule 12(b)(6) motion; instead, a plaintiff must specifically allege the circumstances giving rise to a plausible inference of racially discriminatory intent." *Rodgers,* 56 F. Supp. 3d at 1051 (quoting *Odom v. Columbia Univ.*, 906 F. Supp. 188, 195 (S.D.N.Y. 1995)). Because Doe "fails to allege facts that support [his] bare accusations of unequal treatment," his § 1981 claim fails. *Id.* [6] Thus, the Court grants Defendants' motion to dismiss as to Count 5.

## V.   CONCLUSION

The Court grants Defendants' motion to dismiss as to Doe's breach of contract claim as

---

[6] Doe alleges "race was a 'motivating factor' in his expulsion." ECF No. 57 ¶ 476; *see also* ECF No. 87 at 31 ("Defendants' actions were motivated, in part, by Doe's race and national origin."). After Doe filed his third amended complaint, the Supreme Court held a § 1981 plaintiff "must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020). The Court rejected the argument that race need only be "a motivating factor." *Id.* The third amended complaint fails to plead a § 1981 claim under either causation standard.

unresisted (Count 7). The Court denies Defendants' motion to dismiss as to the substantive due process component of Doe's due process claim (Count 1). The Court denies Defendants' motion to dismiss as to Doe's equal protection claim (Count 6). The Court does not consider Defendants' argument that Doe may not seek injunctive relief against most of the individual Defendants. Doe's request for declaratory and injunctive relief in Count 8 survives, except to the extent Doe fails to plead a procedural due process claim. None of the individual Defendants are entitled to absolute immunity. The Court grants Defendants' motion to dismiss as to the procedural due process component of Doe's due process claim (Count 1) to the extent Doe seeks damages because all individual Defendants sued in their individual capacities are entitled to qualified immunity on that claim. The Court denies Defendants' motion to dismiss as to Doe's erroneous outcome claim (Count 2) but grants it as to Doe's hostile environment and deliberate indifference claims (Counts 3 and 4). The Court grants Defendants' motion to dismiss as to Doe's claim for race discrimination under § 1981 (Count 5). In summary, Counts 1 and 8 survive in part and Counts 2 and 6 survive in full.

Accordingly, **IT IS ORDERED** that Defendants' Motion to Dismiss Plaintiff John Doe's Third Amended Complaint, ECF No. 60, is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

Dated this 17th day of July, 2020.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE