**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION**

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff,<br><br>v.<br><br>UNIVERSITY OF IOWA; BOARD OF REGENTS, STATE OF IOWA, TIFFINI STEVENSON EARL, individually and in official capacity, IRIS FROST, individually and in official capacity, LYN REDINGTON, individually and in official capacity, ANGIE REAMS in official capacity, CONSTANCE SCHRIVER CERVANTES, individually and in official capacity, JOHN KELLER, individually and in official capacity, MONIQUE DICARLO, individually and in official capacity, MARK BRAUN, individually and in official capacity,<br><br>    Defendants. | **CASE NO. 3-19-CV-00047**<br><br><br><br><br><br>**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

## TABLES OF CONTENTS

I. INTRODUCTION ............................................................................................................. 2

II. ARGUMENT ................................................................................................................... 3

    **A. This Court Should Grant Summary Judgment to the Defendants on Plaintiff's Erroneous Outcome Claim under Title IX of the Education Amendments of 1972.** ................................................................................................................................. 4

        i.  Plaintiff cannot establish that there were substantive flaws in his student disciplinary process nor that the process reached an outcome that contradicted the weight of the evidence ............................................................................................................. 5

        ii.  The evidentiary record does not support Plaintiff's broader claims of systemic pressures and gender bias within the University's procedures ................................................... 22

**B. This Court Should Grant Summary Judgment to the Defendants on Plaintiff's 42 U.S.C § 1983 Claim for Violation of His Substantive Due Process Rights** ............... 30

   i.  The rights Doe describes are not fundamental rights afforded substantive due process protections ............................................................................................................. 31

   ii. Plaintiff cannot demonstrate that the individual Defendants' actions "shocked the conscience" or were "deliberately indifferent" to his fundamental rights, and his substantive due process claim fails on the merits ...................................................... 35

   iii. Even if the rights Doe describes are fundamental rights which should be afforded substantive due process protections, the individual Defendants are entitled to qualified immunity ..................................................................................................................... 36

**C. This Court Should Grant Summary Judgment to the Defendants on Plaintiff's 42 U.S.C. § 1983 Claim for Violation of His Procedural Due Process Rights** ............... 46

**D. This Court Should Grant Summary Judgment to the Defendants on Plaintiff's 42 U.S.C § 1983 Claim for Violation of His Equal Protection Rights** ............................ 48

   i.  Plaintiff has failed to raise a genuine issue of material fact with regard to whether he suffered intentional discrimination because of a protected characteristic ....... 49

   ii. Plaintiff's claims are barred by the doctrine of qualified immunity ..................... 51

**E. This Court Should Grant Summary Judgment to the Defendants on Plaintiff's Request for Declaratory Judgment and Injunctive Relief for Violation of His Rights Under the United States and Iowa Constitutions** ........................................................ 54

   i.  Plaintiff's Claims for Violation of the Iowa Constitution and the First Amendment to the U.S. Constitution Fail ................................................................................. 54

   ii. Plaintiff Cannot Demonstrate that Entry of Declaratory Judgment or Permanent Injunction is Appropriate in this Case ................................................................. 54

   iii. Plaintiff's Requested Relief is Overbroad, Inappropriate, and Inequitable. ......... 56

**III. CONCLUSION** .............................................................................................................. 57

## I.    INTRODUCTION

On February 14, 2020, Plaintiff filed his Third Amended Complaint ("Complaint") against

Defendants the University of Iowa ("UI" or "the University"), the Board of Regents, State of Iowa

("the Board"), and several individual University and Board officials, raising various legal claims

2

stemming from expulsion by the University for violations of the University's Sexual Misconduct Policy and Code of Student Life. Plaintiff had been accused of sexually harassing and assaulting two undergraduate students, as well as possessing and consuming alcohol on campus. While Plaintiff does not deny violating the campus alcohol policy, he has continued to deny he committed any act that violated the Sexual Misconduct Policy. Rather, in his Complaint, Plaintiff alleges numerous faults with the University and Board's handling of his disciplinary proceedings, and claims the proceedings violated his constitutional, statutory, and contractual rights.

On July 17, 2020, this Court issued an order partially granting Defendants' Motion to Dismiss Plaintiff's Complaint. Pursuant to the Order, Plaintiff's Complaint contains four active claims: (1) a 42 U.S.C. § 1983 substantive due process claim (Count 1); (2) an erroneous outcome claim under Title IX of the Education Amendments of 1972 (Count 2); (3) a 42 U.S.C. § 1983 Equal Protection Clause claim (Count 6); and (4) a claim for declaratory judgment for violation of Plaintiff's substantive and procedural due process rights under the United States and Iowa constitutions (Count 8). With the close of discovery in this matter, it is clear that Plaintiff's remaining claims fail as a matter of law. Even when the evidentiary record is viewed in the light most favorable to Plaintiff, there is no genuine issue of material fact with regard to Plaintiff's claims, and Defendants are entitled to judgment as a matter of law.

## II.  ARGUMENT

The court should grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord *United States v. Story Cnty.*, 28 F. Supp. 3d 861, 867 (S.D. Iowa 2014). While the Federal Rules of Civil Procedure give "[d]ue deference" to the "rights of litigants to have their claims adjudicated by the appropriate finder of fact . . . equal deference must be given under Rule 56 to the rights of those defending against such claims to have a just, speedy, and

inexpensive determination of the action where the claims have no factual basis." *Anderson v. Indus. Elec. Reels, Inc.*, 812 F. Supp. 999, 1002 (D. Neb. 1993). Consequently, summary judgment is appropriate where resolution of a question of law is controlling. *See Ferezy v. Wells Fargo Bank, N.A.*, 755 F. Supp. 1010, 1013 (S.D. Iowa 2010). Because there is no genuine issue of material fact with regard to any of Plaintiff's claims, and because the individual Defendants are entitled to a grant of qualified immunity with regard to Plaintiff's constitutional claims, this Court should grant summary judgment in favor of Defendants and Plaintiff's lawsuit should be dismissed with prejudice in its entirety.

### A. This Court Should Grant Summary Judgment to the Defendants on Plaintiff's Erroneous Outcome Claim under Title IX of the Education Amendments of 1972.

In Count 2 of his Complaint, Plaintiff raises an erroneous outcome claim under Title IX of the Education Amendments of 1972. Document 57, ¶¶ 389-412. In its recent decision in *Rossley v. Drake University*, the Eighth Circuit Court of Appeals rejected the categories of Title IX claims set forth by the Second Circuit in *Yusuf v. Vassar College*. *See Rossley*, 979 F.3d 1184, 1192 (8th Cir. 2020); *Yusuf*, 35 F.3d 709, 715 (2d Cir. 1994). Instead, the Eighth Circuit reaffirmed the Title IX pleading standard set forth in *Doe v. University of Arkansas-Fayetteville*. *Rossley*, 979 F.3d at 1192 (citing *Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020)). Under this standard, a plaintiff "must allege adequately that the University disciplined [the plaintiff] on the basis of sex…" *Id.* The Court also explained that the *Yusuf* categories "simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student." *Id.* (quoting *Doe v. Purdue University*, 928 F.3d 652, 667 (7th Cir. 2019)) (internal quotation marks omitted).

While framed under the *Yusuf* category for an erroneous outcome claim, Plaintiff has alleged two main theories in support of his claim that his sex was a motivating factor in the University's decision to discipline him. First, Plaintiff alleges that the University's disciplinary

4

process was rife with procedural flaws at the investigatory, hearing, and appeal stages and that the University reached a conclusion in conflict with the weight of the evidence. Second, Plaintiff alleges that broader trends within the University demonstrate its supposed anti-male bias in student discipline for sexual misconduct.

Plaintiff's claim fails as a matter of law because he cannot establish that the University's disciplinary process was sufficiently flawed or reached an outcome that was so disconnected from the weight of the evidence as to support an inference of gender bias, nor does the evidentiary record support an inference of gender bias based upon Plaintiff's allegations of broader trends within the University.

      i.   Plaintiff cannot establish that there were substantive flaws in his student disciplinary process nor that the process reached an outcome that contradicted the weight of the evidence.

As previously stated, Plaintiff's first alleges that his student disciplinary process was rife with procedural flaws and rendered a conclusion that contradicted the weight of the evidence, such that the process creates an inference of anti-male gender bias. In his Complaint, Plaintiff alleges several procedural flaws and evidentiary weaknesses to challenge the accuracy of the disciplinary outcome in his case, essentially claiming that the process was flawed at every stage.

      a.   Investigation Stage

Starting with the investigations conducted by Defendant Tiffini Stevenson Earl ("Stevenson Earl"), Plaintiff raises several complaints about both how Stevenson Earl conducted her investigations and the eventual investigative reports she wrote at the conclusion of her investigations. *See* Document 57, at ¶¶ 92, 96, 103, 118-37. However, when examined against the evidentiary record, it becomes clear that Plaintiff's allegations do not pass muster.

First, Plaintiff alleges that the investigators – according to him, both Stevenson Earl and Defendant Constance Schriver Cervantes ("Schriver Cervantes") – had conflicts of interest that

—

made their involvement in the case inappropriate. *See id.*, at ¶¶ 16, 119, 399. At the outset, Plaintiff's understanding of some of the roles the University officials played in his disciplinary process is factually wrong – namely, claiming that Schriver Cervantes served a simultaneous/dual role as a "co-investigator" to Stevenson Earl and as the Charging Officer in both cases. However, the reality is Schriver Cervantes served as a "notetaker" during Stevenson Earl's investigations, asking very limited questions for clarification purposes and uninvolved in the drafting of the final investigative reports. Appx. 749-751 at 6:22-7:4, 13:23-14:1, 14:24-25, 15:14-16; Appx. 858 at 16:6-13. Furthermore, at the time of Stevenson Earl's investigations, Schriver Cervantes had not yet been assigned as the Charging Officer in either case. Appx. 750-751 at 13:17-22, 14:5-12. And finally, Schriver Cervantes had no role in drafting or finalizing either investigative report issued in Complainants' cases. Appx. 749 at 6:22-7:4; Appx. 858 at 16:12-13; *see also* Appx. 285-309; Appx. 310-332.

Next, Plaintiff specifically claims that Stevenson Earl was under pressure to act more harshly against male students accused of sexual misconduct. Document 57, at ¶¶ 281, 284-92, 318-19, 324, 326. This claim is undercut in multiple respects. First, Plaintiff confuses and conflates the lawsuits referenced in his Complaint as background pressure on University officials, including Stevenson Earl. Specifically, Plaintiff references four lawsuits filed by Newkirk Zwagerman Law Firm: two connected lawsuits for sex/gender discrimination filed by two former University athletics officials; and two, unconnected Title IX lawsuits filed by female students. *Id.*, at ¶¶ 281-82. The first set of lawsuits were employment discrimination cases, for which one plaintiff successfully won a trial judgment and the other obtained a settlement from the University, for a

total, combined award of $6.5 million.[1] Plaintiff conflates the latter two lawsuits, as well as connecting them to the former settlement. In one case, an undergraduate student alleged a University employee made lewd gestures at her during a student rally – this case was eventually settled for a nuisance amount without any admission of fault by the University.[2] The other lawsuit, which was a Title IX claim by a graduate student alleging the University mishandled her sexual misconduct allegations against a fellow graduate student, was dismissed in its entirety by the Iowa District Court for Polk County upon the University's motion for summary judgment.[3] As for the other instances of alleged pressure, Stevenson Earl responded to those claims directly during her deposition, categorically denying that her judgment or conduct was affected by any of the alleged factors listed by Plaintiff in his Complaint. *See* Appx. 882-883 at 113:17-114:2.

Plaintiff then takes issue with Stevenson Earl allowing certain witnesses to be interviewed twice – specifically Complainant #1's boyfriend, D.L. Document 57, at ¶ 133. However, during his deposition, Plaintiff admitted that he had no evidence regarding the circumstances of Stevenson Earl's decision to "re-interview" D.L., even with access to Stevenson Earl's interview notes. Appx. 820-821 at 71:23-74:2.

He also alleges Stevenson Earl's credibility determinations were "arbitrary" and based upon a backwards presumption of guilt against Plaintiff. Document 57, at ¶¶ 127-31. Specifically, Plaintiff takes issue with Stevenson Earl determining that both complainants' accounts were more credible than his own version of events. *Id.* Here, Plaintiff seems to believe that Stevenson Earl

---

[1] *See* Erin Jordan, "University of Iowa pays $6.5 million in Meyer, Griesbaum cases", THE GAZETTE (May 19, 2017), *available at* https://www.thegazette.com/subject/news/higher-education/university-of-iowa-pays-6-million-in-meyer-griesbaum-cases-20170519.

[2] *See* Settlement Agreement, *Bryant v. University of Iowa, et al.*, *available at* https://settlements-regents.sws.iastate.edu/files/f/7/e/f7e8463cb17a058fcedf8e2cdd3f6ec67a259dd2/10-30-19-Bryant-Settlement-FINAL.pdf (settling Bryant's claims against the University for a total of $21,250, with no admission of liability on the part of the defendants).

[3] *See* Order Re: Defendants' Motion for Summary Judgment, *Lange v. University of Iowa, et al.*, Polk County Case No. LACL139221 (Jan. 17, 2020) (dismissing Lange's petition in its entirety).

was using an inconsistent standard in assessing credibility. Namely, Plaintiff complains that in her report for Complainant #1, Stevenson Earl noted that Plaintiff's account of events "for the most part matched" Complainant #1's, whereas in her report for Complainant #2, she wrote that his account "was extremely different from [Complainant #2's] account…." *See* Appx. 305; Appx. 328. Plaintiff claims these assessments are somehow in conflict; however, it seems clear that Stevenson Earl was assessing credibility based upon the specifics of each individual case. Further, Plaintiff seems to ignore the detailed explanation provided by Stevenson Earl in each report as to her credibility determinations.

Plaintiff also alleges Stevenson Earl refused to interview key fact witnesses, such as the University custodian who allegedly walked in on Plaintiff and Complaint #2 in the SURG Lab or a waiter at a restaurant he and Complainant #2 ate at one time, while conversely contacting "multiple witnesses identified by" both complainants. Document 57, at ¶ 130. However, as Stevenson Earl noted in her deposition, she is afforded discretion in determining which witnesses are worth interviewing. Furthermore, she relies upon the parties in question to provide a description of what proffered witnesses are likely to tell her in order to make this determination – are they material witnesses who can provide key details to the events in question, or are they merely character witnesses or witnesses who can only speak to inconsequential facts? *See* Appx. 875 at 84:12-85:4. In the case of the two "rejected" witnesses identified in Plaintiff's Complaint, Stevenson Earl testified that she did not recall Plaintiff ever identifying either witness to her during her investigation. Further, she stated that even if he did, she likely would not have considered either to be material witnesses warranting contact/interview. Appx. 871 at 67:17-69:1; 875 at 85:11-87:5. The custodian could only speak to facts that were uncontested by both Plaintiff and

Complainant #2.[4] The waiter, based on Stevenson Earl's own assessment, was unlikely to provide critical details beyond simply that Plaintiff and Complainant #2 ate together at the restaurant at least one time, which was again, an uncontested fact. The janitor, as Plaintiff admits in his deposition, did not "see any of the sexual activity." *See* Appx. 824 at 87:9-15.

Finally, Plaintiff claims Stevenson Earl excluded "much exculpatory information" in her investigative reports – specifically that Complainant #1 told her friend R.C. that she "didn't take [her encounter with Plaintiff] so seriously at the time"; that Dr. Lovaglia believed there was a "mutual attraction" between Plaintiff and Complainant #1; that D.L. initially was unaware of Plaintiff alleged touching Complainant #1's breast, but then later recalled the information during a follow-up with Stevenson Earl; that Complainant #1 did not initially inform Dr. Lovaglia about the alleged breast touching; or that Complainant #1 may have been upset with Plaintiff regarding an email in which he questioned her work ethic in the SURG Lab. *See* Document 57, at ¶¶ 133-36. While it is true that Stevenson Earl's reports did not include these specific statements, this does not necessarily cast doubt upon the accuracy of the outcome in Plaintiff's proceeding. First, there is no indication that Stevenson Earl did not at least consider these statements – after all, they were included in her investigation notes, which Stevenson Earl relied upon in drafting her final reports. Second, Stevenson Earl's reports were not the dispositive findings for Plaintiff's disciplinary process. At most, the reports simply advanced both complaints to the hearing phase, where Plaintiff was afforded the opportunity to present witnesses, evidence, and questions addressing the very points Plaintiff believes were missed by Stevenson Earl's reports. *See* Appx. 826 at 94:2-95:16 (Plaintiff admitting that Frost had the opportunity to hear his evidence at hearing even if it was excluded from Stevenson Earl's investigative report).

---

[4] Namely, that both were in the SURG Lab alone on the night in question.

b.  Hearing Stage

Turning to the hearing stage of Plaintiff's disciplinary proceedings, Plaintiff alleges procedural and evidentiary flaws at both the pre-hearing phase and hearing phase. In terms of the pre-hearing phase, Plaintiff alleges that University policy, as well as the Notice of Charges sent to him by Schriver Cervantes, prohibited him from "contact[ing] any of the reporting parties" – presumably for deposition-style interviews – or from "contacting or interviewing material witnesses," and thus "hampered his ability to present a defense" at the hearing. Document 57, at ¶ 143. This in turn, according to Plaintiff, forced him to "rely on Stevenson Earl's inaccurate, incomplete, and intentionally misleading report[s]," compounding the alleged accuracy issues he has raised with regards to Stevenson Earl's investigations. *Id.*, at ¶ 144. However, this allegation is completely contradicted by the evidentiary record. In the Notice of Charges, Schriver Cervantes writes that "the Anti-Retaliation Policy prohibits retaliation against a complaining party." Appx. 356. Further, the Notice of Charges makes no reference to any prohibition against Plaintiff or his attorney contacting any of the witness, other than the Complainants. *Id.* If Plaintiff or his attorney were confused or uncertain about his ability to contact witnesses prior to the hearing, the burden was on them to seek clarification from Schriver Cervantes or any other related University official, which they did not do. Thus, if anyone "forced" Plaintiff to be reliant upon Stevenson Earl's reports, it was Plaintiff and his attorney.[5]

As for the hearing itself, Plaintiff once again raises a claim of bias, this time on the part of the Adjudicator, Defendant Iris Frost ("Frost"). Plaintiff claims that Frost was biased from the

---

[5] Additionally, Defendants note that Plaintiff had access not only to both of Stevenson Earl's investigative reports, but also Stevenson Earl and Schriver Cervantes' witness interview notes as well. *See* Appx. 818-819 at 63:2-68:8 (Plaintiff admitting that he received a packet of interview notes from Connie Schriver Cervantes and Tiffini Stevenson Earl, but apparently taking issue with the completeness of those notes despite being unable to point to any particular notes he suspects were missing).

outset in three respects: first, Frost is a Caucasian female[6]; second, Frost is a former prosecutor[7]; and third, Frost was also a University professor at the time of the hearing.[8] Document 57, at ¶ 145-46. This carries forward in Plaintiff's characterization of Frost's behavior during the hearing itself, in which Plaintiff claims Frost "acted as a prosecutor on behalf of [the University]…cross-examin[ing Plaintiff] with leading, loaded, and incriminating questions…[while] ask[ing] Complainants open-ended softball questions." *Id.*, at ¶ 152. Plaintiff also claims that the consolidation of both cases under one hearing "prejudiced the Adjudicator" and was an abuse of Frost's discretion. *Id.*, at ¶ 160.

Starting with the alleged inherent conflicts Plaintiff raises, each are directly rebutted by both reason and the record. First, Plaintiff points to Frost's race and sex as creating an inherent bias – this is problematic in of itself, with the clear implication being that, as a White female, Frost was inherently biased in favor of the Complainants solely by virtue of their shared racial and sex identities. To flip this "logic" around, could the Complainants not have raised the same concern if the adjudicator was a non-White male? Second, Plaintiff notes that Frost was a former prosecutor – again, the implication being that this inherently biased her against him as the accused "defendant" in the case. However, not only did Frost not work sex crimes cases during her time at the Johnson County Attorney's Office,[9] Plaintiff's allegation falls into the same logic trap as the previous allegation. Namely, are all former prosecutors inherently unable to serve as neutral adjudicators? Could not the Complainants raise the same, related concerns in the event of an adjudicator who

---

[6] The implication being that she was more inclined to side with the Caucasian female complainants.

[7] The implication being that she was more inclined to side with the complainants, or at the very least, inclined to be hostile towards Plaintiff as the "defendant" in the hearing. *See* Document 57, at ¶¶ 148-51.

[8] The implication being that she was more inclined to side with the University, as the "prosecution" in the hearing, out of fear of professional repercussions from the University for an "unfavorable" decision. *See id.*, at ¶¶ 146, 148.

[9] *See* Appx. 760 at 14:15-19.

previously served as a career-long defense attorney? These shallow, conclusory assertions of bias do not provide the "articulable" doubt required of an erroneous outcome claim.

Finally, regarding Frost's simultaneous employment as a University professor, Frost herself testified that at no point did she feel that an "unfavorable" decision would result in retaliation against her by the University. *See* Appx. 760 at 16:2-18. Indeed, Frost noted in her deposition that she has ruled "against" the University in multiple cases since she began serving as a student disciplinary adjudicator at the University. *Id.*

Plaintiff levies a multitude of criticisms towards how Frost conducted the hearing itself, as noted previously. First, Plaintiff takes issue with the witness examination format required under University policy, in which all witness questions must be submitted to Frost, who then has discretion over which questions to ask, what order to ask acceptable questions, and how to phrase those questions. *See* Document 57, at ¶¶ 153, 156, 161. However, multiple courts have approved of of such a hearing format. *See e.g.*, *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018) (holding that a university adjudicating a sexual assault case must provide for "some form" of cross-examination, but noting that an accused student is not guaranteed the right to *personally* confront his accuser and other witnesses); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 401 (6th Cir. 2017) (court looked favorably upon format directing cross-examination questions through the hearing panel to protect the accuser from harassment by the accused student); *Winnick v. Manning*, 460 F.2d 545, 550 (2d Cir. 1972) (holding that "[d]ue process does not invariably require the procedural safeguards accorded in a criminal proceeding" and that "due process did not require cross-examination in this case"); *Furey v. Temple Univ.*, 884 F.Supp.2d 223 (E.D. Penn. 2012) (holding that the plaintiff was afforded the opportunity to cross-examine witnesses by posing questions through the hearing chair, which gave him the opportunity to probe issues of credibility); *see also* Order on Motion to

Dismiss, *Kim v. The Univ. of Northern Iowa, et al.*, No. 19-cv-2037 CJW-KEM (N.D. Iowa Mar. 19, 2019), at 26 (holding that there is "no clearly established right for a plaintiff to cross-examine adverse witnesses in a university's disciplinary proceeding.").

Taking his allegation further, Plaintiff claims "Frost ignored questions [he] provided about inconsistencies regarding [Complainant #2]," such as questions involving Complainant #2's history with alcohol. Document 57, at ¶ 167; *see also* Appx. 371-381. Again, this is contradicted by the evidentiary record. Frost did indeed ask Complainant #2 about going to the Iowa Chop House with Plaintiff, as well as whether Complainant #2 ordered beer while at the restaurant and how she perceived the encounter. *See* Appx. 411-412 at 117:4-119:15. While Frost may not have phrased the questions exactly as Plaintiff did in his list of proposed questions, Frost plainly did not "ignore" the questions. Frost also asked Complainant #2 about her history with alcohol, asking how many times she had previously had beer and about why she had a fake ID. *See* Appx. 407 at 99:11-100:25.

Plaintiff also complains that Frost's line of questioning to Dr. Lovaglia regarding a file on Complainant #2's computer "damaged [Plaintiff's] long-developed relationship with [Dr. Lovaglia]." Document 57, at ¶¶ 170, 175. This allegation says nothing as to the accuracy of the outcome in this proceeding.

Plaintiff also claims that "Frost used leading questions to pressure [Complainant #2] into portraying [Plaintiff] as a sexual predator…" Document 57, at ¶¶ 185-86. This is a gross mischaracterization of the exchange between Frost and Complainant #2. *See* Appx. 424 at 169:5-22. As explained by Frost in her deposition, the line of questions was aimed at addressing one of the elements of the sexual assault charge brought against Plaintiff – namely, whether there was any coercion in the form of a threat of physical violence. *See* Appx. 767 at 43:1-45:3; 771 at 61:4-

24. There is no indication in the hearing transcript that Frost "pressured" Complainant #2 into any specific answer.

Also, as noted previously, Plaintiff believes that Frost's questioning of himself was akin to "cross-examining…as a hardened prosecutor…designed to elicit a confession, rather than an attempt to reconstruct an event factually." Document 57, at ¶ 198. Finally, Plaintiff overall claims Frost "harass[ed Plaintiff] based on his sex and create[ed] a hostile environment…" *Id.*, ¶ 228. However, a fair reading of the transcript and Frost's examination of Plaintiff refutes this characterization. *See* Appx. 548-592 at 654:24-831:4.

Second, Plaintiff argues Frost "abuse [her] discretion" regarding the admissibility of evidence. Document 57, at ¶ 207. Specifically, Plaintiff claims Frost "allowed [Complainant #1] to submit further evidence toward the end of the hearing **after** [Plaintiff] had testified…" *Id.* (emphasis in original). Yet, at the hearing, Plaintiff was represented by counsel – Mr. Marcus Mills – and Mr. Mills made no objections to any of the rebuttal exhibits offered by Schriver Cervantes and accepted by Frost. *See* Appx. 596 at 847:16-849:21. In fact, Mr. Mills indicated that he "had the opportunity to look at all of them" prior to Schriver Cervantes offering them into evidence. *Id.* at 847:19-21.

Next Plaintiff focuses on several complaints with Frost's adjudicative decision. Plaintiff claims that "[r]ather than basing her decision on the evidence, [Frost] based her decision on her 'opinion,' and theories on what neutral events could have meant." Document 57, at ¶ 208. First, Plaintiff alleges Frost "changed the content of the [alcohol related] violation[s]" to find him responsible of both charges. *Id.*, at ¶ 211-12. Again, this is explained by the evidentiary record. In the Notice of Charges, Plaintiff was charged with violating the University's campus alcohol policy in both Fall 2016 and Spring 2017. *See* Appx. 354-357. Frost found Plaintiff responsible for

14

violating the policy related to actions in Fall 2016. *See* Appx. 647-648. Indeed, in her decision, Frost noted that Plaintiff admitted to violations of the policy related to Fall 2016, while denying violations related to Spring 2017. *See* Appx. 625. ("However, after the close of testimony, which included testimony from [Doe] admitting that he did on several occasions in the Fall Semester 2016 possess and consume alcoholic beverages (beer) in the SURG lab in Seashore Hall, which is on the University of Iowa main campus in a University building. [Doe] said he initially had plead NOT RESPONSIBLE because he denied possessing or consuming alcoholic beverages on campus during the Spring Semester 2017.").

Second, he alleges Frost "falsely and arbitrarily" found him to have held an "educational leadership role," despite Stevenson Earl's alleged opposing finding on the matter. Document 57, at ¶ 213. Again, this is a misleading characterization of Frost's decision. While it is true that Frost found Plaintiff held an "educational leadership role" within the SURG Lab, she fully explained the reason for her finding, citing witness testimony and exhibits produced during the hearing. *See* Appx. 628. As for the conflict between Stevenson Earl's investigative findings and Frost's adjudicative decision, Frost was in no way bound by Stevenson Earl's findings – if Frost determined that the evidence supported a different conclusion, she was perfectly within her authority as the adjudicator to make a different finding.

Plaintiff also claims Frost "applied stereotypes based on outdated gender roles, implying that females could not be sexually forward or assertive, and calling [his] belief that [Complainant #2] consented to sexual conduct with him a 'fantasy.'" Document 57, at ¶ 214. As discussed in her deposition, Frost did not discount the possibility that a female student could initiate a sexual encounter – rather, she simply found Plaintiff's version of his encounter with Complainant #2 to

strain credulity. *See* Appx. 630 ("[Plaintiff's] version of the encounter…seems highly unlikely…"); *see also* Appx. 763 at 28:20-29:3, 771 at 60:2-6.

Second, Plaintiff claims Frost "cherry-picked evidence; omitted exculpatory evidence; manipulated and edited facts; ignored inconsistencies in Complainants' stories; and reached conclusions unsupported by the evidence." Document 57, at ¶ 217. As an example of this, Plaintiff asserts that "Frost overlooked that Complainants failed on all factors needed to be deemed credible, including that Complainants' testimonies objectively lacked plausibility; that they had strong motives for falsely accusing [Plaintiff]; and that they failed as it related to corroboration completely." *Id.*, ¶ 218. Defendants are unsure what Plaintiff means by "all factors need to be deemed credible."[10] Frost explained in detail why she made the credibility determinations she did. *See* Appx. 630, 638.

As for the Complainants' alleged motive to lie,[11] while Frost never expressly addresses those concerns in her decision, she does note that her findings were built upon more than Complainants' testimonies. *Id.* (Frost's Adjud. Decision, at 11) ("Nonetheless, this Adjudicator examined other credible evidence."); *Id.* (Frost's Adjud. Decision, at 19) ("Although [Complainant #1] was a credible witness, this Adjudicator chooses to look for additional consistent evidence from other credible witnesses to determine whether there was a violation of the University's Sexual Misconduct Policy."). Thus, even if the Complainants' had a motive to lie, such a concern was mitigated in Frost's decision by Frost's reliance of corroborating evidence providing in the hearing.

---

[10] Notably, Plaintiff disagrees with the basic premise that a factfinder may, in a difficult case where two parties tell conflicting stories, use many factors, including a witness's demeanor and body language, in making credibility determinations. *See* Appx. 822-823 at 78:17-84:17. Plaintiff admits, however, that even if he disagreed with the criteria used by Stevenson Earl to determine whether or not he was a credible witness, that Stevenson Earl did provide rationale for her credibility determination in her investigative report. *See* Appx. 823 at 84:11-17.

[11] Additionally, Plaintiff admits in his deposition that he never presented a "motive" argument during the hearing regarding Complainant #1. Appx. 845 at 170:15-20.

Third, Plaintiff claims Frost "used an improper burden of proof" in her decision. Document 57, at ¶¶ 220-21. Specifically, Plaintiff alleges Frost determined Plaintiff's friend, S.B., was not credible because he "did **not** know about [Plaintiff] touching [Complainant #2's] breast without consent…" *Id.*, at ¶ 220. This is a misleading characterization of Frost's credibility determination with regards to S.B. Specifically, Frost had determined, based on Plaintiff and S.B.'s previous testimony that Plaintiff would often tell S.B. about his various sexual or intimate encounters in detail, that it was notable that S.B. apparently was unaware of some of the major details of Plaintiff's encounter with Complainant #1. *See* Appx. 640. Furthermore, Frost never states she found S.B. to not be a credible witness – rather she found his testimony largely unhelpful as a fact witness, instead concluding that S.B.'s "primary mission as a witness at this hearing was to help [Plaintiff], rather than to report the facts as he knew them." *Id.* Essentially, S.B. was a character witness. And in that vein, Frost did not find his testimony to shift the balance in Plaintiff's favor. *Id.*; *see also* Appx. 771 at 59:20-60:1.

Plaintiff also alleges Frost effectively shifted the burden of proof to Plaintiff, to establish that he obtained affirmative consent from the Complainants. Document 57, at ¶ 221. Once again, this is a mischaracterization of Frost's decision. While Frost did ask Plaintiff pointed questions regarding the issue of affirmative consent, this was after both Complainants had already testified that they did not consent to the sexual activity. *See* Appx. 402 at 81:15-25, 403 at 83:17-19; 423 at 164:25-165:6, 448 at 264:18-25, 456 at 297:19-24. Further, the University's Sexual Misconduct Policy explicitly states, "It is the responsibility of the person who wants to engage in the sexual activity to ensure that consent is obtained from the other person." *See* Appx. 626. In the face of situations where neither incident was observed by a third-party to testify as to consent, Frost was required to make credibility determinations which would settle the issue of consent. That she found

17

the Complainants more credible is not "effectively shifting the burden of proof" against the Plaintiff. Nor is it "burden-shifting" to ask Plaintiff about a rebuttable element of the charges against him.

Finally, Plaintiff alleges that the sanction chosen by Defendant Lyn Redington ("Redington"), the then-Dean of Students at the University, was grossly disproportionate. Document 57, at ¶¶ 232, 408. As explained in her affidavit, Redington first reviewed the recommendations made by the investigator, Stevenson Earl, and the adjudicator, Frost, in this case when deciding upon what sanctions to issue. *See* Appx. 906 at ¶ 10. Further, for every case where final sanctions are imposed upon a student related to sexual misconduct, Frost would consult the University's Office of the Sexual Misconduct Response Coordinator ("OSMRC") and the University's Office of the General Counsel, as well as review University policy and the sanctioning guidelines for sexual misconduct cases developed by the University. *Id.* Redington concluded that the sanctions imposed in Plaintiff's case were consistent with University policy and the sanctioning guidelines. *Id.* at ¶ 11. Plaintiff provides no evidence beyond his own presuppositions and assertions that Redington considered Plaintiff's gender when making her sanctioning decision.

c.   University Appeal Stage

Defendants next turn to Plaintiff's allegations regarding his internal University appeal, handled by Defendant John Keller ("Keller"), the Dean of the University's graduate program.[12]

Plaintiff first raises issue with the fact that the University student disciplinary procedure has a faculty member handle internal appeals, as opposed to hiring an "external panel" as some other universities do. Document 57, at ¶ 236. While it is true that some universities use a panel

---

[12] Notably, many of Plaintiff's allegations regarding his University appeal connect to his since-dismissed Title IX deliberate indifference claim (Count 4). *See* Document 106, at 45.

format for student appeals – with a mix of external and internal panels – other universities follow

a similar appeal format as the University.[13]

---

[13] Specifically, within the Big Ten Conference:
- The **University of Illinois Urbana-Champaign** provides two possible appeal options: (1) appeal to the Director of the Office for Student Conflict Resolution; or (2) appeal to the Senate Committee on Student Discipline ("SCSD"), under which the Chair of the SCSD forms an Appeal Committee comprised of at least three members of the SCSD, including at least one faculty member and one student. *See Article III: Appeals*, Student Disciplinary Procedures, *available at* http://conflictresolution.illinois.edu/policies/student-discipline/articleIII/ (last visited Oct. 28, 2020).
- **Indiana University** provides a "review board" comprised of "a faculty member [ appointed by the "faculty council president"], an administrative officer [appointed by the university president], and a student [appointed by the president of the student body]. *See 3. Appeal*, Code of Student Rights, Responsibilities, & Conduct, *available at* https://studentcode.iu.edu/procedures/bloomington/discipline/personal-misconduct/appeals.html (last visited Oct. 28, 2020).
- The **University of Maryland** provides a panel, known as the "University Senate Student Conduct Committee Appellate Body," which is compromised of "three members from the Student Conduct Committee including at least one student." *See Appeals*, University of Maryland Code of Student Conduct, at 13, *available at* https://policies.umd.edu/assets/section-v/V-100B.pdf (last visited Oct. 28, 2020).
- The **University of Michigan** uses a three-person panel format comprised of "one student appointed by the Central Student Government, one faculty member appointed by the Faculty Senate, and one administrator appointed by the [university] President." *See Stage 3: Appealing the Resolution Process*, Statement of Student Rights and Responsibilities, *available at* https://oscr.umich.edu/statement#stage3 (last visited Oct. 28, 2020).
- In cases of non-academic student discipline, **Michigan State University** provides an appeal panel – the "University Student Appeals Board" – which is comprised of "two undergraduate students, one graduate student, one staff member, and two faculty members." *See* Student Rights and Responsibilities, at Art. 5.I.F., Art. 4.IV.A., *available at* http://splife.studentlife.msu.edu/student-rights-and-responsibilities-at-michigan-state-university (last visited Oct. 28, 2020).
- For cases of student sexual misconduct, the **University of Minnesota** directs appeals to an "appellate officer" – typically a member of the university administration. *See Appeal*, Post-Investigation Procedures for Formal Complaints of Violations of Admin. Policy: Sexual Harassment, Sexual Assault, Stalking and Relationship Violence, *available at* https://policy.umn.edu/hr/sexharassassault-proc01 (last visited Oct. 28, 2020).
- The **University of Nebraska-Lincoln** provides two options for appeal: (1) direct appeal to the "Appeals Officer"; or (2) appeal to an "Appeals Board," both of which are appointed by the Vice Chancellor "responsible for student conduct of each University institution." *See* Student Code of Conduct, at Secs. III & VI, *available at* https://studentconduct.unl.edu/student-code-conduct (last visited Oct. 28, 2020).
- In cases of sexual misconduct between two students, **Northwestern University** directs appeals to the Assistant Dean/Director of Student Conduct. *See* Comprehensive Policy on Sexual Misconduct, at Sec. III.E., *available at* https://www.northwestern.edu/equity/documents/2019-policy-on-sexual-misconduct-final.pdf (last visited Oct. 28, 2020).
- For student sexual misconduct cases, **Ohio State University** provides a single appeals officer to handle a case. *See* Sexual Misconduct Policy, at Sec. VII, *available at* https://policies.osu.edu/assets/docs/policy_pdfs/SexualMisconduct_FINAL.pdf (last visited Oct. 28, 2020).
- For sexual misconduct cases, **Pennsylvania State University** provides a single appeal officer, who, in cases of graduate students, is the Vice Provost for Graduate Education / Dean of the Graduate School or their designee. *See Appeal Rights of Parties*, Title IX Sexual Harassment Policy, *available at* https://policy.psu.edu/policies/ad85#APPEAL%20RIGHTS%20OF%20PARTIES (last visited Oct. 28, 2020).
- **Purdue University** directs appeals to the Vice President for Ethics and Compliance. *See* Procedures for Resolving Complaints of Discrimination and Harassment, at Sec. L, *available at* https://www.purdue.edu/ethics/resources/resolving-complaints.php (last visited Oct. 28, 2020).

Next, Plaintiff claims Keller was "motivated to appear in favor of female students accusing male students of sexual misconduct" due to one of the "relevant" lawsuits Plaintiff references. As stated previously, Plaintiff is simply mistaken about the nature of these lawsuits, particularly the lawsuit to which Keller was connected.[14] And as Keller himself testified, he felt no pressure to rule in Plaintiff's appeal in either direction based upon the referenced lawsuit. *See* Appx. 899 at 51:13-17. In fact, Keller pointed out that he has ruled both for and against accused students in sexual misconduct cases, across his time handling University appeals. Appx. 900-901 at 57:25-58:8.

Finally, Plaintiff argues he met the "burden of proof needed for reversing the findings or demanding further hearing." Document 57, at ¶ 242. Keller was clearly not convinced that that was the case. *See* Appx. 655 ("In reviewing these cases and the subsequent appeal, I find NO violation of any of the five grounds upon which an appeal may be overturned.").

### d.   Board of Regents Appeal

Defendants now turn to Plaintiff's allegations regarding his appeal to Defendant Board of Regents ("Regents"), as directed by Defendant Mark Braun ("Braun"), the Executive Director of the Regents. In his appeal, Plaintiff raised the same allegations regarding the University's investigations and adjudicative hearing that he raises now in his Complaint. *See* Document 57, at ¶¶ 253, 256, 258-62, 266, 268-69. For those arguments, Defendants would simply direct the Court to the preceding discussion.

---

- For student sexual misconduct cases, **Rutgers University** provides appeal to the "Senior Student Affairs Officer" for the appealing student's school and/or division. *See* Student Policy Prohibiting Sexual Harassment, Sexual Violence, Relationship Violence, Stalking, and Related Misconduct, at Sec. VI.H., *available at* https://policies.rutgers.edu/sites/default/files/10.3.12-current.pdf (last visited Oct. 28, 2020).
- For student sexual misconduct cases, the **University of Wisconsin** provides for appeals to the Chancellor of the university, dean of the campus, or their designee. *See* Policy on Sexual Harassment and Sexual Violence, at Sec. VIII.A, *available at* https://compliance.wisc.edu/wp-content/uploads/sites/102/2020/08/policy-8.17.20.pdf (last visited Oct. 28, 2020).

[14] As noted previously, that lawsuit did not result in a settlement, but rather a dismissal upon the University's successful motion for summary judgment. *See supra* fn. 3.

Plaintiff also takes issue with how Braun directed the Regents appeal – namely that Braun denied Plaintiff's requests for a stay on the University's decision and for an extension of his appeal brief length.[15] *Id.*, at ¶ 246-50, 252. Regarding the former, Braun explained in detail his decision to deny Plaintiff's request for a stay. *See* Appx. 680-682. Plaintiff alleges this decision was unreasonable for two reasons. First, he claims Braun was "objectively unreasonable" when Braun concluded that Plaintiff's alleged potential harm related to the loss of "visa status" was "speculative." Document 57, at ¶ 250. However, in his decision, Braun noted that Plaintiff did "not offer information on the availability of alternative visas that would permit him to remain in the United States or travel to a country other than" his country of origin. Appx. 681. Meanwhile, the University "state[d] that alternatives to deportation, such as a request for asylum" were available to Plaintiff. *Id.* As such, Braun concluded that "any change in [Plaintiff's] visa status and his deportation…[was] speculative." *Id.*

Second, Plaintiff complains that Braun was unreasonable in noting that Plaintiff did not provide any evidence to support his claims in his "notice of appeal." Document 57, at ¶ 251. Braun made this note in the context of his assessment of the likelihood of Plaintiff succeeding on the merits of his appeal. *See* Appx. 681. Braun also noted that "[i]n his Notice of Appeal, [Plaintiff did] not directly dispute the alleged misconduct other than to challenge, *without explanation*, the constitutionality of the outcome, the severity of the sanctions, and the fundamental fairness of the process." *Id.* It is in this context that Braun concluded there was insufficient evidence or reason to conclude Plaintiff was likely to succeed on the merits of his appeal such that a stay of the University's decision was warranted. *Id.*

---

[15] On the latter issue, Braun did grant an extension of Plaintiff's page limit, from 25-pages to 35-pages, though Plaintiff requested an extension to 50-pages.

In summary, the allegations Plaintiff makes in his attempt to raise "articulable doubt" as to the accuracy of his student disciplinary proceedings are either erroneous, highly misleading, and/or subjective assertions that are not supported even by a review of the evidentiary record in the light most favorable to the Plaintiff. Plaintiff's allegations rely upon a cherry-picking of events and quotations at almost every level of his proceedings, stripping away critical context to cast them under the narrative necessary for his erroneous outcome claim. As such, these allegations are insufficient to create an inference of gender bias as required for Plaintiff's Title IX claim.

ii. The evidentiary record does not support Plaintiff's broader claims of systemic pressures and gender bias within the University's procedures.

Gender bias may be illustrated by identifying "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Rossley*, 342 F.Supp.3d at 924 (citing *Yusuf*, 35 F.3d at 715). That said, "conclusory allegations of gender bias based on the procedures of the disciplinary proceedings or decisions about the weight of the evidence are insufficient to defeat a motion for summary judgment…" *Id.* at 926. "[M]ere allegations that a disciplinary process was unfair or failed to take into account certain information do not create an inference of gender bias sufficient for Title IX." *Doe v. Blake Sch.*, 310 F.Supp.3d 969, 982 (D. Minn. 2018). Further, allegations "that a university official is biased in favor of the alleged victims of sexual assault…and against the alleged perpetrators" are similarly deficient. *Id.*

Here, Plaintiff has identified five "factors" in support of his allegation of gender bias in his disciplinary proceedings: (1) enforcement pressures created by the 2011 "Dear Colleague Letter" ("2011 DCL") issued by the U.S. Department of Education ("DOE"); (2) "biased statistics" utilized by the University; (3) the University allegedly "pathologizing masculinity"; (4) allegedly

gender biased training and ideology adopted by the University; and (5) campus pressure. Document 57, at ¶ 276.

a.   Alleged Enforcement Pressures Stemming from 2011 DCL

Plaintiff's first factor focuses on alleged pressure towards the University stemming from the 2011 DCL. Specifically, Plaintiff alleges the University feared the loss of federal funding if it did not aggressively, and unfairly, punish male students accused of sexual misconduct.[16] *Id.*, at ¶¶ 277-80. Plaintiff also notes two methods of Title IX enforcement that allegedly put pressure on the University to be biased against accused male students: (1) private lawsuits against the University by aggrieved students; and (2) investigations into the University by the DOE's Office of Civil Rights ("OCR").

On the first issue – private lawsuits against the University – Defendants have already discussed how Plaintiff is confused about the nature and details of the lawsuits he references. *See supra* at 5-6, 18-19. Further, as noted by Keller, the University can face lawsuits stemming from these type of cases regardless of the veracity of the claims or which party "wins" the disciplinary process – the results simply influence which party ends up filing the claim. *See* Appx. 901 at 58:19-59:6. As a result, University officials focus on the facts of the case before them and doing the best job they can. Appx. 898 at 47:4-14.

On the second issue – OCR investigations – federal courts have already found such allegations to be insufficient to demonstrate the requisite gender bias at the summary judgment stage. *See Rossley*, 342 F.Supp.3d at 929-30 (citing *Doe v. Trustees of Boston Coll.*, 892 F.3d 67, 92-93 (1st Cir. 2018); *Doe v. Purdue Univ.*, 281 F.Supp.3d 754, 780 (N.D. Ind. 2017); *Doe v.*

---

[16] The Eighth Circuit recently rejected a similar argument that the 2011 DCL coerced a defendant university into "pursuing punitive, one-sided investigations of male respondents in sexual misconduct disciplinary cases", and instead focused on the letter's use of gender-neutral language and acknowledgement that both men and women can be victims of sexual assault. *Rossley*, 979 F.3d at 1195-96.

*Univ. of Colorado*, 255 F.Supp.3d 1064, 1078 (D. Colo. 2017); *Doe v. Univ. of St. Thomas*, 240 F.Supp.3d 984, 992 (D. Minn. 2017)). This even includes instances where there is alleged "specific pressure by an investigation directed at the [u]niversity…" *Univ. of Colorado*, 255 F.Supp.3d at 1078. Finally, again, the specific Defendants in this case have all affirmatively denied that they felt any pressure to prejudge Plaintiff's case, but instead strove to conduct a fair, impartial process. *See* Appx. 882-883 at 113:17-114:2; Appx. 770 at 56:11-16; Appx. 901 at 58:13-59:3.

b. Alleged "Biased Statistics" Used by the University

Plaintiff's second factor focuses on allegedly "biased" or "misleading" statistics relied upon by the University is justifying various efforts and policies aimed at reducing sexual harassment and sexual assault at the University.

Plaintiff starts by criticizing the statistics used as part of the "It's On Us" campaign – specifically that, according to two studies, 1 in 5 college women are victims are sexual assault. Plaintiff alleges that the "It's On Us" campaign is "Direct and Indirect Evidence of Gender-Biased Motivations" because, at least in part, its promotional materials allegedly portray male students as "sexual predators." Document 57, at ¶ 291. Plaintiff has not provided any of these materials during the course of discovery. In his Complaint, Plaintiff simply cites a URL to the University's webpage on "It's On Us," which displays some of the various statistics to which Plaintiff is referring. *Id.*, at ¶ 291. Notably, none of the statistics displayed on this URL discuss the gender of sexual assailants – indeed, on the same line as the "1 in 5 women" statistics, the URL also notes that "1 in 16 men are sexually assaulted in college," highlighting that the issue of sexual assault affects members of both genders. *See* https://itsonus.org.uiowa.edu/numbers-need-change (last visited Oct. 29, 2020). Further, Plaintiff alleges that Stevenson Earl took part in a panel discussion during the University's "It's On Us" campaign. Document 57, at ¶ 292. However, Stevenson Earl denied this allegation,

and Plaintiff has provided no evidence to otherwise support his allegation. *See* Appx. 879 at 100:10-15.

Plaintiff next discusses the Iowa state legislature's 2017 budget cuts to the University's RVAP, alleging that these cuts somehow pressured the University to take a firmer stand against students accused of sexual misconduct/assault. Document 57, at ¶¶ 293-98.[17] Most of Plaintiff's argument on this point relies upon temporal correlations and conclusory allegations by Plaintiff. Furthermore, Plaintiff gets some of his own statistics wrong – for example, Plaintiff claims that, in 2017, the University "found all students who went through their formal hearing in 2017 responsible for sexual misconduct." *Id.*, at ¶ 295(d). However, in Plaintiff's own citation to the 2017 Report by OSMRC, 24 students were found not responsible for any policy violations. *See* https://osmrc.uiowa.edu/about-us/2017-annual-report/osmrc-case-and-outcome-data/report-resolution-and-outcomes (last visited Oct. 29, 2020).

Other portions of Plaintiff's allegations here rely upon selective and misleading quotations, particularly of statements made by DiCarlo. As an example, Plaintiff alleges that, at a 2018 Faculty Senate meeting, DiCarlo "expressed that one of [the University's] responsibilities is expanding 'programming' on 'masculinity.'" Document 57, at ¶ 300. However, Plaintiff omits that DiCarlo was referring to "programming on **healthy** masculinity." Appx. 743 (emphasis added). In no way was DiCarlo or the University declaring that masculinity was a pathological problem in-of-itself. Rather, as indicated by another of Plaintiff's citations, the University was hoping to engage with male students to have a narrative about various unhealthy versions of masculinity, as only one part of a broader campaign to address the issue of sexual violence on campus. *See*

---

[17] Defendants also note that Plaintiff claims the University found him responsible of sexual assault for a "consensual kiss" between himself and Complainant #1, which is a gross mischaracterization of the findings in Plaintiff's disciplinary proceedings. *See* Document 57, at ¶ 296. Plaintiff was found responsible precisely because Frost determined the kiss in question was **not** consensual. *See* Appx. 647-648 at ¶¶ 1, 3.

*https*://osmrc.uiowa.edu/anti-violence-coalition/2018-2021-anti-violence-plan (last visited Oct. 28, 2020). Finally, Defendants note that many of the quotations and citations in this section date to 2018, well after the conclusion of his proceedings at the University.[18]

Finally, Plaintiff baselessly claims that the University had a "personal and financial stake in ratcheting up the complaints against and punishments for alleged male perpetrators…" Document 57, ¶ 301. Plaintiff has provided no evidence supporting this claim.

### c.   Alleged "Pathologizing" of Masculinity by the University

For his third factor, Plaintiff claims the University effectively "pathologized" masculinity. As an example, Plaintiff cites the 2016 "It's On Us" summit, sponsored by the University. Document 57, at ¶ 306. Plaintiff characterizes this summit as "focusing just on men." *Id.* This characterization appears to be largely based on the reporting by *The Daily Iowan* on the keynote speech by Derrick Williams. *Id.* (citing Onstad-Hargrave, Anna, Sex Assault Summit Focuses on Men, *The Daily Iowan* (Apr. 20, 2016) (last visited Oct. 29, 2020)). However, this is misleading – as the article notes, the "focus on men" came from Williams' speech, rather than necessarily the summit as a whole. Onstad-Hargrave, Anna, Sex Assault Summit Focuses on Men, *The Daily Iowan* (Apr. 20, 2016), *available at* https://dailyiowan.com/2016/04/20/sex-assault-summit-focuses-on-men/ (last visited Oct. 29, 2020). And even this focus was explained within the article, with the author stating, "Williams said his keynote address was specifically targeted for men, saying that he did not want to try to speak for women." *Id.*

Plaintiff also discusses the February 2018 "What About Me(N)" Summit, hosted by the University. Document 57, at ¶ 309. Plaintiff claims this summit was another demonstration of the

---

[18] Stevenson Earl's investigations concluded in June 2017. *See* Appx. 285-309; Appx. 310-332. Frost's adjudicative decision was issued in October 2017. *See* Appx. 620-648. Keller's appeal decision was issued in November 2017. *See* Appx. 655.

University's "institutional hostility against males" because the summit was aimed at, in part, discussing how masculinity impacts rape culture and the culture of violence. Plaintiff points to an article published in *The Daily Iowan* as evidence of the "negative view" of men expressed at the summit. *Id.*, at ¶ 312. However, the article itself undercuts Plaintiff's characterization – rather than an assault on men or masculinity in general, the article describes the message of the summit as tackling unhealthy masculinity and aiming at providing men resources to express more positive forms or notions of masculinity. Woods, Elly, "What's wrong with today's masculinity?", *The Daily Iowan* (Mar. 1, 2018), *available at* https://dailyiowan.com/2018/03/01/whats-wrong-with-todays-masculinity/ (last visited Oct. 29, 2020).

Plaintiff next points to the University's "IDEAL Campus Culture Project," coordinated with RVAP and the Women's Resource & Action Center ("WRAC"), which set out to provide course recommendations for Rhetoric courses at the University involving "rape culture." *See* Document 57, at ¶ 314; *see also* The Campus Culture Project – Series II (Rape Culture) (2017), *available                              at*                              https://ideal.uiowa.edu/wp-content/uploads/sites/33/2017/02/CampusCulture_SeriesII-1.pdf (last visited Oct. 29, 2020). Plaintiff complains that one of the units under the project "encourages students to define their own versions of sexual assault rather than be concrete and objective of the crime that the U.S. DOE and Clery Act defines it to be." Document 57, at ¶ 314. Again, this is a mischaracterization by Plaintiff. Under the project plan, the "Redefining Sexual Assault" lesson is aimed at encouraging students to "confront their assumptions about sexual assault through considering how it impacts people of different genders ("it's not just a woman's issue")." The Campus Culture Project, at 1, https://ideal.uiowa.edu/wp-content/uploads/sites/33/2017/02/CampusCulture_SeriesII-1.pdf.

Beyond these allegations, Plaintiff's allegations are mostly conclusory claims, for which Plaintiff has not provided supporting evidence.

### d.   Allegedly Biased Training and Ideology Adopted by the University

Plaintiff's fourth factor rests on allegations that the University utilized and adopted gender-biased trainings and ideologies. Plaintiff specifically takes issue with allegedly "victim-centered methods" used by the University, including "Start by Believing, trauma-informed, and Forensic Experiential Trauma Interview" methods. Document 57, at ¶ 319. This is allegation fails for multiple reasons.

First, Stevenson Earl specifically rejected the notion that she utilized a "victim-centered" approach to her investigations – nor that she was expressly trained on any such approach. Appx. 877 at 90:21-91:6; 878 at 96:12-15. Rather, Stevenson Earl acknowledged using a trauma-informed approach, which is aimed at understanding the impacts of trauma and incorporating that understanding into interview strategies. Appx. 877 at 91:7-92:4. Further, Stevenson Earl noted that she also works to incorporate the trauma/emotions of the accused student in a similar manner. *Id.*

Second, even under Plaintiff's descriptions in his Complaint, the methodology complained of was gender-neutral. Plaintiff has provided no evidence suggesting or demonstrating that the University only utilized these methods when the reporting party was female and/or the accused party was male. Indeed, Stevenson Earl expressly rejected that she would ever change her approach based upon the genders of the parties. Appx. 882 at 117:1-22. Instead, Plaintiff has continually conflated "accused student" with "male student," insisting that any process or method that is allegedly biased against an "accused student" is inherently biased against "male students" as well.

### e.   Alleged Campus Pressure

Plaintiff's final factor is alleged campus pressure placed on the University to take a stronger stand on sexual violence on campus. Plaintiff starts by discussing a 2007 Special Counsel report

involving an investigation into a sexual assault allegedly committed by two football players. Document 57, at ¶ 324. Plaintiff notes that Stevenson Earl was criticized in the report. *Id.* As noted previously, Stevenson Earl addressed this issue during her deposition, stating that the report was misleading, but also, more importantly, did not create pressure on her to side with reporting parties during her investigations. Appx. 882-883 at 113:17-114:2. This also applies to the 2017 article discussing the Meyers-Griesbaum lawsuits Plaintiff references. Document 57, at ¶ 326. Stevenson Earl, again, denied that this lawsuit influenced her investigation into the allegations against Plaintiff. *Id.*

Plaintiff also raises complaints about the University's revisions to sanction guidelines in sexual misconduct cases. Document 57, at ¶¶ 327-30. While it is true that the University amended its sanctions policies, nothing within the policies demonstrates a gender-bias. Plaintiff has provided no evidence that an accused student's gender is a factor considered as part of the sanctioning decision – rather, the focus is on the severity of the conduct in question. In the specific case of Plaintiff, Redington has explained that the reason she decided expulsion was warranted was because it was consistent with the University's policies and sanctioning guidelines for sexual misconduct cases. Appx. 906 at ¶ 11.

Overall, Plaintiff's allegations on the issue of gender-bias are not supported by the evidentiary record, even when viewed in the light most favorable to Plaintiff. Plaintiff's allegations are a mixture of non-factual statements, cherry-picked quotes, misleading characterizations, and conclusory assertions without evidentiary support. Furthermore, Plaintiff has failed to causally connect any of the alleged gender bias to the outcome of his disciplinary proceedings. For this reason, Plaintiff cannot establish the requisite gender-bias for his erroneous outcome claim, and Defendants are entitled to summary judgment in their favor on Count 2 of his Complaint.

**B. This Court Should Grant Summary Judgment to the Defendants on Plaintiff's 42 U.S.C § 1983 Claim for Violation of His Substantive Due Process Rights.**

In Count 1 of his Third Amended Complaint, brought pursuant to 42 U.S.C. section 1983 against all Individual Defendants, Plaintiff asserts violation of his Fourteenth Amendment right to substantive due process. Document 57, at ¶¶ 339-388. As a result, Plaintiff must show that each individual Defendant, "through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

The Due Process Clause of the Fourteenth Amendment prohibits state governments from depriving any person of "life, liberty, or property, without due process of law . . ." U.S. const. amend. XIV, § 1. The Due Process Clause encompasses two distinct components: procedural due process and substantive due process. *See County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1713 (1998). In analyzing either type of due process claim, the Court first examines the interest allegedly violated. *Dover Elevator Co. v. Arkansas State Univ.*, 64 F.3d 442, 445-46 (8th Cir. 1995). "The possession of a protected life, liberty, or property interest is . . . a condition precedent to the government's obligation to provide due process of law." *Movers Warehouse, Inc. v. City of Little Canada*, 71 F.3d 716, 718 (8th Cir. 1995). Without deprivation of life, liberty, or property, a plaintiff's label of the government's conduct as "arbitrary and capricious" is not sufficient to support a substantive due process claim. *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985).

The substantive component of the due process clause "specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Singleton v. Cecil*, 176 F.3d 419, 425 (8th Cir. 1999) (citing *Washington v. Glucksberg*, 521 U.S. 702 (1997)). "Substantive due process rights are created only by the

Constitution," while procedural due process rights may arise under state law or the Constitution. *Ewing*, 474 U.S. at 229 (Powell, J., concurring). A liberty interest created under state law may be entitled to procedural due process protections, however a state-created liberty interest will never form the basis of a substantive due process claim. *Vitek v. Jones*, 445 U.S. 480, 488 (1980). As such, substantive due process protections have typically only been accorded to fundamental rights which arise under the Constitution, such as the right to marry, procreate, direct the upbringing and education of one's children, to marital privacy, to contraception, to abortion, and to bodily integrity. *Albright v. Oliver*, 510 U.S. 266, 272 (1994); *Moran v. Clarke*, 296 F3d 638, 644-45 n. 5 (8th Cir. 2002).

   i. The rights Doe describes are not fundamental rights afforded substantive due process protections.

   Doe claims a protected property interest in pursuing and continuing his education free from "arbitrary dismissal" or "restrictions on his ability to enter the UI campus." Document 57, at ¶ 350. He further claims that he has a constitutionally-protected right to "future educational and employment opportunities and occupational liberty[.]" *Id.*, at ¶ 350. Doe also asserts a protected "liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process." *Id.*, at ¶ 352. Finally, Doe claims that he had a protected interest in maintaining his F-1 Student Visa. *Id.*, at ¶ 352. Since Doe intermingles his substantive and procedural due process claims, it is difficult to parse which interests he believes are protected by the U.S. Constitution as opposed to state law or some other source. As a result, Defendants will analyze each claim to a liberty or property interest as though Doe has claimed substantive due process protection.

a. The U.S. Constitution does not protect a fundamental right to continued enrollment at the University of Iowa.

Doe claims a protected property interest in pursuing and continuing his education free from "arbitrary dismissal" or "restrictions on his ability to enter the UI campus." Document 57, ¶ 350. Plaintiff appears to assert these claims under a procedural due process theory, given his specific statements about dismissal without process or sanctions relating to his access to campus. *See id.* However, to the extent that Plaintiff asserts violations of his right to substantive due process with regard to his continued enrollment at the University, it is clear that no such fundamental right exists. *See, e.g., San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35–37 (1973) (observing that "Education . . . is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected."); *Plyer v. Doe*, 457 U.S. 202, 221 (1982) ("Public education is not a 'right' granted to individuals by the Constitution."); *Coates v. Natale,* 409 Fed. Appx. 238, 240 (11th Cir. 2010) (holding that a student's substantive due process claim failed "because she failed to identify any fundamental rights that were violated by her expulsion from" college); *Salau v. Denton,* 139 F. Supp. 3d 989, 1004-05 (W.D. Mo. 2015) (dismissing plaintiff's substantive due process for failure to establish the existence of a fundamental right to public university education); *Hill v. Bd. of Trs. of Michigan State Univ.*, 182 F. Supp. 2d 621, 627 (W.D. Mich. 2001) ("The Sixth Circuit has recognized that the right to attend public high school is not a fundamental right for purposes of substantive due process analysis. The right to a public college education and the right to receive notice prior to suspension are even less fundamental."); *Tobin v. Univ. of Maine Sys.*, 59 F. Supp. 2d 87, 90 (D. Me. 1999) ("pursuit of an education is not a fundamental right or liberty for purposes of substantive due process"); *see also Doe v. University of Nebraska*, 451 F. Supp. 3d 1062 fn. 40 (D. Neb. 2020) (summarizing the various circuits' positions on property interests in higher education, and holding

that even if such a property interest were assumed, Plaintiff failed to demonstrate that a state-created property right "could give rise to a substantive due process claim.").  Since there is no established constitutional right to continued enrollment or to higher education in general, and since Plaintiff cannot demonstrate that the presumption of any such right would give rise to a substantive due process claim, Plaintiff's substantive due process claim fails.

   **b. The U.S. Constitution does not protect a fundamental right to pursue "future educational and employment opportunities and occupational liberty[.]"**

Similarly, Plaintiff cannot establish entitlement to the "employment opportunities" or "occupational liberty" he claims he was denied upon expulsion, or show that they are fundamental rights warranting substantive due process protections.[19] *See Singleton v. Cecil*, 176 F.3d 419, 423-29 (8th Cir. 1999) (citing *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 572-75 (1972); *Cafeteria & Restaurant Workers Union, Local 473 v. McElroy,* 376 U.S. 866, 895-96 (1961)). Plaintiff does not have a constitutional right to be employed, generally, or to be employed in the career of his choosing. *Id.; see also, e.g., McKinney v. Pate*, 20 F.3d 1550, 1557 n. 9 (11th Cir. 1994), *Zorzi v. County of Putnam*, 30 F.3d 885 (7th Cir. 1994). Even if Plaintiff could establish such a fundamental right, UI does not have the power to deny him that right.  UI cannot withhold all available employment opportunities from Doe or even to prevent him from seeking certification or a degree from another University in order to pursue his chosen career path. *Roth*, 408 U.S. at 573 ("It stretches the concept [of occupational liberty] too far to suggest that a person is deprived of 'liberty' when he [is discharged from] one job but remains as free as before to seek another."). Here, UI has merely exercised its executive discretion to expel a student found to have violated its

---

[19] *But see, Schware v. Board of Bar Exam. of State of N.M.,* 353 U.S. 323 (1957) (explaining that a substantive due process violation may arise where the government uses its regulatory authority to completely exclude an individual from his chosen profession—for example in this case, where the state denied plaintiff his license to practice law for arbitrary reasons relating to his political beliefs).

policies. *See McElroy*, 367 U.S. 886, 896 (1961); *Singleton*, 176 F.3d at 425 (noting the crucial nature of the distinction between "legislative acts" such as licenses or certifications and "non-legislative or executive" acts like employment terminations in substantive due process analysis) (quoting *McKinney v. Pate*, 20 F.3d 1550, 1557 n. 9 (11th Cir. 1994)).

To the extent that Plaintiff argues he has suffered a substantive due process violation due to stigmatization as a result of his expulsion, Defendants have never publicly disclosed the reasons that he was expelled prior to meeting Plaintiff's allegations in court. *See Singleton*, 176 F.3d at 429. Further, there is no evidence in this record, aside from Plaintiff's unsupported speculation, that Plaintiff would be or has been barred from a similar program at a different University, or that he has applied to another program. Since Plaintiff will be unable to show that the claimed right to "employment opportunities" or "occupational liberty" is a fundamental right granted substantive due process protections, or that these rights were actually violated by Defendants, this claim must fail.

   c. The U.S. Constitution does not protect a fundamental right to Doe's
      "good name, reputation, honor, and integrity."

Plaintiff claims that he was entitled to substantive due process with regard to his constitutionally protected right to maintain his "good name." No such constitutional right exists. *See Paul v. Davis*, 424 U.S. 693, 710-11 (1976) (explaining that while a state may protect an individual's interest in his reputation by way of its tort law, an "interest in reputation . . . is neither 'liberty' or 'property' guaranteed against state deprivation without due process of law"); *Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010) (dismissing appellants' substantive due process claim in a defamation case because there is "no fundamental right to one's own reputation"). As a result, reputational harm cannot form the basis of Plaintiff's substantive due process claim.

34

> d. The U.S. Constitution does not protect a fundamental right for a foreign national to maintain an F-1 visa.

Plaintiff claims that he had a protected property interest in his student visa. Even if Plaintiff is able to articulate some property interest in his student visa arising from federal immigration statutes, that property interest would not rise to the level of a fundamental right protected by the U.S. Constitution or be afforded substantive due process protections. *See Ewing*, 474 U.S. at 229, 106 S. Ct. 507 (Powell, J., concurring) ("Substantive due process rights are created only by the Constitution," while procedural due process rights may arise under state law or the Constitution). Defendants have no control over the issuance or retraction of Plaintiff's visa, as such decisions are made by the federal government. Further, a student's immigration status is not a factor in determining whether he or she has violated the student misconduct policy, and there is no evidence in this record that Doe's immigration status was a motivating factor in UI's decision to expel him. Appx. 906 at ¶ 10. As a result, Plaintiff's failure to obtain a renewal of his F-1 visa cannot form the basis of a substantive due process claim against UI.

> ii. Plaintiff cannot demonstrate that the individual Defendants' actions "shocked the conscience" or were "deliberately indifferent" to his fundamental rights, and his substantive due process claim fails on the merits.

Plaintiff cannot establish that any of the rights or liberties he claims are entitled to substantive due process protections. Even if this Court determines that, for the purposes of this motion, Plaintiff is entitled to an assumption that such rights and liberties exist, his substantive due process claim nevertheless fails because he cannot establish that the individual Defendants were deliberately indifferent to his protected rights.

The "core of the concept [of substantive due process is] protection against arbitrary action" by the government. *Putman v. Keller* 332 F.3d 541, 547 (8th Cir. 2003), quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998). In order to establish his substantive due process

claim, Plaintiff must show that the individual Defendants engaged in arbitrary acts against him which "shock the conscience." *Putnam*, 332 F.3d at 547-48. Plaintiff may prove arbitrary, conscience-shocking behavior in a student misconduct case by demonstrating that 1) the individual defendants exhibited deliberate indifference to his protected rights and 2) that they had an opportunity to "consider other alternatives before choosing a course of action." *Putnam*, 332 F.3d at 548; *Truong v. Hassan*, 829 F.3d 627, 631 (8th Cir. 2016). However, "[m]ere negligence can never be conscience-shocking and cannot support a claim alleging violation of substantive due process rights." *See Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005). Whether the individual Defendants' behavior was conscience-shocking is an "issue of law for the judge, not a question of fact for the jury." *Truong*, 829 F.2d at 631. None of the conduct Doe alleges in support of his substantive due process claim is "conscience shocking" or deliberately indifferent to Doe's constitutional rights, and as a result, his substantive due process claim must be dismissed. *See infra* B(iii)(b)(1)-(8).

> iii. Even if the rights Doe describes are fundamental rights which should be afforded substantive due process protections, the individual Defendants are entitled to qualified immunity.

Under the doctrine of qualified immunity, government officials whose conduct has not "violated clearly established statutory or constitutional rights of which a reasonable person would have known" are not liable for civil damages. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Whether a legally protected interest is clearly established turns on the 'objective legal reasonableness of an official's acts.' Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate." *Burnham v. Ianni*, 119 F.3d 668, 674 (8th Cir. 1997). Qualified immunity balances the need to hold public officials accountable for their conduct with the need to shield public servants from harassment, distraction, and liability when their conduct has been reasonable. *Pearson v. Callahan*, 555 U.S.

223, 231 (2009). Government officials who meet the above criteria are protected by qualified immunity whether the alleged error in conduct is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (citing *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (KENNEDY, J., dissenting) (quoting *Butz v. Economou*, 438 U.S. 478, 507 (1978), for the proposition that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law")). Further, a qualified immunity defense "may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense." *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998).

Lower courts were once required to engage in a rigid two-step analysis to determine whether defendants were entitled to qualified immunity—first, analyzing the facts to decide whether a case could be made for a constitutional violation, and then determining whether, at the time of defendant's alleged misconduct, the constitutional right at issue was "clearly established." *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). However, in *Pearson v. Callahan*, the United States Supreme Court did away with the rigid framework set forth in *Saucier* and determined that requiring courts to decide difficult constitutional questions in cases in which, for example, "it is plain that a constitutional right is not clearly established, but far from obvious whether in fact there is such a right" was an unwise use of scarce judicial resources. 555 U.S. at 236–37. Under *Pearson*, the procedure set forth in *Saucier* is no longer mandatory, and district court judges are encouraged to decide which prong of the test to address first in order to make a "fair and efficient disposition of each case." *Id.* at 236–42.

a. Plaintiff cannot show that the rights he claims were "clearly established" at the time of the events at issue in his Third Amended Complaint.

As outlined above, Doe claims a protected property interest in pursuing and continuing his education free from "arbitrary dismissal" or "restrictions on his ability to enter the UI campus" (Document 57, at ¶ 350), that he has a constitutionally protected right to "future educational and employment opportunities and occupational liberty" (*Id.*, at ¶ 350), that he has a "liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process" (*Id.*, at ¶ 352), and that he had a constitutional right to maintain his F-1 Visa (*Id.*, at ¶ 352). For the same reasons that Plaintiff cannot show that the rights he claims above are fundamental rights, he also cannot demonstrate that they were "clearly established" fundamental rights entitled to substantive due process protections at the time of Defendants' alleged misconduct. *See supra*, sections B(i)(a)-(d). Because Plaintiff will be unable to show that a reasonable public official would have been on notice, pursuant to clearly established law on each claim, that taking the alleged actions would violate Plaintiff's substantive due process rights, this Court must dismiss his claim against the individual Defendants as barred by the doctrine of qualified immunity.

b. Plaintiff cannot show that any of the individual Defendants violated his constitutional rights.

Moreover, Plaintiff cannot show that any of the Defendants actually violated his constitutional rights. This record is devoid of any evidence which supports Plaintiff's claims and he is unable to generate any genuine issue of material fact on this question. As a result, the

individual defendants should be granted qualified immunity from Plaintiff's substantive due process claim.[20]

### 1. Lyn Redington

Plaintiff alleges, without evidence, that Defendant Redington's decision to expel him resulted in a sanction which was "disproportionate to both the severity of the conduct . . . . and to the sanctions imposed in more serious cases of penetrative sexual assault." Document 57, ¶¶ 371, 471. Plaintiff complains that Redington "violated UI Policies and Doe's constitutional rights" by "failing to provide a rationale for her decision." *Id.* at ¶ 370. Defendant Redington is referenced throughout the Third Amended Complaint for her participation in emailing documents to the various individuals involved and for designating Defendant Tiffini Stevenson Earl as Judicial Administrator and Investigator. *Id.* at ¶¶ 118, 231. Such acts in no way violate any of Plaintiff's rights—let alone his fundamental constitutional rights. Plaintiff further complains that Defendant Redington declined to defer his sanctions, though the decision was discretionary, and denied him access to mental health services on campus by refusing to reduce or waive the sanctions against him. *Id.* at ¶¶ 138, 142, 233-35, 373, 425. Plaintiff cannot produce any evidence that any of these alleged acts violated his substantive due process rights.[21] Defendant Redington did not engage in any wrongdoing, was not deliberately indifferent to any of Plaintiff's constitutional rights, and should be granted qualified immunity.

---

[20] Defendants concede that actions for prospective injunctive relief are not barred by the doctrine of qualified immunity. *See Treleven v. Univ. of Minnesota,* 73 F.3d 816, 819 (8th Cir. 1996) (citing *Ex parte Young,* 209 U.S. 123, 155-56 (1908)). However, since Plaintiff can show no violation of his constitutional rights, his claims for prospective injunctive relief should also be dismissed.

[21] The majority of Plaintiff's complaints against Redington, as explained in his deposition, appear to be procedural due process complaints which this Court has already dismissed. Appx. 847-848 at 178:12-182:22 (Plaintiff complaining that Redington's purported departure from UI policy violated his constitutional rights)).

2. *Constance Schriver Cervantes*

Though acknowledging the University's right to issue sanctions in student misconduct cases, Plaintiff accuses Defendant Schriver Cervantes of refusing to allow Doe to finish his degree and of "increasing the interim sanctions" which, while excluding Doe from most University buildings, allowed him to attend his classes in the Lindquist Center. Document 57, ¶¶ 139-140, 370. Plaintiff characterizes Schriver Cervantes' discretionary decisions relating to sanctions as failing to "accommodate his needs." *Id.* at ¶ 451. Plaintiff complains that "Cervantes' notice fail[ed] to mention that Doe will be held responsible for the 'educational mission' of Complainants" and asserts that "[e]very reasonable official would understand that this, along with Doe's right to be heard at a meaningful time and in a meaningful manner, violates clearly established law." *Id.* at ¶ 370. Schriver Cervantes is further accused of "barraging Doe with questions one after another" at the disciplinary hearing in this matter. *Id.* at ¶ 161. Without establishing any cognizable duty to report or any specific incident that should have been reported, Plaintiff complains generally about Schriver Cervantes' alleged failure to report purported "discriminatory conduct" of which she "knew or should have known." *Id.* at ¶¶ 469, 500. There is no evidence in this record that Defendant Schriver Cervantes engaged in any wrongdoing or that she was deliberately indifferent to any of Plaintiff's substantive due process rights. As a result, she should be dismissed on the basis of qualified immunity.

3. *John Keller*

Defendant Keller is accused only of upholding the University's sanctions decision and writing a "single sentence stating he found no violations, and that the sanction was not disproportionate." Document 57, ¶¶ 243-44. Defendant Keller is not accused of violating any of the University's policies—only of addressing Plaintiff's appeal in a "callously indifferent" manner by apparently not including a sufficient explanation for his affirmation of the sanctions decision

in his appeal letter. *Id.* at ¶ 244. Plaintiff admits that in his decision, Keller claims to have carefully reviewed all the documents related to Plaintiff's case in making his appeal decision. Appx. 848 at 184:22-185:8. Plaintiff further admits that he never met Keller and had no interactions with him, outside of reading Keller's appeal decision. Appx. 848 at 185:9-14. Plaintiff cannot produce any evidence that Defendant Keller engaged in any wrongdoing or was deliberately indifferent to his substantive due process rights, and Keller should be dismissed on the basis of qualified immunity.

### 4. Monique DiCarlo

Defendant DiCarlo is accused of implementing biased training, programming, and policies on the University of Iowa's campus through her role as Sexual Misconduct Response Coordinator and Title IX Coordinator for the University of Iowa, and of making public statements related to her job responsibilities. *See, e.g.,* Document 57, ¶¶ 29, 32-35, 40-41, 49, 80-81, 90, 191, 229, 288, 298, 300, 316, 318, 322, 325, 330. Plaintiff further accuses Defendant DiCarlo of helping Lisa Roe to come to the realization that she had described a sexual assault during the course of her report to the Office of Sexual Misconduct Response Coordinator ("OSMRC"), and suggests that DiCarlo was "highly motivated" to influence the investigation in Plaintiff's case to "safeguard the school's Title IX federal funding." *Id.* at ¶¶ 80-82, 90. Without justification or factual basis, Plaintiff accuses DiCarlo of "pressur[ing the victims] to inflate or falsify accusations." *See id.* at ¶¶ 81-82, 90, 359. Finally, Plaintiff claims that Defendant DiCarlo publicly criticized the Department of Education's proposed definition of sexual harassment and discussed the new interim Title IX guidelines—a statement which apparently met Plaintiff's disapproval. *Id.* at ¶¶ 32-35, 191, 229, 288, 298, 300, 316, 318, 322, 330. Plaintiff's allegations against DiCarlo are unsupported in the record and do not reveal a process steeped in gender bias. *See Rossley,* 979 F.3d at 1194-96 (addressing *Rossley's* very similar claims that Drake University's "victim centered" process, purportedly based on the 2011 OCR "Dear Colleague" letter, violated his rights). There is no

evidence in this record that Monique DiCarlo engaged in any wrongdoing or was deliberately indifferent to Plaintiff's substantive due process rights, and as a result she should be dismissed on the basis of qualified immunity.

### 5. Mark Braun

Defendant Mark Braun is accused of denying Plaintiff's request for a stay. Document 57, ¶¶ 249-50. Defendant Braun is otherwise accused of denying Plaintiff an extension on the number of pages he desired for his brief, and of ultimately denying his appeal based on the applicable standards. *Id.* at ¶¶ 252, 272. Plaintiff cannot produce any evidence which suggests that Defendant Braun engaged in any wrongdoing or was deliberately indifferent to Plaintiff's substantive due process rights, and as a result he should be dismissed on the basis of qualified immunity.

### 6. Tiffini Stevenson Earl

Defendant Tiffini Stevenson Earl is accused of being aware of "major inconsistencies" in the complainants' stories and "nurturing bad faith allegations." Document 57, ¶ 92. Plaintiff generally accuses Stevenson Earl of "ignoring" inconsistencies in the complainants' stories and "refusing" to consider his evidence, resulting in "an opportunity for collusion and . . . tainting the investigation and evidence." *Id.* at ¶ 131. Plaintiff takes issue with the fact that Stevenson Earl found the complainants to be more credible than him. *See id.* at ¶¶ 127-29, 131, 136. Plaintiff also complains that Stevenson Earl failed to contact two of his suggested witnesses, though during his deposition he admitted that neither witness had observed any of the alleged misconduct and that he does not recall whether he told Stevenson Earl what evidence each witness might be able to provide. *See id.* at. ¶ 130; Appx. 824-825 at 86:2-92:22. Stevenson Earl is further accused of omitting "exculpatory information" from her report and interview notes and of following up with witnesses, allowing for "collusion." *Id.* at ¶¶ 133-35. Ultimately, Plaintiff believes that Stevenson Earl's investigation was "biased, willful, wanton, malicious, and reckless." *Id.* at ¶ 137. Though

Plaintiff may point to certain pieces of evidence which Stevenson Earl omitted from her investigative report, the premise of his complaint—that Stevenson Earl should have included every minor detail revealed to her during the witness interviews—is unreasonable. Plaintiff will be unable to point to any evidence that Stevenson Earl purposefully omitted information from her report in an attempt to orchestrate a finding against him.

The Eighth Circuit instructs that in order to establish a constitutional violation based on inadequate investigation,[22] a plaintiff must show that the defendant government official's "failure to investigate was intentional or reckless, thereby shocking the conscience." *Doe v. University of Nebraska*, 451 F. Supp. 3d 1062 (D. Neb. 2020) (citing *Winslow v. Smith*, 696 F.3d 716, 732 (8th Cir. 2012)). To establish reckless or intentional failure to investigate that shocks the conscience, a plaintiff may provide "(1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, (3) evidence of systemic pressure to implicate the defendant in the face of contrary evidence." *Id.* "Mere negligent failure to investigate, such as following up on additional leads, does not violate due process." *Id.* Here, Plaintiff can provide no evidence that Stevenson Earl attempted to coerce or threaten him, that she purposefully ignored his evidence, or that there was systemic pressure to implicate him in the face of contrary evidence. Indeed, a review of the investigative materials gathered by Stevenson Earl reveals that her investigation of Doe's case was thorough and her investigative report well-reasoned. Appx. 285-332; Appx. 66-78; 81-83; 97-106; 109-231; 265-280; 283-284; 366-370. That Stevenson Earl found certain evidence more compelling than other evidence, or certain witnesses more credible than others, does not suggest that she ignored Doe's evidence. Appx. 858 at 14:11-13. Further, Plaintiff admits that even if

---

[22] This case sets forth the standard for inadequate investigation in a criminal case. *See Doe v. University of Nebraska*, 451 F. Supp. 3d 1062 (D. Neb. 2020) (citing *Winslow v. Smith*, 696 F.3d 716, 732 (8th Cir. 2012)).

Stevenson Earl omitted evidence that he felt was compelling from her report, he had the opportunity to present that evidence to the adjudicator, Iris Frost, during the student misconduct hearing. Appx. 825-826 at 93:23-95:16.

Plaintiff cannot produce any evidence that Stevenson Earl violated his substantive due process rights through the course of her investigation, and she should be dismissed on the basis of qualified immunity.

*7. Iris Frost*

Defendant Frost is accused of being aware of and ignoring "major inconsistencies" in the complainants' stories and "nurturing bad faith allegations." Document 57, ¶¶ 92, 162, 167-68. Plaintiff alleges that Frost had "blatant conflicts of interest" because she served as an Associate Professor of Rhetoric at UI and because she had previously worked as a prosecutor. *Id.* at ¶ 145. Plaintiff takes issue with the way that Frost questioned him at the hearing, describing her questions as emotionally exhausting, "leading, loaded, and incriminating" and a "barrage" of questions, and her treatment of him as "hounding," "hostile," and contemptuous. *Id.* at ¶¶ 152, 161, 167, 177, 198, 201, 204-05. He contrasts the questions he was asked with those asked of the complainants, which he describes "open-ended softball questions" or questions designed to pressure complainants into "portraying Doe as a sexual predator." *Id.* at ¶¶ 152, 161, 173, 175, 185-87, 198-99. Doe asserts that Frost "ignored" questions he provided to her to be asked of the complainants. *Id.* at ¶¶ 152, 161, 188-89, 191. Frost admits that she declined to ask two of the questions Plaintiff proposed, as she believed them to be irrelevant to the proceedings. Appx. 769-770 at 52:24-54:1. Plaintiff also takes issue with the fact that Frost consolidated the complainants' hearings, and claims that she "selectively merged Sally's story with Lisa's to artificially create a pattern of behavior when there is none[.]" Document 57, ¶¶ 160-61. Finally, Plaintiff criticizes Frost's adjudicative decision, claiming that she included false information and omitted exculpatory

information. Document 57, ¶¶ 164, 166, 169, 178-80, 190, 192-96, 200, 203, 206, 208, 216-18, 222-30.

Each of Plaintiff's claims against Frost are demonstrably false upon cursory review of the hearing transcripts and no rational juror could side with Plaintiff with regard to these claims. Though Plaintiff now has access to the recordings and transcripts from the hearings, as well as a copy of the questions he submitted to Frost prior to the hearing, he continues to make the assertions listed above without any supporting evidence. Appx. 382-616; Appx. 371-381.  When asked in his deposition, he was unable to point to which of Frost's questions at hearing he found to be offensive or manipulative. *See* Appx. 839-841 at 148:14-155:12.

Further, Plaintiff cannot demonstrate that any of Frost's alleged actions would have any effect on his fundamental constitutional rights. Since Plaintiff will be unable to show that Defendant Frost was deliberately indifferent to his substantive due process rights or that she engaged in any wrongdoing, she should be dismissed on the basis of qualified immunity.

8. *Angie Reams*

Plaintiff makes no allegations that Defendant Angie Reams violated his constitutional rights.  *See* Document 57; Appx. 848 at 182:23-183:5. As a result, Defendant Reams should be dismissed on the basis of qualified immunity.

Because Plaintiff cannot establish 1) that the individual Defendants were deliberately indifferent to his fundamental rights which are entitled to substantive due process protections, 2) that the rights he claims were "clearly established" rights entitled to substantive due process protections under the law, or 3) that the individual Defendants violated his substantive due process rights, Plaintiff's substantive due process claim should be dismissed in its entirety—both on the merits and on the basis of qualified immunity.

**C.  This Court Should Grant Summary Judgment to the Defendants on Plaintiff's 42 U.S.C. § 1983 Claim for Violation of His Procedural Due Process Rights.**

This Court has dismissed Plaintiff's claims that the individual Defendants violated his procedural due process rights on the basis of qualified immunity. Document 106, pp. 21-29 (dismissing Plaintiff's procedural due process claims on the basis of qualified immunity). To the extent that a claim for declaratory or injunctive relief remains, it should be dismissed. Plaintiff cannot show that his procedural due process rights were violated while he was a student at the University of Iowa.

Even if this Court assumes, for the purposes of this motion, that Doe has some sort of protected liberty or property interest in his education,[23] Doe will be unable to demonstrate that he was denied due process of the law during his student misconduct proceedings. *See Monroe v. Ark. State Univ.,* 495 F.3d 591, 594 (8th Cir. 2007). The Eighth Circuit applies a reasonableness standard in determining whether a student has been deprived of his or her constitutional rights, and instructs that "procedural due process must be afforded [to] a [disciplined] student on the college campus 'by way of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case and with all necessary protective measures.'" *Jones v. Snead*, 431 F.2d 1115, 1117 (8th Cir. 1970) (quoting *Esteban v. Cent. Mo. State Coll.,* 415 F.2d 1077, 1089 (8th Cir. 1969)). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The "necessary protective measures" outlined in *Jones* do not include the right to a process which

---

[23] Plaintiff claims that his procedural due process right arises from "the express and implied a [sic] contractual relationship between UI and Doe." Document 57, at ¶ 342.  Plaintiff has provided no evidence that such a contractual relationship exists and did not resist Defendants' Motion to Dismiss his breach of contract claim. *See* Document 106, at p. 7.

precisely conforms to criminal procedure. *See Jones*, 431 F.2d at 117; *Esteban,* 415 F.2d at 1077 ("it is not sound to draw any analogy between student discipline and criminal procedure.").

Plaintiff's procedural due process complaints are scattered throughout his Third Amended Complaint and discussed at length in Section A(i)(a)-(d) of this brief.[24] *See supra* Section A(i)(a)-(d); Document 57, at ¶¶ 339-388. As described in that section, Plaintiff's complaints about the process he received are meritless. *Id.* Plaintiff received prompt written notice of the claims and findings against him at each stage. SOF ¶¶ 23-26, 32-34, 58-63, 83-85.   A neutral investigator collected evidence and interviewed a variety of witnesses from both sides, and followed up with witnesses as needed. SOF ¶¶ 23, 27, 30, 35-39. Plaintiff timely received a copy of the investigator's reports, which are very thorough and contain a summary of the investigator's rational and findings of fact. SOF ¶ 50, 52-57, 64. Plaintiff's case proceeded to a three-day hearing before a neutral adjudicator. SOF ¶¶ 65.   Plaintiff was represented by counsel, was provided a complete set of the notes from all witness interviews which occurred during the investigation phase, and was permitted to submit both exhibits and questions to be asked of each witness at hearing. SOF ¶¶ 64-76. Plaintiff was permitted to testify and to call witnesses in his defense. Appx. 386 at 14:5-16; Appx. 529-545 at 584:22-648:12; Appx. 548-593 at 654:24-834:18. After the hearing, Plaintiff timely received a copy of the adjudicator's decision, which found that he had violated various University policies. SOF ¶¶ 77-80.   He was then able to engage in two appeals, each of which were decided against him. SOF ¶¶ 86-101. Plaintiff has been afforded a meaningful opportunity to be heard in this case, and as a result any remaining claim for declaratory or injunctive relief should be dismissed.

---

[24] Additionally, this Court has determined that Doe has, in many instances, failed to articulate a specific right that was violated, and that some of the rights he claims have little to no support in existing law. *See* Document 106, at pp. 23-29 (finding no right to direct cross-examination in the cases cited by the parties).

**D. This Court Should Grant Summary Judgment to the Defendants on Plaintiff's 42 U.S.C § 1983 Claim for Violation of His Equal Protection Rights.**

In Count 6 of his Third Amended Complaint, Plaintiff claims that the individual Defendants violated his equal protection and due process rights,[25] as set forth in the Fourteenth Amendment to the U.S. Constitution, when they discriminated against him on the basis of his "sex, race, national origin, alienage or immigration status" through facilitation of UI's student disciplinary process. Document 57, at ¶¶ 484-510. Section 1 of the Fourteenth Amendment states, in part:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny any person within its jurisdiction the equal protection of the laws.

U.S. Const. Amend. XIV, § 1. Claims for violations of constitutional rights can be properly stated against government officials, in their individual capacities, who are acting under color of state law and whose actions cause a plaintiff to be subjected to a deprivation of those rights. *See* 42 U.S.C. § 1983; *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). There is no "vicarious liability" in a § 1983 lawsuit, and "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Plaintiff improperly incorporates the entirety of his Third Amended Complaint by reference in Count 6, making it nearly impossible for Defendants to parse which of his many allegations are meant to comprise his equal protection claim.[26] Nevertheless, Plaintiff's equal

---

[25] Plaintiff's due process claims fail as discussed above and in Defendants' Brief in Support of Their Motion to Dismiss. *See* Document 61-1, at pp. 9-15.

[26] Plaintiff's 547-paragraph pleading contains "several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions." *See* 3rd Am. Compl. ¶ 487*, incorporating all the allegations set forth in prior counts; Sagez v. Glob. Agr. Invs., LLC*, No. 11-CV-3059-DEO, 2015 WL 1647921 at *4 (N.D. Iowa Apr. 14, 2015).

protection claim should be dismissed because he has failed to generate a question of material fact with regard to whether he has been treated differently by UI *because of* his sex, race, national origin, alienage or immigration status, as well as with regard to whether any of the alleged conduct was intentional.

>    i.   Plaintiff has failed to raise a genuine issue of material fact with regard to whether he suffered intentional discrimination because of a protected characteristic.

Plaintiff admits that UI's student misconduct policies and procedures are facially neutral. Appx. 844-845 at 169:17-171:20. Plaintiff's challenge, then, is to the individual Defendants' application of a facially neutral policy. Appx. 845 at 171:12-20. To successfully challenge a government official's application of a facially neutral policy, Plaintiff must show that he has been treated differently and that the different treatment was *because of* his membership in a particular group. *Keevan v. Smith,* 100 F.3d 644, 647-48 (8th Cir. 1996). "Proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977). In demonstrating that he has been treated differently because of membership in a particular group, Plaintiff must point to other "similarly situated" individuals, who do not belong to the same group, who received favorable treatment while he received unfavorable treatment. *Id.* Here, Plaintiff has failed to identify any students who are similarly situated and who were treated differently than him. Plaintiff claims that his accusers are similarly situated and received favorable treatment, but reporting parties and responding parties are not similarly situated in a student misconduct hearing. *See Rossley*, 979 F.3d at 1194-95 (citing *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio))

---

This style of pleading is "especially problematic when pleading numerous causes of action with substantially different elements." *Id.* As a result, Defendants and the Court must expend significant effort to determine which facts are intended to support each claim. Here, Defendants assert that no claim in Plaintiff's Third Amended Complaint is supported by any evidence, other than Plaintiff's speculation, which raises a genuine issue of material fact for a jury.

("Demonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students."); *Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996).

"Treatment of dissimilarly situated persons in a dissimilar manner by the government does not violate the Equal Protection Clause." *Id.* (citing *Klinger v. Department of Corrections*, 31 F.3d 727, 731 (8th Cir. 1994)). Different treatment suffered by Plaintiff, if any, is the result of his status as a "responding party" rather than a "reporting party" under UI's policies. Appx. 25-42. A true comparator for Plaintiff would be a white, female, U.S. citizen student who was accused of substantially similar sexual misconduct but received more favorable treatment in the student misconduct process. The ability to make sexual assault complaints at UI is not limited to men, women, or non-binary students. As a result, different treatment of accused students in comparison with reporting students "is not the equivalent of demonstrating bias against male students." *Rossley,* 979 F.3d at 1194-95. "Absent a threshold showing that [he] is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim." *Klinger*, 31 F.3d at 731. Here, there is not a scintilla of evidence in the record that Plaintiff suffered any different treatment because of his sex, race, national origin, alienage, or immigration status. Even if Plaintiff could bring forth evidence of different treatment, there is no evidence of discriminatory intent or purpose.  As a result, Plaintiff's equal protection claim must fail on the merits.

ii.  Plaintiff's claims are barred by the doctrine of qualified immunity.

Should this Court determine that Plaintiff has raised a genuine issue of material fact with regard to the merits of his equal protection claim, it should nevertheless dismiss Plaintiff's claim on the basis of qualified immunity.[27] In Count 6, Plaintiff claims the individual Defendants intentionally discriminated against him in violation of the equal protection clause of the Fourteenth Amendment in the following ways:[28]

a.  Monique DiCarlo

Plaintiff claims that Defendant DiCarlo "knew or should have known of the [constitutional] violations since she was copied in the reports." Document 57, at ¶ 493. Plaintiff provides no evidence that DiCarlo purportedly failed to report known violations of Plaintiff's constitutional rights because of his membership in a particular group. Further, Plaintiff cannot established that DiCarlo's failure to *report* a purported constitutional violation would be a constitutional violation in and of itself. Since Plaintiff cannot show that DiCarlo violated his clearly established constitutional rights, she should be dismissed on the basis of qualified immunity.

b.  Tiffini Stevenson Earl

Plaintiff makes the extraordinary claim that Defendant Stevenson Earl discriminated against him "based on alienage" because she inquired about his student visa status "before she produced her report." Document 57, at ¶ 494. Plaintiff fails to provide any evidence that Stevenson Earl altered her report upon learning of Plaintiff's immigration status or that her acquisition of that knowledge changed her decision. Stevenson Earl is also accused of applying unequal "evidentiary standards." *Id.* at ¶ 498. Plaintiff's claims relating to unequal evidentiary standards are based on

---

[27] See the qualified immunity standard set forth *supra* in Section B(iii).

[28] Defendants further assert that none of the claims Plaintiff has made in his Third Amended Complaint, discovery responses, or deposition testimony, even if not listed with specificity in Count 6, are supported by any evidence that the individual Defendants intentionally violated Plaintiff's clearly-established equal protection rights.

nothing more than Plaintiff's speculation and his misunderstanding the investigator's role in the student misconduct process. *See, e.g.*, Appx. 822-823 at 79:5-84:17. Because Plaintiff cannot provide any evidence that Stevenson Earl violated his clearly established constitutional rights, she should be dismissed on the basis of qualified immunity.

### c.  Iris Frost

Plaintiff asserts that Defendant Frost discriminated against him and harassed him because of his sex, race, national origin, and alienage, because she knew he was an "Asian/Middle Eastern international student who had 'nowhere to go[.]'" Document 57, at ¶ 495. As evidence, Plaintiff cites Frost's use of the terms "authoritarian" and "sexist" in her adjudicative decision. *Id.* Plaintiff further claims that Frost's questions were unfair when compared to those asked of the complainants. *Id.*, at ¶ 497. Frost is also accused of applying unequal "evidentiary standards." *Id.* at ¶ 498. Plaintiff cannot provide any evidence in support of his claims, and even if he could, could not provide that any of these acts were intentional or violated the equal protection clause.  As a result, Frost should be dismissed on the basis of qualified immunity.

### d.  Schriver Cervantes

Defendant Schriver Cervantes is accused of failing to report Frost and Stevenson Earl's "discriminatory conduct," of which she apparently "knew or should have known[.]" Document 57, at ¶ 497. There is no evidence in the record which supports that Schriver Cervantes "knew or should have known" of any constitutional violation, particularly since there was no constitutional violation. Further, Plaintiff cannot establish that Schriver Cervantes's failure to *report* a purported constitutional violation would be a constitutional violation in and of itself—the standard is intentional discrimination and not negligence.  Since Plaintiff cannot provide any evidence that Schriver Cervantes violated his clearly-established constitutional rights, she must be dismissed on the basis of qualified immunity.

### e.  Redington

Without any support whatsoever, Plaintiff claims that Defendant Redington discriminated against him on the basis of his race and national origin when she issued the University's decision to expel him. Document 57, at ¶ 501. This unsupported allegation is not sufficient to form the basis of an equal protection claim, and Defendant Redington should be dismissed on the basis of qualified immunity.

### f.  Keller

Defendant Keller is accused of being "deliberately indifferent to allegations of discrimination, harassment, and unequal application of the law." Document 57, at ¶ 502. Plaintiff does not allege that Keller affirmed Frost's decision because of one Doe's membership in a particular group, and there is no evidence in this record that Doe received unequal treatment because of his membership in any of the groups he describes. As a result, Doe cannot show that Keller violated his constitutional rights and Keller should be dismissed on the basis of qualified immunity.

### g.  Braun

Plaintiff asserts that Defendant Braun was deliberately indifferent to his discrimination and harassment reports, and that Braun discriminated against him when he failed to grant Plaintiff additional pages of briefing for purposes of his appeal. Document 57, at ¶¶ 502-03. There is no evidence in this record that Braun violated Plaintiff's constitutional rights, and he should be dismissed on the basis of qualified immunity.

### h.  Angie Reams

Plaintiff makes no allegation that Defendant Angie Reams violated his constitutional rights. *See* Document 57; Appx. 848 at 182:23-183:5. As a result, Defendant Reams should be granted qualified immunity.

**E. This Court Should Grant Summary Judgment to the Defendants on Plaintiff's Request for Declaratory Judgment and Injunctive Relief for Violation of His Rights Under the United States and Iowa Constitutions.**

In Count 8 of his Third Amended Complaint, Plaintiff asks the Court for declaratory and injunctive relief with regard to his claims that Defendants violated the "United States and Iowa Constitutions." Document 57, at ¶¶ 531-47.

    i.   Plaintiff's Claims for Violation of the Iowa Constitution and the First Amendment to the U.S. Constitution Fail.

In Count 8, Plaintiff claims that Defendants violated various provisions of Article I of the Iowa Constitution. Document 57, ¶¶ 533-34. Specifically, Plaintiff complains that UI violated his rights to life and liberty, property, the pursuit of safety and happiness, as well as due process rights which must be afforded to accused persons under the Iowa constitution. *Id.* at ¶¶ 533-34. Plaintiff also makes vague claims about violations of the First Amendment of the U.S. Constitution. Each of these claims are unsupported in this record, and must be dismissed.  To the extent that the due process claims have been properly stated, they should be dismissed for the reasons outlined in Sections B and C of this brief.

    ii.   Plaintiff Cannot Demonstrate that Entry of Declaratory Judgment or Permanent Injunction is Appropriate in this Case.

Plaintiff's request for declaratory and injunctive relief should be denied for two reasons. First, because he cannot support any of his remaining claims and each of them should be dismissed both as a matter of law and/or on the basis of qualified immunity.  Second, because he cannot meet the legal standard for entry of either declaratory judgment or a permanent injunction.

Federal courts may, in cases of "actual controversy,"[29] declare "the rights and other legal relations of any interested party seeking such declaration[.]" 28 U.S.C. § 2201; *see also* Fed. R. Civ. P. 57. The burden of demonstrating that declaratory relief is appropriate is on Plaintiff. *Am. Eagle Ins. Co. v. Thompson*, 85 F.3d 327, 331 (8th Cir. 1996) (citations omitted). For declaratory judgment to be entered, "[t]here must be a concrete dispute between parties having adverse legal interests, and the declaratory judgment plaintiff must seek 'specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Id.* (citations omitted). Declaratory relief is not appropriate in every case, and should not be awarded when it "will not be effective in settling the controversy." Fed. R. Civ. P. 57. Here, Plaintiff cannot raise a genuine issue of material fact with regard to any of his claims and as a result declaratory judgment is unnecessary. Additionally, a declaration that UI's 2017 Student Misconduct policies are "overbroad, unfair, and/or unconstitutional void for vagueness on their face and as applied to Doe" will not be effective in settling this controversy, which centers largely on UI's student disciplinary process, and Doe's allegations about his treatment throughout the course of that process.

Plaintiff goes on to ask the Court to enter a permanent injunction against UI, which would enjoin the University from "enforcing discipline" against Doe and/or subjecting Doe to future discipline "tainted by the bias and constitutional violations addressed in this complaint." Document 57, at ¶ 547. A plaintiff seeking a permanent injunction must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law . . . are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy

---

[29] A "case of actual controversy" refers to any case or controversy justiciable under Article III of the U.S. Constitution. *Maytag Corp. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 687 F.3d 1076, 1081 (8th Cir. 2012).

in equity is warranted; and (4) that the public interest would not be disserved." *eBay Inc. v.*

*MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006). Here, where Plaintiff cannot raise a genuine

issue of material fact with regard to any aspect of his case, and therefore cannot demonstrate that

he has suffered or will suffer an irreparable injury, this court should decline to enter a permanent

injunction. Further, even if Doe could establish that he has suffered an irreparable injury, the

remaining factors weigh against him.

### iii.  Plaintiff's Requested Relief is Overbroad, Inappropriate, and Inequitable.

Doe requests the following relief in Count 8:

> (i) reinstate Doe as a student (ii) expunge Doe's official and unofficial UI files and
> transcript of all information related to UI's Judicial Process and disciplinary record,
> his interactions with Sally and Lisa Roe, any records kept by the Dean of Students,
> including  but not limited to charges and sanctions served, and prohibiting UI from
> disclosing such information to any third party; (b) judgment for attorneys' fees
> pursuant to any applicable statute; (c) a permanent injunction prohibiting UI from
> (i) enforcing discipline that resulted from the unconstitutional hearing, and (ii)
> subjecting Doe to further disciplinary proceedings tainted by the bias and
> constitutional violations addressed in this complaint; and/or (f) such other and
> further relief as this court may deem just, proper, equitable, and appropriate.

Document 57, at ¶ 547.  Plaintiff further requests that this Court declare "that UI's 2017 Policies,

as mentioned above regarding sexual harassment/hostile environment and sexual assault, are

overbroad, unfair, and/or unconstitutional [sic] void for vagueness on their face and as applied to

Doe." Document 57, at ¶ 593. A quick review of UI's broad "policies" applicable to this case

reveals that they are neither overbroad, unfair, and/or vague, either facially or as applied to Doe.

Appx. 03-56; 333-353.

Plaintiff's requested relief is overbroad, inappropriate, and in some instances, impossible.

UI cannot "expunge" all documents related to the complaints made against Doe.  To do so would

be unfair to the Complainants in this case, the witnesses who participated in interviews and testified

at hearing, as well as to the University administrators who poured hours of time and effort into the

thoughtful facilitation of the student misconduct process. Doe's student education record, though protected by FERPA, is a record held by a public institution, and should not be destroyed or unnecessarily altered. Further, UI should not be enjoined from enforcing discipline against Doe, who admits that he violated the University's alcohol possession policies. Appx. 558 at 695:23-696:3. To the extent that Doe is requesting some sort of order granting immunity from future discipline should he be reinstated as a student, Defendants aver that such an order would infringe upon the University's right to govern its internal affairs and to enforce the policies which it believes help to ensure student safety at UI. The Court should deny Plaintiff's requested relief. Since Plaintiff cannot raise a genuine issue of material fact with regard to any of his claims, and since declaratory and injunctive relief are inappropriate in this case, this Court should dismiss Count 8 of Plaintiff's Third Amended Complaint in its entirety.

## III.    CONCLUSION

For all the reasons set forth in their Motion for Summary Judgment and this Memorandum, Defendants respectfully request the Court grant Defendants' Motion for Summary Judgment and dismiss Plaintiff's case in its entirety.

Respectfully Submitted,

**THOMAS J. MILLER**
Attorney General of Iowa

*/s/ Kayla Burkhiser Reynolds*
KAYLA BURKHISER REYNOLDS

*/s/ Christopher J. Deist*
CHRISTOPHER J. DEIST
Assistant Attorneys General
Hoover Building, Second Floor
1305 East Walnut Street
Des Moines, Iowa 50319
PHONE: (515) 281-7240

FAX: (515) 281-7219
kayla.burkhiser@ag.iowa.gov
christopher.deist@ag.iowa.gov
ATTORNEYS FOR DEFENDANTS

| **PROOF OF SERVICE** |
| --- |
| The undersigned certifies that the foregoing instrument was served upon each of the persons identified as receiving a copy by delivery in the following manner on January 15, 2021: |

☐ U.S. Mail                ☐ FAX
☐ Hand Delivery            ☐ Overnight Courier
☐ Federal Express          ☐ Other
☒ CM/ECF

Signature: */s/ Audra Drish*